1   XAVIER BECERRA
    Attorney General of California
2   ANGELA SIERRA
    Senior Assistant Attorney General
3   MICHAEL NEWMAN
    Supervising Deputy Attorney General
4   SARAH BELTON
    LISA EHRLICH
5   LEE SHERMAN
    Deputy Attorneys General
6   State Bar No. 272271
     300 S. Spring St., Suite 1702
7    Los Angeles, CA 90013
     Telephone:  (213) 897-2409
8   Fax:  (213) 897-7605
     E-mail:  Lee.Sherman@doj.ca.gov
9   *Attorneys for the State of California*

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14  | **STATE OF CALIFORNIA, ex rel. XAVIER** | **Case No. 17-cv-4701** |
15  | **BECERRA, in his official capacity as** | |
    | **Attorney General of the State of California** | |
16  | | **COMPLAINT FOR DECLARATORY** |
    |                          Plaintiff, | **AND INJUNCTIVE RELIEF** |
17  | | |
    |        **v.** | |
18  | | |
19  | **JEFFERSON B. SESSIONS, in his official** | |
    | **capacity as Attorney General of the United** | |
20  | **States; ALAN R. HANSON, in his official** | |
    | **capacity as Acting Assistant Attorney** | |
21  | **General; UNITED STATES** | |
    | **DEPARTMENT OF JUSTICE; and DOES** | |
22  | **1-100,** | |
23  |                          Defendants. | |

24

25

26

27

28

1

**INTRODUCTION**

1. Plaintiff State of California, ex rel. Xavier Becerra, in his official capacity as Attorney General of the State ("Plaintiff") brings this complaint to protect California from the Trump Administration's attempt to usurp the State and its political subdivisions' discretion to determine how to best protect public safety in their jurisdictions.  The Administration has threatened to withhold congressionally appropriated federal funds unless the State and local jurisdictions acquiesce to the President's immigration enforcement demands.  This is unconstitutional and should be halted.

2. Congress has appropriated $28.3 million in law enforcement funding to California and its political subdivisions pursuant to the Edward Byrne Memorial Justice Assistance Grant ("JAG") program.  The United States Department of Justice ("USDOJ"), led by Attorney General Jefferson B. Sessions III, and the Office of Justice Programs ("OJP"), led by Acting Assistant Attorney General Alan R. Hanson (collectively, with USDOJ and Attorney General Sessions, the "Defendants"), are responsible for administering these grants.

3. JAG awards are provided to each state, and certain local jurisdictions within each state, to, among other things, support law enforcement programs, reduce recidivism, conduct prevention and education programs for at-risk youth, and support programs for crime victims and witnesses.  Every state is entitled by law to a share of these funds.

4. The JAG authorizing statute, 42 U.S.C. §§ 3750-3758, requires that jurisdictions comply with "applicable Federal laws."  The statute governing OJP, 42 U.S.C. § 3712(a)(6) ("Section 3712"), also allows for the imposition of "special conditions," which historically have been understood to refer to conditions imposed to address performance issues with particular high-risk grantees, and not as conditions to be placed on *all* grantees.

5. In this year's JAG FY 2017 State Solicitation ("JAG State Solicitation"), for the first time, Defendants imposed two additional so-called "special conditions" on all JAG recipients that require compliance with immigration enforcement activities.  These conditions require jurisdictions to: (a) provide federal immigration enforcement agents with the Department of Homeland Security ("DHS") access to detention facilities to interview inmates who are "aliens"

or believed to be "aliens" (the "access condition"); and (b) provide 48 hours' advance notice to DHS regarding the scheduled release date of an "alien" upon request by DHS (the "notification condition").  In effect, they attempt to create, without congressional approval, a national requirement that state and local law enforcement engage in specific behaviors to assist in the Executive's approach to federal immigration enforcement.

6.   Based on one reading of these new conditions, California believes that its laws, in fact, comply with them.  Nevertheless, Defendants' incorrect conclusions about California law have placed at risk the $28.3 million in JAG funds received by the State and its political subdivisions. The Transparency and Responsibility Using State Tools Act ("TRUST Act"), Cal. Gov't Code § 7282 *et seq.*, defines the circumstances in which a local law enforcement agency ("LEA") may detain an individual at the request of federal immigration authorities.  The Transparent Review of Unjust Transfers and Holds ("TRUTH Act"), Cal. Gov't Code § 7283 *et seq.*, provides notice protections to inmates in state and local custody whom Immigration and Customs Enforcement ("ICE") wishes to interview.  Defendant Sessions has inaccurately characterized California's laws as denying ICE access to jails in California.

7.   To compound upon the peril to the State caused by Defendant Sessions' misinterpretation of California law, the grant conditions regarding access and notification also suffer from ambiguity.  The access condition fails to specify whether jurisdictions are prohibited from notifying inmates of their basic rights prior to an ICE interview, which would conflict with the TRUTH Act.  The notification condition is ambiguous as to whether it requires LEAs to hold individuals past their ordinary release when, for example, an individual is booked for a low-level infraction and promptly released, pays bail, or has his or her charges dropped.  USDOJ has signaled that it interprets the notification condition as requiring that, once immigration officials have requested notice, state and local officials may not release an individual until federal agents have had 48 hours to try to take him or her into custody—even if the federal notification request came less than 48 hours before the person's ordinary release.  To comply with this requirement, LEAs would in some instances not only have to violate the TRUST Act, but would also have to violate the Fourth Amendment—because ICE notification and detainer requests are not typically

3

supported by the probable cause required for detentions under the Fourth Amendment.

