1  XAVIER BECERRA
   Attorney General of California
2  ANGELA SIERRA
   Senior Assistant Attorney General
3  SATOSHI YANAI
   Supervising Deputy Attorney General
4  SARAH E. BELTON
   LISA C. EHRLICH
5  LEE SHERMAN (SBN 272271)
   Deputy Attorneys General
6   300 S. Spring St., Suite 1702
    Los Angeles, CA  90013
7   Telephone:  (213) 269-6404
    Fax:  (213) 879-7605
8   E-mail:  Lee.Sherman@doj.ca.gov
   *Attorneys for Plaintiff State of California*

9

10            IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14

|  |  |
|---|---|
| **STATE OF CALIFORNIA, ex rel, XAVIER BECERRA, in his official capacity as Attorney General of the State of California,** | Case No. 17-cv-4701 |
| Plaintiff, | **PLAINTIFF STATE OF CALIFORNIA'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| **JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Acting Assistant Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; and DOES 1-100,** | Date:      December 6, 2017<br>Time:     2:00 p.m.<br>Dept:     2<br>Judge:   Honorable William H. Orrick<br>Trial Date: None Set<br>Action Filed: 8/14/2017 |
| Defendants. | |

# TABLE OF CONTENTS

Page

Notice of Motion and Motion for Preliminary Injunction .................................................. 1

Memorandum of Points and Authorities ............................................................................ 1

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 4

     A.    Section 1373 and the INA ............................................................................ 4

     B.    California's Statutes ...................................................................................... 5

     C.    The History and Purpose of JAG ................................................................. 7

     D.    California's Use of JAG and COPS Funds .................................................. 9

     E.    JAG and COPS Requirements in Relation to Section 1373 ..................... 10

     F.    Defendants' Other Actions Threatening to Find the State in
          Violation of Section 1373 .......................................................................... 11

Legal Argument ............................................................................................................... 12

     I.    Legal Standard .......................................................................................... 12

     II.   California is Likely to Succeed on Its Claims that the JAG Section 1373
         Condition is Unlawful ............................................................................... 13

          A.    The JAG Section 1373 Condition Violates the Spending Clause
               Because it is Unrelated to the Purpose of JAG ......................................... 13

          B.    Imposition of the JAG Section 1373 Condition is Arbitrary and
               Capricious ................................................................................................. 14

     III.  California is Likely to Succeed in Showing that California's Statutes Do
         Not Violate Section 1373 ......................................................................... 15

          A.    Section 1373 Cannot be Lawfully Interpreted or Enforced to Reach
               California's Confidentiality Statutes ......................................................... 15

               1.    California's Confidentiality Statutes Do Not Conflict with
                    Section 1373 ................................................................................. 16

               2.    The Tenth Amendment Does Not Allow for Section 1373 to
                    Commandeer the State in its Control over Governmental
                    Employees and its Residents' Confidential Personal
                    Information .................................................................................... 17

          B.    Section 1373 Does Not Conflict with The Plain Text of the TRUTH
                Act, and Would Constitute Unconstitutional Commandeering if it
                Did ............................................................................................................ 22

     IV.  Without Court Intervention, the Section 1373 Conditions will Cause the
         State Imminent and Irreparable Harm ....................................................... 23

     V.   The Balance of Hardships Favors Granting a Preliminary Injunction ................. 25

Conclusion ....................................................................................................................... 25

# TABLE OF AUTHORITIES

Page

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
  458 U.S. 592 (1982)...................................................................................................................25

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
  559 F.3d 1046 (9th Cir. 2009).............................................................................................23, 24

*Ariz. Dream Act Coalition v. Brewer*
  757 F.3d 1053 (9th Cir. 2014)...................................................................................................25

*Arizona v. United States*
  567 U.S. 387 (2012)...................................................................................................................13

*Atascadero State Hospital v. Scanlon*
  473 U.S. 234 (1985)...................................................................................................................17

*Bond v. United States*
  134 S. Ct. 2077 (2014)...............................................................................................................17

*Cape May Greene, Inc. v. Warren*
  698 F.2d 179 (3d Cir. 1983).......................................................................................................15

*City of Chicago v. Sessions*
  No. 17-cv-5720, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017)......................................21, 22, 24

*City of New York v. United States*
  179 F.3d 29 (2d Cir. 1999)..........................................................................................19, 21, 22

*Cty. of Santa Clara v. Trump*
  250 F. Supp. 3d 497 (N.D. Cal. 2017) .......................................................................................13

*Davis v. Mich. Dep't. of Treasury*
  489 U.S. 803 (1989).............................................................................................................16, 17

*Encino Motorcars, LLC v. Navarro*
  136 S.Ct. 2117 (2016) ................................................................................................................15

*FCC v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009)...................................................................................................................14

*FERC v. Mississippi*
  456 U.S. 742 (1982)...................................................................................................................20

*Giovani Carandola, Ltd. v. Bason*
  303 F.3d 507 (4th Cir. 2002)......................................................................................................25

## TABLE OF AUTHORITIES
### (continued)

Page

*Gregory v. Ashcroft*
   501 U.S. 452 (1991) ........................................................................................ 17, 20

*Kansas v. United States*
   249 F.3d 1213 (10th Cir. 2001) ................................................................................ 23

*Koog v. United States*
   79 F.3d 452 (5th Cir. 1996) .......................................................................... 18, 19, 20

*Massachusetts v. United States*
   435 U.S. 444 (1978) ................................................................................................ 13

*Morales v. Trans World Airlines*
   504 U.S. 374 (1992) ................................................................................................ 23

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) ............................................................................................ 14, 15

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*
   545 U.S. 967 (2005) ................................................................................................ 14

*New York v. United States*
   505 U.S. 144 (1992) .................................................................................. 17, 18, 20, 22

*Nken v. Holder*
   556 U.S. 418 (2009) ................................................................................................ 25

*Printz v. United States*
   521 U.S. 898 (1997) .............................................................................. 17, 18, 19, 20, 22

*Raygor v. Regents of Univ. of Minn.*
   534 U.S. 533 (2002) ................................................................................................ 17

*Romero v. United States*
   883 F.Supp. 1076 (W.D. La. 1995) .......................................................................... 19

*South Dakota v. Dole*
   483 U.S. 203 (1987) ................................................................................................ 13

*Steinle v. City & Cty. of San Francisco*
   230 F. Supp. 3d 994 (N.D. Cal. 2017) ...................................................................... 22

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*
   695 F.3d 676 (7th Cir. 2012) .................................................................................... 24

## TABLE OF AUTHORITIES
### (continued)

Page

*Texas v. United States*
No. 15-cv-151, 2016 WL 4138632 (N.D. Tex. Aug. 4, 2016)....................................................14

*Trump v. Int'l Refugee Assistance Project*
137 S.Ct. 2080 (2017) ..............................................................................................................13

*United States v. Lopez*
514 U.S. 549 (1995)...................................................................................................................20

*United States v. Morrison*
529 U.S. 598 (2000)...................................................................................................................19

*United States v. North Carolina*
192 F. Supp. 3d 620 (M.D.N.C. 2016)......................................................................................24

*Univ. of Texas v. Camenisch*
451 U.S. 390 (1981)...................................................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008)...........................................................................................................12, 13, 25

*Zadvydas v. Davis*
533 U.S. 678 (2001)...................................................................................................................18

FEDERAL STATUTES

5 U.S.C. § 706..............................................................................................................................14

8 U.S.C. § 1101.........................................................................................................................5, 16

8 U.S.C. § 1367.........................................................................................................................5, 16

8 U.S.C. § 1373........................................................................................................................passim

8 U.S.C. § 1644..............................................................................................................................4

34 U.S.C. §§ 10151-58..................................................................................................................7

34 U.S.C. § 10152..................................................................................................................8, 13, 14

34 U.S.C. § 10153..........................................................................................................................8

34 U.S.C. § 10156..........................................................................................................................7

# TABLE OF AUTHORITIES
### (continued)

Page

**CALIFORNIA STATUTES**

Cal. Civ. Proc. Code
§ 155(c) ................................................................................................................. *passim*

Cal. Gov't Code
§ 7282 *et seq.* ........................................................................................................................2

§ 7283 *et seq.* ...................................................................................................................1, 2, 7

§ 7284 *et seq.* ........................................................................................................................2

