XAVIER BECERRA
Attorney General of California
ANGELA SIERRA
Senior Assistant Attorney General
SATOSHI YANAI
Supervising Deputy Attorney General
SARAH E. BELTON
LISA C. EHRLICH
LEE SHERMAN (SBN 272271)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6404
  Fax:  (213) 879-7605
  E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, ex rel, XAVIER BECERRA, in his official capacity as Attorney General of the State of California,**<br><br>Plaintiff,<br><br>**v.**<br><br>**JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Acting Assistant Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; and DOES 1-100,**<br><br>Defendants. | Case No. 17-cv-4701<br><br>**PLAINTIFF STATE OF CALIFORNIA'S NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:           December 13, 2017<br>Time:          2:00 p.m.<br>Dept:          2<br>Judge:        Honorable William H. Orrick<br>Trial Date:   None Set<br>Action Filed:  8/14/2017 |

# TABLE OF CONTENTS

**Page**

Notice of Amended Motion and Amended Motion for Preliminary Injunction ........................... 1

Memorandum of Points and Authorities ..................................................................................... 1

Introduction ..................................................................................................................................1

Background .................................................................................................................................. 4

    A.    Section 1373 and the INA ............................................................................ 4

    B.    California's Statutes ...................................................................................... 5

        1.    The TRUST, TRUTH and Values Acts .......................................... 6

        2.    California's Confidentiality Statutes .............................................. 8

    C.    The History and Purpose of JAG ................................................................ 9

    D.    California's Use of JAG and COPS Funds ............................................... 10

    E.    JAG and COPS Requirements in Relation to Section 1373 .................... 12

    F.    Defendants' Other Actions Threatening to Find the State in Violation of Section 1373 ............................................................................ 13

Legal Argument ........................................................................................................................ 15

I.    Legal Standard .......................................................................................................... 15

II.    California is Likely to Succeed on Its Claims that the JAG Section 1373 Condition is Unlawful ................................................................................................ 15

    A.    The JAG Section 1373 Condition Violates the Spending Clause Because it is Unrelated to the Purpose of JAG ........................................ 15

    B.    Imposition of the JAG Section 1373 Condition is Arbitrary and Capricious ................................................................................................ 16

III.    California is Likely to Succeed in Showing that California's Statutes Do Not Violate Section 1373 ................................................................................................. 17

    A.    The Values, TRUST, and TRUTH Acts Do Not Conflict with Section 1373 ................................................................................................ 18

    B.    California's Confidentiality Statutes Do Not Conflict with Section 1373 ........................................................................................................... 19

    C.    The Tenth Amendment Does Not Allow for Section 1373 to Commandeer the State in its Control over Governmental Employees and its Residents' Confidential Personal Information ........... 20

IV.    Without Court Intervention, the Section 1373 Conditions will Cause the State Imminent and Irreparable Harm ........................................................................ 25

V.    The Balance of Hardships Favors Granting a Preliminary Injunction ................. 27

Conclusion ................................................................................................................................ 28

i

# TABLE OF AUTHORITIES

**Page**

CASES

Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez
    458 U.S. 592 (1982) .................................................................................28

Am. Trucking Ass'ns, Inc. v. City of Los Angeles
    559 F.3d 1046 (9th Cir. 2009)....................................................25, 26, 27

Ariz. Dream Act Coalition v. Brewer
    757 F.3d 1053 (9th Cir. 2014)....................................................................28

Arizona v. United States
    567 U.S. 387 (2012) .................................................................................16

Atascadero State Hospital v. Scanlon
    473 U.S. 234 (1985) .................................................................................20

Bond v. United States
    134 S. Ct. 2077 (2014) .............................................................................20

Cape May Greene, Inc. v. Warren
    698 F.2d 179 (3d Cir. 1983).....................................................................17

Chamber of Commerce of U.S. v. Whiting
    563 U.S. 582 (2011) .................................................................................18

City of Chicago v. Sessions
    No. 17-cv-5720, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017) ...................24, 25, 27

City of New York v. United States
    179 F.3d 29 (2d Cir. 1999).......................................................22, 24, 25

Cty. of Santa Clara v. Trump
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .....................................................15

Davis v. Mich. Dep't. of Treasury
    489 U.S. 803 (1989) .............................................................................19, 20

Encino Motorcars, LLC v. Navarro
    136 S.Ct. 2117 (2016) ..............................................................................17

FCC v. Fox Television Stations, Inc.
    556 U.S. 502 (2009) .............................................................................16, 17

FERC v. Mississippi
    456 U.S. 742 (1982) .................................................................................23

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Giovani Carandola, Ltd. v. Bason*
303 F.3d 507 (4th Cir. 2002)...................................................................................28

*Gregory v. Ashcroft*
501 U.S. 452 (1991) ...................................................................................20, 23

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001).................................................................................25

*Koog v. United States*
79 F.3d 452 (5th Cir. 1996) .............................................................................21, 22, 23

*Massachusetts v. United States*
435 U.S. 444 (1978) .................................................................................................15

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012)....................................................................................28

*Morales v. Trans World Airlines*
504 U.S. 374 (1992) .................................................................................................25

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ...........................................................................................16, 17

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*
545 U.S. 967 (2005) .................................................................................................17

*New York v. United States*
505 U.S. 144 (1992)...........................................................................................20, 21, 23

*Nken v. Holder*
556 U.S. 418 (2009) .................................................................................................27

*Printz v. United States*
521 U.S. 898 (1997)...................................................................................20, 21, 22, 23

*Raygor v. Regents of Univ. of Minn.*
534 U.S. 533 (2002) .................................................................................................20

*Romero v. United States*
883 F. Supp. 1076 (W.D. La. 1994)............................................................................22

*South Dakota v. Dole*
483 U.S. 203 (1987) .................................................................................................15

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Steinle v. City & Cty. of San Francisco*
  230 F. Supp. 3d 994 (N.D. Cal. 2017) .................................................................18

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*
  695 F.3d 676 (7th Cir. 2012).............................................................................27

*Texas v. United States*
  No. 15-cv-151, 2016 WL 4138632 (N.D. Tex. Aug. 4, 2016)................................16

*Trump v. Int'l Refugee Assistance Project*
  137 S.Ct. 2080 (2017) ......................................................................................15

*United States v. Lopez*
  514 U.S. 549 (1995).........................................................................................23

*United States v. Morrison*
  529 U.S. 598 (2000) .........................................................................................22

*United States v. North Carolina*
  192 F. Supp. 3d 620 (M.D.N.C. 2016)................................................................27

*Univ. of Texas v. Camenisch*
  451 U.S. 390 (1981) .........................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008)........................................................................................15, 27

*Zadvydas v. Davis*
  533 U.S. 678 (2001) .........................................................................................21

**FEDERAL STATUTES**

5 U.S.C. § 706 ......................................................................................................16

8 U.S.C. § 1101 .................................................................................................5, 19

8 U.S.C. § 1367 .................................................................................................5, 19

8 U.S.C. § 1373 ............................................................................................. *passim*

8 U.S.C. § 1644 ......................................................................................................4

34 U.S.C. §§ 10151-58...........................................................................................9

34 U.S.C. § 10152 ...........................................................................................10, 16

## TABLE OF AUTHORITIES
### (continued)

**Page**

34 U.S.C. § 10153 ................................................................................................10

34 U.S.C. § 10156 ..................................................................................................9

**CALIFORNIA STATUTES**

Cal. Civ. Code
     § 1798.3 .......................................................................................................7

Cal. Civ. Proc. Code
     § 155 ...................................................................................................... *passim*

Cal. Gov't Code
     § 7282 ..........................................................................................................6
     § 7282.5 .......................................................................................................6
     § 7282.5 (amended and chaptered on Oct. 5, 2017)...................7, 18, 21, 23
     § 7283.1 ..................................................................................................7, 21
     § 7284.2 (chaptered on Oct. 5, 2017).......................................................6, 7
     § 7284.6 (chaptered on Oct. 5, 2017) ................................................ *passim*

Cal. Penal Code
     § 422.93 .................................................................................................. *passim*
     § 679.10 .................................................................................................. *passim*
     § 679.11 .................................................................................................. *passim*

Cal. Welf. & Inst. Code
     § 827 ...................................................................................................... *passim*
     § 831 ...................................................................................................... *passim*

**CONSTITUTIONAL PROVISIONS**

U. S. Const., art. I, § 8, cl. 4 ..................................................................................4

**COURT RULES**

Cal. R. of Ct. 5.552 ................................................................................................9

**OTHER AUTHORITIES**

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (1988) ..................................9

Dep't of Commerce, Justice, and State, the Judiciary, and Related Agencies
     Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996)..............................10

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
     104-208, 110 Stat. 3009-546 (1996) ................................................................5

v

## TABLE OF AUTHORITIES
### (continued)

Page

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990)........................................10

Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-
    232, 105 Stat. 1733 (1991)................................................................................................10

Violence Against Women and Department of Justice Reauthorization Act of 2005,
    Pub. L. No. 109-162, 119 Stat. 2960 (2006) .............................................................10

1   <u>NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR PRELIMINARY INJUNCTION</u>

2   PLEASE TAKE NOTICE that on Wednesday, December 13, 2017, at 2:00 p.m. or as soon

3   thereafter as it may be heard before the Honorable William H. Orrick in Courtroom 2 of the U. S.

