CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
ANTONIA KONKOLY
Trial Attorney
Department of Justice, Room 7210
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone:     (202) 514-3495
Facsimile:     (202) 616-8470
E-mail:        scott.simpson@usdoj.gov
COUNSEL FOR DEFENDANTS
JEFFERSON B. SESSIONS III, Attorney
General of the United States; ALAN R.
HANSON, Principal Deputy Assistant Attorney
General; and U.S. DEPARTMENT OF JUSTICE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, ex rel. XAVIER BECERRA, Attorney General of the State of California, | No. 3:17-cv-04701-WHO |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| JEFFERSON B. SESSIONS III, Attorney General of the United States, *et al.*, | Date:     February 28, 2018 Time:     2:00 p.m. |
| Defendants. | |

Defs' Motion to Dismiss; Memo.
No. 3:17-cv-04701-WHO

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

NOTICE OF MOTION AND MOTION TO DISMISS ...................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

INTRODUCTION ................................................................................................................ 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ............................................ 3

    I.      The Immigration and Nationality Act .......................................................... 3

    II.     DOJ Office of Justice Programs and the Byrne JAG Program ..................... 4

    III.    DOJ Office of Community Oriented Policing Services and the
            Anti-Methamphetamine and Anti-Heroin Task Force Programs ................... 6

    IV.    Recent Developments .................................................................................... 8

ARGUMENT ........................................................................................................................ 8

    I.      The Challenged Immigration-Related Byrne JAG Conditions Are Lawful ........... 9

         A.    The Access and Notice Conditions Are Authorized by Statute
               and Do Not Violate the Separation of Powers ................................... 9

         B.    The Notice, Access, and Section 1373 Conditions
               Are Consistent with the Spending Clause ....................................... 11

              1.    The Notice and Access Conditions Are Unambiguous ................... 11

              2.    The Notice, Access, and Section 1373 Conditions Are
                    Related to the Purposes of the Byrne JAG Program ....................... 13

         C.    Plaintiff's APA Claims Must be Dismissed for
               Additional Reasons ......................................................................... 16

              1.    The APA Claims Do Not Challenge Final Agency Action
                    Reviewable under the APA .............................................................. 16

               2.    The Challenged Conditions Are Not Arbitrary or Capricious ........ 17

    II.     Plaintiff's Claim for a Declaration Regarding its Statutes' Compliance
         with Section 1373 Should Be Dismissed .................................................... 19

          A.    Plaintiff's Request for a Ruling Regarding Compliance with
               Section 1373 Is Non-Justiciable ..................................................... 19

              1.    Plaintiff Lacks Standing to Seek a Ruling Regarding
                    Any State Statute Other Than the Values Act .................................. 21

2. Plaintiff's Request for a Ruling Regarding the Values Act Is Constitutionally Unripe .............................................. 22

B. The Court Should Dismiss Plaintiff's Claim for Declaratory Judgment Regarding the Values Act on Its Merits ...................................... 24

III. Section 1373 Is Consistent with the Tenth Amendment .......................................... 27

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**CONSTITUTION**

U.S. Const. art. I, § 8, cl. 1 ...................................................................................... 11

U.S. Const. art. III, § 2, cl. 1 ................................................................................... 19


**CASES**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ....................................................... 20

*Abbs v. Sullivan*, 963 F.2d 918 (7th Cir. 1992) ...................................................... 17

*Ardalan v. McHugh*, 2014 WL 3846062 (N.D. Cal. Aug. 4, 2014) ......................... 23

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................. 3, 15, 19

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) .................. 11

*Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161 (D.C. Cir. 2004) .......... 14

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................... 16

*Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) .............................................. 13

*Bigelow v. Virginia*, 421 U.S. 809 (1975) ............................................................... 20

*Bologna v. San Francisco*, 121 Cal. Rptr. 3d 406 (Cal. App. 2011) ......................... 25

*Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003) ................................................ 13

*Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) ................................. 8, 30

*Chicago v. Sessions*, 2017 WL 5499167 (N.D. Ill. Nov. 16, 2017) ........................... 23

*Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167 (D.C. Cir. 2004) .............. 16

*Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068 (7th Cir. 2016) .......... 17

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) .................... 17

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) ................................ 29

*Clinton v. City of New York*, 524 U.S. 417 (1998) .................................................... 9

*Conservation Force v. Salazar*, 646 F.3d 1240 (9th Cir. 2011) .................................. 8

*Coons v. Lew*, 762 F.3d 891 (9th Cir. 2014) ....................................................... 21

*Courthouse News Serv. v. Planet*, 750 F.3d 776 (9th Cir. 2014) ........................... 8

*Davis v. Fenton*, 26 F. Supp. 3d 727 (N.D. Ill. 2014) .................................... 25

*Dean v. United States*, 556 U.S. 568 (2009) ................................................. 25

*DKT Mem'l Fund* Ltd. *v. AID*, 887 F.2d 275 (D.C. Cir. 1989) ........................... 9

*Duvall v. Att'y Gen. of U.S.*, 436 F.3d 382 (3d Cir. 2006) ............................... 14

*Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832 (9th Cir. 2003) ........................... 28

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ......................... 18, 19

*Freilich v. Bd. of Directors*, 142 F. Supp. 2d 679 (D. Md. 2001) ..................... 30

*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002) ........... 29

*Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198 (D. Haw. 1998) ............. 20

*J&G Sales Ltd. v. Truscott*, 473 F.3d 1043 (9th Cir. 2007) ........................... 17

*Karst Envtl. Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74 (D.D.C. 2005),
    *aff'd*, 475 F.3d 1291 (D.C. Cir. 2007) ......................................... 16

*Koslow v. Pennsylvania*, 302 F.3d 161 (3d Cir. 2002) ................................. 14

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ............................. 8

*Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048 (9th Cir. 2016) ....... 8

*Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006) ................................... 12

*Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) ............................. 14

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ......................... 25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ..................... 3, 28

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ....................................... 8

*New York v. United States*, 505 U.S. 144 (1992) ......................... 3, 12, 14, 28

*Or. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*,
    288 F.3d 414 (9th Cir. 2002) ........................................................................ 19

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) .................. 16

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ........................................................ 14

*Pollara v. Radiant Logistics Inc.*, 2012 WL 12887095 (C.D. Cal. Sept. 13, 2012) .................... 20

*Pollution Denim & Co. v. Pollution Clothing Co.*, 2009 WL 10672270
    (C.D. Cal. Feb. 9, 2009) ........................................................................ 20, 22

*Preap v. Johnson*, 831 F.3d 1193 (9th Cir. 2016) .............................................. 15, 27

*Printz v. United States*, 521 U.S. 898 (1997) .................................................... 29, 30

*Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181 (9th Cir. 2010) .................. 17

*Rattlesnake Coal. v. EPA*, 509 F.3d 1095 (9th Cir. 2007) .................................... 16

*Reno v. Condon*, 528 U.S. 141 (2000) ............................................................ 29

*S. Dakota v. Dole*, 483 U.S. 203 (1987) ....................................................... 11, 12, 14

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .............................. 20, 22

*Steinle v. San Francisco*, 230 F. Supp. 3d 994 (N.D. Cal. 2017) .......................... 26

*Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386 (1995) ...................... 11

*Texas v. United States*, 523 U.S. 296 (1998) .................................................. 20, 23

*United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002) .............................. 12

*Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835 (9th Cir. 2001),
    *aff'd sub nom. Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) ............ 20

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................ 20, 22

**STATUTES**

5 U.S.C. § 704 ........................................................................................ 16

8 U.S.C. § 1101 .................................................................................. 3, 26

8 U.S.C. § 1226 ............................................................................. 3, 15, 19, 26, 27

8 U.S.C. § 1227 ............................................................................... 3, 4, 14, 26, 29

8 U.S.C. § 1228 ....................................................................................... 3, 4, 29

8 U.S.C. § 1231 ......................................................................................... 15, 27

8 U.S.C. § 1252c ............................................................................................. 15

8 U.S.C. § 1324(c) .......................................................................................... 15

8 U.S.C. § 1357 ......................................................................................... passim

8 U.S.C. § 1373 ......................................................................................... passim

18 U.S.C. § 1913 ............................................................................................ 13

28 U.S.C. § 530C(a)(4) .................................................................................... 10

31 U.S.C. § 1352 ............................................................................................ 13

34 U.S.C. § 10101 ...................................................................................... 4, 10

34 U.S.C. § 10102(a) ........................................................................... 4, 10, 14, 19

34 U.S.C. § 10110 ............................................................................................. 9

34 U.S.C. §§ 10151-58 ....................................................................................... 4

34 U.S.C. § 10152(a) ................................................................................. 4, 5, 14

34 U.S.C. § 10153(a) ......................................................................................... 5

34 U.S.C. § 10154 ...................................................................................... 16, 23

34 U.S.C. § 10156 ............................................................................................. 5

34 U.S.C. § 10202 ............................................................................................. 5

34 U.S.C. § 10223 ............................................................................................ 23

34 U.S.C. § 10251(a)(1) ...................................................................................... 5

34 U.S.C. § 10444(7) ....................................................................................... 10

42 U.S.C. § 11133 ............................................................................................ 29

42 U.S.C. § 11134 ............................................................................................ 29

Consolidated Appropriations Act, Pub. L. No. 115-31, 131 Stat. 135 (2017) .............................. 5, 7

Dep't of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) ...... 10

Joint Resolution Making Continuing Appropriations for FY 1985,
    Pub. L. No. 98-473, 98 Stat. 1837 (1984) ........................................ 10

