1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   STATE OF CALIFORNIA, EX REL.                    Case No.  17-cv-04701-WHO
    XAVIER BECERRA, IN HIS OFFICIAL
8   CAPACITY AS ATTORNEY GENERAL
    OF THE STATE OF CALIFORNIA,                     ORDER DENYING AMENDED
9                                                   MOTION FOR PRELIMINARY
              Plaintiff,                            INJUNCTION
10
         v.
11
    JEFFERSON BEAUREGARD SESSIONS,
12  et al.,
13            Defendants.
14                                 INTRODUCTION

15        The State of California has sued United States Attorney General Jefferson Beauregard

16   Sessions, Acting Assistant Attorney General Alan B. Hanson, and the United States Department of

17   Justice ("DOJ") (collectively, the federal government), seeking a declaration that Section 1373 of

18   the Immigration and Nationalization Act (as interpreted by the federal government) violates the

19   Constitution and an injunction enjoining the federal government from withholding, terminating,

20   disbarring, or making any state entity or local jurisdiction ineligible for certain law enforcement

21   grants.  The State then moved for a preliminary injunction.

22        At some later date, this case may help define the contours of the State's broad

23   constitutional police powers under the Tenth Amendment and the federal government's "broad,

24   undoubted power over the subject of immigration and the status of aliens."  *U.S. v Arizona*, 567

25   U.S. 387, 394 (2012).  The Trump administration's immigration enforcement policy is clearly at

26   odds with the State's determination of the most effective methods to implement criminal law

27   enforcement.  But for today, the question I decide is narrow: is the State entitled to a preliminary

28   injunction to require the federal government to fund a $1 million law enforcement grant that it has

United States District Court
Northern District of California

United States District Court
Northern District of California

1   held up because it appears likely to decide that the State is not complying with 8 U.S.C. § 1373

2   (Section 1373) by restricting its officials from providing personal information and release dates of

3   certain people detained in jails across the state.

4         The injury threatened is not irreparable. The amount of money at stake is small compared

5   to the State's budget. Payment is delayed, for the moment. The DOJ appears to be using its

6   regular administrative process to decide whether it will follow its initial inclinations. Given the

7   number of open questions concerning the federal government's positions concerning the

8   provisions of the statutes in question, the relatively minimal injury its delay has caused thus far,

9   and the extraordinary nature of the relief sought, I deny the State's motion without prejudice.

10   These issues will be better addressed on a more complete record after discovery on a motion for

11   summary judgment.

12                             **BACKGROUND**

13   **I.     CALIFORNIA'S "SANCTUARY CITY" STATUTES**

14         The State has enacted several laws affecting local and state criminal law enforcement

15   concerning immigrants. Mot. at 5 (Dkt. No. 26). These statutes fit into two categories: (1) laws

16   regarding how and in what manner local law enforcement can communicate and assist federal

17   immigration officers (the TRUTH, TRUST, and Values Acts); and (2) statutes related to

18   individuals' confidential information (Penal Code sections 422.93, 679.10, and 679.11, Welfare

19   and Institutions Code sections 827 and 831, and Code of Civil Procedure section 155).

20         **A.    The TRUST, TRUTH and Values Acts**

21         In 2013, the State enacted the TRUST Act, Cal. Gov't Code § 7282 et seq., which explains

22   when local law enforcement officers may abide by a Department of Homeland Security ("DHS")

23   civil detainer request. *See id.* §§ 7282(c), 7282.5. Per the TRUST Act, local law enforcement

24   may only comply with a DHS civil detainer if the detainer does not "violate any federal, state, or

25   local law, or any local policy," and (1) the detainee's criminal background includes one of a

26   delineated list of crimes, (2) the detainee was on the California Sex and Arson Registry, or (3) the

27   detainee was held after a magistrate's finding of probable cause for a serious or violent felony.

28   *See id.* § 7282.5(a).

In 2016, the State enacted the TRUTH Act. Cal. Gov't Code § 7283 *et seq*. The TRUTH Act requires that if a federal immigration agent requests an interview with a detainee, the jail must notify the detainee that such interviews are voluntary and that he has the right to seek counsel. *Id.* § 7283.1(a). Further, when a jail receives a DHS request, local law enforcement must provide the implicated detainee with a copy of the request and inform him whether the jail intends to comply with the request. *Id.* § 7283.1(b).

Most recently, on October 5, 2017, the State passed the California Values Act (the "Values Act"), Cal. Gov't Code § 7284 *et seq.*, "to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments." *Id.* § 7284.2(f). The Values Act prohibits compliance with warrantless detainer requests. *See id.* §§ 7284.2(e), 7284.6(a)(1)(B). It also forbids a local law enforcement officer from asking any individual his immigration status for immigration enforcement purposes. *See id.* § 7284.6(a)(1)(A). Further, the use of local law enforcement funds or personnel to "provid[e] personal information" about an individual "for immigration enforcement purposes" is disallowed unless that information is "available to the public." *Id.* § 7284.6(a)(1)(D).

The Values Act also amends the TRUST Act to clarify when local law enforcement officers have discretion to respond to DHS notification requests. *See id.* §§ 7282.5(a), 7283(f), 7284.6(a)(1)(C). Local law enforcement officers may only comply with notification requests when the relevant individual has a prior criminal conviction included on a long list of specified crimes or if the information that DHS seeks is already available to the public. *See id.* § 7284.6(a)(1)(C).

The Values Act explicitly purports to comply with section 1373 through a savings clause. Section 7284(e) reads:

> This section does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual, or from requesting from federal immigration authorities immigration status information, lawful or unlawful, of any individual, or maintaining or exchanging

that information with any other federal, state, or local government entity, pursuant to Sections 1373 and 1644 of title 8 of the United States Code.

On October 17, 2017, the CalDOJ received a request for a proposed statewide voter referendum regarding the Values Act.  On January 17, 2018, the California secretary of state's office announced that the initiative failed to make the ballot.  Supplemental RJN, Ex. A (Dkt. No. 79).

### B.    Confidentiality Statutes

The State's confidentiality statues purport to protect (1) the confidential information of victims and witnesses of crime, Cal. Penal Code §§ 422.93, 679.10, 679.11, and (2) confidential information of youth in its juvenile court system, Cal. Welf. & Inst. Code §§ 827, 831; Cal. Civ. Proc. Code § 155.  Relevant to this lawsuit, California Penal Code sections 679.10 and 679.11 prohibit any state entity that certifies information for the sake of the U-visa and T-visa application process from disclosing the immigration status of individuals requesting certification "except to comply with federal law or legal process, or if authorized by the victim or person requesting [certification]."  *Id.* §§ 679.10(k), 679.11(k).