8.   The ambiguity regarding how the Defendants will interpret and enforce the access and notification conditions harms California and its local jurisdictions.  If California and local jurisdictions do not accept the funds authorized by the JAG statute and appropriated by Congress, important programs will need to be cut.  And if this ambiguity pressures the State and/or its localities to change their public-safety oriented laws and policies in order to ensure they comply with these ambiguous conditions, they will have abandoned policies that the State and local jurisdictions have found to be effective in their communities.  As a result, the State and its localities will lose control of their ability to focus their resources on fighting crime rather than federal immigration enforcement.  And the trust and cooperation that the State's laws and local ordinances are intended to build between law enforcement and immigrant communities will be eroded.

9.   Moreover, while Section 3712 allows for the imposition of "special conditions," it does not provide OJP with the authority to add these *particular* substantive immigration conditions. These are not special conditions, as that term is generally understood, since they are applicable to all recipients, not just high-risk grantees.  In addition, they conflict with the JAG authorizing statute's Congressional intent to: (a) guarantee the delivery of appropriated formula grant funding to particular state and local jurisdictions so long as they satisfy the requirements found in federal law; and (b) not condition funding on immigration enforcement related activities.

10.  Defendants also have exceeded constitutional limits under the Spending Clause of the United States Constitution.  The access and notification conditions are not sufficiently related to the federal purpose areas of the JAG funding scheme designed by Congress, and the access and notification conditions are too ambiguous to provide clear notice to the State or its political subdivisions as to what is needed to comply.  And depending on how compliance is measured, the notification condition would further offend the Spending Clause prohibition on conditioning funding on unconstitutional activities, here, by attaching funding conditions that may lead to a violation of the Fourth Amendment.

11. These conditions also violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 551

4

*et seq.*, because of their constitutional infirmities, and because Defendants acted in excess of their statutory authority and in an arbitrary and capricious manner.

12. The California Legislature, as well as local governments throughout the State, carefully crafted a statutory scheme that allows law enforcement resources to be allocated in the most effective manner to promote public safety for all people in California, regardless of immigration status, national origin, ancestry, or any other characteristic protected by California law.  The Defendants' actions and statements threaten that design and intrudes on the sovereignty of California and its local jurisdictions.

13. California must apply for its JAG award by August 25, 2017, and the State's local jurisdictions that apply directly to USDOJ for JAG funding must apply by September 5, 2017, subject to the same conditions as the State.  (JAG Solicitation for local jurisdictions ("JAG Local Solicitation") attached as Exhibit B.  The JAG Local Solicitation, with the JAG State Solicitation, are referred to as "JAG Solicitations.")  USDOJ is expected to provide its award notifications to state and local jurisdictions by September 30, 2017, but Defendants have announced that they will not provide any awards to jurisdictions that do not meet the access and notification conditions. California therefore immediately faces the prospect of losing $28.3 million for these "criminal justice" programs.  Without this grant funding, California's award recipients and the programs funded will be harmed, which will have a detrimental effect on state and local law enforcement and budgets.

14.   For these reasons, and those discussed below, the Court should strike down the access and notification conditions in the JAG Solicitations as unconstitutional and as a violation of the APA.

## **JURISDICTION AND VENUE**

15. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this case involves a civil action arising under the Constitution and the laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal government founded upon the Constitution and an Act of Congress.  Jurisdiction is proper under

the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-06.  The

Court has authority to provide relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

16. Pursuant to 28 U.S.C. § 1391(e)(1) and (3), venue is proper in the Northern District of

California because the Attorney General and the State of California have offices at 455 Golden

Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California and

Defendants have offices at 450 Golden Gate Avenue, San Francisco, California.

**INTRADISTRICT ASSIGNMENT**

17.  Assignment to the San Francisco Division of this District is proper pursuant to Civil

Local Rule 3-2(c)-(d) because Plaintiff, the State of California, and Defendants both maintain

offices in the District in San Francisco.

**PARTIES**

18.   Plaintiff State of California is a sovereign state in the United States of America.  Xavier

Becerra is the Attorney General of California, and as such, is the chief law officer in the State and

has "direct supervision over every … sheriff and over such other law enforcement officers as may

be designated by laws, in all matters pertaining to their respective offices."  Cal. Const., art. V, §

13; Cal. Gov't Code § 12500, *et seq; see Pierce v. Super.*, 1 Cal.2d 759, 761-62 (1934) [Attorney

General "has the power to file any civil action or proceeding directly involving the rights and

interests of the state. . . and the protection of public rights and interests."].  California is aggrieved

by the actions of Defendants and has standing to bring this action because of the injury to its

sovereignty as a state caused by the challenged federal actions.  The inclusion of unconstitutional

and unlawful conditions as part of the JAG award impairs the State's exercise of its police power

in a manner it deems necessary to protect the public safety.  As a result of Defendants'

unconstitutional actions, the State of California, including its political subdivisions, is in

imminent danger of losing $28.3 million this fiscal year, including $17.7 million that is owed to

the State itself.

19.   Plaintiff Attorney General Xavier Becerra, on behalf of California, has standing to bring

this action because funding for law enforcement throughout the State is at stake and as the

Attorney General of the State of California, he is responsible for enforcing and protecting

6

California's laws, such as the TRUST and TRUTH Acts, which the access and notification conditions threaten.

20.   Defendant U.S. Department of Justice ("USDOJ") is an executive department of the United States of America pursuant to 5 U.S.C. § 101 and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action, within the meaning of 5 U.S.C. § 702 and is named as a defendant in this action pursuant to 5 U.S.C. § 702.  USDOJ is responsible for administering the JAG funds appropriated by Congress.