Cal. Penal Code
§ 422.93 ................................................................................................................. *passim*
§ 679.10.................................................................................................................. *passim*
§ 679.11.................................................................................................................. *passim*

Cal. Welf. & Inst. Code
§ 827...................................................................................................................... *passim*
§ 831...................................................................................................................... *passim*

**CONSTITUTIONAL PROVISIONS**

Cal. Const., art. II, § 10............................................................................................................3

Cal. Const., art. IV, § 8............................................................................................................3

U. S. Const., art. I, § 8, cl. 4.....................................................................................................4

**COURT RULES**

Cal. R. of Ct. 5.552 .................................................................................................................7

**OTHER AUTHORITIES**

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690 ..........................................................8

Dep't of Commerce, Justice, and State, the Judiciary, and Related Agencies
Appropriations Act of 1996, Pub. L. No. 104-134..........................................................8

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
104-208 .............................................................................................................................5

Immigration Act of 1990, Pub. L. No. 101-649................................................................8

# TABLE OF AUTHORITIES
### (continued)

Page

Technical Immigration and and Naturalization Amendments of 1991, Pub. L. No.
   102-232 ................................................................................................................................8

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on Wednesday, December 6, 2017, at 2:00 p.m. or as soon thereafter as it may be heard before the Honorable William H. Orrick in Courtroom 2 of the U. S. District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General will and does hereby move the Court pursuant to F.R.C.P. 65 for a preliminary injunction against Defendants Attorney General Jefferson Sessions, Assistant Attorney General Alan Hanson, and the United States Department of Justice, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

California moves the Court to enter a preliminary injunction prohibiting Defendants from requiring compliance with 8 U.S.C. § 1373 as a condition for the State and its political subdivisions to receive funding pursuant to the Edward Byrne Memorial Justice Assistance Grant ("JAG") program. In the alternative, because the State's laws comply with Section 1373, California seeks an order enjoining Defendants from interpreting or enforcing Section 1373 in such a manner to withhold or terminate funding from, or disbar or make ineligible, the State or any of its political subdivisions that apply for JAG or Community Policing Services grants on account of the following state statutes:  California Government Code section 7283 *et seq.*, Penal Code sections 422.93, 679.10, 679.11, California Welfare and Institutions Code sections 827 and 831, and California Code of Civil Procedure section 155.  This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the declarations, the Request for Judicial Notice, as well as the papers, evidence and records on file, and any other written or oral evidence or argument as may be presented.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General moves for a preliminary injunction preventing Defendants from enforcing conditions requiring the State and its political subdivisions to comply with 8 U.S.C. § 1373 in order to receive $31.1 million in law enforcement funding pursuant to the Edward Byrne Memorial Justice Assistance Grant ("JAG")

1

and Community Oriented Policing Services ("COPS") grants.[1]  Starting with President Trump's Executive Order No. 13768 directed at so-called "sanctuary jurisdictions," that has already been found likely unconstitutional, the Trump Administration has sought to interpret and use Section 1373 in an constitutionally impermissible manner as a cudgel to force state and local jurisdictions to acquiesce to the President's immigration enforcement demands.  Defendants now require jurisdictions to certify compliance with Section 1373, a statute restricting federal, state, and local jurisdictions from prohibiting the exchange of information regarding an individual's immigration and citizenship status, in order to receive grants that are unrelated to immigration enforcement.

Although Defendants lack constitutional and legal authority to impose the Section 1373 conditions, under normal circumstances there would be no dispute because the State's laws comply with Section 1373.  To be sure, California has enacted confidentiality statutes that protect residents' personal information, including immigration status information, when the State has deemed such statutes necessary for the State and its local governments to effectuate governmental activities.  California has also enacted the Transparent Review of Unjust Transfers and Holds ("TRUTH") Act, Cal. Gov't Code § 7283 *et seq.* to provide greater transparency about local law enforcement involvement in immigration enforcement activities.  These statutes are designed to improve the public safety of all Californians by promoting relationships of trust between the State and its 10 million foreign-born residents and their family members, and encourages victims and witnesses of crime to come forward.  Reading Section 1373 as applying to the TRUTH Act would conflict with the text of Section 1373, while reading Section 1373 as to California's confidentiality statutes would be inconsistent with the remainder of the Immigration and Naturalization Act ("INA") and the federal government's own handling of immigration status information.  And either would violate the Tenth Amendment of the U.S. Constitution.[2]

---

[1] The FY 2017 State and Local Solicitations for JAG are Exhibits A and B, respectively, to the Request for Judicial Notice accompanying this Motion.  The FY 2017 COPS Application Guides for the Anti-Methamphetamine Program and Anti-Heroin Task Forces are Exhibits C and D, respectively, to the Judicial Notice Request.

[2] As reflected in the State's First Amended Complaint ("FAC") (filed Oct. 13, 2017), on October 5, 2017, California enacted an amended TRUST Act, Cal. Gov't Code § 7282 *et seq.* and the Values Act, Cal. Gov't Code § 7284 *et seq.*  On October 17, 2017, the California Department of Justice received a proposed statewide referendum on both laws.  Given the proposed referendum,

1    Defendants have nevertheless indicated their view that statutes and policies similar to those

2    in California are incompatible with Section 1373.  On October 12, 2017, Defendants announced

3    preliminary assessments with respect to seven jurisdictions across the country from which

4    Defendants sought legal opinions validating their compliance with Section 1373.  Defendants

5    determined that five of the jurisdictions had laws or policies that appear to violate Section 1373,

6    including one jurisdiction because it had policies regulating the disclosure of information

7    regarding victims of crime.  The federal government has also indicated that laws and policies that

8    regulate immigration authorities' access to detention facilities violate Section 1373.  California

9    too submitted a legal opinion that analyzed California's laws and concluded that the State does

10   not violate Section 1373.  Unlike the other jurisdictions that submitted legal opinions, however,

11   California has yet to receive any response from the Defendants.  Now, in order to receive FY

12   2017 JAG funding, Defendants demand that the State submit an unqualified certification of

13   compliance, under penalty of perjury, without providing any response to the State's legal opinion.

14   USDOJ will soon make awards for the COPS grants, which Defendants will either deny to the

15   State or demand that the State accept only if it assures that it will comply with all applicable laws,

16   which would include compliance with Defendants' misinterpretation of Section 1373.

17   Defendants' actions cause irreparable harm to the State's sovereignty, public safety, and

18   operations.  Congress has appropriated $28.3 million in JAG funding to California to support

19   criminal justice programs.  Among other things, these programs support crime victims and

20   witnesses, reduce recidivism, facilitate crime prevention education for at-risk youth, and fund

21   other law enforcement programs.  The State is also expected to receive $2.8 million pursuant to

22   two COPS grants, grants that the State has received every year they have existed, which are used

23   _____

24   which at a minimum delays the effective date of the new laws (*see* Cal. Const., art. II, § 10(a); *id.*
     art. IV, § 8(c)(2)), the State does not address the Values Act or amended TRUST Act in this

25   Motion.  Nonetheless, a decision on this Motion regarding the State's Confidentiality Statutes and
     the TRUTH Act will allow the State and its political subdivisions to make an informed decision
     about the interplay between Section 1373, and thus, the grant conditions, and the Values Act and

26   amended TRUST Act when those laws come into effect.  California reserves its right to move for
     preliminary injunction and seek any other relief once these laws become effective or if

27   Defendants seek to enforce the Section 1373 conditions against the State or its political
     subdivisions on account of these laws that have yet to go into effect.

28

3

1    to investigate illicit drug distribution. Loss of these funds will harm public safety. But public

2    safety will also be harmed if the State and its political subdivisions must accede to Defendants'

3    demands in order to receive these federal dollars. Defendants' misinterpretation of Section 1373

4    further means that Californians will not be able to hold its state and local officials appropriately

5    accountable for policy changes that are beyond their control—the very harm the Tenth

6    Amendment aims to prevent. To prevent these harms, a preliminary injunction is necessary.[3]

7    **BACKGROUND**

8    **A.    Section 1373 and the INA**

9      The U.S. Constitution grants Congress the power to regulate immigration and

10   naturalization. *See* art. I, § 8, cl. 4. Congress has done so via the comprehensive framework

11   codified in the INA. Two provisions of the INA restrict federal, state, and local governments in

12   how they may control the exchange of information regarding an individual's immigration and

13   citizenship status. The statute relevant to this litigation is 8 U.S.C. § 1373.[4] Paragraph (a) of

14   Section 1373 provides as follows:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

18   Paragraph (b) forbids federal, state, or local governments from prohibiting the following: (i)

19   "[s]ending [immigration status] information to, or requesting or receiving such information from

20   [federal immigration authorities];" (ii) "[m]aintaining such information;" or (iii) "[e]xchanging

21   such information with any other Federal, State, or local government entity."