4   District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco,

5   CA 94102, Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General will

6   and does hereby move the Court pursuant to F.R.C.P. 65 for a preliminary injunction against

7   Defendants Attorney General Jefferson Sessions, Assistant Attorney General Alan Hanson, and

8   the United States Department of Justice, and their officers, agents, servants, employees, and

9   attorneys, and any other persons who are in active concert or participation with them.

10   California moves the Court to enter a preliminary injunction prohibiting Defendants from

11   requiring compliance with 8 U.S.C. § 1373 as a condition for the State and its political

12   subdivisions to receive funding pursuant to the Edward Byrne Memorial Justice Assistance Grant

13   ("JAG") program.  In addition, because the State's laws comply with Section 1373, California

14   seeks an order enjoining Defendants from interpreting or enforcing Section 1373 in such a

15   manner to withhold, terminate, or claw-back funding from, or disbar or make ineligible, the State

16   or any of its political subdivisions that apply for JAG or Community Policing Services grants on

17   account of the following state statutes:  California Government Code sections 7282 *et seq.*, 7283

18   *et seq.*, 7284 *et seq.*, Penal Code sections 422.93, 679.10, 679.11, California Welfare and

19   Institutions Code sections 827 and 831, and California Code of Civil Procedure section 155.  This

20   Motion is based on this Notice of Motion and Motion, the Memorandum of Points and

21   Authorities, the declarations, the Request for Judicial Notice, as well as the papers, evidence and

22   records on file, and any other written or oral evidence or argument as may be presented.

23   <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

24   <u>INTRODUCTION</u>

25   Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General moves for

26   a preliminary injunction preventing Defendants from enforcing against the State and its political

27   subdivisions conditions requiring compliance with 8 U.S.C. § 1373 in order to receive $31.1

28   million in law enforcement funding pursuant to the Edward Byrne Memorial Justice Assistance

1

Grant ("JAG") and Community Oriented Policing Services ("COPS") grants.[1]  Starting with President Trump's Executive Order No. 13768 directed at so-called "sanctuary jurisdictions," that has already been found likely unconstitutional, the Trump Administration has sought to interpret and use Section 1373 in a constitutionally impermissible manner as a cudgel to force state and local jurisdictions to acquiesce to the President's immigration enforcement demands.  Defendants now require jurisdictions to certify compliance with Section 1373, a statute restricting federal, state, and local jurisdictions from prohibiting the exchange of information regarding an individual's immigration and citizenship status, in order to receive grants that are unrelated to immigration enforcement.

Although Defendants lack constitutional and legal authority to impose the Section 1373 condition for JAG, under normal circumstances there would be no dispute because the State's laws comply with Section 1373.  To be sure, California has enacted one group of statutes that set parameters for when and how state or local law enforcement agencies ("LEAs") may engage in immigration enforcement activities—such as prolonging an individual's ordinary release on the basis of a Department of Homeland Security ("DHS") detainer request, notifying DHS agents of an individual's release date, and informing those detainees that DHS seeks to interview of their rights.  But these statutes do not touch upon the activities regulated by Section 1373.  California has also enacted confidentiality statutes that protect residents' personal information, including immigration status information, when the State has deemed such protection necessary to effectuate State and local governmental activities.  All of these statutes are designed to improve the public safety of all Californians by promoting relationships of trust between the State and its 10 million foreign-born residents and their family members, and encourage victims and witnesses of crime to come forward.  Reading Section 1373 as applying to the first group of statutes would conflict with the text of Section 1373, while reading Section 1373 as to California's confidentiality statutes would be inconsistent with the remainder of the Immigration and

---

[1] The FY 2017 State and Local Solicitations for JAG are Exhibits A and B, respectively, to the Request for Judicial Notice accompanying this Motion.  The FY 2017 COPS Application Guides for the Anti-Methamphetamine Program and Anti-Heroin Task Forces are Exhibits C and D, respectively, to the Judicial Notice Request.

1   Naturalization Act ("INA") and the federal government's own handling of immigration status

2   information.  And either would violate the Tenth Amendment of the U.S. Constitution.

3   Defendants have nevertheless indicated that at least one of California's laws may be

4   incompatible with Section 1373, and that other jurisdictions' statutes and policies similar to those

5   in California are incompatible with Section 1373.  On October 12, 2017, Defendants announced

6   preliminary assessments with respect to seven jurisdictions from which Defendants sought legal

7   opinions validating their compliance with Section 1373.  Defendants determined that five of the

8   jurisdictions had laws or policies that appear to violate Section 1373, including one jurisdiction

9   because it, like California, regulates the disclosure of information regarding victims of crime.

10   California too submitted a legal opinion that analyzed California's laws and concluded that

11   the State does not violate Section 1373.  The day after the State filed its initial Motion for

12   Preliminary Injunction ("PI Mot"), ECF No. 17, Defendants informed the State of their

13   determination that the recently adopted California Values Act, California Government Code

14   section 7284 *et seq.*,[2] a law that has not taken effect yet, "may violate [Section 1373], depending

15   on how your jurisdiction interprets and applies [it]."[3]  Moreover, Defendants expressly stated that

16   they may take action on other California statutes.  Defendants' interpretation of Section 1373 as

17   communicated in that letter interferes with the State's ability to submit an unqualified

18   certification of compliance with Section 1373, under penalty of perjury, that the State must do in

19   order to receive JAG funding.  In addition, USDOJ will soon make awards for the COPS grants,

20   which Defendants will either deny to the State or demand that the State accept only if it assures

21   that it will comply with all applicable laws, which would include compliance with Defendants'

22   misinterpretation of Section 1373.

23   Defendants' actions cause irreparable harm to the State's sovereignty, public safety, and

24   operations.  Congress has appropriated $28.3 million in JAG funding to California to support

25   _____

26   [2] All references to provisions in Government Code section 7284 *et seq.* refer to the law that was
     chaptered on October 5, 2017, and is set to take effect on January 4, 2018.

27   [3] Defendants' November 1, 2017 letter, which seeks to enforce Section 1373 against the Values
     Act as to FY 2016 funds already awarded, although the law was not in effect in that fiscal year,

28   leaves no doubt that the Values Act and amended TRUST Act are ripe for determination here.

3

criminal justice programs.  Among other things, these programs support crime victims and witnesses, reduce recidivism, facilitate crime prevention education for at-risk youth, and fund other law enforcement programs.  The State is also expected to receive $2.8 million pursuant to two COPS grants, grants that the State has received every year they have existed, which are used to investigate illicit drug distribution.  Loss of these funds will harm public safety.  But public safety will also be harmed if the State and its political subdivisions must accede to Defendants' demands in order to receive these federal dollars.  Defendants' misinterpretation of Section 1373 further means that Californians will not be able to hold their state and local officials appropriately accountable for policy changes that are beyond their control—the very harm the Tenth Amendment aims to prevent.  To prevent these harms, a preliminary injunction is necessary.[4]

## BACKGROUND

### A.    Section 1373 and the INA

The U.S. Constitution grants Congress the power to regulate immigration and naturalization.  *See* art. I, § 8, cl. 4.  Congress has done so via the comprehensive framework codified in the INA.  Two provisions of the INA restrict federal, state, and local governments in how they may control the exchange of information regarding an individual's immigration and citizenship status.  The statute relevant to this litigation is 8 U.S.C. § 1373.[5]  Paragraph (a) of Section 1373 provides as follows:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Paragraph (b) forbids federal, state, or local governments from prohibiting the following: (i) "[s]ending [immigration status] information to, or requesting or receiving such information from

---

[4] California has also brought claims challenging Defendants' imposition of conditions requiring jurisdictions to respond to DHS requests for inmates' release dates and to provide DHS agents access to detention facilities for interview purposes. *See, e.g.*, FAC, ¶¶ 122-144.  Those conditions are currently subject to a nationwide injunction. *See City of Chicago v. Sessions*, No. 17-cv-5720, ECF No. 78 (N.D. Ill. Sept. 15, 2017).  California reserves its right to seek a preliminary injunction as to those conditions if the nationwide injunction is stayed or modified.

[5] The other statute, 8 U.S.C. § 1644, exists in a chapter within the INA for "Restricting Welfare and Public Benefits for Aliens" and contains restrictions that are encompassed by Section 1373.

4

[federal immigration authorities];" (ii) "[m]aintaining such information;" or (iii) "[e]xchanging such information with any other Federal, State, or local government entity."