Pub. L. No. 90-351, 82 Stat. 197 (1968) ........................................................ 4

Cal. Civ. Code § 1798.3 ................................................................ 24, 25, 26

Cal. Gov't Code §§ 7282-7282.5 ......................................... 2, 19, 24

Cal. Gov't Code §§ 7283-7283.2 ...................................................... 2, 19

Cal. Gov't Code §§ 7284-7284.12 .......................................... 2, 19, 24

Cal. Gov't Code § 7284.6 .................................................. 2, 21, 22, 24

California Code of Civil Procedure § 155 ................................. 2, 19

California Penal Code § 422.93 ......................................................... 2, 19

California Penal Code § 679.10 ........................................................ 2, 19

California Penal Code § 679.11 ........................................................ 2, 19

California Welfare and Institutions Code § 827 ............................. 2, 19

California Welfare and Institutions Code § 831 ............................. 2, 19

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 109-233 (2005) ............................................................. 10

S. Rep. No. 104-2490 (1996) ......................................................... 29

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

28 C.F.R. Part 18 .................................................................. 16, 23

28 C.F.R. § 0.119 ........................................................................ 7

28 C.F.R. § 0.120 ........................................................................ 7

Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015) ................ 5

**OTHER AUTHORITIES**

Black's Law Dictionary (5th ed. 1979) ................................................................. 25, 26

1    **NOTICE OF MOTION AND MOTION TO DISMISS**

2         PLEASE TAKE NOTICE that on Wednesday, February 28, 2018, at 2:00 p.m., or as soon

3    thereafter as counsel may be heard, before The Honorable William H. Orrick, in Courtroom 2,

4    17th Floor, of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California,

5    the defendants will move, and hereby do move, to dismiss this action under Rule 12(b)(1) and

6    12(b)(6) of the Federal Rules of Civil Procedure.  This motion is based on the following Memo-

7    randum of Points and Authorities, Defendants' Request for Judicial Notice, the other evidence

8    and records on file in this action, and any other written or oral evidence or argument that may be

9    presented at or before the time this motion is heard by the Court.[1]

10    **MEMORANDUM OF POINTS AND AUTHORITIES**

11    **INTRODUCTION**

12         This case asks the Court to determine whether the U.S. Department of Justice ("USDOJ" or

13    "Department") can require, in exchange for certain federal law enforcement grants, that state and

14    local governments comply with federal law and cooperate in providing certain information needed

15    for federal law enforcement.   USDOJ distributes federal grant funds to aid law enforcement in

16    jurisdictions throughout the country.  These funds serve to aid both local and cooperative law

17    enforcement priorities.  Consistent with federal prerogatives, the Department has long imposed

18    conditions on these grants, including in the Edward Byrne Memorial Justice Assistance Grant

19    Program ("Byrne JAG Program").  If plaintiff's theories were correct, all of these longstanding and

20    never-before-challenged conditions would be in jeopardy.

21         To receive grant funds, Byrne JAG Program recipients are required to certify compliance

22    with Section 1373 of Title 8, U.S. Code, part of the Immigration of Nationality Act ("INA"), which

23    bars state and local governments from prohibiting or restricting the exchange of "information

24    regarding the . . . citizenship or immigration status" of any individual with federal immigration

---

26         [1] Plaintiff names "DOES 1-100" as defendants in this matter but does not identify those
27    individuals or specify the capacity in which they are being sued.  *See* Am. Compl. ¶ 29 (Dkt. No.
     11).  Undersigned counsel does not purport to represent those individuals, and claims against
28    them are not at issue in this motion to dismiss.  Moreover, because those individuals have not
     been named or served, granting this motion would resolve this litigation in its entirety.

Defs' Motion to Dismiss; Memo.
No. 3:17-cv-04701-WHO

1  authorities.  Also, grants under the Byrne JAG Program are conditioned on giving federal

2  immigration authorities access to correctional facilities to meet with aliens and on notifying federal

3  authorities "as early as practicable" before the scheduled release of an alien from custody.  Plaintiff

4  argues that these grant conditions are *ultra vires* and violate the constitutional Separation of Powers,

5  the Spending Clause, and the Administrative Procedure Act ("APA").  Those claims are without

6  merit, however, because – as the INA makes clear – immigration enforcement and law enforcement

7  are inextricably linked.  The INA contemplates that federal, state, and local authorities will

8  cooperate on immigration enforcement and that federal authorities will take custody of certain

9  aliens upon their release from state or local custody.

10          Alternatively, plaintiff seeks an order enjoining defendants from finding that any of several

11  state laws violate the Section 1373 compliance condition in either the Byrne JAG Program or two

12  other programs.  Specifically, plaintiff seeks an order that Section 1373 is not violated by Califor-

13  nia's "TRUST Act," Cal. Gov't Code §§ 7282-7282.5; the "TRUTH Act," Cal. Gov't Code §§

14  7283-7283.2; the "California Values Act," Cal. Gov't Code §§ 7284-7284.12 ("Values Act");

15  California Penal Code §§ 422.93, 679.10, or 679.11; California Code of Civil Procedure § 155; or

16  California Welfare and Institutions Code §§ 827 or 831 (Dkt. No. 26-1).  In considering awarding

17  the Byrne JAG grants, the Office of Justice Programs ("OJP") has not, however, indicated that any

18  of those state statutes other than the Values Act *might* violate the Section 1373 condition, and even

19  as to that Act, OJP has not yet reached a final decision.  Therefore, plaintiff lacks standing to seek

20  an order regarding any of those statutes other than Values Act, and even plaintiff's claim regarding

21  that Act is unripe.

22          In any event, even if this alternative claim were justiciable, plaintiff's request for a ruling

23  that the Values Act complies with the Section 1373 condition should be dismissed on its merits.

24  The Values Act, among other things, prohibits state and local agencies from disclosing an

25  individual's release date, personal information (including home address), or "other information,"

26  with certain exceptions not referencing federal immigration authorities.  *See* Cal. Gov't Code

27  § 7284.6(a)(1)(C), (D).  Section 1373 however, bars prohibiting or restricting the exchange of

28  "information regarding" immigration status with federal immigration authorities, which necessarily

1   encompasses information regarding custody status and location as needed to carry out the federal

2   responsibilities to "interrogate any . . . person believed to be an alien as to his right to be or to

3   remain in the United States," to take aliens into federal custody upon release from state or local

4   custody, and to remove certain classes of aliens from the United States as ordered by the Attorney

5   General or the Secretary of Homeland Security.  8 U.S.C. §§ 1357(a)(1), 1226(c)(1), 1227(a), 1228.

6        Finally, plaintiff argues that Section 1373 would violate the Tenth Amendment if

7   defendants construe it as conflicting with any of the state statutes listed above.  Finding that the

8   Values Act – the only state statute legitimately at issue here – violates Section 1373 would not,

9   however, "compel [California] to enact or administer a federal regulatory program" or to "act on the

10   Federal Government's behalf" in violation of the Tenth Amendment.  *See New York v. United*

11   *States*, 505 U.S. 144, 188 (1992); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 620 (2012).

12   This case involves a grant condition that the State is free to accept or reject, and, in any event,

13   merely protecting the exchange of information with federal authorities does not compel state and

14   local governments to administer a federal program.

15        For these reasons, plaintiff's First Amended Complaint and all of its claims should be

16   dismissed.

17           **STATUTORY AND ADMINISTRATIVE BACKGROUND**

18   **I.**     **The Immigration and Nationality Act**

19        Enforcement of the immigration laws, including and especially the investigation and appre-

20   hension of criminal aliens, is quintessentially a law enforcement function.  Through the INA, 8

21   U.S.C. §§ 1101 *et seq*., Congress granted the Executive Branch significant authority to control the

22   entry, movement, and other conduct of foreign nationals in the United States.  These responsibilities

23   are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland

24   Security ("DHS"), USDOJ, and other Executive agencies to administer and enforce the immigration

25   laws.  The INA permits the Executive Branch to exercise considerable discretion to direct enforce-

26   ment pursuant to federal policy objectives.  *See Arizona v. United States*, 567 U.S. 387, 396 (2012).

27        The INA includes several provisions that protect the ability of federal officials to investigate

28   the status of aliens in the United States and otherwise enforce the immigration laws.  For example,

the statute provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).  Separately, pursuant to Section 1373, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  *Id.* § 1373(a).[2]  The INA provides that certain classes of aliens shall be removed from the United States upon order of the Attorney General or Secretary of Homeland Security.  *See*, *e.g.*, *id.* §§ 1227(a), 1228.

## II.     DOJ Office of Justice Programs and the Byrne JAG Program

Title I of the Omnibus Crime Control and Safe Streets Act of 1968 established the Office of Justice Programs ("OJP"), and provides for OJP to be headed by an Assistant Attorney General ("AAG").  *See* Pub. L. No. 90-351, 82 Stat. 197 (1968), *codified as amended at* 34 U.S.C. §§ 10101 *et seq*.  Congress gave the AAG certain "[s]pecific, general and delegated powers," including the power to "*maintain liaison with* . . . State governments in matters relating to criminal justice."  34 U.S.C. § 10102(a)(2) (emphasis added).  Notably, the statute also authorizes the AAG to "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*."  *Id.* § 10102(a)(6) (emphasis added).