California Penal Code section 422.93 also focuses on the confidential information of victims and witnesses of crime.  It prohibits detainment of an individual who is a hate crime victim or witness in instances where the sole reason for the detainment is an "actual or suspected" immigration violation.  Cal. Penal Code § 422.93(b).  Law enforcement also cannot report or turn over the individual to federal immigration authorities.  *Id.*

The State's laws regarding confidential information of juveniles dictate that juvenile court records and any information that the records contain are confidential except to statutorily designated parties.  Cal. Welf. & Inst. Code § 827.  Additionally, in the Special Immigrant Juvenile process, the State's laws require that information regarding a juvenile's immigration status remain confidential.  *See id.* § 831(e).  Accordingly, any information about a child's immigration status that is apparent during any juvenile court proceeding remains confidential and is only available for inspection "by the court, the child who is the subject of the proceeding, the parties, the attorneys for the parties, the child's counsel, and the child's guardian."  Cal. Civ. Proc.

1   Code § 155(c).

2   **II.     THE GRANTS IN QUESTION**

3       The State has been a recipient of both the Byrne JAG and COPS grants, but its future receipt

4   of the grants is threatened by the federal government's interpretation of Section 1373.

5               **A.     The Byrne JAG Program**

6           The Office of Justice Programs ("OJP") administers the Edward Byrne Memorial Justice

7   Assistance Grant Program ("Byrne JAG" Program).  *See* 34 U.S.C. §§ 10151-10158.  The Byrne

8   JAG Program is a mandatory formula grant, meaning that funds from the grant program are

9   awarded based on a statutorily defined formula and the federal government must disburse the grant

10  if an applicant meets the requirements set forth in the authorizing statutes.  *See id.* § 10156.  The

11  Byrne JAG Program supports state and local law enforcement efforts by providing additional

12  funds for personnel, equipment, training, and other criminal justice needs.  *See id.* § 10151.  For

13  the 2017 fiscal year ("FY2017"), Congress has appropriated $396 million for the Byrne JAG

14  Program.  Consolidated Appropriations Act of 2017, Pub. L. No. 115-31, 131 Stat. 135, 203.

15          The current Byrne JAG Program is the result of the merging of two earlier programs: the

16  Edward Byrne Memorial State and Local Law Enforcement Assistance Program grants; and Local

17  Law Enforcement Block Grants.  *See* Pub. L. No. 109-162, 119 Stat. 2960, 3094 (2006).

18  Following the merger of the two programs, Congress enumerated eight type of programs that the

19  grant was meant to encompass: (1) law enforcement programs; (2) prosecution and court

20  programs; (3) prevention and education programs; (4) corrections and community corrections

21  programs; (5) drug treatment and enforcement programs; (6) planning, evaluation, and technology

22  improvement programs; (7) crime victim and witness programs; and (8) mental health programs.

23  34 U.S.C. § 10152(a)(1)(A)-(H).

24              **B.     The Office of Community Oriented Policing Services**

25          The federal government also announced that grants issued by the Office of Community

26  Oriented Policing Services ("COPS") would also have a Section 1373 certification condition.

27  Office of Community Oriented Policing Services' 2017 COPS Anti-Methamphetamine

28  Program Application Guide, RJN, Ex. C at 2, Appx. D (Dkt. No. 27-1); Office of Community

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1    Oriented Policing Services' 2017 COPS Office Anti-Heroin Task Force Program Application

2    Guide, RJN, Ex. D at 1-2, Appx. D (Dkt. No. 27-1). In FY 2017, access to COPS funds will have

3    threshold eligibility requirement of certified compliance with Section 1373. COPS currently

4    administers six programs, including the COPS Anti-Methamphetamine Program ("CAMP") and

5    the Anti-Heroin-Task Force Program ("AHTF"). State law enforcement agencies use CAMP

6    funds to investigate unlawful activities related to the manufacture and distribution of

7    methamphetamine. COPS Fact Sheet, FY2017 COPS Anti-Methamphetamine Program, *available*

8    *at* https://cops. usdoj.gov/pdf/2017AwardDocs/camp/Fact_Sheet.pdf. AHTF funds are used to

9    investigate illegal activities "related to the distribution of heroin or unlawful distribution of

10   prescriptive opioids, or unlawful heroin and prescription opioid traffickers[.]" COPS Fact Sheet,

11   FY2017 COPS Anti-Heroin Task Force Program, *available at* https://cops.usdoj.gov/pdf/2017

12   AwardDocs/ahtf/Fact_ Sheet.pdf. CAMP and AHTF are each authorized by the Consolidated

13   Appropriations Act, 2017. H.R. 244, Pub. L. 115–31.

14   **III.    CALIFORNIA'S USE OF "JAG" AND "COPS" FUNDS**

15        The State's Byrne JAG Program grants are distributed to its Board of State and

16   Community Corrections ("BSCC"). BSCC has received $252.7 million from the Byrne JAG

17   program since 2006. See Declaration of Mary Jolls ("Jolls Decl.") ¶7. For FY2017, the State

18   expects approximately $28.3 million in JAG funding, with $17.7 million going to BSCC. *Id.*, ¶5.

19   BSCC uses the funding to issue subgrants to local jurisdictions; these jurisdictions then use them

20   for education and crime prevention programs, law enforcement programs, and court programs. *Id.*

21   ¶¶s 8, 10, Ex. A. BSCC currently funds programs for 32 local jurisdictions and the CalDOJ; the

22   funds benefit task forces focused on criminal drug enforcement, violent crime, and gang activity.

23   Jolls Decl. ¶10; Caligiuri Decl. ¶¶s 19-21.

24        CalDOJ has received over $11 million in COPS funding to support law enforcement efforts

25   around the State since it began. Caligiuri Decl. ¶4. For FY2017, CalDOJ applied for

26   approximately $2.8 million in CAMP and AHTF grants. The CAMP grant would cover salaries,

27   benefits, and other costs for a task force targeting enforcement against large–scale

28   methamphetamine drug trafficking organizations. *See id.,* ¶¶s 6-8, 10. The AHTF grant covers

6

equipment, consultants, and other costs for support of task forces that conduct large scale heroin investigations, share data and intelligence among law enforcement throughout the State, and hold education sessions in the community about drug abuse awareness.  *See id.,* ¶¶s 12-14, 16.

## IV.    SECTION 1373

Through the Immigration and Nationalization Act ("INA"), 8 U.S.C. §§ 1101 et seq., Congress granted the executive branch near plenary power over the regulation and enforcement of immigration laws in the U.S.  *See Arizona v. United States*, 567 U.S. 387, 396 (2012).  Most pertinent to this lawsuit, Section 1373 of the INA, which was passed in 1996, prohibits local governments from restricting government officials or entities from communicating information regarding immigration status to the U.S. Immigration and Customs Enforcement ("ICE").  It states in relevant part:

> (a) In General. Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
>
> (b) Additional Authority of Government Entities. Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
> > (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
> >
> > (2) Maintaining such information.
> >
> > (3) Exchanging such information with any other Federal, State, or local government entity.

U.S.C. 1373.