21.   Defendant Sessions III, is Attorney General of the United States, and oversees the USDOJ, including the Office of Justice Programs ("OJP").  Defendant Sessions has declared that "[s]ome jurisdictions, including the State of California and many of its largest counties and cities, have enacted statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication with ICE, and denying requests by ICE officers and agents to enter prisons and jails to make arrests."  Defendant Sessions also made a statement announcing the access and notification conditions on the U.S. Department of Justice website on July 25, 2017.  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

22.   Defendant Alan R. Hanson is Acting Assistant Attorney General in charge of the OJP, which administers JAG funding and which set forth the so-called "special conditions" at issue. He is sued in his official capacity pursuant to 5 U.S.C. § 702.

23.   Each of the Defendants named in this Complaint is an agency of the United States government bearing responsibility, in whole or in part, for the acts enumerated in this Complaint.

24.   The true names and capacities of Defendants identified as DOES 1-100 are unknown to Plaintiff, and Plaintiff will amend this Complaint to insert the true names and capacities of those fictitiously named Defendants when they are ascertained.

## **FACTUAL ALLEGATIONS**

**I.    CALIFORNIA'S LAWS SEEK TO PROTECT THE STATE RESIDENTS' SAFETY AND WELFARE BY FOCUSING LAW ENFORCEMENT ON CRIMINAL ACTIVITY AND BY BUILDING TRUST BETWEEN LAW ENFORCEMENT AND COMMUNITIES**

25.   California state and local LEAs, guided by the duly enacted laws of the State and ordinances of local jurisdictions, are tasked with effectively policing, protecting, and serving all

7

residents, including more than 10 million foreign-born individuals, who live in the State. California's laws implicated in this suit, the TRUST Act and the TRUTH Act, are a valid exercise of the State's police power to regulate regarding the health, welfare, and public safety of its residents.

26. California has also enacted other laws that strengthen community policing efforts by encouraging undocumented victims to report crimes to local law enforcement. For example, California's Immigrant Victims of Crime Equity Act, Cal. Penal Code § 679.10, which took effect on January 1, 2016, ensures that all immigrant crime victims have equal access to the U nonimmigrant visa. Laws such as this are specifically designed to encourage immigrants to report crimes so that perpetrators are apprehended before harming others.

27. The purpose of these California laws is to ensure that law enforcement resources are focused on a core public safety mission and to build trust and cooperation between law enforcement and the State's immigrant communities. When local and state LEAs engage in immigration enforcement, as Defendants contemplate, vulnerable victims and witnesses are less likely to come forward to report crimes.

28. California's laws are not unique. Many jurisdictions across the country have policies that define the circumstances under which local law enforcement personnel expend time and resources in furtherance of federal immigration enforcement. Those jurisdictions variously impose limits on compliance with ICE detainer requests, ICE notification requests about release dates, and ICE's access to detainees, or provide additional procedural protections to them.

### A. The TRUST Act

29. In 2013, California enacted the TRUST Act, Cal. Gov't Code, § 7282 *et seq.* The TRUST Act defines the circumstances under which local LEAs may detain an individual at the request of federal immigration authorities. The TRUST Act went into effect on January 1, 2014.

30. The TRUST Act was intended to address numerous public safety concerns regarding the federal practice of issuing detainers to local law enforcement. Among the Legislature's concerns were that federal courts have concluded that detainer requests do not provide sufficient probable cause, and data showing that detainer requests "have erroneously been placed on United States

citizens, as well as immigrants who are not deportable."  Assem. Bill No. 4, 1st Reg. Sess. (Cal. 2013) § 1(c).

31.  The Legislature also found that "immigration detainers harm community policing efforts because immigrant residents who are victims of or witnesses to crime, including domestic violence, are less likely to report crime or cooperate with law enforcement when any contact with law enforcement could result in deportation." *Id.* § 1(d).  The Legislature also considered data demonstrating that the vast majority of individuals detained had no criminal history or were only convicted of minor offenses, and research establishing that "immigrants, including undocumented immigrants, do not commit crimes at higher rates than American-born residents." *Id.*

32.  The TRUST Act sets forth two conditions that must be met for local law enforcement to have discretion to detain a person pursuant to an "immigration hold" (also known as a "detainer request" or "detainer hold") that occurs when a federal immigration agent requests that the law enforcement official "maintain custody of the individual for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays."  Cal. Gov't Code § 7282(c).  First, the detention cannot "violate any federal, state, or local law, or any local policy," which includes the Fourth Amendment of the U.S. Constitution. *Id.* § 7282(a).  Second, law enforcement officers may only detain someone with certain, specified criminal backgrounds, an individual on the California Sex and Arson Registry, or a person charged with a serious or violent felony who was the subject of a probable cause determination from a magistrate judge. *Id.* § 7282.5(a)(1)-(6).  Only when both of these conditions are met may local law enforcement detain an individual "on the basis of an immigration hold after the individual becomes eligible for release from custody." *Id.* § 7282.5(b).

33.  The TRUST Act limits an LEA's discretion as to when it may detain individuals pursuant to an immigration hold beyond their ordinary release.  This limitation is consistent with federal law, in that USDOJ, DHS and the courts have repeatedly characterized detainer requests as voluntary.

34.  The TRUST Act, however, does not limit, in any way, a jurisdiction from complying with notification requests so long as the jurisdiction is not required to hold the individual beyond when he or she is otherwise legally eligible for release.  It also does not prohibit a jurisdiction

from allowing federal immigration enforcement agents to access its jails to interview inmates.

### B.    The TRUTH Act

35.   In 2016, California enacted the TRUTH Act, Cal. Gov't Code § 7283 *et seq.*, which took effect on January 1, 2017.   The purpose of the TRUTH Act is to increase transparency about immigration enforcement and "to promote public safety and preserve limited resources because entanglement between local law enforcement and ICE undermines community policing strategies and drains local resources."  Assem. Bill No. 2792, Reg. Sess. (Cal. 2016) § 2(a)-(c), (g)-(i).