22      Other provisions of the INA provide information-sharing safeguards for certain vulnerable

23   immigrants, including those who are undocumented. For example, the INA offers protections and

---

[3] California has also brought claims challenging Defendants' imposition of conditions requiring jurisdictions to respond to requests by the Department of Homeland Security ("DHS") for inmates' release dates and to provide DHS agents access to detention facilities for interview purposes. *See, e.g.,* FAC, ¶¶ 122-144. Those conditions are currently subject to a nationwide injunction. *See City of Chicago v. Sessions*, No. 17-cv-5720, ECF No. 78 (N.D. Ill. Sept. 15, 2017). California reserves its right to seek a preliminary injunction as to those conditions if the nationwide injunction is stayed or modified.

[4] The other statute, 8 U.S.C. § 1644, exists in a chapter within the INA for "Restricting Welfare and Public Benefits for Aliens" and contains restrictions that are encompassed by Section 1373.

4

1   benefits to victims and witnesses of crime by creating specialized U-visas for those who have

2   cooperated with law enforcement in investigating or prosecuting enumerated crimes such as

3   domestic violence and child abuse, and T-visas for those who have cooperated in prosecuting

4   human trafficking. *Id.* § 1101(a)(15)(T)-(U). Title 8, Section 1367, which was enacted as part of

5   the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, the

6   same Act that created Section 1373,[5] generally prohibits the "use by or disclosure" of any

7   information provided during the process of applying for U- or T- visas, or other benefits available

8   for immigrant witnesses and victims of crime, "to anyone" other than identified federal

9   departments. *See* 8 U.S.C. § 1367(a)(1)-(2). It also prohibits using the information provided to

10   "make an adverse determination of admissibility or deportability" for the immigrant victims and

11   witnesses of crime. *Id.* Moreover, the INA details a "Special Immigrant Juvenile" process,

12   through which certain abused, neglected, or abandoned undocumented immigrant children may

13   seek legal immigration status. *Id.* § 1101(a)(27)(J). Federal law relies on state courts to make the

14   predicate determination for youth who are eligible to apply for this status. *See id.*

15   **B.   California's Statutes**

16   California's laws are consistent with the INA. Relevant to this Motion are the State's laws

17   impacted by Defendants' interpretation of Section 1373, and arguably implicated by the Section

18   1373 conditions. Those are the TRUTH Act and six state statutes relating to confidentiality, the

19   "State's Confidentiality Statutes": Penal Code sections 422.93, 679.10, 679.11, Welfare and

20   Institutions Code sections 827 and 831, and Code of Civil Procedure section 155.

21   California has historically enacted statutes like these to strengthen community policing

22   efforts.[6] Exercising its discretion, California has concluded that statutes like these improve public

23   safety in light of evidence that immigrants are no more likely to commit crimes than native-born

24   Americans,[7] and that a clear distinction between local law enforcement and immigration

25   enforcement results in safer communities. *See, e.g.*, RJN Exs. F at 5, G at 8. The California

26   _____

27   [5] *Compare id.* § 384 *with id.* § 642.
   [6] *See, e.g.*, 2016 Cal. Legis. Serv. Ch. 768 § 2(i) (A.B. 2792 or the "TRUTH Act"); 2013 Cal.
   Legis. Serv. Ch. 570 § 1(d) (A.B. 4 or the "TRUST Act"); Cal. Penal Code § 422.93(a).
28   [7] *See, e.g.*, 2013 Cal. Legis. Serv. Ch. 570 § 1(d) (A.B. 4); RJN Ex. E at 6.

5

1    Legislature has relied on law enforcement officers' statements about the public safety benefits of

2    practices that reduce the entanglement between their agencies and immigration enforcement. *See,*

3    *e.g.,* RJN Ex. G at 9. Law enforcement agencies ("LEAs") throughout the State continue to build

4    trust between LEAs and immigrant communities so that "people could come forward if they are a

5    crime victim or … witness to a crime without fear of being deported." *See* Decl. of L.A. Cty.

6    Sheriff Jim McDonnell in Supp. of Pl.'s Mot. for Prelim. Inj. ("McDonnell Decl."), ¶¶ 10-13; *see*

7    *also* Compl., *City and Cty. of San Francisco v. Sessions,* No. 17-4642 (N.D. Cal. Aug. 11, 2017)

8    ("S.F. Compl.") ¶¶ 19, 28. These laws and local practices protect the public safety of all

9    Californians, regardless of immigration status. *See, e.g.,* FAC, ¶¶ 14, 30-32.

10       To ensure the proper operation of state and local criminal and juvenile justice systems, the

11   State's Confidentiality Statues protect, in discrete circumstances, the confidentiality of sensitive

12   information that the State and its localities collect and maintain. These Confidentiality Statutes

13   can be broken down into two categories. The first category (Cal. Penal Code §§ 422.93, 679.10,

14   679.11) consists of statutes that protect the confidential information of victims and witnesses of

15   crime, in order to "encourag[e]" "victims of or witnesses to crime, or [those] who otherwise can

16   give evidence in a criminal investigation, to cooperate with the criminal justice system." *See,*

17   *e.g.,* Cal. Penal Code § 422.93(a). California Penal Code sections 679.10 and 679.11 implement

18   the state and local LEA's role in the federal U- and T-visa process by, among other things,

19   prohibiting certifying entities from "disclosing the immigration status of a victim" or other person

20   requesting certification "except to comply with federal law or legal process, or if authorized by

21   the victim or person requesting [the certification form]." *Id.* §§ 679.10(k), 679.11(k). These

22   confidentiality protections impact thousands of immigrants who come forward to cooperate with

23   law enforcement. For example, in 2016, the year Section 679.10 came into effect for U-visa

24   applicants, L.A. County Sheriff's Department received double the number of U-visa applications

25   from the year before (954 in total, 80 percent of which were certified), and in 2017, L.A. County

26   has already processed 774 applications, 90 percent of which have been certified. McDonnell

27   Decl., ¶ 14. The third state statute in this category, Penal Code section 422.93, protects hate-

28   crime victims or witnesses who are "not charged with or convicted of committing any crime

6

1   under State law" by prohibiting law enforcement from "detain[ing] the individual exclusively for

2   any actual or suspected immigration violation or report[ing] or turn[ing] the individual over to

3   federal immigration authorities." Cal. Penal Code § 422.93(b).

4       The second category of statutes (Cal. Welf. & Inst. Code §§ 827, 831; Cal. Civ. Proc. Code

5   § 155) protects the confidential information of youth in the State's juvenile court system. The

6   Legislature determined that "[c]onfidentiality is integral to the operation of the juvenile system in

7   order to avoid stigma and promote rehabilitation for all youth." Cal. Welf. & Inst. Code § 831(a).

8   As a general rule, juvenile court records and the information therein is confidential except to

9   statutorily designated parties. Cal. Welf. & Inst. Code § 827; *see also* Cal. R. of Ct. 5.552(b)-(c).

10   Consistent with that general requirement, the State has implemented its role in the federal Special

11   Immigrant Juvenile process, through its dependency court system, by directing that "information

12   regarding the child's immigration status ... remain confidential and shall be available for

13   inspection only" to a handful of enumerated parties. Cal. Civ. Proc. Code § 155(c). Information

14   about a child's immigration status in any juvenile court proceeding must "remain confidential"

15   just like all other information in the youth's court records. *See* Cal. Welf. & Inst. Code § 831(e).

16       In addition, in 2016 the State enacted the TRUTH Act, which increased transparency about

17   local LEA's involvement when federal immigration authorities seek to interview an individual in

18   local custody. Under the TRUTH Act, local jails must notify individuals that the interviews are

19   voluntary, and that they have the right to seek counsel. Cal. Gov't Code § 7283.1(a). And, upon

20   receipt of a detainer, notification, or transfer request, a LEA must provide the subject a copy and

21   inform him or her whether the LEA intends to comply. *Id.* § 7283.1(b).