Other provisions of the INA provide information-sharing safeguards for certain vulnerable immigrants, including those who are undocumented.  For example, the INA offers protections and benefits to victims and witnesses of crime by creating specialized U-visas for those who have cooperated with law enforcement in investigating or prosecuting enumerated crimes such as domestic violence and child abuse, and T-visas for those who have cooperated in prosecuting human trafficking.  *Id.* § 1101(a)(15)(T)-(U).  Title 8, Section 1367, which was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546, the same Act that created Section 1373,[6] generally prohibits the "use by or disclosure" of any information provided during the process of applying for U- or T-visas, or other benefits available for immigrant witnesses and victims of crime, "to anyone" other than identified federal departments.  *See* 8 U.S.C. § 1367(a)(1)-(2).  It also prohibits using the information provided to "make an adverse determination of admissibility or deportability" for the immigrant victims and witnesses of crime.  *Id.*  The INA also details a "Special Immigrant Juvenile" process, through which certain abused, neglected, or abandoned undocumented immigrant children may seek legal immigration status.  *Id.* § 1101(a)(27)(J).  Federal law relies on state courts to make the predicate determination for youth who are eligible to apply for this status.  *See id.*

**B.    California's Statutes**

California's laws are consistent with the INA.  Relevant to this Motion are the State's laws impacted by Defendants' interpretation of Section 1373, and arguably implicated by the Section 1373 conditions.  These laws fit into two categories: (a) those laws that define the circumstances under which LEAs may assist in immigration enforcement (the TRUTH, TRUST, and Values Acts); and (b) six state statutes safeguarding confidentiality, the "State's Confidentiality Statutes": Penal Code sections 422.93, 679.10, and 679.11, Welfare and Institutions Code sections 827 and 831, and Code of Civil Procedure section 155.

---

[6] *Compare id.* tit. III, § 384, 110 Stat. at 3009-652-53 *with id.* tit. VI, § 642, 110 Stat. at 3009-707.

1    California has enacted these statutes to strengthen community policing efforts.[7]  Exercising

2    its discretion, California has concluded that statutes like these improve public safety in light of

3    evidence that immigrants are no more likely to commit crimes than native-born Americans,[8] and

4    that a clear distinction between local law enforcement and immigration enforcement results in

5    safer communities.  *See, e.g.*, RJN, Exs. F at 5, G at 8; W at 8.  The California Legislature has

6    relied on law enforcement officers' statements about the public safety benefits of practices that

7    reduce the entanglement between their agencies and immigration enforcement.  *See, e.g.*, RJN,

8    Exs. G at 9; X at 7.  LEAs throughout the State continue to build trust between LEAs and

9    immigrant communities so that "people could come forward if they are a crime victim or . . .

10   witness to a crime without fear of being deported."  *See* Decl. of L.A. Cty. Sheriff Jim McDonnell

11   in Supp. of Pl.'s Am. Mot. for Prelim. Inj. ("McDonnell Decl."), ¶¶ 10-13; *see also* Compl., *City*

12   *and Cty. of San Francisco v. Sessions*, No. 17-4642 (N.D. Cal. Aug. 11, 2017) ("S.F. Compl.") ¶¶

13   19, 28.  These laws and local practices protect the public safety of all Californians, regardless of

14   immigration status.  *See, e.g.*, Cal. Gov't Code § 7284.2(f); RJN, Ex. X at 1.

15           **1.      The TRUST, TRUTH and Values Acts**

16           In 2013, California enacted the TRUST Act, Cal. Gov't Code § 7282 *et seq.*, which defined

17   when local LEAs could detain an individual for up to 48 hours after the person's ordinary release

18   on the basis of a detainer request.  *See id.* §§ 7282(c), 7282.5.  The TRUST Act allowed

19   compliance with detainers if they did not "violate any federal, state, or local law, or any local

20   policy," and the subject possessed a specified criminal background (including a prior conviction

21   of one of hundreds of crimes), was on the California Sex and Arson Registry, or was held after a

22   magistrate's finding of probable cause for a serious or violent felony.  *See id.* § 7282.5(a).

23           Three years later, the State enacted the TRUTH Act, Cal. Gov't Code § 7283 *et seq.*, which

24   increased transparency about local LEA's involvement when federal immigration authorities seek

25   to interview someone in a jail's custody.  Under the TRUTH Act, a jail must notify such an

26

27   ―――――――――――――
     [7] *See, e.g.*, Cal. Gov't Code § 7284.2(c); 2016 Cal. Legis. Serv. Ch. 768 § 2(i) (the "TRUTH
     Act"); 2013 Cal. Legis. Serv. Ch. 570 § 1(d) (the "TRUST Act"); Cal. Penal Code § 422.93(a).

28   [8] *See, e.g.*, 2013 Cal. Legis. Serv. Ch. 570 § 1(d) (the "TRUST Act"); RJN, Ex. E at 6.

6

individual that interviews are voluntary and the detainee has the right to seek counsel.  *Id.* § 7283.1(a).  Upon receipt of a detainer, notification, or transfer request, a LEA must provide the subject a copy and inform him or her whether the LEA intends to comply.  *Id.* § 7283.1(b).

On October 5, 2017, Governor Edmund G. Brown signed into law the California Values Act, Cal. Gov't Code § 7284 *et seq.*, intended "to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments."  *Id.* § 7284.2(f).  The Values Act accomplishes these goals by generally prohibiting "[i]nquiri[es] into an individual's immigration status," meaning LEAs cannot ask an individual about his or her immigration status for immigration enforcement purposes.  *See id.* § 7284.6(a)(1)(A).  In order to ensure compliance with federal court decisions that have found Fourth Amendment violations when law enforcement holds inmates beyond their ordinary release pursuant to a warrantless detainer request, the Values Act prohibits compliance with such requests.  *See id.* §§ 7284.2(e), 7284.6(a)(1)(B).  The Values Act amends the TRUST Act to define when LEAs have discretion to respond to "notification requests," which are requests by an immigration authority asking an LEA to inform it "of the release date and time in advance of the public of an individual in its custody."  *See id.* §§ 7282.5(a) (chaptered Oct. 5, 2017), 7283(f), 7284.6(a)(1)(C).  LEAs may notify immigration authorities about the release dates of individuals with a prior criminal conviction of one of hundreds of crimes, or if the information is already "available to the public."  *See id.* § 7284.6(a)(1)(C).  The Values Act also prohibits the use of LEA money or personnel to "provid[e] personal information," about an individual "for immigration enforcement purposes," unless that information is "available to the public."[9]  *Id.* § 7284.6(a)(1)(D).  This "personal information" includes information about victims and witnesses of crime that a LEA would also possess.

Notwithstanding any of the above, the Values Act contains a savings clause that expressly permits compliance with all aspects of Section 1373:

---

[9] "Personal information" is defined as "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history.  It includes statements made by, or attributed to, the individual."  Cal. Civ. Code § 1798.3(a).

1

2
> This section does not prohibit or restrict any government entity or official from
> sending to, or receiving from, federal immigration authorities, information regarding
> the citizenship or immigration status, lawful or unlawful, of an individual, or from
> requesting from federal immigration authorities immigration status information,
> lawful or unlawful, of any individual, or maintaining or exchanging that information
> with any other federal, state, or local government entity, pursuant to Sections 1373
> and 1644 of title 8 of the United States Code.

3

4

5   *Id.* § 7284.6(e).  The Values Act also explicitly does not prohibit any jurisdiction from allowing

6   immigration authorities access to jails.  *Id.* § 7284.6(b)(5).

7   ### 2.   California's Confidentiality Statutes

8   To ensure the proper operation of state and local criminal and juvenile justice systems, the

9   State's Confidentiality Statues protect, in discrete circumstances, the confidentiality of sensitive

10  information that the State and its localities collect and maintain.  These Confidentiality Statutes

11  can be broken down into two subcategories.  The first subcategory (Cal. Penal Code §§ 422.93,

12  679.10, 679.11) consists of statutes that protect the confidential information of victims and

13  witnesses of crime, in order to "encourag[e]" "victims of or witnesses to crime, or [those] who

14  otherwise can give evidence in a criminal investigation, to cooperate with the criminal justice

15  system." *See, e.g.*, *id.* § 422.93(a).  California Penal Code sections 679.10 and 679.11 implement

16  the state and local LEA's role in the federal U- and T-visa process by, among other things,

17  prohibiting certifying entities from "disclosing the immigration status of a victim" or other person

18  requesting certification "except to comply with federal law or legal process, or if authorized by

19  the victim or person requesting [the certification form]." *Id.* §§ 679.10(k), 679.11(k).  These

20  confidentiality protections impact thousands of immigrants who come forward to cooperate with

21  law enforcement.  For example, in 2016, the year Section 679.10 came into effect for U-visa

22  applicants, L.A. County Sheriff's Department received double the number of U-visa applications

23  from the year before (954 in total, 80 percent of which were certified), and in 2017, L.A. County

24  has already processed 774 applications, 90 percent of which have been certified.  McDonnell

25  Decl., ¶ 14.  The third state statute in this subcategory, Penal Code section 422.93, protects hate-

26  crime victims or witnesses who are "not charged with or convicted of committing any crime

27  under State law" by prohibiting law enforcement from "detain[ing] the individual exclusively for

28

8

1    any actual or suspected immigration violation or report[ing] or turn[ing] the individual over to

2    federal immigration authorities."  Cal. Penal Code § 422.93(b).