The same title of the Omnibus Crime Control Act also established the Byrne JAG Program.  *See generally* 34 U.S.C. §§ 10151-58.  Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs."  *Id.* § 10152(a)(1).  In the same chapter, "criminal justice" is defined broadly to include

---

[2]  Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, [federal immigration authorites]. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

Defs' Motion to Dismiss; Memo.          4
No.  3:17-cv-04701-WHO

1    various activities of the police, the courts, and "related agencies."  *Id.* § 10251(a)(1).

2         The Byrne JAG Program provides "formula grants" – that is, grants that, when awarded,

3    must follow a statutory formula based on population, the rate of violent crime, and other factors.  *Id.*

4    §§ 10152(a)(1), 10156.  Funding under the Program is subject to annual appropriations.  For FY

5    2017, Congress appropriated $396,000,000 for the Byrne JAG Program, with certain carve-outs

6    from that amount obligated to specific initiatives.  *See* Consolidated Appropriations Act, Pub. L.

7    No. 115-31, Div. B, Title II, 131 Stat. 135, 203 (2017).  By statute, in order to request a Byrne JAG

8    grant, the chief executive officer of a State or unit of local government must submit an application

9    "in such form as the Attorney General may require," 34 U.S.C. § 10153(a); and the application

10   must include, among other things, "[a] certification, made in a form acceptable to the Attorney

11   General . . . that . . . the applicant will comply with . . . all . . . applicable Federal laws," *id.*

12   § 10153(a)(5)(D).  The application also must contain several assurances, including "[a]n assurance

13   that, for each fiscal year covered by an application, the applicant shall maintain and report such

14   data, records, and information (programmatic and financial) as the Attorney General may

15   reasonably require."  *Id.* § 10153(a)(4).

16        OJP has historically included a variety of conditions in Byrne JAG award documents.  For

17   example, OJP has imposed, without objection, conditions related to information sharing and

18   privacy protection, *see* Request for Judicial Notice ("RJN"), Ex. A ¶ 27, research using human

19   subjects, *see id.* ¶ 30, and training, *see id.* ¶¶ 33-34.  Other historical conditions imposed by the

20   Assistant Attorney General have been inspired by Executive Branch prerogatives, and in some

21   instances resulted in *subsequent* congressional codification.  One such condition, which prohibits

22   use of Byrne JAG funds to purchase military style equipment, relates in part to an Executive

23   Order issued by President Obama in 2015.  *See id.* ¶ 43; Exec. Order No. 13,688, 80 Fed. Reg.

24   3451 (Jan. 16, 2015).  Since 2012, other conditions have required that recipients (a) comply with

25   specific national standards when purchasing body armor and (b) institute a "mandatory wear"

26   policy for any purchased armor.  RJN, Ex. A ¶¶ 39-40.  While those conditions have now been

27   codified by Congress, *see* 34 U.S.C. §§ 10202(c)(1)(B), (C), they originated as exercises of

28   USDOJ's authority to impose special conditions.  And the Assistant Attorney General has

1    imposed an "American-made" requirement for body armor purchases, something Congress did

2    not choose to codify last year.  RJN, Ex. A ¶ 39.  The conditions attached to Byrne JAG grants

3    have varied over time, depending on national law enforcement necessities and USDOJ priorities.

4         For the current Byrne JAG grant cycle, Fiscal Year ("FY") 2017, OJP notified applicants

5    that awards under the Program will include three conditions requiring modest cooperation with

6    federal law enforcement prerogatives in the immigration setting.  Those conditions will require

7    grantees to (1) have a policy of providing DHS with advance notice of the scheduled release date of

8    certain individuals held in state or local correctional facilities (the "notice condition"); (2) have a

9    policy permitting federal agents to access state or local correctional facilities for certain immigra-

10   tion enforcement purposes (the "access condition"); and (3) comply with 8 U.S.C. § 1373, which, as

11   noted above, prohibits state and local government and law enforcement entities or officials from

12   restricting certain communications with DHS (the "Section 1373 condition").  RJN, Ex. B

13   (Greenville SC Award 2017) ¶¶ 53, 55, 56; RJN, Ex. C (Binghamton NY Award 2017) ¶¶ 16, 24,

14   41; Am. Compl. ¶¶ 75-77, 84 (Dkt. No. 11).

15        Under the "Rules of Construction" within those grant conditions, the award documents

16   make clear that nothing in the notice or access conditions requires a grantee to detain "any

17   individual in custody beyond the date and time the individual would have been released in the

18   absence of this condition."  RJN, Ex. B ¶¶ 53, 55, 56; RJN, Ex. C ¶¶ 53, 55, 56.  The documents

19   also make clear that these conditions impose no requirements in relation to any requests by

20   federal immigration authorities to detain non-citizens, and that the notice condition requires "only

21   as much advance notice as practicable" before the release of a non-citizen.  *Id*.  Finally, the

22   conditions apply only to the "program or activity" to be funded under the award (as stated above),

23   and they allow awarded funds to be used for costs incurred in implementing the conditions.  *See*

24   *id*.

25   **III.   DOJ Office of Community Oriented Policing Services and the**
          **Anti-Methamphetamine and Anti-Heroin Task Force Programs**
26

27        Pursuant to authority granted by the Violent Crime Control and Law Enforcement Act of

28   1994 ("VCCLEA"), the Attorney General created the Office of Community Oriented Policing

1    Services ("COPS Office") to administer certain community policing grants.  The Office is headed

2    by a Director appointed by the Attorney General, 28 C.F.R. §§ 0.119, 0.120, and currently

3    administers several programs, including the COPS Anti-Methamphetamine Program ("CAMP")

4    and the Anti-Heroin-Task Force Program ("AHTF").  CAMP "provid[es] funds directly to state law

5    enforcement agencies to investigate illicit activities related to the manufacture and distribution of

6    methamphetamine."  RJN, Ex. D (CAMP Fact Sheet 2017).  AHTF "provid[es] funds to investigate

7    illicit activities related to the distribution of heroin or unlawful distribution of prescriptive opioids,

8    or unlawful heroin and prescription opioid traffickers[.]"  RJN, Ex. E (AHTF Fact Sheet 2017); *see*

9    Am. Compl. ¶¶ 95-96.  Both programs are authorized by the Consolidated Appropriations Act,

10   2017.  131 Stat. at 207.

11          Like all programs administered by the COPS Office, CAMP and AHTF are discretionary

12   programs, meaning all applicants must compete against each other for limited available funds.  *See*

13   Am. Compl. ¶¶ 95-96.  Funding under these programs is subject to annual appropriations.  For FY

14   2017, Congress appropriated $7,000,000 "for competitive grants to State law enforcement agencies

15   in States with high seizures of precursor chemicals, finished methamphetamine, laboratories, and

16   laboratory dump seizures" (*i.e.*, CAMP), and $10,000,000 "for competitive grants to statewide law

17   enforcement agencies in States with high rates of primary treatment admissions for heroin and other

18   opioids" (*i.e.*, AHTF).  131 Stat. at 208.

19          CAMP and AHTF grantees, like all federal grantees, are required to comply with all

20   applicable federal laws.  There is no statutorily prescribed method for evaluating CAMP and AHTF

21   applications.  Rather, the COPS Office develops factors and methods to determine how best to allo-

22   cate each program's finite funds each year, and to evaluate and score applications.  RJN, Ex. F

23   (2017 CAMP Methodology), Ex. G (2017 AHTF Methodology).  Beginning with FY 2016, the

24   COPS Office has advised each CAMP and AHTF applicant that this requirement includes

25   compliance with 8 U.S.C. § 1373.  RJN, Ex. H at 1 (CAMP Award Owner's Manual 2016), Ex. I at

26   1 (AHTF Award Owner's Manual 2016).  In FY 2017, the COPS Office required certification of

27   compliance with Section 1373 as a threshold eligibility requirement.  RJN, Ex. J at 5 (CAMP Pre-

28   Award FAQs 2017), Ex. K at 5 (AHTF Pre-Award FAQs 2017).

1  **IV.    Recent Developments**

2       On September 15, 2017, a federal district court entered a partial preliminary injunction in

3  similar litigation brought by the City of Chicago.  *Chicago v. Sessions*, 264 F. Supp. 3d 933, 945

4  (N.D. Ill. 2017) ("*Chicago I*").  The Chicago court enjoined the notice and access conditions in the

5  Byrne JAG Program, but declined plaintiff's request to enjoin the Section 1373 condition.  *See id.*

6  (noting that "Congress could [rationally] expect an entity receiving federal funds to certify its

7  compliance with [Section 1373], as the entity is – independent of receiving federal funds –

8  obligated to comply").  Defendants appealed the preliminary injunction order; that appeal is now

9  fully briefed and scheduled to be argued before the U.S. Court of Appeals for the Seventh Circuit

10  on January 19, 2018, *Chicago v. Sessions*, 17-2991 (7th Cir.).