In the 2016 fiscal year ("FY16"), OJP identified Section 1373 as an applicable federal law for the Byrne JAG Program for the first time since the program's inception.  *See* Decl. of Alan R. Hanson (Hanson Decl.) ¶ 3 (Dkt. No. 42-1).  In receiving the award, the State accepted the Section 1373 compliance condition as it relates to the FY 2016 Byrne JAG Program grant.  *See*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    California's FY 2016 Byrne JAG Program Award Document, Hanson Decl., Ex. A (Dkt. No. 42-

2    1).  In July 2017, OJP sought applications for the FY 2017 Byrne JAG Program.  *See* Edward

3    Byrne Memorial Justice Assistance Grant Program FY 2017 State Solicitation, Request for

4    Judicial Notice ("RJN"), Ex. A (Dkt. No. 27-1).  This solicitation informed prospective applicants

5    that the FY 2017 award would be conditioned on all grantees certifying compliance with Section

6    1373.  *Id.* at 31.  The State's Attorney General must sign a standard affidavit, under penalty of

7    perjury, affirming compliance with Section 1373 on behalf of the State and "any entity, agency, or

8    official" as applicable to the "program or activity to be funded." *Id.* at Appx. II.  Governor

9    Edmund G. Brown must also adopt that certification under penalty of perjury.  *Id.* at Appx. I.

10        California Department of Justice ("CalDOJ") submitted its applications with the executed

11    certifications for AHTF and CAMP on July 7 and 10, respectively.  Decl. of Christopher Caligiuri

12    ("Caligiuri Decl.") ¶¶ 9, 15 (Dkt. No. 30). As part of their applications, CalDOJ included a

13    supplemental statement with its COPS Section 1373 certifications.  *Id.*  It clarified that its

14    certifications were made "as [Section 1373] is lawfully interpreted," and reserved its rights to

15    challenge "any unconstitutional enforcement of Section 1373."  *Id.*  The federal government has

16    yet to respond to CalDOJ's applications.  *See id.* ¶¶ 11, 17.

17    **V.    THE DISPUTE IN CALIFORNIA**

18        On April 21, 2017, the federal government sent letters to nine jurisdictions that received

19    the JAG award in 2016, including the State, demanding an official legal opinion that explained the

20    jurisdictions' compliance with Section 1373.  Department of Justice, Letter to Kathleen Howard,

21    Executive Director of the California Board of State and Community Corrections from Alan R.

22    Hanson, Acting Assistant Attorney General for the Office of Justice Programs (April 21, 2017),

23    RJN, Ex. I (Dkt. No. 27-2); Press Release, U.S. Dep't of Justice, Department of Justice Sends

24    Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373 (Apr. 21, 2017),

25    RJN, Ex. M (Dkt. No. 27-3).  On June 29, BSCC submitted the requested legal opinion explaining

26    the State's laws do not violate Section 1373.  *See* Jolls Decl., Ex. C (Dkt. No. 20-1).  Having not

27    received a response when other jurisdictions had received guidance on Section 1373 compliance,

28    on October 31, the State filed a Motion for Preliminary Injunction to prevent enforcement of the

Section 1373 conditions as to the TRUTH Act and its Confidentiality Statutes.

On November 1, 2017, the federal government sent a preliminary compliance assessment letter to California and alerted the State that three provisions of the Values Act may violate Section 1373. Department of Justice, Letter to Kathleen Howard, Executive Director of the California Board of State and Community Corrections from Alan R. Hanson, Acting Assistant Attorney General for the Office of Justice Programs (November 1, 2017), RJN, Ex. P (Dkt. No. 27-3). The highlighted provisions related to: (i) inquiries into an individual's immigration status, Cal. Gov't Code, § 7284.6(a)(1)(A), (ii) responses to notification requests, *id.* § 7284.6(a)(1)(C), and (iii) the sharing of "personal information," *id.* § 7284.6(a)(1)(D)). RJN, Ex. P at 1-2. To comply with Section 1373, the federal government stated that the State must certify that: (1) it does "not restrict California officers and employees from requesting information regarding immigration status from federal immigration officers", and (2) it "interprets and applies [the notification request and personal information] provisions to not restrict California officers from sharing information regarding immigration status with federal immigration officers, including information regarding release date[s] and home address[es]." *Id.* at 1-2. The federal government interprets the State's laws as violating Section 1373 if it cannot make those certifications.

On November 13, the State replied to the federal government's assessment letter. Hanson Decl. ¶ 14. OJP has not responded. *Id.* ¶ 15. The federal government claims that OJP is not issuing FY 2017 Byrne JAG award documents to any applicants while awaiting developments in the other relevant litigation. *Id.* ¶ 10.

## VI.    OTHER RELATED LITIGATION

There have been two other lawsuits challenging the federal government's imposition of new conditions on the Byrne JAG Program grants. In addition to the Section 1373 certification condition, these lawsuits addressed the federal government's imposition of conditions requiring that local authorities provide federal agents advance notice of the scheduled release from state or local correctional facilities of certain individuals suspected of immigration violations (the "notice condition") and that local authorities provide immigration agents with access to local detention facilities (the "access condition").

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In *City of Chicago v. Sessions*, 264 F.Supp.3d 933, 951 (N.D. Ill. 2017), the court granted the City of Chicago's motion for a nationwide preliminary injunction against the imposition of the notice and access conditions and denied the City of Chicago's motion to enjoin the condition requiring compliance with Section 1373.[1]  *Id.* at 951.  With respect to the certification condition, the court found that a provision of the Byrne JAG Program authorizing statute, 34 U.S.C. § 10153(a)(5)(D) that requires certification that an applicant for Byrne JAG Program funds "will comply with all provisions of this part and all other applicable Federal laws" gave the federal government the statutory authority to impose the Section 1373 certification condition. *Id.* at 944-46.  In the court's view, "[t]he most natural reading of the statute authorizes the Attorney General to require a certification of compliance with all other applicable federal laws, which by the plainest definition includes Section 1373." *Id.* at 945-46.  Accordingly, the court found that the City of Chicago could not demonstrate success on the merits as to the certification condition.  The court's order is on appeal.  *See City of Chicago v. Sessions*, No. 17-02991 (7th Cir. Sept 26, 2017) (case heard and taken under advisement by panel on January 19, 2018).

In *City of Philadelphia v. Sessions*, No. 17–3894, ––– F.Supp.3d ––––, 2017 WL 5489476, at *61-62 (E.D. Pa. Nov. 15, 2017), the court granted the City of Philadelphia's motion for preliminary injunction against the imposition of each of the challenged conditions for the Byrne JAG Program grants.  The court found that the federal government's imposition of the notice and access conditions was without appropriate statutory authority under the APA because it was clear that Section 10102(a)(6), which the federal government argues grants it authority to impose the conditions, did not authorize any of the challenged conditions.  *Id.* at *25-27.  As to the certification condition, the court found that Section 10153(a)(5)(D) may act as a separate grant of authority allowing the federal government's imposition of the certification condition.  *Id.*  But the court held that imposition of the certification condition is arbitrary and capricious under the APA because the federal government "failed to give adequate reasons for its decisions examining the relevant data and articulating a satisfactory explanation for its action including rational connection

---

[1] As a result of the nationwide injunction, this Order focuses on the certification condition, which has not been enjoined.

between the facts found and the choice made." *Id.* at *33 (citing *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal quotations omitted)). Further, the court found that the federal government failed to consider important aspects of the problems it sought to solve and its justifications could not "be ascribed to a difference in view or the product of agency expertise." *Id*. Accordingly, it determined that the City of Philadelphia could demonstrate success on the merits as to challenged conditions.