36.   Under the TRUTH Act, before an interview with ICE takes place, a local law enforcement officer must provide the detained individual with a "written consent form that explains the purpose of the interview, that the interview is voluntary, and that he or she may decline to be interviewed or may choose to be interviewed only with his or her attorney present."  Cal. Gov't Code § 7283.1(a).  In addition, when a local LEA receives a detainer hold, notification, or transfer request, the local LEA must "provide a copy of the request to the [detained] individual and inform him or her whether the law enforcement agency intends to comply with the request."  *Id.* § 7283.1(b).  If the LEA complies with ICE's request to notify ICE as to when the individual will be released, it must also "promptly provide the same notification in writing to the individual and to his or her attorney or to one additional person who the individual shall be permitted to designate."  *Id.*

37. The TRUTH Act does not limit, in any way, a jurisdiction from complying with notification requests; rather, it only requires that the jurisdiction also provide notice to the individual of its actions.  It also does not prohibit a jurisdiction from allowing ICE to access its jails to interview inmates.

## II.    CONGRESS DID NOT INTEND JAG TO BE CONDITIONED ON STATE AND LOCAL LAW ENFORCEMENT ASSISTING IN FEDERAL IMMIGRATION ENFORCEMENT

38.   JAG is administered by OJP within USDOJ.  JAG funding is authorized by Congress under 42 U.S.C. §§ 3750-58.  The authorizing statute has been amended numerous times since its inception in 1988, evolving into the JAG program as it exists today.

39.   The Anti-Drug Abuse Act of 1988 amended the Omnibus Crime Control and Safe Streets Act of 1968 to create the Edward Byrne Memorial State and Local Law Enforcement Assistance

Programs grants ("Byrne Grants") "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system."  Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181 (1988) (repealed 2006).  Congress placed a "special emphasis" on programs that support national drug control priorities across states and jurisdictions.  *Id.*  Congress identified 21 "purpose areas" for which Byrne Grants could be used.  Many of the purpose areas relate to the investigation, enforcement, and prosecution of drug offenses.  *See id.*, tit. V, § 5104.  Immigration enforcement was never specified in any of the grant purpose areas.

40.   In amendments between 1994 and 2000, Congress identified eight more purpose areas for which Byrne funding could be used, bringing the total to 29.  42 U.S.C. § 3751(b) (as it existed on Dec. 21, 2000) (repealed 2006).  For Fiscal Year 1996, Congress separately authorized Local Law Enforcement Block Grants ("LLEBG") that directed payment to units of local government for the purpose of hiring more police officers or "reducing crime and improving public safety." Local Government Law Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995).  Congress identified eight "purpose areas" for LLEBG, none of which were immigration enforcement.

41.   The Byrne Grant and LLEBG programs were then merged to eliminate duplication, improve their administration, and to provide State and local governments "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" to local law enforcement.  Pub. L. No. 108-447, 118 Stat. 2809 (2004); H.R. Rep. No. 109-233, at 89 (2005); *see also* 42 U.S.C. § 3750(a), (b)(1).

42.   Now the JAG authorizing statute enumerates eight purpose areas for: (A) law enforcement programs; (B) prosecution and court programs; (C) prevention and education programs; (D) corrections and community corrections programs; (E) drug treatments and enforcement programs; (F) planning, evaluation, and technology improvement programs; (G) crime victim and witness programs; and (H) mental health programs related to law enforcement and corrections.  42 U.S.C. §3751(a)(1).

43.   The purpose areas for these grants are to support "criminal justice" programs;

immigration enforcement is generally civil in nature. *See Arizona v. U.S.*, 567 U.S. 387, 396 (2012). Immigration enforcement was also never specified in the purpose areas for any of these grants throughout this entire legislative history.

44. In 2006, Congress repealed the only immigration-related requirement that had ever existed for JAG funding, a requirement that the chief executive officer of the state receiving JAG funding provide certified records of criminal convictions of "aliens." *See* Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51 (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006). The repeal of this provision evidences Congress' intent not to condition JAG funding on immigration enforcement-related activities. This is consistent with the statutory scheme that does not include a purpose area connected to immigration enforcement.

45. In addition, more recently, Congress has considered but declined to adopt legislation that would penalize cities for setting their own law enforcement priorities and attempting to impose conditions similar to the conditions here.[1]

### III.   THE JAG AUTHORIZING STRUCTURE REQUIRES THAT STATE AND LOCAL JURISDICTIONS RECEIVE FORMULA GRANTS

#### A.   The JAG Formula Structure and Conditions

46. When creating the merged JAG funding structure in 2006, Congress set a formula to apportion JAG funds to state and local jurisdictions. 42 U.S.C. § 3755. Population and violent crime rates are used to calculate each state's allocation. 42 U.S.C. § 3755(a)(1). Congress guarantees to each state a minimum allocation of JAG funds. 42 U.S.C. § 3755(a)(2).

47. In addition to determining the amount of money received by grantees within each state, Congress set forth how that money is to be shared between state and local jurisdictions. Under the statutory formula, 60 percent of the total allocation to a state must be given directly to the state. 42 U.S.C. § 3755(b)(1).

---

[1] *See, e.g.*, Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) (cloture on the motion to proceed rejected).

48. The statutory formula also provides that 40 percent of the total allocation to a state must be given to local governments within the state.  42 U.S.C. § 3755(d)(1).  Each unit of local government receives funds based on its crime rate.  42 U.S.C. § 3755(d)(2)(A).