22      **C.   The History and Purpose of JAG**

23       JAG is a formula grant authorized by Congress and administered by OJP. 34 U.S.C. §§

24   10151-58. The statutory formula guarantees to each state a minimum allocation based on the

25   state's population and violent crime rate. Sixty percent of a state's total allocation goes directly

26   to the state and the remainder goes directly to local governments. *Id.* § 10156(a), (b)(1), (d).

27       The current JAG program descended from two earlier programs. Congress created the

28   Edward Byrne Memorial State and Local Law Enforcement Assistance Program grants ("Byrne

7

Grants") as part of the Anti-Drug Abuse Act of 1988.  The purpose was "to assist States and units

of local government in carrying out specific programs which offer a high probability of

improving the functioning of the criminal justice system."  Anti-Drug Abuse Act of 1988, Pub. L.

No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4329 (1988).  Between 1988 and 2006, Congress

identified 29 purposes for which Byrne Grants could be used.  *See* 42 U.S.C. § 3751(b) (Dec.

2000) (as it existed on Jan. 4, 2006).  Separately, Congress identified nine purposes for Local

Law Enforcement Block Grants ("LLEBG").[8]  Immigration enforcement never appeared as a

purpose for either the Byrne Grants or LLEBG.[9]

In 2006, Congress merged the Byrne Grant and LLEBG programs to create the current JAG

program.  Pub L. No. 109-162, 119 Stat. 2960, 3094 (2006).  The merger aimed to eliminate

duplication, and to provide state and local governments "more flexibility to spend money for

programs that work for them rather than to impose a 'one size fits' all solution" to local law

enforcement.  H.R. Rep. No. 109-233, at 89 (2005).  Following the 2006 merger, Congress

consolidated the "purpose areas" down to eight: (A) law enforcement programs; (B) prosecution

and court programs; (C) prevention and education programs; (D) corrections and community

corrections programs; (E) drug treatment and enforcement programs; (F) planning, evaluation,

and technology improvement programs; (G) crime victim and witness programs; and (H) mental

health programs related to law enforcement and corrections.  34 U.S.C. § 10152(a)(1).

Congress never created a "purpose area" of immigration enforcement in either the former or

current iterations of JAG.  Only one immigration-related requirement ever existed in any iteration

of the JAG authorizing statute: a requirement that the chief executive officer of the recipient state

provide certified records of "criminal convictions of aliens."[10]  Congress repealed that

requirement in the 2006 merger that created the current JAG program.  *See* 34 U.S.C. § 10153(a).

---

[8] Local Government Law Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995) first authorized as part of the Dep't of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1996, Pub. L. No. 104-134, tit. I, 110 Stat. 1321, 1321-12 (1996).
[9] *See* Decl. of Lee Sherman in Supp. of Pl.'s Mot. for Prelim. Inj. ("Sherman Decl.") Exs. H (identifying the 29 Byrne Grant purposes), I (identifying the 9 LLEBG purposes).
[10] *See* Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51 (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006).

8

### D.    California's Use of JAG and COPS Funds

California's Board of State and Community Corrections ("BSCC") is the State entity that receives California's allocation of the JAG program's formula grant funds. The State has received $252.7 million pursuant to JAG since 2006, excluding funding that the federal government granted directly to the State's local jurisdictions. *See* Decl. of Mary Jolls in Supp. of Pl.'s Mot. for Prelim. Inj. ("Jolls Decl."), ¶ 7. Based on the statutory formula, California is expected to receive approximately $28.3 million in JAG funding in FY 2017, with $17.7 million going to BSCC. *Id.* ¶ 5. The BSCC uses the State's share of the JAG award to issue subgrants to jurisdictions that propose using the funds for education and crime prevention programs, law enforcement programs, and court programs, including toward the goals of improving educational outcomes, increasing graduation rates, curbing truancy, reducing substance abuse, and curtailing delinquency and recidivism for at-risk youth and young adults. *Id.* ¶¶ 8, 10 & Ex. A. For example, L.A. County uses JAG funding to support anti-drug trafficking programs and investigations, intervention programs for vulnerable youth, mental health programs, and anti-gang enforcement activities. McDonnell Decl., ¶¶ 4-9. The City and County of San Francisco relies on JAG to fund, among other thing, projects that seek to reduce recidivism by providing an alternative to suspension and other services for at-risk juveniles and young adults. S.F. Compl., ¶¶ 42-45. BSCC currently funds programs for 32 local jurisdictions, as well as the California Department of Justice ("CalDOJ") to support task forces focused on criminal drug enforcement, violent crime, and gang activity. Jolls Decl., ¶ 10; Decl. of Christopher Caligiuri in Supp. of Pl.'s Mot. for Prelim. Inj. ("Caligiuri Decl."), ¶¶ 19-21. The BSCC plans on using FY 2017 JAG funds to support programs similar to those that it has funded in the past. Jolls Decl., ¶ 11.

The Division of Law Enforcement ("DLE") within CalDOJ is the State entity that receives COPS competitive grants. Since the inception of the COPS program, CalDOJ has received over $11 million to support law enforcement efforts around the State, including work on multi-jurisdictional task forces. Caligiuri Decl., ¶ 4. For this fiscal year, CalDOJ applied for two COPS grants worth $2.8 million. *See id.* ¶¶ 10, 16. CalDOJ applied for the COPS Anti-Methamphetamine Program ("CAMP") grant to cover salaries, benefits, and other costs to

9

1    continue the State's leadership in a task force whose targeted enforcement against large-scale

2    methamphetamine drug trafficking organizations has resulted in the seizure of upwards of $60

3    million of methamphetamine, cocaine, and heroin. *See id.* ¶¶ 6-8, 10. CalDOJ also applied for

4    the COPS Anti-Heroin Task Force ("AHTF") grant, to cover equipment, including potentially-

5    lifesaving TruNarc handheld narcotics analyzers, consultants, and other costs in support of 14

6    heroin-related task forces that conduct large scale heroin investigations, share data and

7    intelligence among law enforcement personnel throughout the State, and hold education sessions

8    in the community about drug abuse awareness. *See id.* ¶¶ 12-14, 16. CalDOJ has been awarded

9    CAMP and AHTF grants for each year these programs have been in existence. *See id.* ¶¶ 5, 12.

10    **E.   JAG and COPS Requirements in Relation to Section 1373**

11    In FY 2016, USDOJ declared Section 1373 an "applicable law" for JAG, RJN Ex. H, and

12    specifically required BSCC to submit a legal opinion validating its compliance with Section 1373.

13    Jolls Decl., Ex. B, ¶ 55. For FY 2017, Defendants announced that all jurisdictions receiving JAG

14    funds must certify compliance with Section 1373. *E.g.*, RJN, Ex. A at 1, Ex. B at 1. Each grant

15    recipient's chief law officer, the Attorney General in the State's case, must sign a standard

16    affidavit, under penalty of perjury, affirming compliance with Section 1373 on behalf of the State

17    and "any entity, agency, or official" of the State as applicable to the "program or activity to be

18    funded." RJN, Ex. A, Appx. II. The grant recipient's chief executive officer, the Governor in the

19    State's case, must adopt that certification, under penalty of perjury. *Id.*, Appx. I. Grant recipients

20    must collect Section 1373 certifications from all subgrant recipients before issuing an award.

21    RJN Ex. J, ¶ 53(2). In addition, USDOJ's represented final award conditions require grantees to

22    monitor their subgrantees' compliance with Section 1373 and to promptly notify OJP if any

23    subgrantee does not comply. *Id.* ¶¶ 53(3), 54(1)(D). USDOJ's Financial Guide explains that

24    jurisdictions "have 45 days from the award date to accept [an] OJP . . . award document or the

25    award may be rescinded," which includes the requisite certifications. *See* RJN, Ex. K, § 2.2.