3        The second subcategory of statutes (Cal. Welf. & Inst. Code §§ 827, 831; Cal. Civ. Proc.

4    Code § 155) protects the confidential information of youth in the State's juvenile court system.

5    The Legislature determined that "[c]onfidentiality is integral to the operation of the juvenile

6    system in order to avoid stigma and promote rehabilitation for all youth."  Cal. Welf. & Inst.

7    Code § 831(a).  As a general rule, juvenile court records and the information therein is

8    confidential except to statutorily designated parties.  *Id.* § 827; *see also* Cal. R. of Ct. 5.552(b)-

9    (c).  Consistent with that general requirement, the State implemented its role in the federal Special

10   Immigrant Juvenile process, through its dependency court system, by directing that "information

11   regarding the child's immigration status . . . remain confidential and shall be available for

12   inspection only" to a handful of enumerated parties.  Cal. Civ. Proc. Code § 155(c).  Information

13   about a child's immigration status in any juvenile court proceeding must "remain confidential"

14   just like all other information in the youth's court records.  *See* Cal. Welf. & Inst. Code § 831(e).

15       **C.    The History and Purpose of JAG**

16       JAG is a formula grant authorized by Congress and administered by OJP.  34 U.S.C. §§

17   10151-58.  The statutory formula guarantees to each state a minimum allocation based on the

18   state's population and violent crime rate.  *Id.* § 10156(a).  Sixty percent of a state's total

19   allocation goes directly to the state and the remainder goes directly to local governments.  *Id.* §

20   10156(b)(1), (d).

21       The current JAG program descended from two earlier programs.  Congress created the

22   Edward Byrne Memorial State and Local Law Enforcement Assistance Program grants ("Byrne

23   Grants") as part of the Anti-Drug Abuse Act of 1988.  The purpose was "to assist States and units

24   of local government in carrying out specific programs which offer a high probability of

25   improving the functioning of the criminal justice system."  Anti-Drug Abuse Act of 1988, Pub. L.

26   No. 100-690, tit. VI, § 6091(a), 102 Stat. 4181, 4329 (1988).  Between 1988 and 2006, Congress

27   identified 29 purposes for which Byrne Grants could be used.  *See* 42 U.S.C. § 3751(b) (Dec.

28   2000) (as it existed on Jan. 4, 2006).  Separately, Congress identified nine purposes for Local

9

1 Law Enforcement Block Grants ("LLEBG").[10]  Immigration enforcement never appeared as a

2 purpose for either the Byrne Grants or LLEBG.[11]

3     In 2006, Congress merged Byrne Grant and LLEBG, creating the current JAG program,

4 Pub. L. No. 109-162, 119 Stat. 2960, 3094 (2006), to provide state and local governments "more

5 flexibility to spend money for programs that work for them rather than to impose a 'one size fits'

6 all solution." to local law enforcement.  H.R., Rep. No. 109-233, at 89 (2005).  Following that

7 merger, Congress consolidated the "purpose areas" down to eight: (A) law enforcement

8 programs; (B) prosecution and court programs; (C) prevention and education programs; (D)

9 corrections and community corrections programs; (E) drug treatment and enforcement programs;

10 (F) planning, evaluation, and technology improvement programs; (G) crime victim and witness

11 programs; and (H) mental health programs.  34 U.S.C. § 10152(a)(1).

12     Congress never created a "purpose area" of immigration enforcement in either the former or

13 current iterations of JAG.  Only one immigration-related requirement ever existed in any iteration

14 of the JAG authorizing statute: a requirement that the chief executive officer of the recipient state

15 provide certified records of "criminal convictions of aliens."[12]  Congress repealed that

16 requirement in the 2006 merger that created the current JAG program.  *See* 34 U.S.C. § 10153(a).

17     **D.     California's Use of JAG and COPS Funds**

18     California's Board of State and Community Corrections ("BSCC") is the State entity that

19 receives California's allocation of JAG's formula grant funds.  The State has received $252.7

20 million pursuant to JAG since 2006, excluding funding that the federal government granted

21 directly to the State's local jurisdictions.  *See* Decl. of Mary Jolls in Supp. of Pl.'s Am. Mot. for

22 Prelim. Inj. ("Jolls Decl."), ¶ 7.  Based on the statutory formula, California is expected to receive

23

---

24 [10] Local Government Law Enforcement Block Grants Act of 1995, H.R. 728, 104th Cong. (1995) first authorized as part of the Dep't of Commerce, Justice, and State, the Judiciary, and Related

25 Agencies Appropriations Act of 1996, Pub. L. No. 104-134, tit. I, 110 Stat. 1321, 1321-12 (1996).

26 [11] *See* Decl. of Lee Sherman in Supp. of Pl.'s Mot. for Prelim. Inj. ("Sherman Decl.") Exs. H (identifying the 29 Byrne Grant purposes), I (identifying the 9 LLEBG purposes).

27 [12] Immigration Act of 1990, Pub. L. No. 101-649, tit. V, § 507(a), 104 Stat. 4978, 5050-51 (1990); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.

28 L. No. 102-232, tit. III, § 306(a)(6), 105 Stat. 1733, 1751 (1991) (repealed 2006).

1    approximately $28.3 million in JAG funding in FY 2017, with $17.7 million going to the BSCC.

2    *Id.* ¶ 5.  The BSCC uses the State's share of the JAG award to issue subgrants to jurisdictions that

3    propose using the funds for education and crime prevention programs, law enforcement

4    programs, and court programs, including toward the goals of improving educational outcomes,

5    increasing graduation rates, curbing truancy, reducing substance abuse, and curtailing

6    delinquency and recidivism for at-risk youth and young adults.  *Id.* ¶¶ 8, 10 & Ex. A.  For

7    example, L.A. County uses JAG funding to support anti-drug trafficking programs and

8    investigations, intervention programs for vulnerable youth, mental health programs, and anti-gang

9    enforcement activities.  McDonnell Decl., ¶¶ 4-9.  The City and County of San Francisco relies

10   on JAG to fund, among other thing, projects that seek to reduce recidivism by providing an

11   alternative to suspension and other services for at-risk juveniles and young adults. S.F. Compl., ¶¶

12   42-45.  The BSCC currently funds programs for 32 local jurisdictions, as well as the California

13   Department of Justice ("CalDOJ") to support task forces focused on criminal drug enforcement,

14   violent crime, and gang activity.  Jolls Decl., ¶ 10; Decl. of Christopher Caligiuri in Supp. of Pl.'s

15   Am. Mot. for Prelim. Inj. ("Caligiuri Decl."), ¶¶ 19-21.  The BSCC plans on using FY 2017 JAG

16   funds to support programs similar to those that it has funded in the past.  Jolls Decl., ¶ 11.

17        The Division of Law Enforcement ("DLE") within CalDOJ is the State entity that receives

18   COPS competitive grants.  Since the inception of the COPS program, CalDOJ has received over

19   $11 million to support law enforcement efforts around the State, including work on multi-

20   jurisdictional task forces.  Caligiuri Decl., ¶ 4.  For this fiscal year, CalDOJ applied for two COPS

21   grants worth $2.8 million.  *See id.* ¶¶ 10, 16.  CalDOJ applied for the COPS Anti-

22   Methamphetamine Program ("CAMP") grant to cover salaries, benefits, and other costs to

23   continue the State's leadership in a task force whose targeted enforcement against large-scale

24   methamphetamine drug trafficking organizations has resulted in the seizure of upwards of $60

25   million of methamphetamine, cocaine, and heroin.  *See id.* ¶¶ 6-8, 10.  CalDOJ also applied for

26   the COPS Anti-Heroin Task Force ("AHTF") grant to cover equipment, including potentially-

27   lifesaving TruNarc handheld narcotics analyzers, consultants, and other costs in support of 14

28   heroin-related task forces that conduct large scale heroin investigations, share data and

11

intelligence among law enforcement personnel throughout the State, and hold education sessions in the community about drug abuse awareness.  *See id.* ¶¶ 12-14, 16.  CalDOJ has been awarded CAMP and AHTF grants for each year these programs have been in existence.  *Id.* ¶¶ 5, 12.

### E.    JAG and COPS Requirements in Relation to Section 1373

In FY 2016, USDOJ declared Section 1373 an "applicable law" for JAG, RJN, Ex. H, and specifically required BSCC to submit a legal opinion validating its compliance with Section 1373. Jolls Decl., Ex. B, ¶ 55.  For FY 2017, Defendants announced that all jurisdictions receiving JAG funds must certify compliance with Section 1373.  *E.g.*, RJN, Ex. A at 1, Ex. B at 1.  Each grant recipient's chief law officer, the Attorney General in the State's case, must sign a standard affidavit, under penalty of perjury, affirming compliance with Section 1373 on behalf of the State and "any entity, agency, or official" of the State as applicable to the "program or activity to be funded."  RJN, Ex. A, Appx. II.  The grant recipient's chief executive officer, the Governor in the State's case, must adopt that certification, under penalty of perjury.  *Id.*, Appx. I.  Grant recipients must collect Section 1373 certifications from all subgrant recipients before issuing an award. RJN, Ex. J, ¶ 53(2).  In addition, USDOJ's represented final award conditions require grantees to monitor their subgrantees' compliance with Section 1373 and to promptly notify OJP if any subgrantee does not comply.  *Id.* ¶¶ 53(3), 54(1)(D).  USDOJ's Financial Guide explains that jurisdictions "have 45 days from the award date to accept [an] OJP . . . award document or the award may be rescinded," which includes the requisite certifications.  *See* RJN, Ex. K, § 2.2.