11                                    **ARGUMENT**

12       Defendants move for dismissal of this action under Rule 12(b)(1) and 12(b)(6) of the

13  Federal Rules of Civil Procedure.  A motion under Rule 12(b)(1) challenges the subject matter

14  jurisdiction of the court to reach a claim.  "A 'facial' attack [on jurisdiction] asserts that a

15  complaint's allegations are themselves insufficient to invoke jurisdiction," *Courthouse News*

16  *Serv. v. Planet*, 750 F.3d 776, 780 n.3 (9th Cir. 2014), while a factual challenge to jurisdiction

17  "relies on affidavits or any other evidence properly before the court to contest the truth of the

18  complaint's allegations," *id.* at 780 (citation omitted).  A motion under Rule 12(b)(6) "tests the

19  legal sufficiency of a claim."  *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal

20  under this rule is proper if there is a "lack of a cognizable legal theory or the absence of sufficient

21  facts alleged under a cognizable legal theory."  *Conservation Force v. Salazar*, 646 F.3d 1240,

22  1241-42 (9th Cir. 2011) (internal citation omitted).  Under both 12(b)(1) and 12(b)(6), the court

23  "may take judicial notice of matters of public record."  *Lee v. City of Los Angeles*, 250 F.3d 668,

24  689 (9th Cir. 2001) (citation omitted); *see Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn*, 829

25  F.3d 1048, 1063 (9th Cir. 2016).

26       Plaintiff's constitutional and APA challenges to the access, notice, and Section 1373

27  conditions in the Byrne JAG Program should be dismissed on their merits under Rule 12(b)(6).

28  Further, plaintiff's request for a ruling that none of its statutes violate Section 1373 should be

1    dismissed under both Rule 12(b)(1) and 12(b)(6):  Plaintiff lacks standing to seek an order regard-

2    ing any of the state statutes it identifies other than the California Values Act and the claim regarding

3    the Values Act is unripe – thus depriving the Court of jurisdiction.  And even if the Court had

4    jurisdiction over plaintiff's request for a ruling regarding the Values Act, the request should be

5    dismissed on its merits under Rule 12(b)(6).  Finally, plaintiff's claim that Section 1373 violates the

6    Tenth Amendment should also be dismissed on its merits.

7    **I.       The Challenged Immigration-Related Byrne JAG Conditions Are Lawful**

8            **A.       The Access and Notice Conditions Are Authorized by Statute**
             **and Do Not Violate the Separation of Powers**
9

10           In the First and Third Claims for Relief in its Amended Complaint,[3] California alleges that

11   the notice and access conditions in the Byrne JAG Program – although not, notably, the Section

12   1373 compliance condition – are *ultra vires* and violate the Constitution's separation of powers.

13   Am. Compl. ¶¶ 122-26, 133-38.  Both theories rest fundamentally on the State's incorrect view

14   that Congress has not authorized USDOJ to impose these conditions.  *See id.* ¶¶ 88-94.

15           As a threshold matter, there is no serious dispute that Congress may delegate to the

16   Executive Branch the authority to attach conditions on funding.  *See, e.g.*, *Clinton v. City of New*

17   *York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to

18   spend, or not to spend, particular sums of money."); *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275,

19   280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and

20   conditions on federal spending programs).  Further, and as relevant here, the Attorney General

21   has "final authority over all functions, including any grants" made by OJP, which administers the

22   Byrne JAG Program.  34 U.S.C. § 10110.  Under the Attorney General's authority, an Assistant

23   Attorney General heads OJP.  *See id.* § 10101; 28 U.S.C. § 530C(a)(4).  In setting forth the duties

24

25           [3] The theories pled under the First Claim for Relief (which purports to arise directly under
     the Constitution) and the Third Claim for Relief (which is pled under the APA) are substantively
26   identical (except insofar as the Third Claim *also* reiterates, under the aegis of the APA, the
     constitutional Spending Clause theory additionally pled as a stand-alone constitutional claim in
27   the Second Claim for Relief).  For the reasons stated in Section I.C. below, the Third Claim
     should be dismissed for the additional threshold reason that California fails to identify a
28   challengeable final agency action under the APA.

1   and functions of the AAG, Congress stated that the AAG is to "exercise such other powers and

2   functions as may be vested in the Assistant Attorney General pursuant to this chapter or by

3   delegation of the Attorney General, including placing special conditions on all grants, and

4   determining priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).

5       Thus, a plain reading of the statutory text indicates that the AAG's power includes, *at a*

6   *minimum*, the power to "plac[e] special conditions on all grants" administered by OJP.  *Id*.  The

7   breadth of the AAG's statutory power is reinforced by the authority to "determin[e] priority

8   purposes for formula grants."  *Id*.  Confirming the statute's plain text, a report accompanying the

9   enactment of this language stated that the provision "allows the Assistant Attorney General to

10  place special conditions on all grants and to determine priority purposes for formula grants."

11  H.R. Rep. No. 109-233, at 101 (2005).

12      Indeed, the particular statutory language at issue here – the authority for "placing special

13  conditions on all grants, and determining priority purposes for formula grants" – was added *as*

14  *part of the very same legislation that created the Byrne JAG Program*.  *See* DOJ Reauthorization

15  Act of 2005, Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960 (2006) (adding language to

16  subsection (a)(6)); *id*. § 1111 (creating Byrne JAG Program).  Prior to that 2006 enactment, the

17  provision stated only that the AAG for OJP "exercise[s] such other powers and functions as may

18  be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney

19  General."  Joint Resolution Making Continuing Appropriations for FY 1985, Pub. L. No. 98-473,

20  § 603, 98 Stat. 1837 (1984).  Also, by contrast, the organic statute for the head of a separate

21  USDOJ grant-making component, enacted in 2002, continues to contain substantially the same,

22  more limited language as Section 10102 earlier contained, without the additional "special

23  conditions" and "priority purposes" powers that Congress elected to bestow with respect to OJP.

24  *See* 34 U.S.C. § 10444(7) (providing only that Director of Violence Against Women Office

25  "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this

26  subchapter or by delegation of the Attorney General").  This context confirms that Congress

27  intended the "special conditions" and "priority purposes" language to confer distinctive and

28  meaningful power.  "When Congress acts to amend a statute, [courts] presume it intends its

1  amendment to have real and substantial effect."  *Stone v. INS*, 514 U.S. 386, 397 (1995).

2      Thus, the notice and access conditions – which merely promote intergovernmental law

3  enforcement cooperation, so that grantee policies do not impair federal policies – come

4  comfortably within the fonts of delegated power in Section 10102(a)(6).  Pursuant to this

5  authority, the AAG may prioritize formula grants, like the Byrne JAG Program, for jurisdictions

6  that cooperate with federal authorities in achieving federal law enforcement priorities, including

7  removal of criminal aliens under immigration law.

8  **B.    The Notice, Access, and Section 1373 Conditions
9         Are Consistent with the Spending Clause**

10      The Second and Third Claims for Relief in the Amended Complaint[4] allege that the

11  notice, access, and Section 1373 conditions in the Byrne JAG Program violate the Spending

12  Clause.  Am. Compl. ¶¶ 127-32, 137.  More specifically, these claims allege that the notice and

13  access conditions – although, again, *not* the Section 1373 compliance condition – are

14  impermissibly ambiguous, *id.* ¶¶ 86-87, 131, and further that all three conditions are insufficiently

15  related to the statutory purposes of the Byrne JAG Program, *id.* ¶ 130; *see id.* ¶ 137.  Both

16  contentions are wrong.

17      **1.    The Notice and Access Conditions are Unambiguous**

18      Article I of the Constitution confers on Congress the authority to "lay and collect Taxes,

19  Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general

20  Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  It is well-established that the Spending

21  Clause authority is "broad," and empowers Congress to "set the terms on which it disburses federal

22  money to the States[.]"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296

23  (2006); *see also*, *e.g.*, *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (noting that Congress has

24  "repeatedly employed the [spending] power to further broad policy objectives by conditioning

26  _____

[4] As with the separation of powers claims in the First and Third Claims for Relief discussed above, there is substantial overlap between the Second and Third Claims for Relief, the latter of which reiterates the theories of the First and Second Claims, but under the aegis of the APA.  Defendants again note that, for the reasons stated in Section I.C. below, the Third Claim fails for the additional threshold reason that California fails to identify a challengeable final agency action under the APA.

receipt of federal moneys upon compliance by the recipient with federal statutory and adminis-trative directives.") (citations omitted); *United States v. Miami Univ.*, 294 F.3d 797, 808 (6th Cir. 2002) ("Spending clause legislation, when knowingly accepted by a fund recipient, imposes enforceable, affirmative obligations" on the recipient).

While it is beyond cavil that the Spending Clause confers "broad" authority, that authority is nonetheless subject to certain discrete limitations, including that any terms attached to the receipt of federal funds must be "unambiguous[]," and thus enable the potential recipient to "exercise [its] choice" to participate (or not) in the program "knowingly, cognizant of the consequences of [its] participation." *Dole*, 483 U.S. at 207 (citations omitted); *see also*, *e.g.*, *Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (the Spending Clause is a "'permissible method of encouraging a State to conform to federal policy choices,' because 'the ultimate decision' of whether to conform is retained by the States – wh[ich] can always decline the federal grant.") (quoting *New York*, 505 U.S. at 168)).  Contrary to plaintiff's assertions, the notice and access conditions easily satisfy the clear-notice requirement.

These conditions clearly state what conduct is required, so that grantees can "exercise their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at 207 (citation omitted).  They require grantees (1) to give "agents of the United States acting under color of federal law" access to correctional facilities "to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States," and (2) to notify DHS, upon "formal written request" and "as early as practicable," before "the scheduled release date and time for a particular alien in such facility." RJN, Ex. B (Greenville SC Award 2017) ¶¶ 55, 56; RJN, Ex. C (Binghamton NY Award 2017) ¶¶ 55, 56.  The award documents also specify that nothing in these conditions requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition"; that the conditions impose no requirements regarding any requests by federal immigration authorities to detain aliens; and that the notice condition requires "only as much advance notice as practicable."  *Id.*  Moreover, to the extent any uncer-

1  tainty might remain, the FY 2017 Byrne JAG solicitation invited any prospective grantee with a

2  question about "any . . .  requirement of this solicitation" to contact OJP's Response Center

3  (customer service center) by telephone, email, or Internet chat.  *See* Am. Compl., Ex. A at 2.  A

4  prospective grantee could also contact the appropriate "State Policy Advisor" – that is, a specific,

5  named OJP employee assigned to work with jurisdictions within a specified geographical area.