The court did not rest its decision on this likely success on the merits however. It found that Philadelphia's laws substantially complied with the Byrne JAG Program conditions. Further, it held that the City of Philadelphia was able to demonstrate irreparable harm and that the balance of equities and the public interest weighed in its favor. Accordingly, it enjoined the federal government from denying the City of Philadelphia's Byrne JAG Program grant for FY 2017. The court's order is also on appeal. *See City of Philadelphia v. Attorney General U.S.*, No. 18-01103 (3d Cir. Jan. 16, 2018)

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This has been interpreted as a four-part conjunctive test, not a four-factor balancing test. However, the Ninth Circuit has held that a plaintiff may also obtain an injunction if he has demonstrated "serious questions going to the merits" that the balance of hardships "tips sharply" in his favor, that he is likely to suffer irreparable harm, and that an injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

## DISCUSSION

## I.    JUSTICIABILITY

The federal government argues that the State's claims are not justiciable because the State cannot demonstrate the injury-in-fact necessary to establish standing and because its claims are not

11

1    ripe for review.  These principles of standing and ripeness go to whether this court has jurisdiction

2    to hear the State's claims.  I conclude that the State has demonstrated Article III standing to

3    challenge the Section 1373 certification condition and that its claims are ripe for review.

4         The federal government challenges the justiciability of the State's claims on standing and

5    ripeness grounds.  It contends that because it has not withheld or threatened to withhold grant

6    funding on any state statute except for the Values Act, the State lacks standing to seek a ruling on

7    any other state statute.  It also asserts that there is not a ripe controversy because the federal

8    government has not made a final decision as to whether the Values Act violates Section 1373.  (Its

9    argument that the Values Act is not currently in effect and may never be in effect due to a

10   proposed voter referendum is moot because the referendum failed due to lack of signatures on

11   January 17, 2017.)  I address standing and ripeness in turn.

12        **A.  Standing**

13        Article III, section 2 of the Constitution limits the jurisdiction of the federal courts to

14   "Cases" and "Controversies." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007); *see* U.S. Const.

15   art. III, §, cl. 1.  "Standing is an essential and unchanging part of the case-or-controversy

16   requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing a

17   plaintiff must demonstrate "that it has suffered a concrete and particularized injury that is either

18   actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a

19   favorable decision will redress that injury." *Massachusetts*, 549 U.S. at 517 (citing *Lujan*, 504

20   U.S. at 560-61).  An entity facing enforcement action may establish standing by demonstrating a

21   well-founded fear of enforcement and a threatened injury that is "sufficiently real and imminent"

22   or that the well-founded fear is itself causing the present injury. *Cty. of Santa Clara v. Trump*, 250

23   F. Supp. 3d 497, 519 (N.D. Cal. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1976)).

24        The State claims that it has standing to seek relief concerning the amended TRUST Act,

25   TRUTH Act, and state confidentiality statutes because it has a well-founded fear of enforcement

26   against its statutes and the requisite injury-in-fact.  It contends that (1) the federal government has

27   repeatedly highlighted the State's laws as generally not in compliance with Section 1373; (2) the

28   federal government has sought to enforce Section 1373 against laws and policies similar to its

United States District Court
Northern District of California

12

1   confidentiality statutes; and (3) the federal government expressly states that potentially

2   noncompliant laws "may not be limited to" the Values Act and "reserv[es] the right to identify

3   additional bases of potential violations of Section 1373."  RJN, Ex. P.

4          The State asserts that, because the federal government's interpretation of Section 1373 and

5   its certification requirement undermine the "exercise of its sovereign power to create and enforce a

6   legal code," it suffers the requisite injury-in-fact to satisfy the standing requirement.  It also argues

7   that the federal government's actions threaten the loss of Byrne JAG Program funds promised

8   under federal law as well as already awarded COPS funds, which is also sufficient to demonstrate

9   injury-in-fact.

10         The federal government responds that there is no "live controversy" regarding whether any

11   statutes other than the Values Act may comply with Section 1373 and no foreseeable injury-in-fact

12   arising out of the federal government's view of these statutes.  Additionally, it contends that any

13   assumption that the federal government will withhold grant funds based on any statute other than

14   the Values Act is purely speculative and therefore cannot be the basis for standing.

15         As I discuss below, the State has a well-founded fear of enforcement regarding the

16   amended TRUST Act, TRUTH Act, and state confidentiality statutes under the federal

17   government's Section 1373 interpretation and certification condition.  Such enforcement would

18   deprive it of federal grants to which it is otherwise entitled.  The State has demonstrated Article III

19   standing.

20         **1.      California Has Demonstrated a Well-founded Fear of Enforcement**

21          In assessing whether enforcement action is likely, courts look to the past conduct of the

22   government, as well as the government's statements and representations, to determine whether

23   enforcement is likely or simply "chimerical."  *Compare Steffel v. Thompson*, 415 U.S. 452, 459

24   (1947) (finding that petitioner who had been warned twice to stop handbilling, and whose

25   companion had been arrested for handbilling, had well-founded fear of enforcement), *with Poe v.*

26   *Ullman*, 367 U.S. 497, 508 (1961) ("we cannot accept, as the basis of constitutional adjudication,

27   other than as chimerical, the fear of enforcement of provisions that have during so many years

28   gone uniformly and without exception unenforced").  A plaintiff does not need to have been

United States District Court
Northern District of California

United States District Court
Northern District of California

1   specifically threatened with enforcement action to show that enforcement action is likely. *See*

2   *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (plaintiffs had credible threat of

3   enforcement even though newly enacted law had not become effective and no enforcement action

4   had been brought or threatened under it). But "the threat of enforcement must at least be

5   'credible,' not simply 'imaginary or speculative.' " *Thomas v. Anchorage Equal Rights Comm'n*,

6   220 F.3d 1134, 1140 (9th Cir. 2000) (en banc) (citing *Babbitt v. United Farm Workers Nat'l*

7   *Union*, 442 U.S. 289, 298 (1979)).

8          The federal government's contention that the State's fear of enforcement is speculative

9   bears little weight. The federal government has actively sought to enforce Section 1373 against

10  jurisdictions whose laws are undeniably similar to the State's confidentiality statutes. For

11  example, the federal government seeks to enforce Section 1373 against Vermont's Model Fair and

12  Impartial Policing Policy, in which officers are required to communicate that they will not report

13  immigrants or immigration status of victims or witnesses to crimes. Letter to Vermont from Alan

14  R. Hanson, Acting Assistant Attorney General for the OJP at the DOJ, Supplemental RJN, Exh. H

15  (Dkt. No. 61). The requirements of Vermont's law closely mirror that of California's

16  confidentiality statutes.  The same is true of Philadelphia's policy regarding victims of crimes,

17  against which the federal government has also sought to enforce Section 1373. *See* RJN, Exh. R,

18  Letter to Philadelphia from Alan R. Hanson, Acting Assistant Attorney General for the OJP at the

19  DOJ (Dkt. No. 27-3). And in its November letter to the State regarding Section 1373's

20  relationship to the Values Act, the federal government indicated that it "reserves the right to

21  identify additional bases of potential violations of Section 1373." RJN, Ex. P.