49.  According to Congress's JAG funding scheme, states and local governments that apply for JAG funds are required to make limited certifications and assurances.  Beyond ministerial requirements identified in the authorizing statute, the chief executive officer of each applicant must certify that: (A) the law enforcement programs to be funded meet all requirements of the JAG authorizing statute; (B) all information in the application is correct; (C) there was coordination with affected agencies; and (D) the applicant will comply with all provisions of the JAG authorizing statute.  42 U.S.C. § 3752(a)(5).

50.  Congress has enacted reductions or penalties in JAG funds when certain conditions occur, such as a state failing to substantially implement the Sex Offender Registration and Notification Act or a governor not certifying compliance with the national Prison Rape Elimination Act standards.  *See* 42 U.S.C. §§ 16925, 15607(e)(2).  Unlike the access and notification conditions, these conditions were explicitly added by Congress.

### B.    California's Allocation and Use of the JAG Award

51.  Based on the formula prescribed by statute, California is expected to receive approximately $28.3 million in JAG funding in FY 2017, with $17.7 million going to the Board of State and Community Corrections ("BSCC"), the entity that receives the formula grant funds that are allocated to the State.

52.  BSCC disburses JAG funding using subgrants predominately to local jurisdictions throughout California to fund programs that meet the purpose areas identified in the JAG authorizing statute.  Between FY 2015-17, BSCC funded 32 local jurisdictions and the California Department of Justice.

53.  In the past, BSCC prioritized subgrants to those jurisdictions that focus on education and crime prevention programs, law enforcement programs, and court programs, including indigent defense.  Some examples of California jurisdictions' purpose-driven use of JAG funds include: (a) implementing educational programs to improve educational outcomes, increase graduation

rates, and curb truancy; (b) providing youth and adult gang members with multi-disciplinary education, employment, treatment, and other support services to prevent gang involvement, reduce substance abuse, and curtail delinquency and recidivism; (c) implementing school-wide prevention and intervention initiatives for some of the county's highest-risk students; (d) providing comprehensive post-dispositional advocacy and reentry services to improve outcomes and reduce recidivism for juvenile probationers; (e) providing a continuum of detention alternatives to juvenile offenders who do not require secure detention, which includes assessment, referral, case advocacy, home detention, reporting centers, non-secure, shelter, intensive case management and wraparound family support services; and (f) funding diversion and re-entry programs for both minors and young adult offenders.

## IV.   OJP HAS EXCEEDED ITS STATUTORY AUTHORITY BY IMPOSING THE NEW CONDITIONS

### A.   Description of the JAG Solicitation

54.   On July 25, 2017, OJP announced the FY 2017 State JAG Solicitation.  OJP set the deadline for applications as August 25, 2017.  On August 3, 2017, OJP announced the FY 2017 JAG Local Solicitation with a deadline of September 5, 2017.

55.   In the JAG Solicitations, for the first time in Fiscal Year 2017, OJP announced two additional substantive "special conditions" related to federal immigration enforcement.  To receive a JAG award, jurisdictions must:

- permit personnel of the U.S. Department of Homeland Security ("DHS") to access any correctional or detention facility in order to meet with an "alien" (or an individual believed to be an "alien") and inquire as to his or her right to be or remain in the United States (the "access condition"); and

- provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an "alien" in the jurisdiction's custody when DHS requests such notice in order to take custody of the individual pursuant to the Immigration and Nationality Act (the "notification condition").

Exh. A, at 32.  Both of these conditions exist in the State and Local JAG Solicitations.

14

56.   Grant recipients, including the BSCC, must execute "Certified Standard Assurances" that it "will comply with all award requirements," including the access and notification conditions. *See id.* at Appx. IV.

57.   Subgrantees must assure that they will comply with all award conditions, including the access and notification conditions. *See id.* at 20-21.

58.   Based on information and belief, the state recipient must execute the Certified Standard Assurances by the application deadline on August 25, 2017.  "OJP expects to issue award notifications by September 30, 2017." *Id.* at 31.

59.   At no point has USDOJ or OJP provided any explanation as to how the access and notification conditions relate to Congress's intent in authorizing JAG.

**B.    OJP Lacks Statutory Authority to Impose "Special Conditions" of this Type**

60.   JAG's authorizing statute provides no authority for OJP to impose the access and notification conditions (the so-called "special conditions") on all grant recipients.  Indeed, the same statute that authorizes JAG funding, the Omnibus Crime Control and Safe Streets Act of 1968, also authorizes funding pursuant to the Violence Against Women Act ("VAWA") that permits the Attorney General to "impose reasonable conditions on grant awards."  42 U.S.C. § 3796gg-1(e)(3).  Congress's clear direction to USDOJ to add "reasonable conditions" pursuant to VAWA, but not for JAG, strongly indicates that Congress did not intend to confer discretion on OJP to add unlimited substantive conditions at its whim.

61.   Although nothing related to the access and notification conditions is found within the statutory text or legislative history related to JAG, OJP claims it has the authority to add these conditions under Section 3712, which allows OJP to add "special conditions on all grants."

62.   OJP's basis for using its purported authority to add these conditions here, without limitation, is statutorily and constitutionally flawed.

63.   In 2006, when Section 3712 was amended to permit OJP to "plac[e] special conditions on all grants," the term "special conditions" had a precise meaning.  According to a USDOJ regulation in place at the time, the agency could impose "special grant or subgrant conditions" on

15

"high-risk grantees" if the grant applicant: (a) had a history of poor performance; (b) was not financially stable; (c) had a management system that did not meet certain federal standards; (d) had not conformed to the terms and conditions of a previous grant award; or (e) was not otherwise responsible. 28 C.F.R. § 66.12 (removed December 25, 2014).  This language was based on the grants management common rule adopted by the Office of Management and Budget ("OMB"), and followed by "all Federal agencies" when administering grants to state and local governments. OMB Circular A-102 (as amended Aug. 29, 1997).  Other federal statutes and regulations have also historically identified "special conditions" as those that federal agencies may place on particular high-risk grantees who have struggled or failed to comply with grant conditions in the past, not on all grantees irrespective of performance.