26    USDOJ announced that COPS applicants for 2017 must execute a similar Section 1373

27    certification of compliance with respect to the "program or activity to be funded." RJN, Ex. C at

28    2 & Appx. D; Ex. D at 1-2 & Appx. D. CalDOJ submitted its applications with the executed

10

1  certifications for AHTF and CAMP on July 7 and 10, respectively. Caligiuri Decl., ¶¶ 9, 15 &
2  Exs. B, D. As part of their applications, DLE included a supplemental statement by CalDOJ in
3  connection with the COPS Section 1373 Certifications. *Id.* There, CalDOJ clarified that the
4  COPS Section 1373 Certifications were made "as that federal statute is lawfully interpreted," and
5  reserved its rights to challenge "any unconstitutional enforcement of Section 1373." *Id.*, Exs. B,
6  D. On September 7, 2017, USDOJ communicated to applicants that it was "committed" to
7  "announcing this year's award recipients as quickly as possible." Sherman Decl., Ex. J. As has
8  been required in years' past, once CAMP and AHTF COPS awards are announced, recipients will
9  have to execute award conditions certifying that they will comply with all applicable laws, which
10 includes Section 1373. *See* Caligiuri Decl., ¶¶ 5, 13 & Exs. A, ¶ 1, C, ¶ 1. On October 23, 2017,
11 USDOJ announced COPS awards for other programs, RJN Ex. L, but as of the date of this filing,
12 DLE has not received any response to its applications. *See* Caligiuri Decl., ¶¶ 11, 17.

13    **F.    Defendants' Other Actions Threatening to Find the State in Violation of
             Section 1373**
14

15     On April 21, 2017, Defendants sent letters to nine jurisdictions that received the JAG award
16 in 2016, including the BSCC, demanding that they submit an official legal opinion validating
17 their compliance with Section 1373. RJN, Exs. I, M. That same day, Defendants Sessions and
18 USDOJ both stated that the State of California has laws "that potentially violate 8 U.S.C. §
19 1373," relying on an Office of Inspector General Report.[11] RJN Exs. M, N. On June 29, the
20 BSCC submitted the requested legal opinion explaining the State's laws do not violate Section
21 1373, focusing on the applications of Section 1373 discussed in that OIG Report. *See* Jolls Decl.,
22 Ex. C. On July 6, Defendant Sessions suggested, without offering any support, that the nine
23 jurisdictions may not be in compliance with Section 1373 saying, "It is not enough to assert
24 compliance, the jurisdictions must actually be in compliance." RJN, Ex. P.

25

26 [11] Defendants are incorrect in claiming that the OIG Report found California in "potential"
violation of Section 1373. The State of California was identified in the OIG report, in large part,
27 because of the relatively large amount of money it receives in federal funding from USDOJ. *See*
RJN, Ex. O at 3. While the OIG Report commented about some jurisdictions' compliance with
28 Section 1373, the report did not discuss in detail California's law as it existed at that time.

1    In August 2017, Defendants informed two of those jurisdictions that they comply with

2   Section 1373. On October 12, 2017, Defendants announced that they made preliminary

3   compliance assessments on the other six jurisdictions (plus one other jurisdiction). *See* RJN, Ex.

4   Q. Defendants announced that they found no evidence of non-compliance with Section 1373 as

5   to two of the seven jurisdictions. *Id.* Defendants preliminarily determined that the other five

6   jurisdictions appeared not to comply with Section 1373. *Id.* For one jurisdiction, Defendants

7   based their determination, in part, on the jurisdiction's protections against the disclosure of crime

8   victims' information, *see* RJN, Ex. R at 1-2, which California's laws also protect in some

9   instances. California remains the only jurisdiction that provided a legal opinion to which

10   Defendants have not responded, making the Defendants' last word their prior erroneous

11   statements about California's "potential" non-compliance with Section 1373.

12    The Administration has made additional statements suggesting it has an even broader

13   interpretation of Section 1373 than communicated in the preliminary assessment letters, and a

14   misunderstanding about California's laws. On June 13, 2017, the Acting Director of Immigration

15   and Customs Enforcement ("ICE"), Thomas Homan, testified before Congress that jurisdictions

16   that "have some sort of policy where they don't … allow [ICE] access to the jails" violate Section

17   1373. *See* RJN, Ex. S at 35, 47-48. Although California's TRUTH Act does not prohibit LEAs

18   from providing such access, Defendant Sessions has stated that "the State of California . . . [has]

19   enacted statutes . . . designed to specifically prohibit or hinder ICE from enforcing immigration

20   law by . . . denying requests by ICE officers and agents to enter prisons and jails to make arrests."

21   RJN, Ex. T at 2.

22                              **LEGAL ARGUMENT**

23   I.   **LEGAL STANDARD**

24    "The purpose of a preliminary injunction is merely to preserve the relative position of the

25   parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395

26   (1981). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

27   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

28   balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

                                       12

1 *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A preliminary injunction is "often dependent

2 as much on the equities of [the] case as the substance of the legal issues it presents." *Trump v.*

3 *Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017).

4 **II.  CALIFORNIA IS LIKELY TO SUCCEED ON ITS CLAIMS THAT THE JAG SECTION 1373**
  **CONDITION IS UNLAWFUL**

5

6      Before considering whether California's laws comply with Section 1373, the Court must

7 first determine whether Defendants may even lawfully impose the JAG Section 1373 Condition.

8 They cannot: The State is likely to succeed on its claims that this Section 1373 Condition violates

9 the Spending Clause and is arbitrary and capricious under the Administrative Procedure Act.

10      **A.  The JAG Section 1373 Condition Violates the Spending Clause Because it**
       **is Unrelated to the Purpose of JAG**

11

12      Congress may only use its spending power to place conditions on federal funds that are

13 related "'to the federal interest in particular national projects or programs.'"  *South Dakota v.*

14 *Dole*, 483 U.S. 203, 207 (1987) (quoting *Massachusetts v. United States*, 435 U.S. 444, 461

15 (1978)).  This Court has determined that the same test applies when the Executive Branch

16 imposes a condition by purported delegation from Congress, and that "funds conditioned on

17 compliance with Section 1373 must have some nexus to immigration enforcement." *See Cty. of*

18 *Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017).

19      Section 1373 has no such nexus to the JAG program.  Congress has never identified

20 immigration enforcement as a "purpose area" for JAG, and repealed the only immigration-

21 enforcement related condition that it had ever authorized for JAG funding.  *Supra* at 8.  The

22 present statute identifies eight purpose areas for JAG, which the State predominantly uses to fund

23 community policing initiatives for crime prevention and education for at risk youth, drug

24 treatment and enforcement, and mental health programs.  *See* Jolls Decl., ¶¶ 8, 10.

25      Congress has been clear in identifying these as purposes areas to fund "*criminal* justice"

26 initiatives, 34 U.S.C. § 10152, (emphasis added), whereas, immigration enforcement is generally

27 *civil* in nature and predominantly the responsibility of the federal government.  *See Arizona v.*

28 *United States*, 567 U.S. 387, 396 (2012).  In reinforcement of this distinction, the only

13

immigration enforcement related condition that ever existed for JAG required jurisdictions to
provide records for "criminal convictions of aliens." *Supra* at 8. The Executive Branch's
unilateral act to add Section 1373 as an "applicable law" violates the nexus prong of the Spending
Clause as it requires state and local jurisdictions to comply with a condition to support a different
program (the federal government's civil immigration priorities) than the "criminal justice"
program being funded. 34 U.S.C. §§ 10152; *see Texas v. United States*, No. 15-cv-151, 2016 WL
4138632, at *17 (N.D. Tex. Aug. 4, 2016) (holding that a Spending Clause claim was viable
because a challenged health insurance fee was not "'directly related,' let alone 'reasonably
related'" to Medicaid since its purpose was to fund a different federal program).

**B.     Imposition of the JAG Section 1373 Condition is Arbitrary and Capricious**

Defendants' identification of Section 1373 as an "applicable law" for JAG is arbitrary and
capricious in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). "[A]n agency
must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle
Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). Before 2016,
JAG was never linked to Section 1373 at any point in the nearly twenty years that Section 1373
has been law. In response to an inquiry by one Congressman, and without providing any
evidence that Congress intended for immigration enforcement to be a purpose area for JAG, in
2016, USDOJ declared Section 1373 an "applicable law," with which JAG recipients must
comply. *See* RJN, Ex. H. At no point, either for FY 2016 or 2017, have Defendants "show[n]
that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S.
502, 515 (2009); *see also State Farm*, 463 U.S. at 50 ("It is well established that an agency's
action must be upheld, if at all, on the basis articulated by the agency itself.").