USDOJ announced that COPS applicants for 2017 must execute a similar Section 1373 certification of compliance with respect to the "program or activity to be funded."  RJN, Ex. C at 2 & Appx. D; Ex. D at 1-2 & Appx. D.  CalDOJ submitted its applications with the executed certifications for AHTF and CAMP on July 7 and 10, respectively.  Caligiuri Decl., ¶¶ 9, 15 & Exs. B, D.  As part of their applications, DLE included a supplemental statement by CalDOJ in connection with the COPS Section 1373 Certifications.  *Id.*  There, CalDOJ clarified that the COPS Section 1373 Certifications were made "as that federal statute is lawfully interpreted," and reserved its rights to challenge "any unconstitutional enforcement of Section 1373."  *Id.*, Exs. B, D.  On September 7, 2017, USDOJ communicated to applicants that it was "committed" to

12

"announcing this year's award recipients as quickly as possible."  Sherman Decl., Ex. J.  As has been required in years' past, once CAMP and AHTF COPS awards are announced, recipients will have to execute award conditions certifying that they will comply with all applicable laws, which includes Section 1373.  *See* Caligiuri Decl., ¶¶ 5, 13 & Exs. A, ¶ 1, C, ¶ 1.  On October 23, 2017, USDOJ announced COPS awards for other programs, RJN, Ex. L, but as of the date of this filing, DLE has not received any response to its applications.  *See id.* ¶¶ 11, 17.

**F.      Defendants' Other Actions Threatening to Find the State in Violation of Section 1373**

On April 21, 2017, Defendants sent letters to nine jurisdictions that received the JAG award in 2016, including the BSCC, demanding they submit an official legal opinion validating their compliance with Section 1373.  RJN, Exs. I, M.  That same day, Defendants Sessions and USDOJ both stated that the State of California has laws "that potentially violate 8 U.S.C. § 1373," relying on an Office of Inspector General Report.[13]  RJN, Exs. M, N.  On June 29, the BSCC submitted the requested legal opinion explaining the State's laws do not violate Section 1373, focusing on the applications of Section 1373 discussed in that OIG Report.  *See* Jolls Decl., Ex. C.

In August 2017, Defendants informed two of the nine jurisdictions that they comply with Section 1373.  On October 12, 2017, Defendants announced that they made preliminary compliance assessments on six of the other jurisdictions (plus one other jurisdiction).  *See* RJN, Ex. Q.  Defendants announced that they found no evidence of non-compliance with Section 1373 as to two jurisdictions, and preliminarily determined that the remaining five appeared not to comply with Section 1373.  *Id.*  For one jurisdiction's negative preliminary determination, Defendants based their determination, in part, on the jurisdiction's protections against the disclosure of crime victims' information, *see* RJN, Ex. R at 1-2, which California's laws also protect against in some instances.

---

[13] Defendants are incorrect in claiming that the OIG Report found California in "potential" violation of Section 1373.  The State of California was identified in the OIG report, in large part, because of the relatively large amount of money it receives in federal funding from USDOJ.  *See* RJN, Ex. O at 3.  While the OIG Report commented about some jurisdictions' compliance with Section 1373, the report did not discuss in detail California's law as it existed at that time.

13

1    Having not received a preliminary assessment letter, on October 31, California filed its

2    initial PI Motion to prevent enforcement of the Section 1373 conditions as to the TRUTH Act and

3    the State's Confidentiality Statutes, but not the laws that have yet to go in effect.  On November

4    1, Defendants sent the State a preliminary compliance assessment letter asserting that three

5    provisions of the Values Act may "violate 8 U.S.C. § 1373, depending on how [the State]

6    interprets and applies them."  RJN, Ex. P at 1.  Those are the provisions regulating: (i) inquiries

7    into an individual's immigration status (Gov't Code, § 7284.6(a)(1)(A)); (ii) responses to

8    notification requests (*id.* § 7284.6(a)(1)(C)); and (iii) the sharing of "personal information" (*id.* §

9    7284.6(a)(1)(D)).  RJN, Ex. P at 1-2.  As to the first provision, Defendants said that to comply

10   with Section 1373, the State must certify it interprets that provision as "not restrict[ing] California

11   officers and employees from requesting information regarding immigration status from federal

12   immigration officers."  *Id.* at 2.  For the notification request and personal information provisions

13   to comply with Section 1373, Defendants said the State must certify it "interprets and applies

14   these provisions to not restrict California officers from sharing information regarding immigration

15   status with federal immigration officers, including information regarding release date[s] and

16   home address[es]."  *Id.* at 1.  If the State cannot so "certify," then "[USDOJ] has determined that

17   these provisions violate [Section 1373]."  *Id* at 1-2.  Defendants further "reserve[d] [their] right to

18   identify additional bases of potential violation of 8 U.S.C. § 1373."  *Id.* at 2.

19   The Administration has made additional statements suggesting it has an even broader

20   interpretation of Section 1373 than communicated in the preliminary assessment letters, and a

21   misunderstanding about California's laws.  On June 13, 2017, the Acting Director of Immigration

22   and Customs Enforcement ("ICE"), Thomas Homan, testified before Congress that jurisdictions

23   that "have some sort of policy where they don't . . . allow [ICE] access to the jails" violate

24   Section 1373.  *See* RJN, Ex. S at 35, 47-48.  Although California's TRUTH Act does not prohibit

25   LEAs from providing such access, Defendant Sessions has stated that "the State of California . . .

26   [has] enacted statutes . . . designed to specifically prohibit or hinder ICE from enforcing

27   immigration law by . . . denying requests by ICE officers and agents to enter prisons and jails to

28   make arrests."  RJN, Ex. T at 2.

14

1

<u>LEGAL ARGUMENT</u>

2

**I.    LEGAL STANDARD**

3

"The purpose of a preliminary injunction is merely to preserve the relative position of the

4

parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395

5

(1981). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

6

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

7

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

8

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is "often dependent

9

as much on the equities of [the] case as the substance of the legal issues it presents." *Trump v.*

10

*Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017).

11

**II.    CALIFORNIA IS LIKELY TO SUCCEED ON ITS CLAIMS THAT THE JAG SECTION 1373 CONDITION IS UNLAWFUL**

12

13

Before considering whether California's laws comply with Section 1373, the Court must

14

first determine whether Defendants may even lawfully impose the JAG Section 1373 Condition.

15

They cannot: the State is likely to succeed on its claims that this Section 1373 Condition violates

16

the Spending Clause and is arbitrary and capricious under the Administrative Procedure Act.

17

**A.    The JAG Section 1373 Condition Violates the Spending Clause Because it is Unrelated to the Purpose of JAG**

18

19

Congress may only use its spending power to place conditions on federal funds that are

20

related "'to the federal interest in particular national projects or programs.'" *South Dakota v.*

21

*Dole*, 483 U.S. 203, 207 (1987) (quoting *Massachusetts v. United States*, 435 U.S. 444, 461

22

(1978)). This Court has determined that the same test applies when the Executive Branch

23

imposes a condition by purported delegation from Congress, and that "funds conditioned on

24

compliance with Section 1373 must have some nexus to immigration enforcement." *See Cty. of*

25

*Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017).

26

Section 1373 has no such nexus to the JAG program. Congress has never identified

27

immigration enforcement as a "purpose area" for JAG, and repealed the only immigration-

28

enforcement related condition that it had ever authorized for JAG funding. *Supra* at 9-10. The

15

1    present statute identifies eight purpose areas for JAG, which the State predominantly uses to fund

2    community policing initiatives for crime prevention and education for at-risk youth, drug

3    treatment and enforcement, and mental health programs.  *See* Jolls Decl., ¶¶ 8, 10.

4         Congress has been clear in identifying these as purposes areas to fund "*criminal* justice"

5    initiatives, 34 U.S.C. § 10152, (emphasis added), whereas, immigration enforcement is generally

6    *civil* in nature and predominantly the responsibility of the federal government.  *See Arizona v.*

7    *United States*, 567 U.S. 387, 396 (2012).  In reinforcement of this distinction, the only

8    immigration enforcement related condition that ever existed for JAG required jurisdictions to

9    provide records for "criminal convictions of aliens."  *Supra* at 10.  The Executive Branch's

10   unilateral act to add Section 1373 as an "applicable law" violates the nexus prong of the Spending

11   Clause as it requires state and local jurisdictions to comply with a condition to support a different

12   program (the federal government's civil immigration priorities) than the "criminal justice"

13   program being funded.  34 U.S.C. §§ 10152; *see Texas v. United States*, No. 15-cv-151, 2016 WL

14   4138632, at *17 (N.D. Tex. Aug. 4, 2016) (holding that a Spending Clause claim was viable

15   because a challenged health insurance fee was not "'directly related,' let alone 'reasonably

16   related'" to Medicaid since its purpose was to fund a different federal program).