6  *Id*.; BJA Programs Office Contact Information, *available at* https://www.bja.gov/ About/

7  Contacts/ ProgramsOffice.html (last visited Jan. 16, 2018).[5]

8        Further, to the extent there is any uncertainty at the margins of the notice and access

9  conditions, such a penumbra would not render these conditions unconstitutionally ambiguous.

10  Indeed, "the exact nature of [grant] conditions may be largely indeterminate, provided that the

11  existence of the conditions is clear, such that States have notice that compliance with the

12  conditions is required."  *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation

13  omitted); *see*, *e.g.*, *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress

14  clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not

15  specifically identify and proscribe in advance every conceivable state action that would be

16  improper.") (citation omitted).  Moreover, plaintiff does not complain about the clarity of any

17  other Byrne JAG conditions, such as those requiring compliance with restrictions on lobbying

18  under 18 U.S.C. § 1913 and 31 U.S.C. § 1352, RJN, Ex. B (Greenville SC Award 2017) ¶ 19;

19  compliance with "federal appropriations statutes" generally, *id.* ¶ 20; reporting of evidence of

20  violations of the False Claims Act, *id.* ¶ 21; and compliance with prohibitions on reprisal under

21  41 U.S.C. § 4712, *id.* ¶ 23.

22          **2.      The Notice, Access, and Section 1373 Conditions Are
23                  Related to the Purposes of the Byrne JAG Program**

24        California further alleges that the notice, access, and Section 1373 compliance conditions

25  are not adequately related to the purposes of the Byrne JAG Program to satisfy the Spending

26  Clause.  Am. Compl. ¶ 130.  This argument also fails on its face.

27  _____

28        [5] "BJA" refers to the Bureau of Justice Assistance, the OJP component that administers
     the Byrne JAG Program.

First, any relatedness inquiry required by the Spending Clause does not pose a difficult hurdle; to the contrary, the Ninth Circuit has emphasized that this is a "low-threshold" inquiry that "is a far cry from . . . an exacting standard for relatedness." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see id.* (stating that conditions on federal grants "*might* be illegitimate if the conditions share no relationship to the federal interest in particular national projects or programs") (citation omitted)).  Thus, in *Dole*, the Supreme Court upheld conditioning the receipt of federal highway funds on the loosely-related requirement that a State adopt a minimum drinking age.  *See* 483 U.S. at 208-09; *see also New York*, 505 U.S. at 167 (stating that only "some relation-ship" is necessary between spending conditions and "the purpose of the federal spending."); *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (explaining that there need only be a "discern-able relationship" between a condition imposed pursuant to the Spending Clause and the "federal interest in a program it funds").  As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds."  *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here easily satisfy this "low-threshold" relatedness inquiry. *Mayweathers*, 314 F.3d at 1067.  The Byrne JAG Program's organic statute specifies that program funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention, and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of the AAG, which involve "disseminat[ing] infor-mation" and "*maintain[ing] liaison with* . . .  State governments" in matters relating to "criminal justice."  34 U.S.C. § 10102(a)(1), (2) (emphasis added).  Further, immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide array of criminal offenses renders an alien removable from this country.  *See* 8 U.S.C. § 1227(a)(2). Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes."  *Duvall v. Att'y Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deporta-tion or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes")

1    (citation omitted).  Once removed, a criminal alien who has committed a removable offense – for

2    example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses – is no

3    longer present in this country with the potential to re-offend.

4          The Immigration and Nationality Act also repeatedly contemplates cooperation among

5    state and local officers and federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C.

6    § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state

7    and local officers may perform specified functions of a federal immigration officer in relation

8    to the investigation, apprehension, or detention of aliens); *id*. § 1324(c) (authorizing state and

9    local officers to make arrests for violations of the INA's prohibition against smuggling,

10   transporting, or harboring aliens); *id*. § 1252c (authorizing state and local officers to arrest certain

11   felons who have unlawfully returned to the United States).  Under authorities such as these, "state

12   officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.

13   Furthermore, given that the INA contemplates the federal detention of certain aliens upon their

14   release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as

15   seeking to ensure that a state or local grantee's law enforcement activities not impair the law

16   enforcement activities of the federal government.  Congress has mandated that certain aliens who

17   have committed criminal offenses be taken into federal custody pending removal proceedings, but

18   only "when the alien is released" from state custody.  *Id.* § 1226(c)(1); *see Preap v. Johnson*, 831

19   F.3d 1193, 1199 (9th Cir. 2016) (holding that mandatory detention provision applies only to

20   aliens who are detained promptly after their release from criminal custody).  With respect to

21   incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90

22   days that begins with the date of the alien's release.  8 U.S.C. § 1231(a)(1)(B).  It is crucial to this

23   cooperative law enforcement framework that states and localities respond to requests for release

24   date information, give federal agents access to detainees in their custody, and avoid restricting

25   communication of information regarding immigration status to DHS.

26

27

28

**C.     Plaintiff's APA Claims Must Be Dismissed for Additional Reasons**

**1.     The APA Claims Do Not Challenge Final Agency Action Reviewable under the APA**

"To obtain judicial review under the APA, [a plaintiff] must challenge a final agency action." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citing 5 U.S.C. § 704). "[F]inality is . . . a jurisdictional requirement," *id.* (internal citation omitted), which is satisfied only when the challenged action (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Notwithstanding this black-letter requirement, neither of California's APA claims (the Third and Fourth Claims for Relief) identifies any qualifying final agency action.  Indeed, California initiated this litigation before even seeing the text of the actual conditions, and even now USDOJ has not yet reached a final determination as to whether to grant or deny the State's FY 2017 Byrne JAG application.  To the contrary, the Department has, to date, issued only a "preliminary assessment" of California's compliance with Section 1373, RJN, Ex. L, and the State's response to the same, RJN, Ex. M, remains under consideration.  Further, even if OJP determined to deny California's grant application at the conclusion of this process, the State would then be entitled to invoke regulatory appeal procedures before any such denial could become statutorily "final[]."  34 U.S.C. § 10154; *see generally* 28 C.F.R. Part 18.  In such circumstances, no final, reviewable agency action will exist until OJP has thoroughly "reviewed [the] grant application *and decided [whether] to disburse the funds*." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) (emphasis added); *see, e.g.*, *Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004) ("Until EPA completes its review and reaches a decision [as to whether to award a proposed grant], there has been no final agency action . . . and the matter is not ripe for judicial review."); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (no final agency action where agency had taken "some action with respect to the grant application, but "had not yet decided whether to award the grant"), *aff'd*, 475

1   F.3d 1291 (D.C. Cir. 2007).

2       Thus, as concerns California's challenge to the conditions, the consummation of OJP's

3   decision-making process has not yet occurred, plaintiff's "rights or obligations" have not been

4   determined, and no "legal consequences" have arisen.  *Cf. Citizens for Appropriate Rural Roads*

5   *v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016) (affirming dismissal because "a challenge to agency

6   conduct is ripe only if it is filed after the final agency action"; the challenge otherwise "rests upon

7   contingent future events that may not occur as anticipated, or that may not occur at all"); *Abbs v.

8   Sullivan*, 963 F.2d 918, 927 (7th Cir. 1992) ("A challenge to administrative action . . . falls

9   outside the grant of jurisdiction in . . .  the Administrative Procedure Act when the only harm the

10  challenger seeks to avert is the inconvenience of having to go through the administrative process

11  before obtaining a definitive declaration of his legal rights.").  This Court should, accordingly,

12  dismiss both of California's APA claims on this threshold jurisdictional ground alone.

13              **2.      The Challenged Conditions Are Not Arbitrary or Capricious**

14      Plaintiff's Fourth Claim for Relief alleges that the notice, access, and Section 1373

15  conditions are arbitrary or capricious in violation of the APA.  *See* Am. Compl. ¶¶ 139-44.  As an

16  initial matter, if the conditions are statutorily authorized and comport with the Spending Clause –

17  which plaintiff largely *concedes* at least for the Section 1373 condition[6] – it is unclear how

18  "arbitrary or capricious" scrutiny could otherwise limit USDOJ's broad discretion.  In any event,

19  when the courts review an agency's action under the "arbitrary or capricious" standard, it is

20  "required to be 'highly deferential,'" and to "presum[e] the agency action to be valid" as long as

21  it is supported by a rational basis.  *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190

22  (9th Cir. 2010) (quoting *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)).  This

23  standard of review is "narrow," and does not authorize a district court "to substitute its judgment

24  for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416

25  (1971).

26

27      [6] As explained above, the Amended Complaint raises no claim that the Section 1373
    compliance condition violates the separation of powers, is *ultra vires*, or offends the "ambiguity"
28  inquiry under the Spending Clause.