22         Members of the Executive Branch have made no secret of their hostility to the State's view

23  of its obligations under Section 1373. Thomas Homan, the Acting Director of Immigration and

24  Customs Enforcement, recently threatened criminal prosecution of political leaders in sanctuary

25  jurisdictions. *See* Interview by Fox News with Thomas Homan, Acting Director, Immigration and

26  Customs Enforcement (Jan. 2, 2018) (Stating "[w]e've got to start charging some of these

27  politicians with crimes" in reference to leaders in "sanctuary cities"); *see also Oversight of the*

28  *United States Department of Homeland Security: Hearing Before the S. Comm. on the Judiciary*

(2018) (statement of Kirstjen Nielsen, United States Department of Homeland Security Director) (noting that DOJ is reviewing "what avenues might be available" to hold leaders accountable for "sanctuary city" policies).  .  On June 13, 2017, Acting Director Homan testified before Congress that jurisdictions that "have some sort of policy where they don't . . . allow [ICE] access to the jails" violate Section 1373.  United States. Cong. House. Appropriations Committee on Home Security. June 13, 2017 (statement of Thomas Homan, Acting Director of the Immigration and Customs Enforcement), RJN, Ex. S at 35, 47-48 (Dkt. No. 27-3).  Further, Attorney General Sessions has stated that "the State of California . . . [has] enacted statutes . . . designed to specifically prohibit or hinder ICE from enforcing immigration law by . . . denying requests by ICE officers and agents to enter prisons and jails to make arrests."  Letter from Jefferson B. Sessions, Attorney General at the U.S. Dep't of Justice and John F. Kelly, then-Secretary of the U.S. Dep't of Homeland Security to the Honorable Tani G. Cantil-Sakauye, Chief Justice of the Supreme Court of California (March 29, 2017), RJN, Ex. T at 2 (Dkt. No. 27-3).   The President himself has threatened to withdraw ICE agents from California because of the state's sanctuary policies.  CNN, *Trump Considers Pulling ICE Agents to Punish California*, Youtube (Feb. 22, 2018), https://www.youtube.com/watch?v=1C3coXw2AI0.

Taken together, these facts establish that California has a well-founded fear of enforcement concerning its amended TRUST Act, TRUTH Act, and state confidentiality statutes.  It has demonstrated that other states that have similar statutes and practices have faced enforcement and that the federal government has a contrary view of Section 1373's reach that would affect its relevant statutes.  And it has established that the federal government has specifically identified the State as having other policies that purportedly violate Section 1373 that were not mentioned in the preliminary assessment letter.  Accordingly, the State has shown that the "threat of enforcement [is] credible, not simply imaginary or speculative."  *Thomas,* 220 F.3d at 1140.

### 2.    California Has Demonstrated Injury-in-fact

The State asserts that because the federal government's interpretation of Section 1373 and its certification requirement undermine the "exercise of its sovereign power to create and enforce a legal code," it suffers the requisite injury-in-fact to satisfy the standing requirement.  It also argues

1   that the federal government's actions threaten the loss of Byrne JAG Program funds promised

2   under federal law as well as already awarded COPS funds, which is also sufficient to demonstrate

3   injury-in-fact.

### a.    California's claims implicate a constitutional interest

5   The State has broad police powers reserved to it under the Constitution to determine its

6   local policies and enforcement priorities pursuant to the Tenth Amendment.  *See Alfred L. Snapp*

7   *& Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (highlighting that states have

8   a sovereign interest in "the exercise of sovereign power over individuals and entities within the

9   relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and

10  criminal"); *see also New York v. United States*, 505 U.S. 144, 157-158 (1992) ("[T]he Tenth

11  Amendment confirms that the power of the Federal Government is subject to limits that may, in a

12  given instance, reserve power to the States.").  The State asserts that the relevant statutes here "are

13  designed to improve public safety of all Californians." Mot. at 2 (Dkt. No. 26).  The statutes

14  strengthen community policing efforts and improve public safety because immigrants are no more

15  likely to commit crimes than native-born Americans and because a clear distinction between local

16  law enforcement and immigration enforcement results in safer communities.  *Id.* at 6.

17  These statutes reflect the State's local judgment of what policies and practices are most

18  effective for maintaining public safety and community health. The State's claim is that the federal

19  government's interpretation of Section 1373 and the compliance condition conflict with its police

20  powers because the federal government seeks to compel it to change its policies in violation of the

21  Tenth Amendment.  *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011)

22  ("when a federal law interferes with a state's exercise of its sovereign 'power to create and enforce

23  a legal code' [] it inflict[s] on the state the requisite injury-in-fact."); *Ohio ex rel. Celebrezze v.*

24  *U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985) (Ohio had standing to litigate the

25  constitutionality of its own law where "effective enforcement of the Ohio statute" was rendered

26  "uncertain by the formal position of the [U.S. Department of Transportation] that the Ohio statute

27  is preempted" as "threatened injury to a State's enforcement of its safety laws" constitutes an

28  injury-in-fact).  This is sufficient to demonstrate injury-in-fact for Article III standing.

United States District Court
Northern District of California

16

United States District Court
Northern District of California

b.      **California is threatened with the loss of federal grants**

The State claims that the federal government threatens to penalize it for failing to comply with the federal government's interpretation of Section 1373 by withholding the COPS grant and the Byrne JAG Program grant.  The State previously received these grants in each year since their inception.  This threatened injury meets Article III's standing requirements.  A "loss of funds promised under federal law [] satisfies Article III's standing requirement." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015).

In sum, the State has established both its well-founded fear of enforcement and a threatened injury that is "sufficiently real and imminent."  It has Article III standing.

**B.    Ripeness**

The federal government asserts that the State's claims regarding the Values Act are not ripe for three reasons: (1) the Office of Justice Programs has not yet responded to the State's letter regarding the Values Act and has not determined administratively whether the Act violates Section 1373; (2) the Values Act is not currently in effect and, due to a referendum request, may never become effective; and (3) a ruling that the Values Act does not violate Section 1373 would not free the State from legal jeopardy unless all its laws, together with policies implementing those laws, are also consistent with Section 1373.

The State points out that those arguments focus on prudential, not constitutional, ripeness. The State contends that its claims are constitutionally ripe because (1) its response to the November 1 Letter effectively "articulated a concrete plan to violate the federal government's interpretation the law in question;" (2) the federal government made a "threat of prosecution" against the State in the letter and through public statements; and (3) the federal government has repeatedly sought to enforce Section 1373 over the past two months, including against the State. As to the prudential ripeness standards, the State believes that the issues in this case are fit for decision and that it will suffer hardship from delayed review.