64.   Interpreting OJP's authority to permit it to impose any substantive conditions with respect to formula grants, like JAG, beyond what is allowed under federal law further conflicts with Congressional intent in establishing a prescribed formula grant structure.  Congress designed JAG so that "*each State*" receives an allocation according to a precise statutory formula.  42 U.S.C. § 3755(a) (emphasis added).  Likewise, Congress's formula provides allocation to "*each unit of local government.*" 42 U.S.C. § 3755(d)(2) (emphasis added).  As such, if USDOJ makes grants from funds that Congress appropriated to JAG, OJP must disburse the funds according to the statutory formula enacted by Congress so long as the jurisdiction complies with the conditions that exist in federal law.

65.   The conditions also conflict with the immigration enforcement scheme set forth by Congress in the Immigration and Naturalization Act ("INA") that makes cooperation with immigration enforcement agencies voluntary.  There is no provision in the INA, or any federal law, that requires jurisdictions to assist with otherwise voluntary immigration enforcement related activities in order to receive these federal funds.

66.   While USDOJ has the ability to add conditions to JAG awards, it cannot add substantive grant conditions such as these, that are not tethered to any federal statute.  For instance, it could add "special conditions" for high-risk grantees as described above.  It could add conditions that stem from the authorizing JAG statute.  And it could add conditions that Congress directed be

16

applied to federally funded programs. *See, e.g.,* 42 U.S.C. § 2000d-1; 29 U.S.C. § 794(a)(1); 20 U.S.C. § 1681(a)(1); 42 U.S.C. § 6102.

**C.    The Access and Notification Conditions do not Provide Jurisdictions with Clear Notice of what the Conditions Require**

67.  It is ambiguous what the access and notification conditions require grant recipients to do. For example, it is unclear whether the condition requiring jurisdictions to provide ICE jail access for interview purposes prohibits grant recipients from informing inmates of their right to have a lawyer present or decline an interview with ICE, which would implicate the notice requirements in the TRUTH Act.

68.   It is also ambiguous as to whether the condition requiring compliance with immigration notification requests should be applied when an individual is scheduled to be released less than 48 hours after the jurisdiction receives a notification request, or if the individual becomes eligible for release without advance warning (*i.e.*, released on bail).

**D.    Interpreting the Notification Condition as a Requirement to Hold an Individual Past His or Her Ordinary Release would mean OJP is Conditioning Funding on Unconstitutional Activities**

69.   If OJP interprets the ambiguous notification condition to require a jurisdiction to hold an individual beyond his or her scheduled release date and time in order to comply with the 48-hour notice requirement, OJP would be transforming the notification request into a secondary immigration hold request.  This would force jurisdictions to risk engaging in activities barred by the Fourth Amendment of the U.S. Constitution in order to receive federal funding.  That is because jurisdictions would be required to detain individuals beyond when they would otherwise be eligible for release even if the jurisdiction lacks probable cause to do so.

70.   As a matter of practice, when issuing detainer notification requests, ICE checks a box identifying whether: (a) there is a final order of removal; (b) removal proceedings are pending as to the individual; (c) "[B]iometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law;" and/or (d) "[S]tatements made by the alien to an

17

1   immigration officer and/or reliable evidence that affirmatively indicate that the alien either lacks

2   immigration status or notwithstanding such status is removable under U.S. immigration law."[2]

3       71.   The notification and detainer requests alone do not provide jurisdictions with any other

4   individually particularized information about the basis for removability.  And detainer and

5   notification requests are typically only accompanied by an ICE administrative warrant, which has

6   not been reviewed and approved by a neutral magistrate.  As federal courts throughout the

7   country have determined, jurisdictions that hold individuals beyond their ordinary release

8   pursuant to ICE detainer requests violate the Fourth Amendment of the U.S. Constitution if the

9   detainer requests are not supported by independent probable cause or a judicial warrant.  *See, e.g.,*

10  *Cty of Santa Clara,* slip op. at 6 (N.D. Cal. Apr. 25, 2017).

11      72.   OJP appears to interpret the notification condition as requiring jurisdictions to hold an

12  individual beyond when he or she is otherwise eligible for release if necessary to provide 48-hour

13  notice to ICE before release.  On August 3, 2017, OJP sent a letter to four local jurisdictions,

14  including the California cities of Stockton and San Bernardino, interested in the Public Safety

15  Partnership ("PSP") Program, a non-formula grant funding source administered through JAG.

16  The letter asked jurisdictions to inform ICE whether the jurisdiction has a "statute, rule,

17  regulation, policy, or practice that is designed to ensure that your correctional and detention

18  facilities provide at least 48 hours' advance notice, *where possible*, to DHS regarding the

19  scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such

20  notice in order to take custody of the alien."[3]

21      73.   A similar "where possible" limitation is not included in the JAG Solicitations.  It thus

22  appears that OJP may expect jurisdictions to detain individuals beyond their release date in order

23  to comply with the condition—which would require the recipient jurisdictions to potentially

24  violate the Fourth Amendment.  But even adding a "where possible" limitation does not cure the

25  existing ambiguity.  To cure the ambiguity and the Fourth Amendment problems with the

26  

27      [2] *See* Department of Homeland Security, Immigration Detainer – Notice of Action, I-247A, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

28      [3] *See* U.S. Department of Justice, *Alan Hanson Letters to Jurisdictions re PSP* (Aug 3. 2017), https://www.justice.gov/opa/press-release/file/986411/download (emphasis added).

notification condition, OJP would need to explicitly state that jurisdictions do not need to detain an individual beyond his or her ordinary release in order to comply with the condition.