Indeed, Defendants have put forth *nothing*—no studies, no reports, no analysis—to support
the JAG Section 1373 Condition. The OIG Report does not discuss or contemplate how the
Section 1373 Condition is consistent with the underlying goals of JAG, or Congress' intent in
adopting JAG. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,
981 (2005) ("Unexplained inconsistency is. . . a reason for holding an interpretation to be an
arbitrary and capricious change from agency practice under the Administrative Procedure Act.");

14

1  *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 186-87 (3d Cir. 1983) (invalidating agency

2  action on grant conditions as arbitrary and capricious where the agency sought "to accomplish

3  matters not included in that statute"). Neither do the JAG Solicitations. A general recitation of

4  "Border Security" as an area of emphasis in the JAG Solicitations, RJN, Ex. A at 11, falls "short

5  of the agency's duty to explain why it deemed it necessary to overrule its previous position,"

6  particularly where Congress never identified Border Security as a purpose. *Encino Motorcars,*

7  *LLC v. Navarro*, 136 S.Ct. 2117, 2125, 2126 (2016); *see id.* ("Agencies are free to change their

8  existing policies as long as they provide a reasoned explanation for the change.").

9      There is also nothing to suggest that Defendants considered the empirical evidence and law

10  enforcement perspectives that jurisdictions around the country, including the State and its

11  political subdivisions, have relied upon in exercise of their sovereign discretion, that policies that

12  build trust and cooperation with immigrant communities result in positive criminal enforcement

13  and safety outcomes. *See, e.g.*, RJN, Exs. E-G; McDonnell Decl., ¶ 12; S.F. Compl., ¶ 28; *see*

14  *also State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if

15  the agency has . . . entirely failed to consider an important aspect of the problem. . . .").

16  III.  CALIFORNIA IS LIKELY TO SUCCEED IN SHOWING THAT CALIFORNIA'S STATUTES
         DO NOT VIOLATE SECTION 1373

17

18      Even if the JAG Section 1373 Condition is lawful, the State is likely to succeed in showing

19  that the applicable State's statutes do not conflict with Section 1373, or, alternatively, Section

20  1373 cannot be enforced against those statutes, which is relevant to both JAG and COPS.

21      A.  **Section 1373 Cannot be Lawfully Interpreted or Enforced to Reach
             California's Confidentiality Statutes**

22

23      California's Confidentiality Statutes protect the confidentiality of sensitive information the

24  State collects in the course of undertaking core state functions. These statutes do not conflict with

25  Section 1373 read in the context of the entire INA. Furthermore, reading Section 1373 to

26  invalidate these statutes would constitute commandeering prohibited by the Tenth Amendment.

27  ///

28

15

1     **1. California's Confidentiality Statutes Do Not Conflict with Section 1373**

2

3    Section 1373 must be read in the context of the rest of the INA. *See Davis v. Mich. Dep't.*

4 *of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that

5 the words of a statute must be read in their context and with a view to their place in the overall

6 statutory scheme."). The INA specifically protects the confidentiality of information about those

7 who have been victims of or witnesses to certain crimes. Section 1367(a)(2), enacted as part of

8 the same legislative act as Section 1373, prevents federal employees from "disclos[ing] to anyone

9 [with exceptions] any information which relates to an alien who is the beneficiary of an

10 application for relief" under the statute, *i.e.* certain victims and witnesses of crime including U-

11 and T-visa recipients. The Defendants' reading of Section 1373 would require federal employees

12 to violate Section 1373(b)(3)'s prohibitions on limits to the disclosure of immigration status

13 information from federal employees to other governmental entities to implement the general

14 disclosure prohibitions in Section 1367(a)(2).

15    The INA also provides protections and support for certain juveniles. For example, the

16 "Special Immigrant Juvenile" process allows abused, abandoned and neglected immigrant youth

17 to secure lawful immigration status, demonstrating the INA's broader concern with the long-term

18 safety of such children generally. *See* 8 U.S.C. § 1101(a)(27)(J). Furthermore, in implementing

19 the Deferred Action for Childhood Arrivals ("DACA") program, United States Citizenship and

20 Immigration Services ("USCIS") specifically determined that the information provided by DACA

21 applicants must be "protected from disclosure to ICE and CBP for the purpose of immigration

22 enforcement proceedings," with limited exceptions. *See* RJN, Ex. U, Q19.

23    Accordingly, reading the text of Section 1373 in the context of the rest of the INA shows

24 that the prohibition on limiting information-sharing should not be properly interpreted to cover

25 the limited circumstances encompassed by the State's Confidentiality Statutes. The persons

26 covered by the State's statutes are similar classes of individuals to those that the INA (and the

27 federal government) itself seeks to protect both through confidentiality and other protections: (a)

28

1  victims and witnesses of crime (Cal. Penal Code §§ 422.93, 679.10(k), and 679.11(k)); and (b)

2  vulnerable youth (Cal. Civ. Proc. Code § 155(c); Welf. & Inst. Code §§ 827, 831).

3       The plain language of Section 1373 does not demand a different reading.  The words in

4  Section 1373 regarding the immigration status of "any individual," must "be read in their context

5  and with a view to their place in the overall statutory scheme." *Davis*, 489 U.S. at 809.  For

6  example, in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), the Supreme Court read

7  "*any* recipient of Federal assistance" to not include every recipient, but instead to exclude state

8  defendants.  *Id.* at 245-46 (emphasis in original), *superseded by statute*; *see also Raygor v.*

9  *Regents of Univ. of Minn.*, 534 U.S. 533, 545-46 (2002) ("any claim" did not include every claim,

10  but instead excluded certain claims against state defendants).  In this instance, "any individual"

11  should be read in the context of the rest of the INA to exclude those individuals protected by

12  other specific sections of the INA.  That is particularly so given the serious constitutional

13  questions about the statute that would otherwise arise, as discussed below.  *See Bond v. United*

14  *States*, 134 S. Ct. 2077, 2089 (2014) ("'[I]t is incumbent upon the federal courts to be certain of

15  Congress' intent before finding that federal law overrides' the 'usual constitutional balance of

16  federal and state powers.'") (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

17       **2.**    **The Tenth Amendment Does Not Allow for Section 1373 to**
         **Commandeer the State in its Control over Governmental Employees**
18           **and its Residents' Confidential Personal Information**

19       The Supreme Court has read the Tenth Amendment to impose recognized limits on

20  Congressional enactments.  The Framers "explicitly chose a Constitution that confers upon

21  Congress the power to regulate individuals, not States" and the Constitution "has never been

22  understood to confer upon Congress the ability to require the States to govern according to

23  Congress' instructions." *New York v. United States*, 505 U.S. 144, 162, 166 (1992).  As such, the

24  Supreme Court held in *New York* and *Printz v. United States*, 521 U.S. 898 (1997) that the federal

25  government may not "commandeer" state and local governments and officials "by directly

26  compelling them to enact and enforce a federal regulatory program." *Printz*, 521 U.S. at 935;

27  *New York*, 505 U.S. at 162.  Both cases advance the principles that: (i) "the federal government

28  may not compel the States to enact or administer a federal regulatory program" *e.g.*, *New York*,

17

1   505 U.S. at 188; (ii) such coercion is impermissible where the "whole object" of the

2   Congressional action is direction of state functions, *e.g.*, *Printz*, 521 U.S. at 932; and (iii) the

3   intrusion on state sovereignty is "worse" where the federal government "strips" away at state and

4   local government's discretion at policy-making.  *E.g.*, *Printz*, 521 U.S. at 927-28; *see also Koog*

5   *v. United States*, 79 F.3d 452, 457-60 (5th Cir. 1996).  These principles ensure that state and local

6   governments remain politically accountable to their residents.  *See Printz,* 521 U.S. at 920, 922-

7   23; *Koog*, 79 F.3d at 460-61.  Reading Section 1373 to cover the State's Confidentiality Statutes

8   violates these principles and upsets constitutional notions of political accountability.  The Court

9   should thus construe Section 1373 in a manner that prevents its "invalidation."  *See Zadvydas v.*

10  *Davis*, 533 U.S. 678, 689 (2001) ("We have read significant limitations into other immigration

11  statutes in order to avoid their constitutional invalidation.").