17   **B.    Imposition of the JAG Section 1373 Condition is Arbitrary and Capricious**

18        Defendants' identification of Section 1373 as an "applicable law" for JAG is arbitrary and

19   capricious in violation of the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).  "[A]n agency

20   must cogently explain why it has exercised its discretion in a given manner."  *Motor Vehicle*

21   *Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).  Before 2016,

22   JAG was never linked to Section 1373 at any point in the nearly twenty years that Section 1373

23   has been law.  In response to an inquiry by one Congressman, and without providing any

24   evidence that Congress intended for immigration enforcement to be a purpose area for JAG, in

25   2016, USDOJ declared Section 1373 an "applicable law," with which JAG recipients must

26   comply.  *See* RJN, Ex. H.  At no point, either for FY 2016 or 2017, have Defendants "show[n]

27   that there are good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S.

28

502, 515 (2009); *see also State Farm*, 463 U.S. at 50 ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Indeed, Defendants have put forth *nothing*—no studies, no reports, no analysis—to support the JAG Section 1373 Condition.  The OIG Report does not discuss or contemplate how the Section 1373 Condition is consistent with the underlying goals of JAG, or Congress' intent in adopting JAG.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is. . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act."); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 186-87 (3d Cir. 1983) (invalidating agency action on grant conditions as arbitrary and capricious where the agency sought "to accomplish matters not included in that statute").  Neither do the JAG Solicitations.  A general recitation of "Border Security" as an area of emphasis in the JAG Solicitations, RJN, Ex. A at 11, falls "short of the agency's duty to explain why it deemed it necessary to overrule its previous position," particularly where Congress never identified Border Security as a purpose.  *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125, 2126 (2016); *see id.* ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

There is also nothing to suggest that Defendants considered the empirical evidence and law enforcement perspectives that jurisdictions around the country, including the State and its political subdivisions, have relied upon in exercise of their sovereign discretion, that policies that build trust and cooperation with immigrant communities result in positive criminal enforcement and safety outcomes.  *See, e.g.*, RJN, Exs. E-G, X; McDonnell Decl., ¶ 12; S.F. Compl., ¶ 28; *see also State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem. . . .").

### III.   CALIFORNIA IS LIKELY TO SUCCEED IN SHOWING THAT CALIFORNIA'S STATUTES DO NOT VIOLATE SECTION 1373

Even if the JAG Section 1373 Condition is lawful, the State is likely to succeed in showing that the applicable state statutes do not conflict with Section 1373, or, alternatively, Section 1373 cannot be enforced against those statutes, which is relevant to both JAG and COPS.  The Values,

1    TRUST, and TRUTH Acts do not regulate the activities covered by Section 1373.  The State's

2    Confidentiality Statutes do not conflict with Section 1373 when read in the context of the rest of

3    the INA.  And reading Section 1373 to invalidate all of these statutes would constitute

4    unconstitutional commandeering that the Tenth Amendment prohibits.

5        **A.    The Values, TRUST, and TRUTH Acts Do Not Conflict with Section 1373**

6        The TRUST, TRUTH, and Values Acts do not conflict with Section 1373 because they do

7    not regulate the sharing of "information regarding the citizenship or immigration status" of

8    individuals.  8 U.S.C. § 1373.  The TRUTH Act simply provides transparency surrounding LEAs'

9    interactions with ICE.  The Values and amended TRUST Acts identify when LEAs have

10   discretion to respond to "notification requests," *i.e.*, requests for release dates.  Cal. Gov't Code

11   §§ 7282.5(a); 7284.6(a)(1)(C) (both chaptered Oct. 5, 2017).  These provisions do not fall within

12   the ambit of Section 1373 because "no plausible reading of 'information regarding . . . citizenship

13   or immigration status' encompasses the release date of an undocumented inmate."  *Steinle v. City*

14   *& Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

15       In fact, the Values Act's savings clause explicitly permits the exchange of such information

16   in complete accordance with Section 1373.  *See* Cal. Gov't Code § 7284.6(e).  The "authoritative

17   statement" of a statute is its "plain text," including its "savings clause."  *Chamber of Commerce*

18   *of U.S. v. Whiting*, 563 U.S. 582, 599 (2011).  In light of the Values Act's plain text, including its

19   savings clause, *none* of the Values Act's provisions restrict communications on immigration

20   status information between LEAs and federal immigration authorities.  For instance, the

21   prohibition on "[i]nquiring into an individual's immigration status" means that LEAs may not ask

22   an individual about his or her immigration status, or may not ask for that information from non-

23   governmental third parties.  Although Defendants suggested in their letter to the State, RJN, Ex.

24   P, that this prohibition may restrict requesting immigration status information from federal

25   officials, the savings clause makes clear that is not the case.  The savings clause, however, does

26   not limit the scope of the notification request or "personal information" provisions since such

27   information, including home addresses, are not covered by Section 1373.

28

1   **B.    California's Confidentiality Statutes Do Not Conflict with Section 1373**

2       Section 1373 must be read in the context of the rest of the INA.  *See Davis v. Mich. Dep't.*

3   *of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that

4   the words of a statute must be read in their context and with a view to their place in the overall

5   statutory scheme.").  The INA specifically protects the confidentiality of information about those

6   who have been victims of or witnesses to certain crimes.  Section 1367(a)(2), enacted as part of

7   the same legislative act as Section 1373, prevents federal employees from "disclos[ing] to anyone

8   [with exceptions] any information which relates to an alien who is the beneficiary of an

9   application for relief" under the statute, *i.e.* certain victims and witnesses of crime including U-

10  and T-visa recipients.  The Defendants' reading of Section 1373 would require federal employees,

11  in implementing Section 1367(a)(2)'s general disclosure prohibitions, to violate Section

12  1373(b)(3)'s prohibitions on limits to the disclosure of immigration status information from

13  federal employees to other governmental entities.

14      The INA also provides protections and support for certain juveniles.  For example, the

15  "Special Immigrant Juvenile" process allows abused, abandoned and neglected immigrant youth

16  to secure lawful immigration status, demonstrating the INA's broader concern with the long-term

17  safety of such children generally.  *See* 8 U.S.C. § 1101(a)(27)(J).  Furthermore, in implementing

18  the Deferred Action for Childhood Arrivals ("DACA") program, United States Citizenship and

19  Immigration Services ("USCIS") specifically determined that the information provided by DACA

20  applicants must be "protected from disclosure to ICE and CBP for the purpose of immigration

21  enforcement proceedings," with limited exceptions.  *See* RJN, Ex. U, Q19.

22      Accordingly, reading the text of Section 1373 in the context of the rest of the INA shows

23  that the prohibition on limiting information-sharing should not be properly interpreted to cover

24  the limited circumstances encompassed by the State's Confidentiality Statutes.  The persons

25  covered by the State's statutes are similar classes of individuals to those that the INA (and the

26  federal government) itself seeks to protect both through confidentiality and other protections: (a)

27  victims and witnesses of crime (Cal. Penal Code §§ 422.93, 679.10(k), and 679.11(k)); and (b)

28  vulnerable youth (Cal. Civ. Proc. Code § 155(c); Welf. & Inst. Code §§ 827, 831).

19

1    The plain language of Section 1373 does not demand a different reading.  The words in

2    Section 1373 regarding the immigration status of "any individual," must "be read in their context

3    and with a view to their place in the overall statutory scheme."  *Davis*, 489 U.S. at 809.   For

4    example, in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), the Supreme Court read

5    "*any* recipient of Federal assistance" to not include every recipient, but instead to exclude state

6    defendants.  *Id.* at 245-46 (emphasis in original), *superseded by statute*; *see also Raygor v.*

7    *Regents of Univ. of Minn.*, 534 U.S. 533, 545-46 (2002) ("any claim" did not include every claim,

8    but instead excluded certain claims against state defendants).  In this instance, "any individual"

9    should be read in the context of the rest of the INA to exclude those individuals protected by

10   other specific sections of the INA.  That is particularly so given the serious constitutional

11   questions about the statute that would otherwise arise, as discussed below.  *See Bond v. United*

12   *States*, 134 S. Ct. 2077, 2089 (2014) ("'[I]t is incumbent upon the federal courts to be certain of

13   Congress' intent before finding that federal law overrides' the 'usual constitutional balance of

14   federal and state powers.'") (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

15   **C.    The Tenth Amendment Does Not Allow for Section 1373 to Commandeer**
     **the State in its Control over Governmental Employees and its Residents'**
16   **Confidential Personal Information**

17   The Supreme Court has read the Tenth Amendment to impose recognized limits on

18   Congressional enactments.  The Framers "explicitly chose a Constitution that confers upon

19   Congress the power to regulate individuals, not States" and the Constitution "has never been

20   understood to confer upon Congress the ability to require the States to govern according to

21   Congress' instructions."  *New York v. United States*, 505 U.S. 144, 162, 166 (1992).  As such, the

22   Supreme Court held in *New York* and *Printz v. United States*, 521 U.S. 898 (1997) that the federal

23   government may not "commandeer" state and local governments and officials "by directly

24   compelling them to enact and enforce a federal regulatory program."  *Printz*, 521 U.S. at 935;

25   *New York*, 505 U.S. at 162.  Both cases advance the principles that: (i) "the federal government

26   may not compel the States to enact or administer a federal regulatory program" *e.g.*, *New York*,

27   505 U.S. at 188; (ii) such coercion is impermissible where the "whole object" of the

28   Congressional action is direction of state functions, *e.g.*, *Printz*, 521 U.S. at 932; and (iii) the

20

1    intrusion on state sovereignty is "worse" where the federal government "strips" away at state and

2    local government's discretion at policy-making.  *E.g.*, *Printz*, 521 U.S. at 927-28; *see also Koog*

3    *v. U.S.*, 79 F.3d 452, 457-60 (5th Cir. 1996).  These principles ensure that state and local

4    governments remain politically accountable to their residents.  *See Printz,* 521 U.S. at 920, 922-

5    23; *Koog*, 79 F.3d at 460-61.  Reading Section 1373 to cover the Values, TRUST, and TRUTH

6    Acts and the State's Confidentiality Statutes violates these principles and upsets constitutional

7    notions of political accountability.  The Court should thus construe Section 1373 in a manner that

8    prevents its "invalidation."  *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("We have read

9    significant limitations into other immigration statutes in order to avoid their constitutional

10   invalidation.").