1    Here, plaintiff's claim fails because "the agency's reasons for" imposing the challenged

2    conditions "were entirely rational."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517

3    (2009).  The imposition of the challenged conditions is understandable as a result of a May 2016

4    report by the Department's Office of Inspector General ("OIG") finding deteriorating local

5    cooperation with "efforts to remove undocumented criminal aliens from the United States."  RJN,

6    Ex. N (OIG Memorandum) at 1-2 n.1.  The 2016 OIG report advised that "the information we

7    have learned to date during our recent work about the present matter differs significantly from

8    what OIG personnel found nearly 10 years ago" in a 2007 audit, in which federal immigration

9    authorities had "commented favorably to the OIG with respect to cooperation and information

10   flow they received from the seven selected jurisdictions" that were examined.  *Id.*  The OIG

11   report focused on California, among other jurisdictions, in reaching its conclusions about the

12   changed state of affairs in 2016.  *See id.* at 13.

13    In the FY 2016 grant cycle, USDOJ under the prior Administration instituted a

14   requirement for grantees to certify compliance with Section 1373.  RJN, Ex. C ¶ 55 (California

15   Byrne JAG Award 2016).  For the FY 2017 cycle, the Department maintained that condition and

16   added the notice and access conditions, publicly offering a sound explanation for all three

17   conditions.  The Department's "Backgrounder on Grant Requirements" of July 25, 2017, RJN,

18   Ex. O, stated that the conditions have a "goal of increasing information sharing between federal,

19   state, and local law enforcement" so that "federal immigration authorities have the information

20   they need to enforce the law and keep our communities safe."  *Id*.  The Backgrounder also noted

21   that some jurisdictions have "refus[ed] to cooperate with federal immigration authorities in

22   information sharing about illegal aliens who commit crimes," and stated that the conditions will

23   "prevent the counterproductive use of federal funds for policies that frustrate federal immigration

24   enforcement."  *Id.*  Thus, the three conditions are "common-sense measures," *id.*, and "even in the

25   absence of evidence, the agency's predictive judgment (which merits deference) makes entire

26   sense" as "an exercise in logic rather than clairvoyance."  *Fox Television*, 556 U.S. at 521.

27    Finally, as discussed above in relation to the Spending Clause, immigration enforcement

28   undoubtedly relates to criminal justice.  Numerous federal statutes expressly connect these two

1  subjects.  *See supra* text at 13-15.  The challenged conditions thus rationally promote interests in

2  "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34

3  U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress

4  contemplates in immigration enforcement.  *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373;

5  *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important

6  feature of the immigration system" and Congress "has encouraged the sharing of information

7  about possible immigration violations.").

8  **II.     Plaintiff's Claim for a Declaration Regarding its Statutes' Compliance**
9  **with Section 1373 Should Be Dismissed**

10         Aside from the Byrne JAG grant conditions, plaintiff's Fifth Claim for Relief seeks a

11  declaration that several California statutes "comply with Section 1373" – specifically, the TRUST

12  Act, Cal. Gov't Code §§ 7282-7282.5; the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2; the

13  California Values Act, Cal. Gov't Code §§ 7284-7284.12 ("Values Act"); California Penal Code §§

14  422.93, 679.10, and 679.11; California Code of Civil Procedure § 155; and California Welfare and

15  Institutions Code §§ 827 or 831.  *See* Am. Compl. ¶¶ 145-153.  Plaintiff also seeks an order

16  enjoining the defendants from "withholding [funding] and terminating, or disbarring and making

17  ineligible the State and its political subdivisions" under the Byrne JAG Program or any COPS

18  Office program based on Section 1373 and any of those state statutes.  *Id.* at 38.  Plaintiff lacks

19  standing, however, to seek a ruling regarding any state statutes other than the Values Act, and its

20  request for a ruling on the Values Act is unripe.  Alternatively, if plaintiff's claim regarding the

21  Values Act were justiciable, the Court should deny on its merits the State's request for a declaration

22  that the Act does not violate Section 1373.

23         **A.     Plaintiff's Request for a Ruling Regarding Compliance**
24         **with Section 1373 Is Non-Justiciable**

25         Under Article III of the Constitution, the jurisdiction of the federal courts extends only to

26  "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  Matters outside this rubric are "non-

27  justiciable."  *Or. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*, 288 F.3d

28  414, 416 (9th Cir. 2002).  Two principles of justiciability are involved here:  standing and ripeness.

1    "While standing is concerned with *who* is a proper party to litigate a particular matter, the doctrines

2    of mootness and ripeness determine *when* that litigation may occur." *Haw. Cty. Green Party v.*

3    *Clinton*, 14 F. Supp. 2d 1198, 1201 (D. Haw. 1998). Where a plaintiff lacks standing or its claims

4    are unripe, the court lacks jurisdiction, and where jurisdiction is lacking, the plaintiff necessarily

5    cannot show a likelihood of success for purposes of a preliminary injunction. *See Pollara v.*

6    *Radiant Logistics Inc.*, 2012 WL 12887095, at *5 (C.D. Cal. Sept. 13, 2012) (noting that "standing

7    to bring a claim . . . is a necessary predicate to demonstrate a likelihood of success on the

8    merits").

9            To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demon-

10   strate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's

11   conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998)

12   (citation omitted). The injury needed for constitutional standing must be "concrete," "objective,"

13   and "palpable," not merely "abstract" or "subjective." *See Whitmore v. Arkansas*, 495 U.S. 149,

14   155, 178 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17, 830 (1975). Additionally, the injury

15   must be "certainly impending" rather than "speculative." *Whitmore*, 495 U.S. at 157, 158. In short,

16   for the plaintiff to have standing, "an actual, live controversy must exist between parties with

17   adverse legal interests." *Pollution Denim & Co. v. Pollution Clothing Co.*, 2009 WL 10672270, at

18   *8 (C.D. Cal. Feb. 9, 2009).

19           Constitutional justiciability also requires that a dispute be ripe for judicial consideration. In

20   a challenge to governmental action, that means the challenged action must have been "formalized

21   and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S.

22   136, 148-49 (1967). In other words, "[a] claim is not ripe for adjudication if it rests upon contin-

23   gent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v.*

24   *United States*, 523 U.S. 296, 300 (1998) (citation omitted). Like the rules of standing described

25   above, these considerations are part of whether the case presents a concrete controversy under

26   Article III. *See Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001)

27   ("The ripeness doctrine is derived from Article III's case or controversy requirement. It prevents

28   the courts from entangling themselves in abstract disagreements over administrative policies, and

1    also protects the agencies from judicial interference until an administrative decision has been

2    formalized and its effects felt in a concrete way by challenging parties.") (citation omitted), *aff'd*

3    *sub nom. Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003).[7]

4         Applying these standards here, the plaintiff cannot show the "injury in fact" needed for

5    constitutional standing, and its claims are not constitutionally ripe for judicial review.  First,

6    defendants have not withheld or threatened to withhold grant funding based on any state statute

7    other than the Values Act, such that plaintiff lacks standing to seek a ruling regarding any of the

8    other statutes listed.  Second, there is no ripe controversy regarding the Values Act itself because

9    defendants have not yet made a final determination regarding whether it violates Section 1373.

10   **1.     Plaintiff Lacks Standing to Seek a Ruling Regarding**
11   **Any State Statute Other Than the Values Act**

12   OJP wrote to the California agency responsible for administering Byrne JAG grants on

13   April 21, 2017, asking the agency to document its compliance with 8 U.S.C. § 1373.  RJN, Ex. L.

14   That letter did not refer to any specific California statutes.  On June 29, 2017, the State responded

15   that "there are no state laws of general application that violate Section 1373," and specifically

16   discussed only two enactments – the TRUST Act and the TRUTH Act – asserting that those statutes

17   do not "create tension with Section 1373."  *Id.* Ex. M.

18   In its reply of November 1, 2017, OJP stated that the Department of Justice had determined

19   that two provisions of a different enactment – namely, the Values Act – "may violate 8 U.S.C.

20   § 1373, depending on how your jurisdiction interprets and applies them":  specifically, Sections

21   7284.6(a)(1)(A) and 7284.6(a)(1)(C) and (D) of that Act, which prohibit a law enforcement agency

22   from using money or personnel to "[i]nquir[e] into an individual's immigration status" or to

23   disclose, with certain exceptions, an individual's release date, personal information (including home

24   address), or "other information."  *Id.* Ex. N.  OJP asked the State to "certify that it interprets and

25   applies [Section 7284.6(a)(1)(A)] to not restrict California officers and employees from requesting

26   information regarding immigration status from federal immigration officers" and that it "interprets

27        [7] These considerations do not involve merely "prudential ripeness," which asks, in contrast,
28   about the "fitness" of the issues presented for judicial review and whether withholding review
     would subject the parties to "hardship."  *See Coons v. Lew*, 762 F.3d 891, 900 (9th Cir. 2014).

1  and applies [Section 7284.6(a)(1)(C) and (D)] to not restrict California officers from sharing

2  information regarding immigration status with federal immigration officers, including information

3  regarding release date and home address." *Id.*

4       California responded on November 13, 2017, stating (1) that Section 7284.6(a)(1)(A)

5  "prohibits law enforcement officers from asking an individual about his or her immigration status,

6  or from asking for that information from non-governmental third parties, but does not restrict law

7  enforcement from inquiring about an individual's immigration status from government entities,"

8  and (2) that Section 7284.6(a)(1)(C) and (D) prohibit the disclosure of release dates and home

9  addresses, but purportedly "do not violate Section 1373 because Section 1373 only prohibits

10  restrictions on 'citizenship or immigration status information,' not other information." *Id.* Ex. O.

11  OJP has not yet responded to California's letter of November 13; thus, OJP has not yet determined

12  administratively whether the State's laws comply with Section 1373.