A dispute is ripe in the constitutional sense if it "present[s] concrete legal issues, presented in actual cases, not abstractions."  *Colwell v. HHS*, 558 F.3d 1112, 1123 (9th Cir.2009) (internal quotation marks omitted).  In the context of a declaratory judgment suit, the inquiry "depends

1   upon 'whether the facts alleged, under all the circumstances, show that there is a substantial

2   controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

3   warrant the issuance of a declaratory judgment.' " *United States v. Braren*, 338 F.3d 971, 975 (9th

4   Cir.2 003) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co*., 312 U.S. 270, 273 (1941)).

5          Ripeness and standing are closely related because they "originate from the same Article III

6   limitation."  *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 n. 5 (2014) (internal

7   quotation marks omitted) ("[T]he Article III standing and ripeness issues in this case boil down to

8   the same question." (internal quotation marks omitted)).  As a result, the Ninth Circuit has

9   recognized that "in many cases, ripeness coincides squarely with standing's injury in fact prong."

10  *Thomas*, 220 F.3d at 1138 ("The constitutional component of the ripeness inquiry is often treated

11  under the rubric of standing . . . .  Indeed, because the focus of our ripeness inquiry is primarily

12  temporal in scope, ripeness can be characterized as standing on a timeline.").

13         In order to be constitutionally ripe, the State must demonstrate that the injury is

14  "imminent."   An injury is imminent "if the threatened injury is 'certainly impending,' or there is a

15  " 'substantial risk" that the harm will occur.' " *Susan B. Anthony List*, 134 S.Ct. at 2341 (quoting

16  *Clapper v. Amnesty Int'l USA*, 133 S.Ct. at 1147, 1150 n. 5 (2013)).  The State asserts that it will

17  be harmed by the federal government's interpretation of Section 1373 because the State's laws

18  violate the federal government's broad interpretation of Section 1373, open up the State to

19  prosecution and endanger its future grant funds.  Through the federal government's November

20  letter to the State, it showed that it intends to prosecute any entities that do not comply with its

21  interpretation of Section 1373.  The federal government has also sought to enforce the compliance

22  condition with respect to other laws that mirror those of the State.  And finally, the federal

23  government has explicitly stated that receipt of both the Byrne JAG Program and COPS funds are

24  conditioned on the Section 1373 certification.  Accordingly, the State has demonstrated both that

25  the threatened injury is "certainly impending" and that there is a "substantial risk" that harm will

26  occur.  *See id.*  This is sufficient to establish constitutional ripeness.

27         The Ninth Circuit has previously declined to reach prudential ripeness when constitutional

28  ripeness is satisfied.  *See Susan B. Anthony List*, 134 S.Ct. at 2347 (refusing to "resolve the

United States District Court
Northern District of California

18

1  continuing vitality of the prudential ripeness doctrine"). I follow its direction. The State has

2  demonstrated that its claims are ripe for review. I now move to the merits of its motion for

3  preliminary injunction.

4  **II.      LIKELIHOOD OF SUCCESS ON THE MERITS**

5         The State challenges the Section 1373 certification condition on four grounds: (1) the

6  imposition of the condition is arbitrary and capricious in violation of the Administrative Procedure

7  Act ("APA"); (2) the condition violates the Spending Clause because it is unrelated to the purpose

8  of the JAG Byrne Program; (3) the State's statutes do not violate Section 1373; and (4) the Tenth

9  Amendment does not allow for Section 1373 to "commandeer" the State's control over

10 governmental employees and its residents' confidential personal information. The federal

11 government responds that the Section 1373 condition is consistent with the APA and the spending

12 clause; the State cannot demonstrate that none of its laws would violate the Section 1373

13 compliance condition; and the State cannot show that the Section 1373 compliance condition

14 violates the Tenth Amendment.

15        **A.    APA Claim**

16        The State argues that the Section 1373 certification condition is "arbitrary and capricious"

17 under the APA. The federal government contends that the APA claim cannot go forward because

18 it does not challenge "final agency action" given that the federal government has not made a final

19 determination that the State violates the certification condition. 5 U.S.C. § 704. The federal

20 government also asserts that even if APA review is available at this point in time, the challenged

21 condition is well supported by a reasoned explanation. I address each argument in turn.

22        **1.    Imposition of the Certifying Condition Is Final Agency Action**

23        For agency action to be final, the action must (1) "mark the consummation of the agency's

24 decisionmaking process," meaning not "tentative or interlocutory" and (2) "be one by which rights

25 or obligations have been determined, or from which legal consequences will flow." *Bennett v.*

26 *Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted). To satisfy the first prong of the *Bennett*

27 test, an agency must have "rendered its last word on the matter." *Whitman v. Am. Trucking Ass'n*,

28 531 U.S. 457, 478 (2001) (quotation omitted).

The imposition of the certification condition on the Byrne JAG program meets this requirement. By imposing the certification condition, the federal government has articulated that certain funds, namely the COPS grants and the Byrne JAG Program grants, will require adherence to the certification condition. It has rendered its final word, satisfying the first prong of the *Bennett* test.

As to the second prong of the *Bennett* test, legal consequences clearly flow from the imposition of the certification condition. Receipt of the grants is conditioned on certifying compliance with the federal government's interpretation of Section 1373. *See Appalachiam Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding that a EPA guidance document gives "marching orders" to be final agency action despite explicit language disclaiming that information provided was merely guidance). Further, the State must certify compliance to the federal government's interpretation of Section 1373 under penalty of perjury. Given the parties' diverging interpretation of the breadth of Section 1373, the certifying condition clearly opens up the State to potential legal consequences.

### 2. It Is Too Soon To Determine Whether the Federal Government's Imposition of the Certifying Condition Is Arbitrary and Capricious

The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The justification for an agency's final action is typically apparent as the result of formal rulemaking, notice-and-comment requirements, and associated hearings. But because the State's challenge is to grant conditions, these administrative procedures were not required prior to the federal government's decision to impose the certification condition. *See id.* § 553(a)(2) (exempting "matter(s) relating to agency management or personnel or to public property, loans, grants, benefits, or contracts" from rulemaking requirements).

The State argues that the identification of Section 1373 as an "applicable law" for the Byrne JAG Program grant is arbitrary and capricious in violation of the APA. It contends that the federal government has failed to identify a good reason for the policy change as required by the APA. The federal government responds that it has met its burden to demonstrate that its reasons

1    for imposing the condition were rational.

2          In order to demonstrate these "rational" reasons, the federal government points only to a

3    press release that it issued on July 25, 2017.  *See* Press Release, U.S. Dep't of Justice,

4    Backgrounder on Grant Requirements ("Backgrounder") (July 25, 2017), *available at*

5    https://www.justice.gov/opa/ press-release/file/984346/download.  The Backgrounder highlights

6    three of the federal government's concerns as they pertain to Section 1373 compliance condition:

7    (1) jurisdictions that refuse to cooperate with federal immigration authorities in information

8    sharing about undocumented immigrants who commit crimes; (2) the use of federal funds for

9    policies that frustrate federal immigration enforcement; and (3) jurisdictions that jeopardize the

10    safety of their residents and undermine the Department's ability to protect the public and reduce

11    crime and violence.  *City of Philadelphia v. Sessions*, --- F.Supp.3d ---, 2017 WL 5489476, at *31

12    (E.D. Pa. Nov. 15, 2017).  The federal government could place conditions on grants with these

13    goals in mind if there is a "rational connection between the facts found and the choice made" to

14    achieve these goals.  *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto Ins. Co*, 463 U.S. 29, 43

15    (1983).