## V.   USDOJ HAS MADE CLEAR THAT IT DOES NOT BELIEVE CALIFORNIA COMPLIES WITH THE ACCESS AND NOTIFICATION CONDITIONS

74.   Although California's laws comply with the access and notification conditions under one interpretation of the conditions, Defendants have consistently stated or suggested their perception that California and its local jurisdictions fail to comply with these conditions.

### A.   California Has a Credible Fear that USDOJ Will Wrongly Withhold Funding Based on the Access Condition

75.   On March 29, 2017, Defendant Sessions and then-DHS Secretary John Kelly sent a joint letter to the Chief Justice of California.  The letter, which responded to the Chief Justice's expression of concern about ICE arrests occurring in state courthouses, stated that "[s]ome jurisdictions, including the State of California and many of its largest counties and cities, have enacted statutes and ordinances designed to specifically prohibit or hinder ICE from enforcing immigration law by prohibiting communication with ICE, and denying requests by ICE officers and agents to enter prisons and jails to make arrests."[4]

76.   No California law prohibits ICE's access to jails.  The TRUST Act only limits circumstances under which local law enforcement have discretion to comply with detainer requests.  And the TRUTH Act only provides protections so that inmates are aware of their rights before they make the voluntary decision of whether to speak to ICE.

77.   Defendant Sessions' inaccurate characterization of California law as denying ICE access to jails, and thereby failing to satisfy this new condition in the JAG Solicitations, places California and local jurisdictions at risk of not receiving the JAG funds.

---

[4] *Attorney General Jefferson B. Sessions and Secretary John F. Kelly Letter to the Honorable Tani G. Cantil* (Mar. 29, 2017), https://www.nytimes.com/interactive/2017/03/31/us/sessions-kelly-letter.html.

19

### B.    California Has a Credible Fear that USDOJ Will Wrongly Withhold Funding Based on the Notification Condition

78. California has a credible fear that the notification condition requires local jurisdictions to hold an individual beyond his or her ordinary release and, therefore, USDOJ will find that California and its political subdivisions fail to comply with this condition because of the TRUST Act.

79.   In addition to the ambiguous wording of the notification condition, Defendant Sessions has made numerous statements asserting his desire to take federal funding away from jurisdictions that do not comply with detainer requests.  For instance, on March 27, 2017, Defendant Sessions exclusively discussed "policies" regarding refusals "to detain known felons under federal detainer requests."[5]  Defendant Sessions threatened that "policies" that limit compliance with detainer requests placed jurisdictions "at risk of losing valuable federal dollars."[6]

80.   Defendant Sessions' statements targeting jurisdictions that do not universally comply with detainer holds further corroborate that USDOJ intends to enforce this condition to require jurisdictions to hold individuals beyond their ordinary release.

### VI.    THE IMPOSITION OF THE ILLEGAL FUNDING CONDITIONS WILL CREATE IRREPARABLE HARM TO THE STATE AND ITS LOCAL JURISDICTIONS

81.   The ambiguity in the access and notification conditions, in combination with Defendants' interpretations of California law, create the prospect that the State and/or its local jurisdictions will not apply for JAG unless there is clarification about the scope of the new conditions.  That means a loss of up to $28.3 million in critical funds that would otherwise go toward programs throughout the State that reduce recidivism for at-risk youth, counter the distribution of illegal drugs, advance community policing, and improve educational outcomes.

82.   Another prospect is that the State and/or its localities accept the funding and change their public-safety oriented laws and policies in order to ensure they are viewed as complying with these ambiguous access and notification conditions.  Abandoning these policies, that law

---

[5] U.S. Department of Justice, *Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions* (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

[6] *Id.*

1  enforcement has found to be effective in their communities, could divert resources away from

2  fighting crime and erode trust between the state and local governments and their immigrant

3  communities that the TRUST and TRUTH Acts, as well as local ordinances, are intended to

4  build.

5      83.   In order to compel jurisdictions to adopt its federal immigration program, the

6  Administration has admitted that it intends to force state and local jurisdictions to abandon

7   policies these jurisdictions have adopted based on their considered judgment on how best to

8  enhance public safety.  The ambiguity of these conditions is part and parcel of the

9  Administration's plan to create a chilling effect that makes state and local jurisdictions think

10  twice about maintaining their current policies.  If Defendants clarify the access condition to

11  explain that they expect jurisdictions to not provide any procedural protections to detainees before

12  an ICE interview, or the notification condition to mean that jurisdictions must provide ICE with

13  48-hour notice even if it means holding someone beyond his or her ordinary release, jurisdictions

14  will still feel pressured to change their laws or policies to avoid losing any federal funding.

15      84.   Compelling state and local governments to make a decision without providing clarity

16  about the scope of the conditions, or construing these funding conditions to prohibit jurisdictions

17  from providing notice protections for inmates or requiring jurisdictions to detain individuals

18  beyond their ordinary release, undermines public safety, is unconstitutional, and should be halted.

19                              **FIRST CLAIM FOR RELIEF**

20            **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

21      85.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

22      86.   Article I, Section I of the United States Constitution enumerates that "[a]ll legislative

23  Powers herein granted shall be vested in [the] Congress."

24      87.   Article I, Section VIII of the United States Constitution vests exclusively in Congress the

25  spending power to "provide for . . . the General Welfare of the United States."

26      88.   Defendants have exceeded Congressional authority by adding conditions requiring

27  jurisdictions to provide access to detention facilities to interview inmates and to comply with

28  notification requests that are not conferred by the JAG authorizing statute or any other federal

law.  *See* 42 U.S.C. §§ 3750-58.  The new access and notification conditions therefore unlawfully exceed the Executive Branch's powers and intrude upon the powers of Congress.