12      First, construing Section 1373 to cover the State's Confidentiality Statues would compel the

13  State to participate in the administration of a federal regulatory program of immigration

14  enforcement. *See New York*, 505 U.S. at 176, 188.  The state statutes at issue here apply to

15  criminal and juvenile systems, which the State and local governments must provide for.  To

16  comply with Defendants' apparent reading of Section 1373, the State Legislature, in setting

17  policy for those systems where the State's residents' immigration status information may be

18  relevant, would either have to make no assurances about the confidentiality of that information, or

19  affirmatively make exceptions to allow for disclosure to federal immigration authorities, even

20  when disclosure is prohibited in other instances. *See* Cal. Penal Code §§ 679.10-.11; Cal. Civ.

21  Proc. Code § 155(c); Cal. Welf. & Inst. Code §§ 827, 831.  Regardless of what the State does, it

22  would have to act in furtherance of a federal program that is not its own.  Where the whole

23  purpose of some of these statutes is to encourage residents to report crimes (*see, e.g.*, Cal. Penal

24  Code §§ 422.93, 679.10-.11), the enforcement of Section 1373 against these statutes would force

25  the State to surrender its own judgment regarding the importance of providing confidentiality

26  assurances to encourage the reporting of crime in favor of the federal government's preference

27  that federal immigration enforcement should prevail over all other concerns.  This is "tantamount

28  to forced state legislation" and coercion to administer a federal program that the Tenth

18

1  Amendment prohibits. *See Koog*, 79 F.3d at 458.

2       Second, construing Section 1373 in a manner to negate the State's Confidentiality Statutes

3  would make the "whole object of [Section 1373] to direct the functioning of the state executive,"

4  a state of affairs that the Supreme Court has found to destabilize the framework of dual

5  sovereignty ingrained in the Constitution. *See Printz*, 521 U.S. at 932. Whether Section 1373

6  could be enforced against a categorical prohibition on sharing of immigration status information

7  with federal immigration authorities, *see City of New York v. United States*, 179 F.3d 29, 35 (2d

8  Cir. 1999), is not at issue in this case. When applied to the State's Confidentiality Statutes,

9  however, Section 1373 directs action at the core of the State's sovereign power to make its own

10  determination about how to best address crime and public safety. *See United States v. Morrison*,

11  529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the

12  Founders denied the National Government and reposed in the States, than the suppression of

13  violent crime and vindication of its victims."). It is the State or its political subdivisions that have

14  the responsibility to certify U- or T-visa requests, receive reports from victims and witnesses of

15  crimes, and operate the juvenile court system. If applied to these statutes, Section 1373 would be

16  enforced against the use of information that "belongs to the State" and that is "available to [law

17  enforcement officers] only in their official capacity." *Printz*, 521 U.S. at 932 n.17. Section 1373

18  is, thus, inevitably an "object … to direct the functioning of the State" if the statute is enforced

19  against these aspects of the State's sovereignty. *See id.* at 932; *see also Romero v. United States*,

20  883 F.Supp. 1076, 1086-87 (W.D. La. 1995) (holding Tenth Amendment limits Congress's ability

21  to preempt "state regulation for the maintenance of public order" where a statute "remove[d] [the

22  sheriff's] ability to perform certain tasks assigned him by the state which preserve the public

23  order and therefore remove their sovereign authority to maintain public order").

24       Third, construing Section 1373 to encompass the State's Confidentiality Statutes would

25  take away the State's discretion in establishing policies about how governmental employees may

26  handle private information about the State's residents within the custody and control of the State,

27  thus "worsen[ing] the intrusion upon state sovereignty." *See Printz*, 521 U.S. at 927-28. The

28  State has no blanket prohibition on government employees sharing immigration status

1   information with federal immigration enforcement agents.  Instead, the State has made nuanced

2   decisions regulating the specific circumstances where such information is protected from

3   disclosure in general (not solely as to immigration enforcement agents), and the limited class of

4   individuals to whom such protections apply.  *See* Cal. Penal Code §§ 422.93 (limited to hate

5   crime victims and witnesses, who are not perpetrators of crime); 679.10-11 (limited to U- or T-

6   visa applicants); Cal. Civ. Proc. Code, § 155(c) (limited to "Special Immigrant Juvenile"

7   applicants); Cal. Welf & Inst. Code §§ 827 & 831 (limiting disclosure of juvenile case files to all

8   except statutorily designated parties).  The enforcement of Section 1373 as to these statutes would

9   weaken the State's ability to regulate the actions of their own governmental employees, *see*

10  *Gregory*, 501 U.S. at 160, and "foreclose[] the State[] from experimenting and exercising [its]

11  own judgment in an area to which States lay claim by right of history and expertise." *See United*

12  *States v. Lopez*, 514 U.S. 549, 583 (1995).  "Whatever the outer limits of state sovereignty may

13  be, it surely encompasses the right to set the duties of office for state-created officials and to

14  regulate the internal affairs of government bodies." *Koog*, 79 F.3d at 460 (citing *FERC v.*

15  *Mississippi*, 456 U.S. 742, 761 (1982)).

16      Fourth, commandeering the State in the handling of its residents' personal information

17  undermines state and local accountability.  The U.S. Constitution's structure of dual sovereignty

18  between the federal government and the states "reduce[s] the risk of tyranny and abuse from

19  either front." *Printz*, 521 U.S. at 921 (quoting *Gregory*, 501 U.S. at 458).  Commandeering

20  forces the states to "bear the brunt of public disapproval." *New York*, 505 U.S. at 169.  As the

21  Court warned in *Printz*, "[t]he power of the Federal Government would be augmented

22  immeasurably if it were able to impress into its service—and at no cost to itself—the police

23  officers of the 50 States." 521 U.S. at 922.  This is exactly what Defendants would be permitted

24  to accomplish if Section 1373 were construed to forbid states and localities from ensuring that

25  LEAs safeguard the confidentiality of victims' and witness' personal information.  Should

26  Section 1373 be enforced as to the State's Confidentiality Statutes, some witnesses and victims

27  will be less inclined to report crimes, *see* RJN, Ex. V, and relationships between immigrant

28  communities and state and local officials would be strained.  State and local governments would

20

1  "face the brunt of public disapproval," rather than the Defendants who effectively coerced the

2  State and localities to act according to a federal program.

3  Although two federal courts have upheld Section 1373 against challenges of facial

4  unconstitutionality, neither ruling is dispositive to the issues presented in this case. In fact, both

5  decisions reflect significant concern about extending Section 1373 to apply to confidentiality

6  statutes such as those at issue here. In *City of Chicago v. Sessions*, No. 17-cv-5720 (N.D. Ill.

7  Sept. 15, 2017), while the district court held that there was a likelihood that Section 1373 was

8  facially constitutional, it also expressed concern about its potential applications. The court noted

9  that Section 1373 "mandate[s]" state and local governments to give employees the option of

10  providing information to federal immigration agents. 2017 WL 4081821, at *12. The court

11  found that the "practical" impact is that state and local governments are "limited [in their] ability

12  to decline to administer or enforce a federal regulatory program" and "extricate their state or

13  municipality's involvement in a federal program." *Id.*

14  In *City of New York*, the city argued that Section 1373 was facially unconstitutional, in part,

15  because it interfered with the use of confidential information and control over the city's

16  employees in a range of local government functions. The Second Circuit held Section 1373

17  facially constitutional, but recognized:

18  The City's concerns [about confidentiality] are not insubstantial. The obtaining of
    pertinent information, which is essential to the performance of a wide variety of state
19  and local governmental functions, may in some cases be difficult or impossible if
    some expectation of confidentiality is not preserved. Preserving confidentiality may
20  in turn require that state and local governments regulate the use of such information
    by their employees.
21

22  179 F.3d at 36. The Second Circuit acknowledged that the Tenth Amendment may limit Section

23  1373 from being "an impermissible intrusion on state and local power to control information

24  obtained in the course of official business or to regulate the duties and responsibilities of state and

25  local governmental employees," but it did not consider these arguments in earnest because the

26  city's executive order promoted a policy of "non-cooperation while allowing City employees to

27  share freely the information in question with the rest of the world." *See id.* at 37. The Second

28  Circuit determined that the city was attempting to transform "the Tenth Amendment's shield

21

1  against the federal government's using state and local governments to enact and administer

2  federal programs into a sword allowing states and localities to engage in passive resistance that

3  frustrates federal programs." *Id.* at 35.