11        First, construing Section 1373 to cover these statutes would compel the State to participate

12   in the administration of a federal regulatory program of immigration enforcement.  *See New York*,

13   505 U.S. at 176, 188.  The state statutes at issue here apply to criminal and juvenile systems,

14   which the State and local governments must provide for.  To comply with Defendants' reading of

15   Section 1373, the State Legislature, in setting policy for those systems where the State's

16   residents' immigration status information may be relevant, would either have to make no

17   assurances about the confidentiality of that information, or affirmatively make exceptions to

18   allow for disclosure to federal immigration authorities, even when disclosure is prohibited in

19   other instances.  *See* Cal. Penal Code §§ 679.10-.11; Cal. Civ. Proc. Code § 155(c); Cal. Welf. &

20   Inst. Code §§ 827, 831.  Regardless of what the State does, it would have to act in furtherance of

21   a federal program that is not its own.  Furthermore, where the whole purpose of the statute is to

22   encourage residents to report crimes (*see, e.g.*, Cal. Penal Code §§ 422.93, 679.10-.11), or to

23   define the roles of state and local law enforcement (*see, e.g.*, Cal. Gov't Code §§ 7282.5(a)

24   (chaptered Oct. 5, 2017), 7283.1, 7284.6(a)(1)(C)-(D)), the enforcement of Section 1373 against

25   these statutes would force the State to surrender its own judgment regarding the public safety risk

26   of entangling local law enforcement in federal immigration matters in favor of the federal

27   government's preference that federal immigration enforcement prevails over all other concerns.

28   This is "tantamount to forced state legislation" and coercion to administer a federal program that

1   the Tenth Amendment prohibits.  *See Koog*, 79 F.3d at 458.

2          Second, construing Section 1373 in a manner to negate the Values, TRUST, and TRUTH

3   Acts and the State's Confidentiality Statutes would make the "whole object of [Section 1373] to

4   direct the functioning of the state executive," *see Printz*, 521 U.S. at 932, by commanding solely

5   state and local governments to allow the unfettered use of their resources and personnel to act in

6   furtherance of a federal immigration enforcement program.  Whether Section 1373 could be

7   enforced against a categorical prohibition on sharing of immigration status information with

8   federal immigration authorities, *see City of New York v. United States*, 179 F.3d 29, 35 (2d Cir.

9   1999), is not at issue in this case.  When applied to these State statutes, however, Section 1373

10  directs action at the core of the State's sovereign power to make its own determination about how

11  to best address crime and public safety.  *See United States v. Morrison*, 529 U.S. 598, 618 (2000)

12  ("[W]e can think of no better example of the police power, which the Founders denied the

13  National Government and reposed in the States, than the suppression of violent crime and

14  vindication of its victims.").  It is the State or its political subdivisions that have the responsibility

15  to manage detention facilities, operate the juvenile court system, certify U- or T-visa requests, and

16  receive reports from victims and witnesses of crime.  If applied to these statutes, Section 1373

17  would be enforced against the use of information that "belongs to the State" and that is "available

18  to [law enforcement officers] only in their official capacity."  *Printz*, 521 U.S. at 932 n.17.

19  Section 1373 is, thus, inevitably an "object … to direct the functioning of the State" if the statute

20  is enforced against these aspects of the State's sovereignty.  *See id.* at 932; *see also Romero v.*

21  *United States*, 883 F. Supp. 1076, 1086-87 (W.D. La. 1994) (the Tenth Amendment limits

22  Congress from preempting "state regulation for the maintenance of public order" that "remove[d]

23  [the sheriff's] ability to perform certain tasks assigned him by the state which preserve the public

24  order and therefore remove their sovereign authority to maintain public order").

25         Third, construing Section 1373 to encompass the Values, TRUST, and TRUTH Acts and

26  the State's Confidentiality Statutes would take away the State's discretion in establishing policies

27  about how governmental employees may handle private information about the State's residents

28  within the custody and control of the State and local governments, thus "worsen[ing] the intrusion

22

1   upon state sovereignty." *See Printz*, 521 U.S. at 927-28.  The State has no blanket prohibition on

2   government employees sharing immigration status information with federal immigration

3   enforcement agents.  Instead, the State has made nuanced decisions regulating the specific

4   circumstances where immigration status information, personal information, and release dates are

5   protected from disclosure in general (not solely as to immigration enforcement agents), and/or the

6   limited class of individuals to whom such protections apply.  *See* Cal. Penal Code §§ 422.93

7   (limited to hate crime victims and witnesses, who are not perpetrators of crime); 679.10-11

8   (limited to U- or T-visa applicants); Cal. Civ. Proc. Code § 155(c) (limited to "Special Immigrant

9   Juvenile" applicants); Cal. Welf & Inst. Code §§ 827 & 831 (limiting disclosure of juvenile case

10  files to all except statutorily designated parties); Cal. Gov't Code, §§ 7282.5(a) (chaptered Oct. 5,

11  2017), 7284.6(a)(1)(C)-(D) (defining when release dates and personal information may be

12  disclosed, including when "available to the public").  The enforcement of Section 1373 as to these

13  statutes would weaken the State's ability to regulate the actions of their own governmental

14  employees, *see Gregory*, 501 U.S. at 160, and "foreclose[] the State[] from experimenting and

15  exercising [its] own judgment in an area to which States lay claim by right of history and

16  expertise."  *See United States v. Lopez*, 514 U.S. 549, 583 (1995).  "Whatever the outer limits of

17  state sovereignty may be, it surely encompasses the right to set the duties of office for state-

18  created officials and to regulate the internal affairs of government bodies."  *Koog*, 79 F.3d at 460

19  (citing *FERC v. Mississippi*, 456 U.S. 742, 761 (1982)).

20      Fourth, commandeering the State in the handling of its residents' personal information

21  undermines state and local accountability.  The U.S. Constitution's structure of dual sovereignty

22  between the federal government and the states "reduce[s] the risk of tyranny and abuse from

23  either front."  *Printz*, 521 U.S. at 921 (quoting *Gregory*, 501 U.S. at 458).  Commandeering

24  forces the states to "bear the brunt of public disapproval."  *New York*, 505 U.S. at 169.  As the

25  Court warned in *Printz*, "[t]he power of the Federal Government would be augmented

26  immeasurably if it were able to impress into its service—and at no cost to itself—the police

27  officers of the 50 States."  521 U.S. at 922.  This is exactly what Defendants would be permitted

28  to accomplish if Section 1373 were construed to forbid states and localities from ensuring that

1  LEAs safeguard the confidentiality of victims' and witness' personal information, or to prevent

2  the setting of boundaries on law enforcement's involvement in immigration enforcement.  Should

3  Section 1373 be enforced as to the Values, TRUST, and TRUTH Acts and the Confidentiality

4  Statutes, witnesses and victims will be less inclined to report crimes, *see, e.g.*, RJN, Ex. V, and

5  relationships between immigrant communities and state and local officials would be strained.

6  State and local governments would "face the brunt of public disapproval," rather than the

7  Defendants who effectively coerced the State and localities to act according to a federal program.

8       Although two federal courts have upheld Section 1373 against facial constitutional

9  challenges, neither ruling is dispositive to the issues presented in this case.  In fact, both decisions

10  reflect significant concern about extending Section 1373 to apply to statutes such as those at issue

11  here.  In *City of Chicago v. Sessions*, while the district court held that there was a likelihood that

12  Section 1373 was facially constitutional, it also expressed concern about its potential applications.

13  The court noted that Section 1373 "mandate[s]" state and local governments to give employees

14  the option of providing information to federal immigration agents.  2017 WL 4081821, at *12.