13       Under these circumstances, plaintiff lacks standing to seek a ruling on whether any state

14  laws other than the Values Act violate Section 1373 such that defendants may withhold federal

15  grant funds based on non-compliance.  Given that USDOJ has not addressed whether any provi-

16  sions of California law other than the Values Act may violate Section 1373 and thus render Califor-

17  nia ineligible for grant funds, there is no "live controversy" regarding whether any other state

18  statutes comply with Section 1373 and no foreseeable "injury in fact" arising out of defendants'

19  application of any such statutes.  *See Pollution Denim & Co.*, 2009 WL 10672270, at *8-10; *Steel*

20  *Co.*, 523 U.S. at 102-03.  Any assumption that defendants might one day withhold grant funds

21  based on any California statute other than the Values Act would be "speculative," and thus cannot

22  be the basis for standing.  *See Whitmore*, 495 U.S. at 157, 158.

23                 **2.       Plaintiff's Request for a Ruling Regarding the**
24                         **Values Act Is Constitutionally Unripe**

25       Plaintiff's request for a ruling on whether defendants can withhold grant funds based on the

26  Values Act is also non-justiciable, for two reasons.  First, as noted already, OJP has not yet

27  responded to California's letter regarding the Values Act, and thus has not determined adminis-

28  tratively whether the Act violates Section 1373.  RJN, Ex. O.  OJP has only stated that portions of

the Values Act "may" violate Section 1373, and has not had an opportunity to fully consider the State's arguments to the contrary. *Id.* Ex. N.  Moreover, OJP's letter of November 1 stated explicitly that it was only a "preliminary assessment of [California's] compliance with 8 U.S.C. § 1373" and did not "constitute final agency action." *Id.* Ex. N; *see* 34 U.S.C. § 10223 (stating that OJP's "determinations, findings, and conclusions shall be final and conclusive upon all applications").  As the district court in Chicago recently explained, "addressing an as-applied challenge to Section 1373 based on [USDOJ's preliminary determination regarding plaintiff's compliance] is premature." *Chicago v. Sessions*, 2017 WL 5499167, at *1 (N.D. Ill. Nov. 16, 2017) *("Chicago II")*.  Moreover, even after OJP determines whether the Values Act violates Section 1373, the State will have an opportunity to appeal that initial determination administratively.  *See* 34 U.S.C. § 10154; *see generally* 28 C.F.R. Part 18.  OJP could decide, either upon consideration of the State's letter of November 13, 2017, or upon consideration of any administrative appeal, that the Values Act does not violate Section 1373 and thus that USDOJ will not withhold grant funds on that basis.  Therefore, plaintiff's request for a ruling on whether the Values Act violates Section 1373 "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (citation omitted).[8]

Additionally, this case is not justiciable because a ruling that the Values Act does not violate Section 1373 would not free the State from legal jeopardy unless all its laws, together with policies implementing those laws, are consistent with Section 1373.  That is a fact-intensive inquiry, and is much better handled through the administrative process rather than through the type of ruling sought here.  As noted earlier, that process is ongoing and is narrowing the scope of the dispute between the parties.  Importantly, if this Court does address the Values Act, that ruling cannot properly immunize the State from liability under Section 1373 if it turns out, in fact, that the State is

---

[8] Defendants' alternative argument below that the Court should dismiss plaintiff's request for a declaratory judgment regarding the Values Act on its merits does not make this claim ripe, given that OJP must still be permitted to consider the State's arguments in the administrative process. *Cf. Ardalan v. McHugh*, 2014 WL 3846062, at *12 n.10 (N.D. Cal. Aug. 4, 2014) (noting that "the futility exception [to administrative exhaustion] requires a plaintiff [to] show it is *certain* that the claim will be denied on appeal, or that resort to administrative remedies is clearly useless") (citations omitted).

1   implementing the Act in a way that violates Section 1373.

2       Under these circumstances, plaintiff's request for an order regarding whether the Values Act

3   would violate the Section 1373 compliance condition is unripe, in that it "rests upon contingent

4   future events that may not occur as anticipated, or indeed may not occur at all." *Id*. Thus, any

5   judicial consideration of this issue should await further developments.[9]

6   ### B.    The Court Should Dismiss Plaintiff's Claim for Declaratory
       Relief Regarding the Values Act on Its Merits
7

8       Alternatively, even if plaintiff's request for an order against withholding grant funds based

9   on any California laws were justiciable at this point, this Court should dismiss on its merits

10  plaintiff's request for an order that none of its laws would violate the Section 1373 compliance

11  condition.  As explained already, the only state law that may legitimately be at issue here is the

12  California Values Act, Cal. Gov't Code §§ 7284-7284.12.  Assuming this issue were justiciable,

13  however, the Court should decline to rule that the Values Act is consistent with Section 1373.

14      The Values Act provides, among other things, that California law enforcement agencies

15  shall not use "moneys or personnel to investigate persons . . . for immigration enforcement

16  purposes," including by "[p]roviding information regarding a person's release date or responding to

17  requests for notification by providing release dates or other information unless that information is

18  available to the public, or is in response to a notification request from immigration authorities in

19  accordance with Section 7282.5," or by "[p]roviding personal information, as defined in Section

20  1798.3 of the Civil Code, about an individual, including, but not limited to, the individual's home

21  address or work address unless that information is available to the public."  Cal. Gov't Code

22  § 7284.6(a).  Section 7282.5 of the Government Code, referenced in the Values Act, sets forth a

23  very specific list of circumstances in which a law enforcement agency is permitted to "cooperate

24  with [federal] immigration officials," based mostly on whether the individual in question has

25  committed any of certain listed felonies.  *Id.* § 7282.5(b).  Section 1798.3 of the Civil Code, also

26      [9] In opposing plaintiff's motion for preliminary injunction, defendants argued that
    plaintiff's request for a ruling regarding the Values Act was unripe for the additional reason that
27  the California Secretary of State had received a request for a voter referendum on the Act.  As far
    as defendants have been able to learn, however, no signatures in support of that referendum have
28  been submitted, and the Values Act is apparently in effect.

cited in the Values Act, defines "personal information" as "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history."  Cal. Civ. Code § 1798.3(a).

As described earlier, 8 U.S.C. § 1373 provides, among other things:

> Notwithstanding any other provision of . . . law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal authorities] information regarding the citizenship or immigration status . . . of any individual.

8 U.S.C. § 1373(a).  The Values Act cannot be squared with this statute.

**a**.  Section 1373 forbids a state or local government from prohibiting the exchange of "information *regarding*" an individual's immigration status, not merely the individual's immigration status.  Congress's use of "information regarding" was clearly intended to broaden the scope of the information covered, as demonstrated by comparing Section 1373(a) to Section 1373(c), which uses the different phrase "[immigration] status information."  8 U.S.C. §1373; *see Dean v. United States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.") (citations omitted).  And the meaning of the word "regarding" is quite broad.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (concluding that "ordinary meaning" of the closely analogous "relating to" is "a broad one – 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with'") (citing Black's Law Dictionary 1158 (5th ed. 1979)); *Davis v. Fenton*, 26 F. Supp. 3d 727, 740 (N.D. Ill. 2014) (concluding that "regarding" is "just as broad . . . as 'arising out of' and 'relating to'").  The breadth of this provision is also reinforced by other language that Congress used, such as making clear that no local policy could "in any way restrict" the sharing of such information, reinforcing Congress's overarching interest in halting policies that might stymie the sharing of information between local law enforcement and immigration authorities.  *See Bologna v. San Francisco*, 121 Cal. Rptr. 3d 406, 414 (Cal. App. 2011) (law "'designed to prevent any State or local law . . . that prohibits or *in any way restricts* any

communication between State and local officials and the INS'") (quoting House report) (emphasis added).  Indeed, a contrary reading of Section 1373 would render it largely meaningless, as DHS is already aware of an individual's legal right to be present in the United States.  *See Steinle v. San Francisco*, 230 F. Supp. 3d 994, 1016 (N.D. Cal. 2017) (explaining that "ICE was already aware of Lopez-Sanchez's immigration status").

**b**.  The Values Act prevents sharing personal and identifying information that plainly qualifies as information regarding immigration status.  First, California law defines personal information very broadly as "any information . . . that identifies or describes an individual" such as name or address.  *See* Cal. Civ. Code § 1798.3.  Thus, under the Values Act, state officials would be unable to confirm or reveal the identity of individuals in state custody.  But a person's identity and name are highly relevant to determining immigration status and removability:  No such evaluation can be made if the person's identity is not disclosed.  And the person's address directly relates to whether the person is "lawfully *present* in the United States," which Congress described as a component of "immigration status."  8 U.S.C. § 1357(g)(10)(A) (emphasis added); *see* Black's Law Dictionary 1065 (5th ed. 1979) (defining "presence" as "being in a certain place and not elsewhere").  Identity and other personal information are also relevant to many immigration status issues, such as whether the person was born outside the United States, whether the person derived citizenship from a relative, whether the person qualifies for immigrant status under 8 U.S.C. § 1101(a)(15), whether the alien's place of residence qualifies them as a non-resident visitor, 8 U.S.C. § 1227(a)(1)(C); such information also facilitates taking an alien into custody for lawful removal proceedings, *id.* § 1226(a).  The restrictions on sharing personal information cannot be squared with Section 1373.