16          It is not clear, however, that the certifying condition has the requisite rational connection to

17    the facts articulated in the Backgrounder.  As the court in *City of Philadelphia* explains, the plain

18    language of Section 1373 is too broad to achieve the information sharing goal listed in the first

19    concern.  2017 WL 5489476, at *3.  The immigration information implicated by Section 1373

20    captures the immigration status of all people in the United States, not merely those who are

21    present unlawfully.  *See* 8 U.S.C. §1372.  Its language does not limit its mandate to merely

22    immigrants who have committed crimes.  *Id.*  Section 1373's language captures so broad a

23    category of individuals that requiring compliance cannot further the goal of better information-

24    sharing between the federal government and local law enforcement regarding illegal immigrants

25    who commit crimes.

26          As to the federal government's second concern, the funds from the Byrne JAG Program

27    are used for purposes unrelated to immigration enforcement, such as funding task forces focused

28    on criminal drug enforcement, violent crime, and gang activity.  Jolls Decl. ¶ 10.  Consequently,

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1    withholding the grant funds because of the certification condition does not further the federal

2    government's goal of prohibiting "use of federal funds for policies that frustrate federal

3    immigration enforcement."  Instead, the certification condition amounts to a way to target

4    jurisdictions that do not comply with the federal government's interpretation of Section 1373.

5            Its third concern—jurisdictions that jeopardize the safety of their residents and undermine

6    the Department's ability to protect the public and reduce crime and violence—is unsupported.

7    The federal government presents no evidence that there is any link between increases in crime and

8    violence and imposing the certification condition, especially given that Section 1373's language

9    captures the immigration status of both criminal and non-criminal immigrants.

10           The State points to evidence that keeping the immigration status of undocumented

11   immigrants confidential in certain circumstances improves the community's relationship with law

12   enforcement, making immigrants, both documented and undocumented, more likely to report

13   crimes.  California Assembly Committee on Public Safety's analysis of AB 2792 ("the TRUTH

14   Act"), RJN, Ex. F at 5 (Dkt. No. 27-2).  It also highlights studies that concluded that first

15   generation immigrants, including undocumented immigrants, were considerably less likely to

16   commit violent acts than third-generation Americans.  This study also revealed that living in

17   neighborhoods of concentrated immigration was associated with lower violence.  California

18   Senate Committee on Public Safety's analysis of AB 4 ("the TRUST Act"), RJN, Ex. G at 8.

19   Given the State's evidence that immigration status is not linked to pervasive criminal activity and

20   violence and the federal government's lack of evidence supporting such an assertion, there does

21   not appear to be rational connection between imposing the certification condition and "the

22   Department's ability to protect the public and reduce crime and violence."

23           All that said, criminal law impacts the INA in a variety of ways, and, as discussed below,

24   the relationship the government needs to add conditions to the receipt of grants does not need to be

25   close.  While the federal government fails to identify any goal set out in the Backgrounder that is

26   furthered by the imposition of the certification condition, I am not prepared at the moment to find

27   that the certification condition is arbitrary and capricious under the APA.  5 U.S.C. § 706(2)(A).

28   The change in policy might "be ascribed to a difference in view," *Motor Vehicle*, 463 U.S. at 43.

An issue that needs to be tied down is whether the federal government's interpretation of Section 1373 is unconstitutional because it is so broad that it violates the State's police powers under the Tenth Amendment.

## B.   Spending Clause

In authorizing the Byrne JAG Program, Congress indicated its intent to require "applicant[s]" to "comply with . . . all other applicable Federal laws." *See* 34 U.S.C. § 10153(a)(5)(D).   The federal government contends that there is a clear relationship between the Section 1373 condition and the Byrne JAG Program goals.   Relying on *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002), it argues that the condition "satisfies the 'low-threshold' relatedness inquiry."

The State responds that, even at a low bar, the condition requiring compliance with Section 1373, an immigration statute, is unrelated to the funding of local "criminal justice" programs that JAG is intended to support.   The State argues that Section 1373 has no nexus to the purpose of the implicated funds.   To bolster its position, it points to *City of Philadelphia,* where the court found that "federal interest in enforcing immigration laws falls outside of the scope of the Byrne JAG program."   2017 WL 5489476, at *48.

The State's reliance on the statement from *City of Philadelphia* ignores that the court also declared that "the Certification Condition appears to have some relationship with the JAG Program" and that "the 'relatedness issue' is a close call." *Id.* at *50.  In *New York v. United States,* 505 U.S. 144, 167 (1992), the U.S. Supreme Court stated that "[s]uch conditions must . . . bear *some relationship* to the purpose of the federal spending."  (emphasis added). This language does not support a demanding reading of the relatedness requirement.   Rather, it appears to enforce a rather low-threshold relatedness test.   Given this, the Section 1373 certification condition may have a sufficient nexus to the purpose of the implicated funds, depending on the breadth of the federal government's interpretation of Section 1373.

## C.   Tenth Amendment and Section 1373

The State contends that the federal government's enforcement of Section 1373 against its statutes constitutes commandeering of the State's oversight of governmental employees and

23

1    handling of its residents' confidential personal information.  In its view, the relevant question is

2    whether Section 1373 can be enforced against the state's statutes under the Tenth Amendment of

3    the Constitution.

4          The federal government argues that it is not violating the Tenth Amendment by arguing

5    that the Values Act does not comply with Section 1373.  It provides three justifications for its

6    position: (1) the dispute here does not involve a federal statutory mandate that directly regulates

7    the State, but rather a condition on receipt of federal funds that the State and its subdivisions are

8    free to accept or reject; (2) the purpose and effect of Section 1373 and the challenged grant

9    conditions are to further the express goals of the INA, not to "commandeer" state officials; and (3)

10   a mere requirement not to prohibit individuals from providing information would not violate the

11   Tenth Amendment.

12         "The Federal Government may not compel the States to enact or administer a federal

13   regulatory program." *New York*, 505 U.S. at 188.  "The Federal Government may neither issue

14   directives requiring the States to address particular problems, nor command the States' officers, or

15   those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*

16   *v. United States*, 521 U.S. 898, 935 (1997).  "That is true whether Congress directly commands a

17   State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own."

18   *NFIB*, 132 S.Ct. at 2602.