89.   For the reasons stated herein, the access and notification conditions in the JAG Solicitations are unlawful, unconstitutional, and should be set aside under 28 U.S.C. § 2201.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF CONGRESSIONAL SPENDING AUTHORITY**

90.   Plaintiff incorporates the allegations of the preceding paragraphs by reference.

91.   Congress' spending power is not unlimited.  When "Congress desires to condition the States' receipt of federal funds, it 'must do so (a) unambiguously …, enable[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation;'" (b) by placing conditions that are related "to the federal interest in particular national projects or programs;" and (c) to not "induce the States to engage in activities that would themselves be unconstitutional."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

92.   To the extent that Congress delegated its authority to impose conditions (special conditions or otherwise) on JAG funding (which Plaintiff does not concede), the access and notification conditions violate the Spending Clause of the U.S. Constitution.

93.   The access and notification conditions are unrelated to the "federal interest in particular national projects or programs" for which Congress intended JAG funding to be used.

94.   The access and notification conditions violate the Spending Clause because they are ambiguous and do not provide the State with notice to make a "choice knowingly" of whether to comply.

95.  Additionally, if the notification condition requires jurisdictions to hold individuals beyond their ordinary release to comply with the notification condition, that condition would also violate the independent constitutional bar prong of the Spending Clause by requiring local law enforcement to comply even when doing so would violate the Fourth Amendment of the U.S. Constitution.

96.   For the reasons stated herein, the access and notification conditions in the JAG Solicitations are unlawful, and should be set aside under 28 U.S.C. § 2201.

**THIRD CLAIM FOR RELIEF**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

**(Constitutional Violations and Excess of Statutory Authority)**

97.  Plaintiff incorporates the allegations of the preceding paragraphs by reference.

98.  Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG solicitation is an "agency action" under the APA, *id.* § 551(13).

99. The JAG Solicitations constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  Id. § 704.

100.     The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(B)-(C).

101.     Defendants' imposition of the access and notification conditions in the JAG Solicitations is unconstitutional because Defendants overstepped their powers by exercising lawmaking authority that is solely reserved to Congress under Article I, Section I of the U.S. Constitution.  Also, Defendants' imposition of the access and notification conditions in the JAG Solicitations was in excess of their statutory authority.  Furthermore, both conditions violate the Spending Clause because they are unrelated to the federal purpose of the grant, ambiguous, and/or tied to unconstitutional activities.

102.     Because Defendants acted unconstitutionally and in excess of their statutory authority through the JAG Solicitations, these actions are unlawful and should be set aside under 5 U.S.C. § 706.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

**(Arbitrary and Capricious )**

103.  Plaintiff incorporates the allegations of the preceding paragraphs by reference.

104.     Defendant USDOJ is an "agency" under the APA, 5 U.S.C. § 551(1), and the JAG solicitation is an "agency action" under the APA, *id.* § 551(13).

105.    The JAG Solicitations constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

106.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

107.    The imposition of the access and notification conditions is arbitrary and capricious and an abuse of discretion because Defendants have relied on factors that Congress did not intend by adding these conditions to JAG funding.

108.    For the reasons discussed herein, the access and notification conditions in the JAG solicitation are unlawful and shall be set aside under 5 U.S.C. § 706 for being arbitrary and capricious and an abuse of discretion.

## FIFTH CLAIM FOR RELIEF

## DECLARATORY RELIEF

109.    Plaintiff incorporates the allegations of the preceding paragraphs by reference.

110.    An actual controversy between California and Defendants exists as to whether the State of California and its localities comply with the access and notification conditions on the basis of the TRUST and TRUTH Acts.  Although California law actually complies with an interpretation of the conditions, Defendants' statements indicate that they will determine that California does not comply with the conditions.

111.    Plaintiff is entitled to a declaration that the TRUST and TRUTH Acts do not violate the access and notification conditions, and thus, should not be a basis for withholding, terminating, disbarring, or making ineligible federal funding from the State and its political subdivisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, including the State of California, respectfully that this Court enter judgment in its favor, and grant the following relief:

1.    Issue a declaration that the access and notification conditions in the JAG Solicitations are unconstitutional and/or unlawful because (a) they exceed the Congressional authority conferred to the Executive Branch; (b) to the extent there is Congressional authorization, exceeds the Congress's spending powers under Article I of the Constitution; and (c) they violate the Administrative Procedures Act;

2.    Permanently enjoin Defendants from using the access and notification conditions as restrictions for JAG funding;

3.    Permanently enjoin Defendants from withholding, terminating, disbarring or making any state entity or local jurisdiction ineligible for JAG funding on account of the TRUTH Act or any law or policy that provides procedural protections to inmates about their rights;

4.    Permanently enjoin Defendants from withholding, terminating, disbarring, or making any state entity or local jurisdiction ineligible for JAG funding on account of the TRUST Act or any law or policy that limits compliance with detainer requests;

5.    In the alternative, declare that the State's TRUST and TRUTH Acts comply with the access and notification conditions in the JAG Solicitations; and

6.    Award the State costs and grant such other relief as the Court may deem just and proper.

Dated:  August 14, 2017                    Respectfully submitted,

                                           XAVIER BECERRA
                                           Attorney General of California
                                           ANGELA SIERRA
                                           Senior Assistant Attorney General
                                           MICHAEL NEWMAN
                                           Supervising Deputy Attorney General
                                           SARAH BELTON
                                           LISA EHRLICH
                                           Deputy Attorneys General

                                            /s/ Lee Sherman

                                           LEE SHERMAN
                                           Deputy Attorney General
                                           *Attorneys for the State of California*

OK2017900935

Complaint for Declaratory and Injunctive Relief