4      That is not so with the State's Confidentiality Statutes. They either generally prohibit

5  disclosure to a wide range of individuals, not just to federal agents, or narrowly tailor the segment

6  of the population that is protected. As a result, these statutes possess the qualities that eluded the

7  jurisdictions' facial challenges in *City of New York* and *Chicago*, and underscore the serious

8  constitutional issues that the Second Circuit and the Northern District of Illinois found troubling

9  in Section's 1373's practical application. *See Chicago*, 2017 WL 4081821, at *12 ("practically

10  limit[ing] the ability of state and local governments to decline to administer or enforce a federal

11  regulatory program" could "implicate the logic underlying the *Printz* decision").

12      **B.**    **Section 1373 Does Not Conflict with The Plain Text of the TRUTH Act,**
13              **and Would Constitute Unconstitutional Commandeering if it Did**

14      The TRUTH Act does not conflict with Section 1373 because it does not regulate the

15  sharing of "information regarding the *citizenship or immigration status*" of individuals. 8 U.S.C.

16  § 1373 (emphasis added). The TRUTH Act simply provides transparency surrounding inmates or

17  LEAs' interactions with ICE by requiring LEAs to notify inmates of their rights before they make

18  the voluntary decision of whether to speak to ICE. It does not fall within the ambit of Section

19  1373 because "no plausible reading of 'information regarding … citizenship or immigration

20  status'" encompasses requirements on LEAs to notify inmates of their rights before allowing ICE

21  access to interviews. *See Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015

22  (N.D. Cal. 2017). In addition, interpreting Section 1373 to encompass the TRUTH Act would

23  amount to unconstitutional commandeering for the reasons discussed *supra* III(A)(2), particularly

24  since the federal government would be compelling the State to not inform detainees' of their

25  rights in furtherance of a federal immigration enforcement program. *See Printz*, 521 U.S. at 932;

26  *New York,* 505 U.S. at 176, 188.

27  ///

28

## IV. WITHOUT COURT INTERVENTION, THE SECTION 1373 CONDITIONS WILL CAUSE THE STATE IMMINENT AND IRREPARABLE HARM

"[C]onstitutional violation[s] alone, coupled with the damages incurred, can suffice to show irreparable harm." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009) (relying on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)). Moreover, injuries where "sovereign interests and public policies [are] at stake" are irreparable. *Kansas v. United States*, 249 F.3d 1213, 1228 (10th Cir. 2001).

California will suffer a constitutional injury to the State's sovereignty if Defendants effectively coerce the State and its political subdivisions to carry out their federal immigration enforcement agenda, particularly under their misinterpretation of Section 1373. A plaintiff can suffer a constitutional injury by being forced either to comply with an unconstitutional law or else face community and financial injury. *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058-59 (plaintiffs were injured where they were faced with the choice of signing unconstitutional agreements or a loss of customer goodwill and significant business). Such is the case here where the State is confronted with making an unqualified certification of compliance under penalty of perjury under the shadow of Defendants' statements about the State's potential Section 1373 noncompliance and the preliminary noncompliance of other jurisdictions with similar policies.[12] *See Morales*, 504 U.S. at 380-81 (injunctive relief proper where "respondents were faced with a Hobson's choice: continually violate the Texas law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the dependency of the proceedings").

Construing Section 1373 to invalidate the State's statutes will also cause real harm to our communities, no matter what the State does. If the State changes its laws to comply with a constitutionally impermissible interpretation of Section 1373, the relationship of trust that these State statutes are intended to build between law enforcement and immigrant communities will

---

[12] Even if the State submits a statement explaining why the State's laws comply with Section 1373, notwithstanding Defendants' apparent interpretation, the State still has to submit the standard certification required by Defendants in order to receive funding, and Defendants may deny the State funding on the basis of this explanatory statement.

23

1    erode.  *See* McDonnell Decl., ¶¶ 10, 12; San Francisco Compl., ¶ 28.  Alternatively, if the State

2    preserves its laws and Defendants cut millions of dollars in JAG funding that the State is

3    otherwise entitled to by statutory formula, the State would be unable to fund critical public safety

4    programs, *see* Jolls Decl., ¶ 19; Caligiuri Decl., ¶¶ 19-22, and local jurisdictions' programs will

5    be detrimentally impacted, including the possibility that programs and staff positions will be

6    eliminated in their entirety.  *See* McDonnell Decl., ¶¶ 8-9, 15; S.F. Compl., ¶ 46; *see United*

7    *States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) (finding irreparable harm

8    where the lack of funds was "likely to have an immediate impact on [the state's] ability to provide

9    critical resources to the public, causing damage that would persist regardless of whether funding

10   [was] subsequently reinstated").  Furthermore, without any guidance from Defendants, BSCC

11   will be placed in the position of having to monitor subgrantees and report them for having

12   policies that the State and/or the subgrantees determined benefit public safety.  *See* RJN, Ex. J, ¶¶

13   53(3), 54(1)(D); *see also* Jolls Decl., ¶¶ 21-22.

14        The harm to the State from the loss of COPS grants is at least as immediate.  USDOJ is

15   poised to "quickly" issue COPS awards and demand compliance with applicable laws, including

16   Section 1373, based on their apparent misreading of the statute.  *See supra* at 11.  If CalDOJ does

17   not receive the COPS grants based on Defendants' interpretation of Section 1373 or they are

18   conditioned based on this apparent misinterpretation, CalDOJ will be unable to fund task forces

19   and equipment that combat heroin and methamphetamine distribution, creating harm that will

20   extend to the local jurisdictions that those task forces serve.  *See* Caligiuri Decl., ¶¶ 10, 16.

21        The damages incurred here—the deprivation of constitutional rights, the loss of community

22   goodwill, decrease in public safety, and the loss of millions of dollars of funding —"suffice to

23   show irreparable harm."  *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058; *Stuller, Inc. v. Steak N*

24   *Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (injuries to goodwill not easily

25   measurable and often irreparable).  These are the same types of damages that the court in *Chicago*

26   recently found to be irreparable in enjoining other immigration enforcement related conditions for

27   JAG.  *See Chicago*, 2017 WL 4081821, at *12-14.

28

## V.   THE BALANCE OF HARDSHIPS FAVORS GRANTING A PRELIMINARY INJUNCTION

A party seeking a preliminary injunction "must establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the balance of the hardships and public interest both favor "'prevent[ing] the violation of a party's constitutional rights.'" *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

Here, the balance of the hardships and the public interest favor an injunction. California has determined that the public safety requires protecting its residents' personal information and requires transparency about its participation in immigration enforcement. Defendants—who have chosen to leave California in the dark about its position on the State's compliance, even when providing clarity to other jurisdictions—are forcing California, under extreme time pressure, to consider undermining these policies to avoid losing critical federal funding. An injunction protects the public interest in shielding the State's sovereignty from unconstitutional conditions without harm to the federal government's ability to enforce federal laws with federal resources.

The Government "is in no way harmed by issuance of a preliminary injunction which prevents the [federal government] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted). This is particularly true when an injunction protects a State's interest in "the exercise of sovereign power over individuals and entities within . . . [their] jurisdiction that involves the power to create and enforce a legal code, both civil and criminal." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). The potential impact on numerous local jurisdictions further tips the balance of interests. *See, e.g.*, McDonnell Decl., ¶ 8-9, 15; S.F. Compl., ¶ 46. In contrast, Defendants face no harm since the status quo would remain, and would only have to provide money that Congress has already appropriated.

### CONCLUSION

For the foregoing reasons, California requests this Court grant its Motion.

25

Dated:  October 31, 2017

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
ANGELA SIERRA
Senior Assistant Attorney General
SATOSHI YANAI
Supervising Deputy Attorney General
SARAH E. BELTON
Deputy Attorney General


/s/ LEE SHERMAN
/s/ LISA C. EHRLICH

LEE SHERMAN
LISA C. EHRLICH
Deputy Attorney General
*Attorneys for Plaintiff*
*State of California*

Plaintiff's Not. of Mot. and Motion for Preliminary Injunction; MPA in Support Thereof (17-cv-4701)