15  The court found that the "practical" impact is that state and local governments are "limited [in

16  their] ability to decline to administer or enforce a federal regulatory program" and "extricate their

17  state or municipality's involvement in a federal program."  *Id.*

18       In *City of New York*, the city argued that Section 1373 was facially unconstitutional, in part,

19  because it interfered with the use of confidential information and control over the city's

20  employees in a range of local government functions.  The Second Circuit held Section 1373

21  facially constitutional, but recognized:

22       The City's concerns [about confidentiality] are not insubstantial.  The obtaining of
     pertinent information, which is essential to the performance of a wide variety of state
23       and local governmental functions, may in some cases be difficult or impossible if
     some expectation of confidentiality is not preserved.  Preserving confidentiality may
24       in turn require that state and local governments regulate the use of such information
     by their employees.
25

26  179 F.3d at 36.  The Second Circuit acknowledged that the Tenth Amendment may limit Section

27  1373 from being "an impermissible intrusion on state and local power to control information

28  obtained in the course of official business or to regulate the duties and responsibilities of state and

24

local governmental employees," but it did not consider these arguments in earnest because the city's executive order promoted a policy of "non-cooperation while allowing City employees to share freely the information in question with the rest of the world."  *See id.* at 37.  The Second Circuit determined that the city was attempting to transform "the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs."  *Id.* at 35.

That is not so with the State's Confidentiality Statutes, the only statutes that are arguably relevant to the grants at issue that place limited regulations on the sharing of immigration status information.  They either generally prohibit disclosure to a wide range of individuals, not just to federal agents, or narrowly tailor the segment of the population that is protected.  The same is true of the notification request provision in the Values and amended TRUST Acts and the personal information provision in the Values Act which allow for disclosure when the information is already "available to the public."  And the TRUTH Act does not regulate the sharing of any information.  As a result, these statutes possess the qualities that eluded the jurisdictions' facial challenges in *City of New York* and *Chicago*, and underscore the serious constitutional issues that the Second Circuit and the Northern District of Illinois found troubling in Section's 1373's practical application.  *See Chicago*, 2017 WL 4081821, at *12 ("practically limit[ing] the ability of state and local governments to decline to administer or enforce a federal regulatory program" could "implicate the logic underlying the *Printz* decision").

IV.   **WITHOUT COURT INTERVENTION, THE SECTION 1373 CONDITIONS WILL CAUSE THE STATE IMMINENT AND IRREPARABLE HARM**

"[C]onstitutional violation[s] alone, coupled with the damages incurred, can suffice to show irreparable harm."  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009) (relying on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)).  Moreover, injuries where "sovereign interests and public policies [are] at stake" are irreparable.  *Kansas v. United States*, 249 F.3d 1213, 1228 (10th Cir. 2001).

1   California will suffer a constitutional injury to the State's sovereignty if Defendants

2   effectively coerce the State and its political subdivisions to carry out their federal immigration

3   enforcement agenda, particularly under their misinterpretation of Section 1373.  A plaintiff can

4   suffer a constitutional injury by being forced either to comply with an unconstitutional law or else

5   face community and financial injury.  *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058-59

6   (plaintiffs were injured where they faced the choice of signing unconstitutional agreements or a

7   loss of customer goodwill and business).  Such is the case here where the State is confronted with

8   making an unqualified certification of compliance under penalty of perjury under the shadow of

9   Defendants' misinterpretation of Section 1373, specifically as to the State's law.  Defendants'

10  November 1 letter makes clear that Defendants view the State as currently ineligible to receive

11  grant funds because of the Values Act, and that the State likely will face legal jeopardy should it

12  execute the certification based on Defendants' erroneous interpretation of Section 1373.[14]  *See*

13  *Morales*, 504 U.S. at 380-81 (injunctive relief proper where "respondents were faced with a

14  Hobson's choice: continually violate the Texas law and expose themselves to potentially huge

15  liability; or violate the law once as a test case and suffer the injury of obeying the law during the

16  pendency of the proceedings").

17      Construing Section 1373 to invalidate the State's statutes will also cause real harm to our

18  communities, no matter what the State does.  If the State changes its laws to comply with an

19  unlawful and constitutionally impermissible interpretation of Section 1373, the relationship of

20  trust that these State statutes are intended to build between law enforcement and immigrant

21  communities will erode.  *See* McDonnell Decl., ¶¶ 10, 12; San Francisco Compl., ¶ 28.

22  Alternatively, if the State preserves its laws and Defendants cut millions of dollars in JAG

23  funding that the State is otherwise entitled to by statutory formula, the State would be unable to

24  fund critical public safety programs, *see* Jolls Decl., ¶ 19; Caligiuri Decl., ¶¶ 19-22, and local

25  jurisdictions' programs will be detrimentally impacted, including the possibility that programs

26

---

27  [14] Even if the State submits a statement explaining why the State's laws comply with Section 1373, notwithstanding Defendants' misinterpretation, the State still has to submit the standard certification required by Defendants in order to receive funding, and Defendants may deny the

28  State funding on the basis of this explanatory statement.

26

1   and staff positions will be eliminated in their entirety.  *See* McDonnell Decl., ¶¶ 8-9, 15; S.F.

2   Compl., ¶ 46; *see United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016)

3   (finding irreparable harm where the lack of funds was "likely to have an immediate impact on

4   [the state's] ability to provide critical resources to the public, causing damage that would persist

5   regardless of whether funding [was] subsequently reinstated").  Furthermore, without any

6   guidance from Defendants, BSCC will be placed in the position of having to monitor subgrantees

7   and report them for having policies that the State and/or the subgrantees determined benefit

8   public safety.  *See* RJN, Ex. J, ¶¶ 53(3), 54(1)(D); *see also* Jolls Decl., ¶¶ 21-22.

9       The harm to the State from the loss of COPS grants is at least as immediate.  USDOJ is

10   poised to issue COPS awards and demand compliance with applicable laws, including Section

11   1373, based on their apparent misreading of the statute.  *See supra* at 12-13.  If CalDOJ does not

12   receive the COPS grants based on Defendants' interpretation of Section 1373 or they are

13   conditioned based on this misinterpretation, CalDOJ will be unable to fund task forces and

14   equipment that combat heroin and methamphetamine distribution, creating harm that will extend

15   to the local jurisdictions that those task forces serve.  *See* Caligiuri Decl., ¶¶ 10, 16.

16       The damages incurred here—the deprivation of constitutional rights, the loss of community

17   goodwill, decrease in public safety, and the loss of millions of dollars of funding —"suffice to

18   show irreparable harm."  *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058; *Stuller, Inc. v. Steak N

19   Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (injuries to goodwill not easily

20   measurable and often irreparable).  These are the same types of damages that the court in *Chicago*

21   recently found to be irreparable in enjoining other immigration enforcement related conditions for

22   JAG.  *See Chicago*, 2017 WL 4081821, at *12-14.

23   **V.   THE BALANCE OF HARDSHIPS FAVORS GRANTING A PRELIMINARY INJUNCTION**

24       A party seeking a preliminary injunction "must establish . . . that the balance of equities tips

25   in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  These two

26   factors merge when the government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  And

27   the balance of the hardships and public interest both favor "'prevent[ing] the violation of a party's

28

1  constitutional rights.'" *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)

2  (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

3      Here, the balance of the hardships and the public interest favors an injunction.  California

4  has determined that the public safety requires protecting its residents' personal information and

5  limiting law enforcement's entanglement in immigration enforcement.  Defendants are forcing

6  California, under extreme time pressure, to consider undermining these policies to avoid losing

7  critical federal funding.  An injunction protects the public interest in shielding the State's

8  sovereignty from unconstitutional conditions without harm to the federal government's ability to

9  enforce federal laws with federal resources.

10     The Government "is in no way harmed by issuance of a preliminary injunction which

11 prevents the [federal government] from enforcing restrictions likely to be found unconstitutional.

12 If anything, the system is improved by such an injunction."  *See Giovani Carandola, Ltd. v.*

13 *Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted).  This is particularly true when an

14 injunction protects a State's interest in "the exercise of sovereign power over individuals and

15 entities within . . . [their] jurisdiction that involves the power to create and enforce a legal code,

16 both civil and criminal."  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S.

17 592, 601 (1982).  The potential impact on numerous local jurisdictions further tips the balance of

18 interests.  *See, e.g.*, McDonnell Decl., ¶ 8-9, 15; S.F. Compl., ¶ 46.  In contrast, Defendants face

19 no harm since the status quo would remain, and they would only have to provide money that

20 Congress has already appropriated.

21                              **CONCLUSION**

22     For the foregoing reasons, California requests this Court grant its Motion.

23

24

25

26

27

28

1    Dated:  November 7, 2017                    Respectfully Submitted,

2                                               XAVIER BECERRA
                                                Attorney General of California
3                                               ANGELA SIERRA
                                                Senior Assistant Attorney General
4                                               SATOSHI YANAI
                                                Supervising Deputy Attorney General
5                                               SARAH E. BELTON
                                                Deputy Attorney General
6
                                                */s/ Lee Sherman*
7                                               */s/ Lisa C. Ehrlich*

8                                               LEE SHERMAN
                                                LISA C. EHRLICH
9                                               Deputy Attorneys General
                                                *Attorneys for Plaintiff*
10                                              *State of California*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29