**c**.  The Values Act provisions that prevent the sharing of prisoner release dates also violate Section 1373 because an alien's release date is information regarding the person's immigration status.  An alien's release date is directly relevant to when the alien can ultimately be removed from the country.  Federal immigration law recognizes the importance of allowing States and localities to impose criminal punishment on individuals who are in this country illegally and commit crimes.  Thus, federal law specifies that, except in limited circumstances, DHS "may not remove an alien

1   who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C.

2   § 1231(a)(4). But that law – and the comity interests that underlie it – render the time of an alien's

3   release from state custody critical information regarding the alien's immigration status, as the alien

4   is subject to removal only at the end of that custody period. *See id.* § 1231(a)(1)(B)(iii) (removal

5   period "begins on . . .  the date the alien is released from [state criminal] detention"). Similarly,

6   the statute requiring the detention of criminal aliens specifies that immigration detention for

7   removal proceedings must begin "when the alien is released" from state criminal custody. *Id.*

8   § 1226(c)(1). The Ninth Circuit has held that this statute requires immigration custody to begin

9   immediately upon release from state criminal custody, underscoring the importance of the release

10   date to the person's status under the immigration laws. *See Preap v. Johnson*, 831 F.3d 1193, 1202

11   (9th Cir. 2016) (Section 1226(c) "governs the full life cycle of the criminal aliens' detention"

12   including "specifying the requirements for taking them into custody"), *pet. for cert. filed*, No. 16-

13   1363 (May 11, 2017). Other INA provisions also confirm that an alien's release date is highly

14   relevant to the person's status under the immigration laws given the relevance of that persons'

15   location within the United States. *See* 8 U.S.C. § 1357(g)(10)(A) ("immigration status" includes

16   whether individual is "lawfully *present* in the United States"); *id.* § 1357(a)(1) (immigration

17   officers "shall have power without warrant . . .  to interrogate any alien or person believed to be an

18   alien as to his right to be or to remain in the United States"); *id.* § 1226(a) ("alien may be arrested

19   and detained" on a warrant). Thus, release date information relates to an individual's status under

20   the immigration laws because it is a core aspect of the enforcement process Congress designed.

21        In light of all the above, although OJP has made no final agency decision, this Court should

22   decline to hold that the Values Act does not violate Section 1373 or to enter an injunction regarding

23   conformity of California's laws with Section 1373.

24   **IV.**    **Section 1373 Is Consistent with the Tenth Amendment**

25        Plaintiff's final claim is that the Section 1373 compliance condition would violate the Tenth

26   Amendment if the statute were construed as "extending" to the state statutes identified in the

27   Amended Complaint. See Am. Compl. ¶¶ 149-150, 153. The Tenth Amendment provides that

28   "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the

1   States, are reserved to the States respectively, or to the people." It stands for the proposition that

2   "[t]he Federal Government may not compel the States to enact or administer a federal regulatory

3   program" or to "act on the Federal Government's behalf." *New York*, 505 U.S. at 188; *see Nat'l*

4   *Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 620 (2012).

5       As explained above, only one state statute could possibly become legitimately at issue here

6   under the present circumstances: the Values Act. The question under plaintiff's Tenth Amendment

7   claim, therefore, is whether applying the Section 1373 compliance condition in such a way that the

8   Values Act violates the condition would "compel the State[] to enact or administer a federal regula-

9   tory program" or to "act on the Federal Government's behalf." *Id*. at 575, 620. For several reasons,

10  it would not.

11      First, the dispute here does not involve a federal statutory mandate that directly regulates

12  California, but rather a condition on receipt of federal funds that the State and its subdivisions are

13  free to accept or reject. Thus, the relevant question here is not whether Section 1373, as an

14  independent statutory obligation, would violate the Tenth Amendment. Instead, the only pertinent

15  question is whether conditioning the receipt of federal funds on compliance with Section 1373 is a

16  valid exercise of the spending power – which, as discussed above, it is. In this context, it is well-

17  settled that the federal government "may offer funds to the States, and may condition those offers

18  on compliance with specified conditions." *Id*. at 537; *cf. Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832,

19  847 (9th Cir. 2003) ("[A]s long as the alternative to implementing a federal regulatory program

20  does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult,

21  expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation.")

22  (citation omitted). In effect, by requesting funds from the Federal Government, the State acts

23  voluntarily and waives any Tenth Amendment concerns.

24      Second, the purpose and effect of Section 1373 and the challenged grant condition are to

25  further the express goals of the INA, not to "commandeer" state officials. As noted earlier, the INA

26  provides that a federal immigration officer "shall have power without warrant . . . to interrogate

27  any alien or person believed to be an alien as to his right to be or to remain in the United States." 8

28  U.S.C. § 1357(a)(1). The INA also provides that certain classes of aliens, including certain criminal

1    aliens, shall be removed from the United States upon the order of the Attorney General or the

2    Secretary of Homeland Security, *see*, *e.g.*, *id.* §§ 1227(a), 1228.  Federal officials cannot carry out

3    these duties without knowing where those persons are located.  Indeed, the legislative history of

4    Section 1373 indicates that the statute was intended to counteract passive resistance to sharing

5    information.  *See*, *e.g.*, S. Rep. No. 104-249, at 19-20 (1996) (noting that "[t]he acquisition,

6    maintenance, and exchange of immigration-related information by State and local agencies is

7    consistent with, and potentially of considerable assistance to, the Federal regulation of immigration

8    and the achieving of the purposes and objectives of the [INA]").

9           Third, even if an outright mandate rather than a grant condition were involved here, a mere

10   requirement not to prohibit individuals from providing information would not violate the Tenth

11   Amendment.  The courts have rejected Tenth Amendment challenges to a number of federal

12   statutes that regulated the handling of information.  For example, in *Reno v. Condon*, the Supreme

13   Court rejected a challenge to a federal law regarding information on motor vehicle operators, which

14   both required States to disclose information in certain circumstances and prohibited its disclosure in

15   other circumstances.  528 U.S. 141, 143-46, 149-150 (2000).  Similarly, in *Freilich v. Upper*

16   *Chesapeake Health, Inc*., the Fourth Circuit rejected a challenge to a federal statute that required

17   health care entities to provide certain information regarding physicians to the State Board of Medi-

18   cal Examiners, and required state boards to forward that information to a federal database.  313 F.3d

19   205, 213-14 (4th Cir. 2002); *see* 42 U.S.C. §§ 11133, 11134.  In rejecting that claim, the court

20   wrote that the federal statute "does not commandeer the state legislature or executive" and "does

21   not compel states to implement a federal regulatory program either.  . . .  All that the [statute]

22   requires of states is the forwarding of information."  313 F.3d at 213-14.  Further, the Second

23   Circuit has rejected a Tenth Amendment facial challenge to Section 1373 of the kind the State

24   raises here, noting that the Tenth Amendment does not give States and their subdivisions "an

25   untrammeled right to forbid all voluntary cooperation by state or local officials with particular

26   federal programs," particularly in the information sharing context.  *City of New York v. United*

27   *States*, 179 F.3d 29, 34-35 (2d Cir. 1999); s*ee Printz v. United States*, 521 U.S. 898, 918 (1997)

28   (contrasting federal statutes that "require only the provision of information to the Federal

Government" with those that "force[] participation of the States' executive in the actual admin-istration of a federal program"); *Freilich v. Bd. of Directors*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state."); *accord Chicago I*, 264 F. Supp. 3d at 946-47.

Fourth, contrary to plaintiff's allegation, the Section 1373 condition – again, even assuming it were more than a mere grant condition – does not "commandeer[] the State and its political subdivisions by directing their personnel how to act and handle data under State and local control in order to advance a federal program." *See* Am. Compl. ¶ 150.  For this proposition, plaintiff cites *Printz v. United States*, 521 U.S. 898, 918 (1997), but that decision actually undercuts the State's claim.  There, the Court struck down certain provisions of the Brady Act, which required local law enforcement officers to conduct background checks on prospective handgun purchasers.  The Act required much more than the forwarding of information, compelling officers to "make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a handgun] would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General," and to provide, upon request, a written statement of the reasons for any contrary determination.  *Id.* at 903 (citation omitted).  Other federal laws requiring action by state or local officials were cited in support of the constitutionality of those provisions, but the Court rejected the relevance of those laws, observing that some were "connected to federal funding measures, and [could] perhaps be more accurately described as conditions upon the grant of federal funding than as mandates to the States" and that others "require[d] only the provision of information to the Federal Government" and thus did not "involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program." *Id.* at 917-18.  Unlike the Brady Act, Section 1373 only involves the exchange of information with federal authorities, and it is only a prohibition on policies that bar sharing information, not an affirmative obligation to share information.

## CONCLUSION

Accordingly, the Court should dismiss plaintiff's First Amended Complaint and all of its claims.

Dated:  January 16, 2018

Respectfully submitted,

CHAD A.  READLER
Acting Assistant Attorney General

BRIAN STRETCH
United States Attorney

JOHN R.  TYLER
Assistant Director

/s/ W. Scott Simpson
_____
W.  SCOTT SIMPSON (Va.  Bar #27487)

ANTONIA KONKOLY
Trial Attorney

Attorneys, Department of Justice
Civil Division, Room 7210
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C.  20530
Telephone:   (202) 514-3495
Facsimile:    (202) 616-8470
E-mail:        scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS
JEFFERSON B.  SESSIONS III, Attorney
General of the United States; ALAN R.
HANSON, Principal Deputy Assistant Attorney
General; and U.S. DEPARTMENT OF JUSTICE