19         I agree with the courts in *City of Philadelphia*, 2017 WL 5489476, at *48, and *City of*

20   *Chicago,* 264 F. Supp. 3d at 949, that whether the certification condition violates the Tenth

21   Amendment is "a unique and novel constitutional question."  No cited authority holds that the

22   scope of state sovereignty includes the power to forbid state or local employees from voluntarily

23   complying with a federal program.  Section 1373 "does not require" that the State "enact any laws

24   or regulations.  And it does not require state officials to assist in the enforcement of federal

25   statutes regulating private individuals."  *See Reno v. Condon*, 528 U.S. 141, 151 (2000).  It does

26   prohibit the State from restricting its officials from assisting a federal program.

27         There is an interpretation of Section 1373 that is consistent with the constitutional

28   principles discussed in *New York* and *Printz*.  *See Printz*, 521 U.S. at 935; *New York*, 505 U.S. at

United States District Court
Northern District of California

24

1    161–63.  Section 1373 can be interpreted not to import an affirmative duty at all.  But it is not

2    clear that the federal government has adopted such an interpretation.  The question is whether the

3    federal government's interpretation exceeds the constitutional reach of Section 1373.

4         Section 1373 requires the sharing of information with the federal government "regarding

5    immigration status."  The meaning of that phrase is ambiguous.  The federal government has not

6    tried to define that phrase, and has not settled on a definition now, even though some of its

7    officials are threatening criminal prosecution against political leaders whose understanding of the

8    constitutional reach of Section 1373 differs from theirs.  Under the INA, almost every bit of

9    information about an individual could be relevant to status, particularly with respect to the right to

10   asylum or as a defense to removal.  The State reads the phrase narrowly, as requiring only

11   information whether a person is a citizen of the US, present here in some other capacity, or

12   undocumented, which is literally what "status" is.  *See Steinle v. City & Cnty. of San Francisco*,

13   230 F.Supp.3d 994, 1015-16 (N.D. Cal. 2017) (finding that city policy would only violate Section

14   1373 by "restricting the provision of inmates' citizenship and immigration status to ICE").

15        At this time, only the State's obligation to communicate "personal information" and

16   release dates of detainees is in dispute with respect to the Values Act.  There is a nationwide

17   injunction against the federal government regarding the effect of Section 1373 on other aspects of

18   the Byrne grants.  *City of Chicago,* 264 F. Supp. 3d at 952.  The personal information and dates of

19   release from jail of undocumented detainees are of obvious interest to the federal government for

20   purposes of immigration enforcement, but not so obviously for immigration status.  It is valuable

21   to ICE to cross-check names and addresses of detainees to insure that it only targets persons

22   eligible for removal, and to pick them up from local jails before their release.  But ICE's

23   enforcement interest conflicts with the reason the State passed the Values Act, which was to

24   encourage cooperation between law enforcement and immigrant communities.

25        As I understand it, the disagreement here involves a subset of detained, undocumented

26   people.  The State's statutes do not impact the free flow of this information regarding those

27   accused of hundreds of the most serious state crimes; it exempts those arrested or convicted of less

28   serious, largely non-violent, offenses.  The State's law enforcement strategy depends on keeping

United States District Court
Northern District of California

the trust of immigrant communities so that, among other things, they will report crimes and rely on law enforcement, not criminal gangs, for protection.  The state statutes also explicitly keep confidential information in juvenile records and regarding those people federal law also protects who are eligible for "U" and "T" visas.  The government has not articulated its position regarding the confidentiality statutes in this litigation.

DOJ is apparently processing the COPS grant according to its usual administrative procedure and has yet to make a final pronouncement, although all indications are that it will find the State out of compliance with Section 1373 because of the personal information and release date provisions.  The federal government has authority to set immigration policy.  But where that policy collides with the State's constitutional police powers, it is important to understand the parameters of the federal government's interpretation of Section 1373.  Does DOJ assert that the State's confidentiality statutes should not be respected?  How does it square that with the INA statutes requiring confidentiality concerning the same subject matter?  If personal information and release dates of detainees are encompassed within Section 1373's sweep as "regarding immigration status," what are the contours of DOJ's definition; does it include every fact about a detainee's life, or something else?  How does that square with the language and intent regarding Section 1373?  The State has been transparent about the purpose of its statues, but the Values Act has just been implemented.  What is the burden on a local enforcement agency to provide personal information and release dates for persons the agency knows are undocumented (recognizing the Values Act precludes officers from requesting information on status for less serious offenses, so this information may not be readily available unless it is determined that Section 1373 requires the agency to maintain and disclose status information)?  How does the State comply with Section 1373 in providing information regarding immigration status?

Those are a few of the issues that should be clarified.  I find that the record is not sufficient at this stage to determine that State has shown a likelihood of success on the merits.

## III.  IRREPARABLE HARM

The State asserts two ways in which it will suffer imminent and irreparable harm if I deny its motion for a preliminary injunction: (1) it will suffer a constitutional injury to its sovereignty if

United States District Court
Northern District of California

the fellow government follows its interpretation of Section 1373 and requires certification of such interpretation from applicants of the Byrne JAG Program funds; and (2) construing Section 1373 to invalidate its statutes would either cause harm to its communities, eroding trust between law enforcement and immigrant communities, or force the State to lose the Byrne JAG Program funding, which would leave law enforcement programs detrimentally impacted.  The federal government argues that the State has failed to demonstrate immediate and irreparable harm because (1) the amount of potential funding at stake is not coercively high; and (2) the State's claim is belied because its long delay in bringing a legal challenge despite the certification requirement was required for FY 2016.

At the moment, the merits of the State's constitutional claim are uncertain and its injury is the delay of a $1 million grant.  While delay in funding is potentially injurious, the amount is not so great that the State could not cover it while the litigation continues.  At this point, the injury is not irreparable.

## IV.   PUBLIC INTEREST AND BALANCE OF EQUITIES

The remaining two factors in the preliminary injunction calculus are considered together in litigation in where the federal government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). The State's evidence demonstrates how its statutes related to the confidentiality of and release of immigration status information are consistent with the exercise of its police powers.  It also shows the important criminal law enforcement measures for which it intends to use the grant funds.  The federal government does not address how declining to enforce the certification condition against the State would affect it.

On this record, the public interest would appear to be better served if the State did not have to choose between the Byrne JAG Program grant funds to assist its criminal law enforcement efforts and the health of its relationship with the immigrant community.  But in light of the uncertainty of the merits and the current lack of irreparability of the injury, these factors do not tip the scale sufficiently to require injunctive relief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

The issues in this case will benefit from further development.  It is unclear to me whether the State's or federal government's interpretation of Section 1373 and the Tenth Amendment will prevail on the personal information and release date issues; moreover, this lawsuit addresses a plethora of other issues besides those discrete ones.  While the State to date has suffered an injury, it is only in the delay of $1 million of a federal grant that it previously received, not in the refusal to pay.  I find that the State has not demonstrated that I should issue a preliminary injunction at this time.  Its motion is DENIED.[2]

**IT IS SO ORDERED.**

Dated: March 5, 2018

William H. Orrick
United States District Judge

---

[2] To the extent that I rely on the documents in this docket of which California requests judicial notice, its requests for judicial notice are GRANTED.  *See* Dkt. Nos. 27, 61, 79.  All other requests for judicial notice are DENIED AS MOOT.

28