XAVIER BECERRA
Attorney General of California
SATOSHI YANAI
Supervising Deputy Attorney General
SARAH E. BELTON
LISA C. EHRLICH
LEE SHERMAN (SBN 272271)
Deputy Attorneys General
 300 S. Spring St., Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6404
 Fax:  (213) 879-7605
 E-mail:  Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, ex rel, XAVIER BECERRA, in his official capacity as Attorney General of the State of California,**<br><br>Plaintiff,<br><br>v.<br><br>**JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States; ALAN R. HANSON, in his official capacity as Principal Deputy Assistant Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; and DOES 1-100,**<br><br>Defendants. | Case No.  3:17-cv-04701-WHO<br><br>**PLAINTIFF STATE OF CALIFORNIA'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:          September 5, 2018<br>Time:          2:00 p.m.<br>Dept:          2<br>Judge:        Honorable William H. Orrick<br>Trial Date:  January 28, 2019<br>Action Filed:  August, 14, 2017 |

1

**TABLE OF CONTENTS**

2

**Page**

3

Notice of Motion and Motion for Summary Judgment.................................................. 1

4

Memorandum of Points and Authorities ...................................................................... 1

Introduction .................................................................................................................. 1

5

Background .................................................................................................................... 3

6

I.      Section 1373 and the INA .............................................................. 3

7

II.     California's Statutes ........................................................................ 4

8

A.      The TRUST, TRUTH, and Values Acts and California's
        Implementation ................................................................... 5

9

B.      California's Confidentiality Statutes.................................... 7

10

III.    The JAG Authorizing Statute and the State's JAG and COPS Grants ................. 8

IV.     Defendants' Conduct with Respect to JAG and COPS Grants ............................ 8

11

Argument ..................................................................................................................... 10

12

I.      Legal Standard .............................................................................. 10

13

II.     Defendants Lack Statutory Authority to Impose the Access and
        Notification Conditions (Counts 1 and 3) ................................... 11

14

III.    All Three JAG Conditions Violate the Spending Clause (Counts 2 and 3) ......... 14

15

A.      There is No Sufficient Nexus Between the Conditions and JAG's
        Purpose ............................................................................... 14

16

B.      The Access and Notification Conditions are Ambiguous......................... 15

IV.     All Three JAG Conditions Are Arbitrary and Capricious (Count 4) .................. 15

17

V.      This Court Should Declare That § 1373 Cannot be Lawfully Enforced
        Against the Identified State Laws (Count 5) ................................ 19

18

A.      *Murphy* Confirms § 1373 Cannot be Constitutionally Enforced
        Against the State Laws ....................................................... 19

19

B.      Defendants' Expansive Interpretation of § 1373 Cannot be
        Constitutionally Enforced Against the State's Laws ............................ 20

20

C.      The State's Laws Comply with § 1373 as Lawfully Construed ............... 25

21

D.      The State Laws Allow LEAs to Provide Information to Immigration
        Authorities as Defendants' Interpretation of § 1373 Requires ............... 27

22

VI.     The State is Entitled to Injunctive Relief .................................... 30

23

A.      Irreparable Harm and Balance of Hardships and the Public Interest ........ 30

24

B.      Nationwide Injunctive Relief .............................................. 32

25

C.      Mandamus Relief/Mandatory Injunction ............................ 33

26

Conclusion ................................................................................................................... 35

27

28

i

1

# TABLE OF AUTHORITIES

2

**Page**

3    CASES

4    *Alden v. Maine*

5       527 U.S. 706 (1999)................................................................................20

6    *Am. Bioscience, Inc. v. Thompson*
        269 F.3d 1077 (D.C. Cir. 2001) .............................................................10

7
     *Am. Trucking Ass'ns, Inc. v. Los Angeles*
8       559 F.3d 1046 (9th Cir. 2009)..........................................................30, 31

9    *Ariz. Dream Act Coalition v. Brewer*
        757 F.3d 1053 (9th Cir. 2014)................................................................32
10

11   *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
        548 U.S. 291 (2006)..........................................................................11, 13
12
     *Bennett v. Spear*
13      520 U.S. 154 (1997)................................................................................16

14   *Bond v. United States*
        134 S. Ct. 2077 (2014)............................................................................25
15

16   *Bresgal v. Brock*
        843 F.2d 1163 (9th Cir. 1987).................................................................33
17
     *Califano v. Yamasaki*
18      442 U.S. 682 (1979)................................................................................33

19   *Cape May Greene, Inc. v. Warren*
        698 F.2d 179 (3d Cir. 1983).....................................................................16
20

21   *Casa De Maryland v. DHS*
        284 F. Supp. 3d 758 (D. Md. 2018) ........................................................27
22

23   *Chamber of Commerce of the U.S. v. Whiting*
        563 U.S. 582 (2011)................................................................................25

24   *Charles v. Verhagen*
        348 F.3d 601 (7th Cir. 2003)...................................................................15
25

26   *Chicago v. Sessions*
        264 F. Supp. 3d 933 (N.D. Ill. 2017) ........................................................9

27   *Chicago v. Sessions*
        888 F.3d 272 (7th Cir. 2018)............................................................ *passim*
28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Chicago v. Sessions*
    No. 17-2991 (7th Cir. (*en banc*) 2018) .................................................3, 9, 10, 31

4

5

*City of Arlington, Tex. v. FCC*
    569 U.S. 290 (2013).................................................................................11

6

*City of New York v. United States*
    179 F.3d 29 (2d Cir. 1999)....................................................................20, 23

7

8

*Custis v. United States*
    511 U.S. 485 (1994)...............................................................................25

9

*DeCanas v. Bicas*
    424 U.S. 351 (1976)...............................................................................24

10

*eBay Inc. v. MercExchange, LLC*
    547 U.S. 388 (2006)...............................................................................30

11

12

*Encino Motorcars, LLC v. Navarro*
    136 S. Ct. 2117 (2016)...........................................................................18

13

14

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009)...............................................................................19

15

*FDA v. Brown & Williamson Tobacco Corp.*
    529 U.S. 120 (2000)...............................................................................13

16

17

*Gregory v. Ashcroft*
    501 U.S. 452 (1991)...........................................................................20, 25

18

19

*Hawaii v. Trump*
    585 U.S. __, slip op. (2018) .....................................................................26

20

*Jama v. ICE*
    543 U.S. 335 (2005)...............................................................................11

21

22

*Kansas v. United States*
    249 F.3d 1213 (10th Cir. 2001).................................................................30

23

24

*Los Angeles v. Adams*
    556 F.2d 40 (D.C. Cir. 1977)....................................................................34

25

26

*Los Angeles v. McLaughlin*
    865 F.2d 1084 (9th Cir. 1989)...................................................................34

27

28

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3
4
*Los Angeles v. Sessions*
293 F. Supp. 3d 1087 (C.D. Cal. 2018)............................................................11, 31

5
*Marquez v. Hardin*
339 F. Supp. 1364 (N.D. Cal. 1969) .................................................................35

6
7
*Melendres v. Arpaio*
784 F.3d 1254 (9th Cir. 2015)...........................................................................33

8
9
*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992) ..........................................................................................30

10
*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ............................................................................................16

11
12
*Murphy v. NCAA*
138 S. Ct. 1461 (2018) ............................................................................. *passim*

13
14
*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*
545 U.S. 967 (2005) ..........................................................................................18

15
*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*
145 F.3d 1399 (D.C. Cir. 1998) ........................................................................32

16
17
*New York v. United States*
505 U.S. 144 (1992) ....................................................................................14, 22

18
19
*Nken v. Holder*
556 U.S. 418 (2009) ..........................................................................................30

20
*Norton v. S. Utah Wilderness Alliance*
542 U.S. 55 (2004) ............................................................................................34

21
22
*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*
477 F.3d 668 (9th Cir. 2007)..............................................................................18

23
24
*Occidental Eng'g Co. v. INS*
753 F.2d 766 (9th Cir. 1985).............................................................................11

25
*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981) ................................................................................11, 13, 14

26
27
*Philadelphia v. Sessions*
280 F. Supp. 3d 579 (E.D. Pa. 2017) ..........................................................17, 18

28

iv

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Philadelphia v. Sessions*
No. 17-3894, 2018 WL 2725503 (E.D. Pa. June 6, 2018) ................................. *passim*

*Presley v. Etowah Cty. Comm'n*
502 U.S. 491 (1992) ................................................................................................21

*Printz v. United States*
521 U.S. 898 (1997) ................................................................................20, 22, 24

*Providence Yakima Med. Ctr. v. Sebelius*
611 F.3d 1181 (9th Cir. 2010) ..........................................................................16

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*
566 U.S. 639 (2012) ................................................................................................27

*Raley v. Ohio*
360 U.S. 423 (1959) ................................................................................................27

*Roach v. Mail Handlers Ben. Plan*
298 F.3d 847 (9th Cir. 2002) ..........................................................................26

*Sanchez v. Sessions*
870 F.3d 901 (9th Cir. 2017) ..........................................................................27

*Santa Clara v. Trump*
250 F. Supp. 3d 497 (N.D. Cal. 2017) ..........................................................15

*Sierra Pacific Industries v. Lyng*
866 F.2d 1099 (9th Cir. 1989) ..........................................................................34

*South Dakota v. Dole*
483 U.S. 203 (1987) ................................................................................................14

*State Highway Comm'n of Mo. v. Volpe*
479 F.2d 1099 (8th Cir. 1973) ....................................................................12, 34

*Steinle v. City & Cty. of San Francisco*
230 F. Supp. 3d 994 (N.D. Cal. 2017) ......................................................25, 26

*Stone v. INS*
514 U.S. 386 (1995) ................................................................................................12

*Stuller, Inc. v. Steak N Shake Enters., Inc.*
695 F.3d 676 (7th Cir. 2012) ..........................................................................31

v

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Suffolk v. Sebelius*
  605 F.3d 135 (2d Cir. 2010)..................................................................................32

*Telecommc'ns. Research & Action v. FCC (TRAC)*
  750 F.2d 70 (9th Cir. 1984)............................................................................34, 35

*Train v. City of New York*
  420 U.S. 35 (1975)..............................................................................................34

*United States v. California*
  No. 18-cv-490 (E.D. Cal. 2018)................................................................... *passim*

*United States v. Lopez*
  514 U.S. 549 (1995)............................................................................................24

*United States v. Morrison*
  529 U.S. 598 (2000)..............................................................................22, 24, 25

*United States v. North Carolina*
  192 F. Supp. 3d 620 (M.D.N.C. 2016)................................................................31

*Utility Air Regulatory Grp. v. EPA*
  134 S. Ct. 2427 (2014)........................................................................................33

*Whitman v. Am. Trucking Ass'ns*
  531 U.S. 457 (2001)............................................................................................13

*Whole Woman's Health v. Hellerstedt*
  136 S. Ct. 2292 (2016)........................................................................................33

*Zamecnik v. Indian Prairie Sch. Dist. #204*
  636 F.3d 874 (7th Cir. 2011)..............................................................................33

**STATUTES**

5 United States Code
  § 706..........................................................................................................15, 33, 34

vi

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

8 United States Code
     § 1101 ........................................................................................4, 21, 27

4

     § 1152 ..............................................................................................26

5

     § 1182 ........................................................................................14, 21
     § 1186 ..............................................................................................21

6

     § 1202 ..............................................................................................14
     § 1225 ........................................................................................21, 26

7

     § 1231 ..............................................................................................26
     § 1360 ..............................................................................................26

8

     § 1367 ....................................................................................4, 26, 27

9

     § 1373 ........................................................................................ passim
     § 1446 ..............................................................................................21

10

26 United States Code

11

     § 6103 ..............................................................................................30

12

34 United States Code
     § 10102 ...................................................................................1, 12, 13

13

     § 10152 ..........................................................................................8, 14

14

     § 10153 ..........................................................................................8, 11
     § 10156 ...................................................................................8, 33, 34

15

     § 10228 ..............................................................................................13
     § 20927 ........................................................................................13, 32

16

     § 30307 ..............................................................................................32

17

California Civil Code

18

     § 1798.3 ..............................................................................................5

19

California Code of Civil Procedure
     § 155 ..........................................................................................5, 7, 27

20

California Government Code

21

     § 6254 ..............................................................................................28

22

     § 7282 ..........................................................................................5, 28
     § 7282.5 ..............................................................................................29

23

     § 7283 ................................................................................................5
     § 7283.1 ..............................................................................................5

24

     § 7284.2 ..........................................................................................4, 5
     § 7284.4 ................................................................................................6

25

     § 7284.6 ....................................................................................... passim

26

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

California Penal Code

4

§ 422.93................................................................................................4, 5, 7, 26
§ 679.10.................................................................................................5, 7, 26

5

§ 679.11.................................................................................................5, 7, 26
§ 5025.......................................................................................................6, 28

6

§ 5026.......................................................................................................6, 28

7

California Welfare & Institutions Code

8

§ 827.......................................................................................................5, 7, 27
§ 831.......................................................................................................5, 7, 27

9

**CONSTITUTIONAL PROVISIONS**

10

United States Constitution, Tenth Amendment ...........................................2, 19, 20, 21

11

**COURT RULES**

12

California Rules of Court

13

Rule 5.552(b)-(c) .............................................................................................7

14

Federal Rules of Civil Procedure

15

Rule 56(a) .....................................................................................................10

16

**OTHER AUTHORITIES**

17

8 Code of Federal Regulations

18

§ 244.16.........................................................................................................30

19

28 Code of Federal Regulations

§ 66.12.........................................................................................................12

20

151 Cong. Rec. 25 (2005) ...................................................................................14

21

2013 Cal. Legis. Serv. Ch. 570 § 1(d)......................................................................4

22

2016 Cal. Legis. Serv. Ch. 768 § 2(i)........................................................................4

23

H.R. Rep. 109-233 (2005)................................................................................8, 12

24

TRAC Reports, Inc., Latest Data: Immigration and Customs Enforcement

25

Detainers, California (2018)................................................................................4

26

27

28

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on Wednesday, September 5, at 2:00 p.m. or as soon thereafter as it may be heard before the Honorable William H. Orrick in Courtroom 2 of the U.S. District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff State of California, ex rel. Xavier Becerra, California Attorney General, will and does hereby move for summary judgment. This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the declarations, the Request for Judicial Notice, as well as the papers, evidence and records on file, and any other written or oral evidence or argument as may be presented at or before the time this Motion is heard by the Court.

California respectfully requests that the Court enter judgment in its favor as to each of its claims for relief because the undisputed evidence shows that: (1) the imposition of the Access and Notification Conditions violates the constitutional separation of powers; (2) the Access, Notification, and § 1373 Conditions (Challenged Conditions) violate the Spending Clause; (3) the Challenged Conditions violate the APA; (4) California is entitled to declaratory relief that all of the laws identified in its First Amended Complaint (FAC) comply with 8 U.S.C. § 1373 and § 1373 is unconstitutional on its face and in application; and (5) California is entitled to injunctive relief prohibiting Defendants from unlawfully withholding Edward Byrne Memorial Justice Assistance Grants (JAG) and Community Oriented Policing Services (COPS) funds.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This Motion seeks to stop Defendants' unilateral and unconstitutional imposition of funding requirements designed to strip critical law enforcement grants from California for exercising its constitutionally protected right not to acquiesce to the federal government's immigration enforcement demands. To justify at least two of the conditions, Defendants rely on an administrative provision outside of the JAG authorizing statute, 34 U.S.C. § 10102, that allows Defendants to place "special conditions" on grants. But two district courts and the Seventh Circuit have already held § 10102 does not provide Defendants with the authority they claim here. *E.g.*, *Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018). Defendants also rely on 8 U.S.C. § 1373

1

1  purportedly being an "applicable law" for JAG and COPS. To justify withholding funding from

2  California, Defendants wrongly enlarge the scope of § 1373's prohibition on restricting

3  "information regarding . . . citizenship or immigration status" as requiring the State to allow

4  release dates, addresses, and an expansive array of other personal information about the State's

5  residents to be used for immigration enforcement purposes. But *no* federal court has accepted that

6  reading and multiple courts have, at a minimum, questioned § 1373's constitutionality.

7      Most recently, Judge Mendez in the Eastern District of California rejected the enforcement

8  of this broad reading of § 1373 against two of the statutes at issue here. The day after this Court

9  denied Defendants' motion to dismiss and the State's motion for preliminary injunction in this

10  case, ECF 88, 89, the United States sued California requesting that Senate Bill 54 (the California

11  Values Act and Amended TRUST Act) be preliminarily enjoined because it allegedly conflicts

12  with § 1373 and is otherwise preempted by federal law, *United States v. California*, 18-cv-490.

13  The court denied that request, determining that § 1373 does not govern release dates and

14  addresses. It explicitly found that "Section 1373 and the information sharing provisions of SB 54

15  do not directly conflict." ECF 189, slip op. at 41-42 (July 5, 2018) (E.D. Cal. Op.), and *dismissed*

16  *the United States' SB 54 claim without leave to amend*. ECF 197, slip op. at 5-7 (July 9, 2018). In

17  addition, the Supreme Court's recent decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018),

18  confirms that § 1373, a prohibition directed at the State, or at minimum, Defendants' broad

19  interpretation of that statute, is unconstitutional under the Tenth Amendment. Defendants cannot

20  require compliance with an unconstitutional law for the State to receive JAG and COPS funding.

21  *See Philadelphia v. Sessions*, 17-3894, 2018 WL 2725503, at *31-33 (E.D. Pa. June 6, 2018). In

22  any event, the undisputed record in this case unequivocally demonstrates that the State complies

23  with § 1373 as that statute may be correctly construed, and to require California to do anything

24  more would greatly burden the State, undermine trust between law enforcement agencies (LEAs)

25  and the communities they serve, and jeopardize the health, safety, and welfare of all Californians.

26      Due to Defendants' actions, California and its political subdivisions have been unjustly

27  denied law enforcement grants to the detriment of their communities. On June 26, 2018, while

28  leaving the injunction in place for the City of Chicago, the Seventh Circuit stayed the scope of a

preliminary injunction of the Access and Notification Conditions pending disposition by the en banc court of the propriety of a nationwide injunction.[1] Freed from the nationwide injunction, Defendants have sown confusion and uncertainty into the FY 2017 grant-awarding process by entirely withholding awards from state and local jurisdictions in six states, including California. In the remaining 44 states, Defendants are disbursing federal funds, but have not awarded grants to local jurisdictions that Defendants ostensibly believe do not comply with § 1373. The result is a loss of $28.3 million to California and at least $56.6 million to jurisdictions nationwide.

This selection of winners and losers is not what Congress intended when creating JAG. Defendants cannot withhold congressionally authorized and appropriated formula grants for reasons not contemplated by the authorizing statute. They also cannot continue to withhold funding based on an incorrect determination that the State does not comply with a law that is on its face, and in application, unconstitutional. The same holds true for jurisdictions throughout the nation. Accordingly, California respectfully requests that: (a) Defendants be enjoined from imposing the Challenged Conditions in California or anywhere; (b) Defendants award the money and grant awards to all eligible jurisdictions without these conditions; and (c) the Court declare that the laws identified in the FAC comply with the only correct and constitutional construction of § 1373, or in the alternative, declare that § 1373 is unconstitutional on its face.

## BACKGROUND

### I. SECTION 1373 AND THE INA

Section 1373(a) of the Immigration and Nationality Act (INA) states:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Section 1373(b) proscribes federal, state, or local governments from prohibiting the "[s]ending," "[m]aintaining," or "[e]xchanging" of such information "with any other Federal, State, or local government entity." In contrast, other INA provisions protect certain vulnerable immigrants. For

---

[1] Order, *Chicago v. Sessions*, 17-2991 (7th Cir. June 26, 2018). A unanimous panel held Chicago established a likelihood of success on the merits. *Chicago*, 888 F.3d at 287. The Seventh Circuit voted to rehear the case en banc "only as to the narrow issue" of the scope of the injunction. Order, *Chicago v. Sessions* (7th Cir. June 4, 2018).

3

1   example, 8 U.S.C. § 1367(a), which was enacted as part of the same legislation as § 1373, *see*

2   Pub. L. 104-208, generally prohibits the "use by or disclosure" of any information provided

3   during the application process for certain witnesses and victims of crime, including U- or T-visas

4   applicants, "to anyone" other than identified federal departments. It prohibits using such

5   information to "make an adverse determination of admissibility or deportability." *Id.* The INA

6   also details a "Special Immigrant Juvenile" process, through which certain abused, neglected, or

7   abandoned children may seek legal immigration status. *Id.* § 1101(a)(27)(J).

8   ## II.   CALIFORNIA'S STATUTES

9        The statutes at issue here respond to two overarching state interests. First, the Legislature

10   found that LEAs' "limited resources" should be directed to the "matters of greatest concern to

11   state and local governments," which is public safety, not immigration enforcement. Gov't Code §

12   7284.2(f). For example, the Values Act responds to the concern that the federal government's

13   expanded immigration enforcement priorities and plan to use local law enforcement as "force

14   multipliers" would cause LEAs to be inundated with immigration enforcement requests. Req. for

15   Judicial Notice (RJN) Exs. 1 at 8; 2 at 1, 2, 9. This concern proved prescient.[2] Second, California

16   concluded that prescribing clear limits on law enforcement involvement with immigration

17   enforcement results in safer communities.[3] *E.g.*, RJN Exs. 4-6. The Legislature relied on law

18   enforcement officers' statements about the public safety benefits of these community-policing

19   centered practices. *See, e.g.*, RJN Exs. 7 at 7 (Presidential Taskforce describing how law

20   enforcement entanglement with immigration enforcement makes it less likely for victims and

21   witnesses to report crimes); 8 at 9 (San Francisco Sheriff describing concerns with law

22   enforcement providing information to immigration authorities about domestic violence victims).

23   LEAs throughout the State find it vital to maintain trust with immigrant communities; otherwise

24   people "fail to disclose crimes that they witness and/or are victims to out of fear of deportation."

25   Hart Decl. ¶¶ 7; *id.* ¶¶ 9, 11-18, 21; Rosen Decl. ¶¶ 6-9; *see also* Wong Decl. ¶¶ 4, 34-38, 44, 48,

26   ---
[2] *See* TRAC Reports, Inc., Latest Data: Immigration and Customs Enforcement Detainers, California (2018),
27   http://trac.syr.edu/phptools/immigration/detain/ (showing increase of 15,000 detainers in FY 2016 to 30,000 in FY 2017); *see also* RJN Ex. 3 (over 80 percent increase in detainers issued nationally after January 2017).
28   [3] *See, e.g.*, Gov't Code § 7284.2(c); 2016 Cal. Legis. Serv. Ch. 768 § 2(i) (the "TRUTH Act"); 2013 Cal. Legis. Serv. Ch. 570 § 1(d) (the "TRUST Act"); Cal. Penal Code § 422.93(a).

1   53. The need to foster trust with immigrant communities has become more critical in light of data

2   showing declines in the State's immigrant communities reporting crimes in the face of the federal

3   government's expanded immigration enforcement priorities. RJN Exs. 9, 10.

4       The State's declaratory relief claim involves two sets of California statutes: (a) statutes

5   regulating when LEAs may assist in federal immigration enforcement (the TRUST, TRUTH, and

6   Values Acts); and (b) six "State Confidentiality Statutes" (Penal Code §§ 422.93, 679.10, and

7   679.11, Welfare and Institutions Code §§ 827 and 831, and Code of Civil Procedure § 155).

8       **A.**    **The TRUST, TRUTH, and Values Acts and California's Implementation**

9       In 2013, California enacted the TRUST Act, Gov't Code § 7282 *et seq.*, which defined

10  when local LEAs could detain an individual for up to 48 hours after their ordinary release due to a

11  detainer request. RJN Ex. 6. In 2016, the State enacted the TRUTH Act, Gov't Code § 7283 *et*

12  *seq.*, which increases transparency about local LEAs' involvement in immigration enforcement

13  and requires notifications to inmates prior to an interview with immigration authorities, but does

14  not prohibit access to jails. *Id.* § 7283.1(a).

15      On October 5, 2017, Governor Brown signed into law the Values Act, Gov't Code § 7284

16  *et seq.*, which expands upon the TRUST and TRUTH Acts. The Values Act addresses the

17  Legislature's concern with limiting the use of state and local law enforcement resources for

18  immigration enforcement and preserving community trust between state and local governments

19  and the State's immigrant communities. *Id.* § 7284.2. Two provisions are relevant here. First, the

20  Values Act amends the TRUST Act to regulate LEAs' response to "notification requests," which

21  are requests by immigration authorities to be informed, "in advance of the public," about "the

22  release date and time . . . of an individual in . . . custody." *Id.* §§ 7282.5(a), 7283(f),

23  7284.6(a)(1)(C); *see also* RJN Ex. 11 (I-247A "detainer" form with notification requests). The

24  Values Act imposes some specified constrains on LEAs sharing of release dates, but allows them

25  to notify immigration authorities about the release date of anyone who has been previously

26  convicted of one of hundreds of crimes, or if the information is "available to the public." Gov't

27  Code §§ 7282.5(a), 7284.6(a)(1)(C). Second, the Values Act prohibits the use of LEA money or

28  personnel to "provid[e] personal information," as defined in California Civil Code § 1798.3,

1   about individuals, including victims and witnesses of crime, "for immigration enforcement

2   purposes," unless that information is "available to the public." *Id.* § 7284.6(a)(1)(D).

3        The Values Act also permits many other forms of cooperation with immigration authorities.

4   The Values Act provisions at issue in this case do not apply to the California Department of

5   Corrections and Rehabilitation (CDCR), *id.* § 7284.4(a), which continues to cooperate with ICE,

6   including by responding to notification requests and transferring persons in state custody to

7   immigration authorities. RJN Exs. 12-16; *see also* Pen. Code §§ 5025-26 (requiring CDCR to

8   cooperate with immigration authorities and to identify and refer "names and locations" of those in

9   CDCR's custody who may be subject to deportation to immigration authorities). The Values Act

10   does not restrict LEAs from sharing criminal-history information from California law

11   enforcement databases accessible to immigration authorities. Gov't Code § 7284.6(b)(2); Reich

12   Decl. ¶ 12. It also permits LEAs to participate in task forces with immigration authorities or share

13   confidential information if the "primary purpose" of the task force is not immigration

14   enforcement. Gov't Code § 7284.6(b)(3)(A). The Values Act explicitly permits jurisdictions to

15   allow immigration authorities access to jails. *Id.* § 7284.6(b)(5). And, the Values Act expressly

16   authorizes compliance with all aspects of § 1373. *Id.* § 7284.6(e).

17        On March 28, 2018, the California Department of Justice Division of Law Enforcement

18   (DLE) provided guidance to LEAs about compliance with these state statutes. *See* RJN Ex. 17.

19   The guidance reiterated that all LEAs are authorized to comply with § 1373. *Id.* at 3, 7. The

20   guidance reminds LEAs of all of the circumstances where they may share release dates and other

21   personal information, including when the information is "available to the public." *Id.* at 3, 5. It

22   explains that "'available to the public' refers to information where a law enforcement agency has

23   a practice or policy of making such information public, such as disclosing the information on its

24   website or it has a practice or policy of providing the information to individuals in response to

25   specific requests," so long as the LEA complies with state and federal privacy laws. *Id.* at 3.

26        During discovery, California produced "policies, manuals, bulletins, and orders" applicable

27   to the only state LEA that receives JAG or COPS funding, the Bureau of Investigation's (BI),

28   communications with immigration authorities. Sherman Decl. Ex. A (CA RFP Resp. 5). Among

1    the documents produced were DLE's policy manual and all manuals for the BI task forces funded

2    through JAG and the COPS CAMP grant. Caligiuri Decl. ¶ 11, Exs. A-B. There is nothing in this

3    record showing BI has restricted the exchange of information with immigration authorities

4    beyond the limitations contained in California law. It is also undisputed that the Values Act has

5    not affected immigration authorities' access to addresses in three state-run criminal history

6    databases. *See* Gov't Code § 7284.6(b)(2); Reich Decl. ¶¶ 6-12 & Exs. A-C.

7        **B.    California's Confidentiality Statutes**

8            To ensure the proper operation of state and local criminal and juvenile justice systems,

9    California law contains long-standing protections of sensitive information concerning victims,

10   witnesses, and juveniles. Penal Code §§ 679.10 and 679.11 prohibit entities that certify a person's

11   cooperation with law enforcement from "disclosing the immigration status of a victim" or other

12   person requesting certification "except to comply with federal law or legal process, or if

13   authorized by the victim or person requesting [the certification form]." *Id.* §§ 679.10(k),

14   679.11(k); *see also* RJN Ex. 18. These protections impact thousands of immigrants who

15   cooperate with law enforcement each year.[4] Penal Code § 422.93(b) protects hate-crime victims

16   and witnesses "not charged with or convicted of committing any crime under State law" from

17   being "detain[ed] . . . exclusively for any actual or suspected immigration violation or report[ed]

18   or turn[ed] . . . over to federal immigration authorities." The State has also found confidentiality

19   for juveniles essential "to avoid[ing] stigma and promot[ing] rehabilitation." Welf. & Inst. Code §

20   831(a). Generally, information in juvenile court records is confidential, with only limited

21   disclosure allowed. *Id.* § 827; Cal. R. of Ct. 5.552(b)-(c). Consistent with that rule, the State

22   implemented its role in the federal Special Immigrant Juvenile process by requiring that

23   "information regarding the child's immigration status . . . remain confidential" with disclosure

24   permitted to only a handful of enumerated parties. Civ. Proc. Code § 155(c). Information about a

25   child's immigration status in any juvenile court proceeding must "remain confidential" just like

26   all other information in the youth's court records. Welf. & Inst. Code § 831(e).

27   _____

28   [4] For example, in 2016, the year § 679.10 came into effect for U-visa applicants, L.A. County received twice as many
     applications as the year before (954 in total, 80% of which were certified). McDonnell Decl., ECF 31, ¶ 14.

7

### III.   THE JAG AUTHORIZING STATUTE AND THE STATE'S JAG AND COPS GRANTS

Under its authorizing statute, JAG is a formula grant guaranteeing to each state a minimum allocation based on the state's population and violent crime rate. 34 U.S.C.§ 10156(a). The current JAG program derives from two earlier programs, which were merged in 2006. RJN Exs. 19, 20. The merger was designed to provide state and local governments "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits' all solution." H.R. Rep. 109-233, at 89 (2005). Immigration enforcement was never listed as a purpose of JAG's predecessor programs, and is not contemplated by any of the current program's eight congressionally specified "purpose areas." 34 U.S.C. § 10152(a)(1). Of particular significance, the only immigration-related requirement that has ever existed in any iteration of JAG (*i.e.*, a requirement that the recipient state provide certified records of "criminal convictions of aliens" [5]) was *repealed* by Congress in 2006 as part of the merger legislation. *See* 34 U.S.C. § 10153(a).

California's Board of State and Community Corrections ("BSCC") is the state entity that receives the State's share of JAG funds. According to the statutory formula, California should have received $28.3 million in JAG funding for FY 2017: $17.7 million to the BSCC, and the rest directly to local jurisdictions. Jolls Decl., ECF 29, ¶ 5. In previous years, the BSCC has issued subgrants to 32 local jurisdictions for education and crime prevention, law enforcement, and court programs. *Id.* ¶¶ 8, 10 & Ex. A. The BSCC also has funded BI to support task forces focused on criminal drug enforcement, violent crime, and gang activity. *Id.* ¶ 10; Caligiuri Decl. ¶ 27. BI additionally receives COPS competitive grants to support law enforcement efforts, including work on multi-jurisdictional task forces. Caligiuri Decl. ¶ 13. BI uses its COPS Anti-Methamphetamine Program ("CAMP") grant to provide State leadership on a task force that has resulted in the seizure of upwards of $30 million of illegal drugs since 2015. *See id.* ¶¶ 14-19.

### IV.   DEFENDANTS' CONDUCT WITH RESPECT TO JAG AND COPS GRANTS

In FY 2016, USDOJ declared § 1373 an "applicable law" for JAG, AR-384[6], and specifically required BSCC to submit a legal opinion validating its compliance with § 1373. Jolls

---

[5] Immigration Act of 1990, Pub. L. 101-649, § 507(a); Misc. and Tech. Immigration and Naturalization Amend. of 1991, Pub. L. 102-232, § 306(a)(6) (repealed 2006).
[6] The Administrative Record was filed at ECF 96.

1   Decl. Ex. B, ¶ 55. For FY 2017, each grant recipient's chief law officer must sign an affidavit,

2   under penalty of perjury, affirming compliance with § 1373 on behalf of the State and "any entity,

3   agency, or official" as applicable to the "program or activity to be funded." AR-1032-33; *see also*

4   RJN Ex. 21. USDOJ represented final award conditions require grantees to collect § 1373

5   certifications from all subgrant recipients, monitor their subgrantees' compliance with § 1373 and

6   to notify USDOJ of noncompliance. AR-994.

7        In 2017, Defendants sent letters to 38 state and local jurisdictions across the country,

8   including to California and 12 of its political subdivisions, inquiring into their compliance with §

9   1373 and threatening to strip their JAG funding. RJN Exs. 22-25. California responded that it

10  complies with § 1373. RJN Ex. 26. Defendants claim they are "still in the fact gathering stage"

11  and do not know "exactly when [they] will make a final determination" on the State's compliance

12  with § 1373. Sherman Decl. Ex. B (Defs. Rog Resp. 5). However, the federal government's filing

13  of *United States. v. California* removes all doubt that a final determination already exists and that,

14  in its view, the Values and TRUST Acts violate § 1373. *See* ECF 102 at 1.

15       In FY 2017, Defendants also added two new conditions to JAG. Jurisdictions must adopt

16  with respect to the "program or activity" to be funded, a statute, rule, regulation, policy, or

17  practice "designed to ensure" both: (1) "that agents of the United States . . . are given . . . access

18  [to] any State (or State-contracted) correctional facility for the purpose of permitting such agents

19  to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to

20  such individuals' right to be or remain in the United States" (Access Condition); and (2) "that,

21  when a State (or State-contracted) correctional facility receives from DHS a formal written

22  request . . . that seeks advance notice of the scheduled release date and time for a particular alien

23  in such facility, then such facility will honor such request and–as early as practicable . . . provide

24  the requested notice to DHS" (Notification Condition). ECF 42-1, Ex. B ¶¶ 55-56.

25       On September 15, 2017, the Northern District of Illinois enjoined the imposition of the

26  Access and Notification Conditions nationwide. *Chicago v. Sessions*, 264 F. Supp. 3d 933, 951

27  (N.D. Ill. 2017). The Seventh Circuit upheld that decision. *Chicago*, 888 F.3d at 293. Defendants

28  refused to issue JAG awards until the injunction was lifted. *See* Letter from USDOJ, *Chicago v.*

9

1   *Sessions*, 17-2991, at *1 (7th Cir., sent June 14, 2018). When the Seventh Circuit partially stayed

2   application of the injunction beyond Chicago, Defendants selectively issued $197.3 million worth

3   of JAG awards nationwide. RJN Exs. 27, 28. State and local jurisdictions in California and five

4   other states were entirely shut out from those JAG awards. *See id.*; Schmidt Decl. ¶ 13. At least

5   17 local jurisdictions in the remaining 44 states have not been awarded JAG funds. *See* Sherman

6   Decl. Ex. C. In total, Defendants withheld at least $56.6 million nationwide.

7       USDOJ announced that COPS applicants for 2017 must execute a § 1373 certification of

8   compliance, similar to the one requested for JAG, with respect to the "program or activity to be

9   funded." RJN Ex. 29 at 2 & Appx. D.[7] In FY 2017, BI applied for a COPS CAMP grant,

10  submitted the requested § 1373 certification with a supplemental statement, and was awarded the

11  grant. Caligiuri Decl. ¶¶ 22-23. However, Defendants have refused to allow BI to draw down

12  these grant funds pending their administrative review into California's compliance with § 1373.

13  *Id.* Following the Court's guidance in its order on the State's motion for preliminary injunction,

14  BI decided to use the State's own dollars to "cover" the costs of the grant "while the litigation

15  continues." ECF 89 at 27; Caligiuri Decl. ¶¶ 24-25. The COPS award, however, contains a

16  provision prohibiting a recipient from using grant funds to replace dollars that the State already

17  expends on the same program, or as the award calls it, "supplanting." RJN Ex. 31 at 5; ECF 91-1

18  at 14 n.4. Defendants, have refused to waive the supplanting prohibition in the COPS grant for

19  BI, Sherman Decl. ¶ 6 & Ex. D, raising the specter that Defendants will use the supplanting

20  prohibition to deny COPS funds to BI.

21                                    **ARGUMENT**

22  **I.   LEGAL STANDARD**

23      Summary judgment is appropriate "if the movant shows there is no genuine issue as to any

24  material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

25  56(a). In a challenge to agency action, "the district judge sits as an appellate tribunal," and

26  "review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir.

27  ───────────────

28  [7] USDOJ inserted the same requirements into the FY 2018 COPS CAMP application. RJN Ex. 30 at 11 & Appx. E. BI applied for that grant on June 27 with the certification and a supplemental statement. Caligiuri Decl. ¶ 26.

1    2001). The "function of the district court is to determine whether or not as a matter of law the

2    evidence in the administrative record permitted the agency to make the decision it did."

3    *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

4    **II.   DEFENDANTS LACK STATUTORY AUTHORITY TO IMPOSE THE ACCESS AND
         NOTIFICATION CONDITIONS (COUNTS 1 AND 3)**

5

6           Defendants' unauthorized imposition of the Access and Notifications Conditions violates

7    the Separation of Powers. Congress—not the Executive Branch—holds power under the

8    Spending Clause "to set the terms on which it disburses federal money to the States." *Arlington*

9    *Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "[I]f Congress intends to

10   impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*

11   *State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Defendants cannot unilaterally insert

12   conditions into grant awards without clear authorization from Congress. *See City of Arlington,*

13   *Tex. v. FCC*, 569 U.S. 290, 297 (2013).

14          As every federal court to consider the issue has concluded, the Access and Notification

15   Conditions violate these principles. Congress "did not impose any immigration enforcement

16   conditions on the receipt of [JAG] funds," and Defendants cannot "use[] the sword of federal

17   funding to conscript state and local authorities to aid in federal civil immigration enforcement."

18   *Chicago*, 888 F.3d at 277; *Philadelphia*, 2018 WL 2725503, at *25 (holding the conditions

19   "violate the constitutional principle of separation of powers"); *accord Los Angeles v. Sessions*,

20   293 F. Supp. 3d 1087, 1097 (C.D. Cal. 2018) (substantively similar conditions were ultra vires

21   because the authorizing statute "does not plainly or even arguably authorize the Attorney

22   General" to add the conditions). In short, the Executive Branch has no authority "to condition the

23   payment of such federal funds on adherence to its political priorities." *Chicago*, 888 F.3d at 283.

24          Congress prescribed only ministerial requirements and certifications for JAG recipients,

25   *e.g.*, 34 U.S.C. § 10153(a)(5), and did not provide "open-ended authority to impose additional

26   conditions." *Chicago*, 888 F.3d at 285 ("the notion of a broad grant of authority to impose any

27   conditions on grant recipients is at odds with the nature of the[] JAG grant, which is a formula

28   grant"); *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) (courts will "not lightly assume that

                                                   11

1    Congress has omitted from its adopted text requirements that it nonetheless intends to apply").

2    "None of [the] provisions" of the JAG statute "grant the Attorney General the authority to impose

3    conditions that require state or local governments to assist in immigration enforcement, nor to

4    deny funds to states or local governments for the failure to comply with those conditions."

5    *Chicago*, 888 F.3d at 284; *see also State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1109

6    (8th Cir. 1973) (holding that agency did not have "unfettered discretion as to when and how" to

7    allocate formula grants that "circumscribes that discretion").

8           Congress's overarching goal in creating JAG was to provide state and local governments

9    with "more flexibility to spend money for programs that work for them rather than to impose a

10   'one size fits all' solution" to local law enforcement. H.R. Rep. 109-233, at 89 (2005). Consistent

11   with this goal, when creating the current program, it repealed the only immigration related

12   requirement that ever existed. *Supra* at 8. Defendants' attachment of the Access and Notification

13   Conditions imposes the very type of immigration condition that Congress repealed. *See Stone v.*

14   *INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends

15   its amendment to have real and substantial effect."). Congress has also repeatedly declined to

16   attach similar conditions to JAG, *see, e.g.*, RJN Exs. 32-35, including most recently on June 21,

17   2018. RJN Ex. 36 (House voting down HR 4760 by vote of 231-193).

18          The Access and Notification Conditions cannot be justified by 34 U.S.C. § 10102(a)(6), as

19   Defendants' interpretation of that provision "is contrary to the plain meaning of the statutory

20   language." *Chicago*, 888 F.3d at 284. In 2006, when § 10102(a)(6) was amended to permit OJP to

21   "plac[e] special conditions on all grants," the term "special conditions" had a precise meaning—

22   one that does not encompass the ability to add the Access and Notification Conditions. According

23   to a USDOJ regulation in place at the time, Defendants could impose "*special* grant or subgrant

24   conditions" only on "high-risk" grantees. 28 C.F.R. § 66.12 (removed Dec. 19, 2014). USDOJ

25   still embraces this narrow meaning of "special condition" by distinguishing the new § 1373

26   "Special Award Condition" added to BI's COPS grant as a "High Risk Condition," RJN Ex. 31 at

27   20, while identifying other conditions as "Award Terms and Conditions." *Id.* at 5.

28

12

1    Moreover, § 10102(a)(6) is an OJP administrative provision that lies outside the JAG

2    authorizing statute. Congress does not "alter the fundamental details of a regulatory scheme" in

3    such "vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468

4    (2001). The Seventh Circuit found it "inconceivable that Congress would have anticipated that

5    [USDOJ] could abrogate the entire distribution scheme" such that the "tightly-circumscribed

6    structure of the[] JAG grants can be upended by some unbounded authority in § 10102." *Chicago*,

7    888 F.3d at 286. Instead, the Seventh Circuit recognized that § 10102(a)(6) "merely exemplifie[s]

8    the type of other powers that the Assistant Attorney General may possess by delegation

9    elsewhere." *Id.* at 285. Interpreting § 10102(a)(6) to provide limitless agency discretion "would

10   allow [Defendants] to impose any conditions on the grants at will," and transform an

11   administrative provision into "a tremendous power of widespread impact." *Id.* at 285, 287.

12   When Congress wanted to add substantive compliance conditions to JAG, it has done so

13   explicitly. *E.g.*, 34 U.S.C. § 20927(a) (permitting 10 percent penalty for failing to "substantially

14   implement" the Sex Offender Registration and Notification Act). Although "the Attorney General

15   is authorized by other statutes to reduce [JAG] funding in certain circumstances . . . even then the

16   amount of the reduction is set by statute." *Chicago*, 888 F.3d at 286; *see also Pennhurst*, 451 U.S.

17   at 23. In contrast, there is no statutory authority that "even hint[s]" at requiring compliance with

18   the Access and Notification Conditions, or conferring a broad delegation of authority for JAG.

19   *See Arlington Cent. Sch. Dist.*, 548 U.S. at 297.[8] All of Congress's actions in connection with

20   JAG and otherwise—providing flexibility to jurisdictions, expressly removing a condition related

21   to immigration enforcement, repeatedly rejecting the attachment of funding conditions to

22   immigration enforcement, and using precise and narrow terminology to define the authority to

23   add conditions outside the JAG statute—point toward one conclusion: The Access and

24   Notification Conditions are not permitted. *See FDA v. Brown & Williamson Tobacco Corp.*, 529

25   U.S. 120, 143-44, 155-56, 160 (2000) (considering all of Congress's actions "[t]aken together" to

26

27   _____

     [8] Further undercutting the imposition of the Access and Notification Conditions is 34 U.S.C. § 10228(a), which is
28   codified in the same chapter as the JAG authorizing statute, and prohibits the use of federal law enforcement grants to
     exercise "any direction, supervision, or control" over a state or local police force or criminal justice agency.

                                                        13

1   conclude that "Congress could not have intended to delegate a decision of such economic and

2   political significance to an agency in so cryptic a fashion").

3   **III.   ALL THREE JAG CONDITIONS VIOLATE THE SPENDING CLAUSE (COUNTS 2 AND 3)**

4        Congress may only use its spending power to place funding conditions that are related "to

5   the federal interest in particular . . . programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

6   Conditions on federal funds must also be "unambiguous," so that recipient jurisdictions may

7   "exercise their choice knowingly, cognizant of the consequences of their participation."

8   *Pennhurst*, 451 U.S. at 17. The Challenged Conditions fail both tests.

9        **A.   There is No Sufficient Nexus Between the Conditions and JAG's Purpose**

10        The Spending Clause requires funding conditions "bear some relationship to the purpose of

11   the federal spending," *New York v. United States*, 505 U.S. 144, 167 (1992), and be "reasonably

12   calculated" to address the "particular . . . purpose for which the funds are expended." *Dole*, 483,

13   U.S. at 208-09. All three conditions fail to have a sufficient nexus to the particular purpose of

14   JAG, and in fact undermine that purpose. The JAG legislative history is replete with recognition

15   of local control to support local public safety priorities. *E.g.*, 151 Cong. Rec. 25, 919 (2005)

16   (statement of Sen. Dayton) ("Byrne grants fund local law enforcement to combat the most urgent

17   public safety problems in their own communities."). That purpose is reflected in the program's

18   structure, which affords recipients flexibility to use funds for any of the eight criminal justice

19   purposes—none of which include immigration enforcement. *See* 34 U.S.C. § 10152(a)(1).

20        The Challenged Conditions, which pertain to federal civil immigration enforcement, have

21   little connection to local criminal justice. *See* AR-992 (AG Sessions announcing the conditions

22   will "ensur[e] that federal immigration authorities have the information they need to enforce

23   immigration laws."). Many immigration violations (such as overstaying a visa) do not intersect

24   with criminal law at all, as those violations are subject only to civil penalties. *E.g.*, 8 U.S.C. §§

25   1182(a)(6)(A) & (9)(B), 1202(g); 1227(a)(1)(B). The Administration's expanded focus on the

26   removal of all "classes or categories of removable aliens," RJN Ex. 37 at 2, has only reinforced

27   the attenuated relationship between these conditions and local criminal justice purposes. Since

28   2017, immigration authorities have substantially increased enforcement against those without

14

criminal convictions. RJN Ex. 3 at 7 (150% increase in ICE at-large arrests for non-criminal

immigration violators between FY 2016 and FY 2017); Ex. 38 (approximate doubling of non-

criminal immigration arrests nationally during the first six months of FY 2018); Ex. 39 (increase

from 1,000 to 3,400 non-criminal arrests in California during that same time). Since Defendants

consider those who have not been convicted of a crime within the scope of § 1373, Sherman Decl.

Ex. E (Defs. RFA Resp. 18), the § 1373 Condition requires the State to comply with respect to

persons who only violated the civil laws. Such a condition does not "share[] the same goal" that

Congress had in creating JAG. *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003).

### B.    The Access and Notification Conditions are Ambiguous

In addition, the Access and Notification Conditions do not provide clear notice of what the

conditions require. Defendants have not identified a single statute that provides guidance on these

conditions and have not issued specific guidance themselves. For example, the conditions fail to

explain whether the undefined term "designed to ensure" means that a jurisdiction must adopt a

policy specifically directed to the conditions, or whether general regulations or practices are

sufficient. *See* ECF 42-1, Ex. B ¶¶ 55, 56. When asked in discovery whether the TRUTH Act

would disqualify the State for funding based on the Access Condition, Defendants refused to

answer, stating it would depend on the "interpretation and application in specific factual

scenarios." Sherman Decl. Ex. E (Defs. RFA Resp. 39). Defendants also refused to clarify which

state entities they consider to be within the "program or activity" of the BSCC's award, and thus

subject to the conditions. *Id.* Ex. B (Defs. Rog. Resp. 21). The conditions' "vague language does

not make clear what conduct [they] proscribe[] or give[] jurisdictions a reasonable opportunity to

avoid [their] penalties." *Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017).

### IV.    ALL THREE JAG CONDITIONS ARE ARBITRARY AND CAPRICIOUS (COUNT 4)

Courts must "hold unlawful and set aside agency action, findings and conclusions found

to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). As the Court has already determined, there is no question that the imposition

of the Challenged Conditions is "final agency action" because it is the "consummation of the

agency's decision making process" and determines "obligations . . . from which legal

15

1    consequences flow." ECF 89 at 19-20 (relying on *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

2    The Court also observed that it was "not clear" that the § 1373 Condition has the "requisite

3    rational connection" necessary for Defendants to impose the condition. *See id.* at 21 (quoting

4    *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

5    The full Administrative Record does not ameliorate the Court's previous concern as to the § 1373

6    Condition, nor justify the imposition of the Access and Notification Conditions. Rather, as the

7    *Philadelphia* court determined when considering a virtually identical record, "if anything, the

8    Administrative Record bolsters [the] view that the DOJ's decision to tie the Byrne JAG funds to

9    the Challenged Conditions was arbitrary and capricious." *Philadelphia*, 2018 WL 2725503, at

10   *28. The Administrative Record shows Defendants: (a) relied on factors Congress did not intend

11   for it to consider; (b) failed to consider an important aspect of the problem the agency is

12   addressing; and (c) offered an explanation for its decision that runs counter to the evidence before

13   the agency. *State Farm*, 463 U.S. at 43. Any of these defects would suffice to find the Challenged

14   Conditions arbitrary and capricious. All three exist here.

15          First, Defendants have not, and cannot, demonstrate that they acted consistent with factors

16   that Congress intended in imposing any of the Challenged Conditions. The Access and

17   Notification Conditions have no support in the JAG statute. *Supra* at 11-12. And although the

18   JAG statute has never been linked to § 1373, without offering any evidence that Congress

19   intended immigration enforcement to be a purpose area for JAG, USDOJ declared § 1373 an

20   "applicable federal law." AR-384. At no point have Defendants adequately explained how the

21   conditions are consistent with the underlying goals of JAG, or with Congress's intent in adopting

22   JAG. The federal government's interest in immigration enforcement is not enough to show that

23   interest is sufficiently connected to JAG to satisfy the arbitrary and capricious analysis. *See Cape*

24   *May Greene, Inc. v. Warren*, 698 F.2d 179, 186-87 (3d Cir. 1983) (invalidating agency action on

25   grant conditions where the agency sought "to accomplish matters not included in that statute").

26          Second, Defendants have failed to grapple with the important public safety repercussions of

27   the Challenged Conditions. *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th

28   Cir. 2010) ("The agency . . . is required to examine the relevant data and articulate a satisfactory

16

1    explanation for its action including a rational connection between the facts found and the choices

2    made . . .”). The Administrative Record contains evidence from JAG recipient jurisdictions that

3    “gain[ing] the trust and cooperation of . . . residents, crime victims and witnesses . . . regardless of

4    their immigration status” makes the “community stronger and . . . streets safer.” AR-640; *see also*

5    AR-487, AR-722. Yet, Defendants responded by not just keeping the § 1373 Condition, but

6    adding the Access and Notification Conditions, without *any* consideration or analysis beyond the

7    vague rhetoric in the documents announcing these new conditions. *See* AR-992-1037.

8            Third, Defendants' explanation for the Conditions runs counter to the evidence before the

9    agency. This Court previously analyzed three reasons cited by Defendants and found each to be

10   insufficient to justify the § 1373 Condition. For example, in their earlier briefing, Defendants

11   alleged the § 1373 Condition was needed because of jurisdictions' refusal “to cooperate with

12   federal immigration authorities in information sharing about undocumented immigrants who

13   commit crimes.” ECF 89 at 21. But, this Court determined that the “language of Section 1373 is

14   too broad to achieve this information sharing goal” because it “captures the immigration status of

15   all people” and not “merely immigrants who have committed crimes.” *Id*. The other reasons that

16   the Court found insufficient to support the § 1373 Condition are just as unpersuasive now for all

17   three Challenged Conditions.[9] “DOJ has not anywhere demonstrated a link between localities

18   maintaining as confidential the immigration status of non-criminal aliens or citizens and increases

19   in crime and violence.” *Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 624 (E.D. Pa. 2017).

20           This Court previously based its analysis on the Backgrounder on Grant Requirements, ECF

21   89 at 21, and nothing within the rest of the Administrative Record justifies a different result. The

22   press release, AR-993, to which the Backgrounder was attached made claims about “sanctuary”

23   jurisdictions and the need for the Challenged Conditions “without any support whatsoever.”

24   *Philadelphia*, 280 F. Supp. 3d at 623. Nor does the 2016 Office of Inspector General (“OIG”)

25   Memorandum, AR-366-381, discuss or contemplate how the conditions are consistent with

26   _____

     [9] In addition, this Court recognized that Defendants' second concern with awarding federal funds to jurisdictions that

27   “frustrate federal immigration enforcement” is not addressed by the conditions since JAG funds “are used for
     purposes unrelated to immigration enforcement.” Finally, the Court found Defendants' assertion that jurisdictions

28   with policies like California “jeopardize the safety of their residents and undermine [Defendants'] ability to protect
     the public and reduce crime and violence” to be “unsupported” by the evidence in front of the agency. *Id*.

1    Congress's intent in adopting JAG or the contrary evidence before the agency. *See Philadelphia*,

2    280 F. Supp. 3d at 624 ("the memorandum did not purport to assess the wisdom" of imposing a

3    Section 1373 Condition "and its effect on immigration policy or criminal justice"); *see also Nat'l*

4    *Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). A 2007 OIG

5    Report about a different federal grant program similarly "does nothing to change the analysis"

6    and "can hardly explain the DOJ's decision." *Philadelphia*, 2018 WL 2725503 at 26-27.

7          Moreover, all of the Challenged Conditions depart from past practice without any

8    explanation. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir.

9    2007). USDOJ administered the current version of JAG for a decade without these conditions,

10   and Defendants have fallen short of their "duty to explain why [they] deemed it necessary to

11   overrule its previous position." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

12   Instead, the Administrative Record offers undeniable evidence that USDOJ: (a) has limited

13   discretion when administering a formula grant; and (b) understood negative consequences would

14   result from linking § 1373 to JAG. USDOJ acknowledged its limited discretion to add new grant

15   conditions on multiple occasions. In response to a request to "implement . . . a certification" on

16   grants requiring "cooperat[ion] with federal immigration laws," AR-111, USDOJ responded in

17   September 2015 that "many Department grant funds are formula-based, with the eligibility

18   criteria (and related penalties, if any) set firmly by statute." AR-113. USDOJ explicitly

19   recognized that "[i]n many cases," as with JAG, it "does not have the discretion to suspend

20   funding *at all*." *Id*. (emphasis added). Just five months later, then-AG Loretta Lynch informed

21   Congress that USDOJ was creating a new "policy" requiring compliance with § 1373 due to

22   USDOJ "discussions" with select members of Congress. AR-202. Yet, USDOJ did not provide, at

23   that time or since, justification for the "policy" change in light of the evidence before it.

24         Further, USDOJ found "[w]ithholding . . . funding would have a significant, and unintended,

25   impact on the underserved populations who benefit" from the grant programs "most of whom

26   have no connection to immigration policy." AR-113. This was consistent with a longstanding law

27   enforcement view, apparent from the Administrative Record, that such actions would be

28   "detrimental." AR-85 (Major Cities Chiefs of Police Statement: "Merely shifting or diverting

18

1    federal funding . . . to any new immigration enforcement initiative would only result in a

2    detrimental net loss"). When asked specifically by Congress about "policies that prohibit

3    reporting illegal status" of individuals, AG Lynch responded that "with the current state of the

4    law," and as to "local jurisdictions," this is "a local matter." AR-273. USDOJ's dramatic change

5    in position has not been accompanied by the "reasoned explanation" that is required when an

6    agency "disregard[s] facts and circumstances that underlay or were engendered by the prior

7    policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

8    **V.    THIS COURT SHOULD DECLARE THAT § 1373 CANNOT BE LAWFULLY ENFORCED**
     **AGAINST THE IDENTIFIED STATE LAWS (COUNT 5)**

9

10        **A.    *Murphy* Confirms § 1373 Cannot be Constitutionally Enforced Against the**
          **State Laws**

11        Section 1373 cannot be "constitutionally enforced against the State statutes," FAC ¶ 153,

12   because § 1373 is unconstitutional on its face. The Supreme Court's decision in *Murphy* confirms

13   that a prohibition directed at the States violates the anti-commandeering doctrine and the Tenth

14   Amendment just as much as an affirmative command. *Murphy* struck down the Professional and

15   Amateur Sports Protection Act (PASPA), which made it "unlawful" for a "governmental entity"

16   to "sponsor" or "authorize" sports betting. The Court held that this prohibition toward the states

17   violates the anti-commandeering rule because it "unequivocally dictates what a state legislature

18   may and may not do." *Murphy*, 138 S. Ct. at 1478. Such prohibitions force "state legislatures [to

19   be] under the direct control of Congress. It is as if federal officers were installed in state

20   legislative chambers and were armed with the authority to stop legislators from voting on any

21   offending proposals. A more direct affront to state sovereignty is not easy to imagine." *Id.*

22        Section 1373, like PASPA, is a prohibition on "state" or "local governmental entit[ies] or

23   official[s]"—specifically, it prohibits them from restricting governmental entities or officials from

24   exchanging information regarding a person's immigration or citizenship status with other

25   governmental entities. This prohibition "dictates what a State legislature may and may not do."

26   Defendants state that to comply with § 1373, California "must repeal or eliminate the law, policy,

27   or practice." Sherman Decl. Ex. B (Defs. Rog. Resp. 7). And, because § 1373 is not a provision

28

19

1    "that regulates private actors," under *Murphy*, it cannot possibly preempt state law. *See* 138 S. Ct.

2    at 1479.

3         Furthermore, the "whole object" of § 1373 is to "direct the functioning of the state

4    executive," *Printz v. United States*, 521 U.S. 898, 932 (1997), which is an additional intrusion on

5    the State's sovereignty absent in *Murphy*. "The choice as to how to devote law enforcement

6    resources—including whether or not to use such resources to aid in federal immigration efforts—

7    would traditionally be one left to state and local authorities." *Chicago*, 888 F.3d at 282; *see also*

8    *Alden v. Maine*, 527 U.S. 706, 752 (1999) ("[D]isplace[ment] [of] a State's allocation of

9    governmental power and responsibility" strikes at federalism). If Congress cannot direct a state

10   legislature in how to regulate its private residents engaging in sports betting, then it certainly

11   cannot direct the legislature on how to regulate its own law enforcement officers. *See Gregory v.*

12   *Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government . . . a State defines

13   itself as a sovereign.").

14        In response to Philadelphia's request for declaratory relief "that it complies with § 1373, as

15   constitutionally construed," the court found *Murphy* dispositive and held that the § 1373

16   Condition is unconstitutional because it "requires compliance with an unconstitutional statute (in

17   this case, Section 1373)." *Philadelphia*, 2018 WL 2725503, at 31; *see also* E.D. Cal. Op. at 35

18   (finding constitutionality of § 1373 "highly suspect"). For all the reasons identified by the

19   *Philadelphia* court, this Court should likewise conclude that § 1373 is unconstitutional.[10]

20        **B.    Defendants' Expansive Interpretation of § 1373 Cannot be Constitutionally**
             **Enforced Against the State's Laws**
21

22        If § 1373 on its face survives after *Murphy*, Defendants still cannot constitutionally employ

23   it to strong-arm the State into allowing a vast assortment of personal information that it possesses

24   about its residents to be used for immigration enforcement. Judge Mendez is only the latest court

25   to reject Defendants' interpretation because their view undermines the notion that § 1373 is "a

26   _____
     [10] *Murphy* also casts doubt on the Second Circuit's decision in *City of New York v. United States*, 179 F.3d 29 (2d
27   Cir. 1999). That decision was rooted in the view that § 1373's prohibition did not violate the Tenth Amendment
     because it did not "affirmatively conscript[]" nor "directly compel states or localities to require or prohibit anything."
     *Id.* at 35. This is a "distinction" that *Murphy* found to be "empty." 138 S. Ct. at 178; *see also* E.D. Cal. Op. at 51
28   ("…*Murphy* undercuts portions of the Second Circuit's reasoning and calls its conclusion into question.").

                                                        20

1    narrowly drawn information sharing provision." *See* E.D. Cal. Op. at 52. Instead, such a broad

2    "Congressional mandate prohibiting states from restricting their law enforcement agencies'

3    involvement in immigration enforcement activities . . . would likely violate the Tenth

4    Amendment." *Id.* ("The Tenth Amendment analysis in *Murphy* supports this conclusion.")*.*

5    Specifically, Defendants' interpretation invades "the Constitution's structural protections of

6    liberty," undermines political accountability, and "shift[s] the costs of regulation to the States."

7    *Murphy*, 138 S. Ct. at 1477 (discussing three reasons for anti-commandeering doctrine).

8            Defendants consider § 1373 as a "very broad" statute. RJN Ex. 40 at 141:25-142:1, 149:17-

9    23. Under their interpretation of § 1373, Defendants require the State to allow the disclosure of

10   any "alien's" address, "location information," release date, date of birth, familial status, contact

11   information, and identity. Sherman Decl. Ex. E (Defs. RFA Resps. 9-16). Moreover, Defendants

12   expansively interpret the phrase "information . . . regarding immigration status" as prohibiting

13   restrictions on any information that "supports federal immigration authorities in performing their

14   duties under the INA." *Id.* Ex. B (Defs. Rog. Resp. 17); *see also id.* 6. By tying "information

15   regarding . . . immigration status" to anything that supports immigration authorities' "duties under

16   the INA," Defendants' interpretation requires the State to allow disclosure of a person's medical,

17   *e.g.*, 8 U.S.C. § 1182(a)(1), educational, *e.g.*, *id.* § 1101(a)(15)(F)(i), and financial records, *e.g.*,

18   *id.* § 1186b(d)(1). Other INA provisions allow an immigration officer to consider "any

19   information" about a person when evaluating his or her admission or continued stay in the United

20   States, further broadening the scope of information encompassed by Defendants' view of § 1373.

21   *See id.* § 1225(a)(5); *see also, e.g., id.* § 1225(d)(3) (allowing consideration of "any matter which

22   is material and relevant to the enforcement of this Act"); *id.* § 1446 (authorizing immigration

23   officer to take testimony on "any matter touching or in any way affecting . . . admissibility" for

24   naturalization). The United States has, thus, "fail[ed] to provide a workable standard" to avoid

25   "information . . . regarding immigration status" swallowing whole aspects of the state's provision

26   of services to its residents. *See Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 504 (1992).

27           Not only do Defendants fail to establish a limiting principle for the information covered by

28   § 1373, under Defendants' theory, "Section 1373 requires California to allow LEAs to respond to

                                                        21

1  *all* inquiries" from federal immigration authorities about release dates and personal information.

2  Sherman Decl. Ex. B (Defs. Rog. Resps. 17, 18) (emphasis added). There are no exceptions,

3  according to Defendants, *id.* (Defs. Rog. Resp. 7), including when a person has not been

4  convicted of a crime. *Id.* Ex. E (Defs. RFA Resp. 38). The federal government has confirmed that

5  it considers § 1373 as potentially invalidating state and federal privacy statutes. RJN Ex. 40 at

6  153:12-20. Indeed, the Department of Homeland Security (DHS) has already sought to invalidate

7  at least two of the State's Confidentiality Statutes under the basis they violate § 1373. RJN Ex. 41

8  at 5-6  ("[T]o the extent that section 827 . . . is applicable, it is preempted by 8 U.S.C. § 1373.").

9  To comply with Defendants' interpretation of § 1373, California would have to allocate its

10  law enforcement resources to allow: (a) the exchange of essentially all information that is

11  provided to the State about all its "alien" residents; (b) regardless of whether those persons

12  committed a crime; and (c) every time the State is asked for this information. In addition, by

13  enforcing § 1373 against the State's statutes, Defendants are not applying it to information

14  "available to the public," *see, e.g.*, Gov't Code, § 7284.6(a)(1)(C)-(D), but to information that

15  "belongs to the State and is available to them in [law enforcement's] official capacity." *Printz*,

16  521 U.S. at 932 n.17. Under this interpretation, California's only alternative would be to stop

17  providing essential governmental services, including enforcing the State's generally applicable

18  criminal laws against its "alien" residents, that result in the collection of any information that

19  Defendants assert is encompassed by § 1373. *See United States v. Morrison*, 529 U.S. 598, 618

20  (2000) ("[W]e can think of no better example of the police power which the Founders denied the

21  National Government and reposed in the States, than the suppression of violent crime and

22  vindication of its victims."). Thus, in order to comply with § 1373, California would be left with

23  no "legitimate choice" to decline participation in the federal government's immigration

24  enforcement program. *See New York*, 505 U.S. at 177, 185.

25  This interpretation of § 1373 burdens the State in at least two significant respects. *See* ECF

26  89 at 26. First, entangling state and local law enforcement with immigration enforcement erodes

27  community trust, which jeopardizes public safety and impedes the State's ability to be politically

28  accountable to its residents. *See Murphy*, 138 S. Ct. at 1477; *Printz*, 521 U.S. at 921-22; E.D. Cal.

22

1    Op. at 50 ("[W]hen California assists federal immigration enforcement in finding and taking

2    custody of immigrants, it risks being blamed for a federal agency's mistakes [and] errors . . . .").

3    Unquestionably, trust is essential to encouraging victims and witnesses to report crime. Wong

4    Decl. ¶¶ 4, 41-44, 52-53; *see also id.* ¶¶ 19-21, 30 (finding crime is lower in jurisdictions that

5    limit entanglement with immigration enforcement); Hart Decl. ¶¶ 9, 11; Goldstein Decl. ¶ 5;

6    Rosen Decl. ¶¶ 4, 8; *see also Chicago*, 888 F.3d at 280 (recognizing legitimate reasons why some

7    jurisdictions "have determined that their local law enforcement efforts are handcuffed by such

8    unbounded cooperation with immigration enforcement"). It is just as clear that state or local

9    governments entanglement with immigration enforcement causes undocumented immigrants to be

10   less inclined to use public services that require providing contact information, such as seeking

11   health care and enrolling their children in school. *See* Wong Decl. ¶¶ 39-40, 44; Goldstein Decl. ¶

12   7; *see also City of New York*, 179 F.3d at 36 ("The obtaining of pertinent information, which is

13   essential to the performance of a wide variety of state and local government functions, may in

14   some cases be difficult or impossible if some expectation of confidentiality is not preserved.");

15   E.D. Cal. Op. at 51 ("Even perceived collaboration with immigration enforcement could upset the

16   balance California aims to achieve"). This damage would extend to the State's dependency

17   system if the State was unable to preserve the confidentiality of information about youth. Coyne

18   Decl. ¶¶ 9-10. The State's communities would be less safe, healthy, and educated, harms that

19   would be extend to *all* Californians. *See* Hart Decl. ¶¶ 7, 13, 14; Goldstein Decl. ¶ 9; Rosen Decl.

20   ¶ 6; Wong Decl. ¶¶ 4, 40, 44, 51, 53.

21        Second, Defendants' interpretation of § 1373 would effectively allow the federal

22   government to "shift[] the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477. For

23   example, ICE doubled the number of detainer requests issued to California LEAs from around

24   15,000 in FY 2016 to 30,000 in FY 2017. *Supra* at 4 n.2. Under Defendants' theory, Sherman

25   Decl. Ex. B (Defs. Rog. Resp. 17), the State must allow its LEAs to respond to each request,

26   including requests for release dates, no matter how many and regardless of whether immigration

27   authorities continue to increase the number of requests they make of LEAs. That is both

28   burdensome to LEAs, *see* Hart Decl. ¶ 19, and impracticable for persons detained on a short-term

23

1   basis. *Id.* ¶ 20. The State is forced to "absorb the financial burden of implementing [this] federal

2   regulatory program," and divert resources from criminal law enforcement. *Printz*, 521 U.S. at

3   930; *see also* E.D. Cal. Op. at 49-51 (finding it "entirely reasonable for the State to determine that

4   assisting immigration enforcement . . . is a detrimental use of state law enforcement resources").

5   As in *Printz*, the Federal government is seeking to "augment[]" its own powers by "impress[ing]"

6   into its service—and at no cost to itself—the police officers of the 50 States." 521 U.S. at 922.

7       Since § 1373, or Defendants' interpretation of it, constitutes commandeering, "a balancing

8   analysis is inappropriate." E.D. Cal. Op. at 48 (quoting *Printz*, 521 U.S. at 932); *see* ECF 102 at 2

9   (requesting parties address whether a "balancing" of the constitutional interests is "necessary or

10   appropriate"). But, even if the Court determines that Defendants' actions do not clearly rise to the

11   level of commandeering, Defendants' interpretation of § 1373 still exceeds Congress' authority

12   because of the level of intrusiveness into the state's police power imposed by their interpretation.

13   For example, in *United States v. Lopez*, the Court read "judicially enforceable outer limits" into

14   the broad scope of the Commerce Clause when rejecting part of a federal statute that criminalized

15   possession of a firearm in a school zone. 514 U.S. 549, 566 (1995). The Court said the law erased

16   the distinction between "what is truly national and what is truly local." *Id.* at 567-68. The Court

17   held similarly in *United States v. Morrison*, where the relationship of the Violence Against

18   Women Act to interstate commerce was insufficient to interfere with the "local . . . regulation and

19   punishment of intrastate violence." 529 U.S. at 618. Here, by broadening § 1373 to invalidate

20   state statutes that in no way regulate immigration, Defendants stretch Congress' immigration

21   powers beyond permissible limits while encroaching on the State's sovereign powers to regulate

22   its law enforcement. *See DeCanas v. Bica*, 424 U.S. 351, 355-56 (1976) (recognizing that

23   Congress is "powerless to authorize or approve" an immigration statute to preempt a state statute

24   that does not regulate "determination[s] of who should or should not be admitted into the country,

25   and the conditions upon which a legal entrant may remain"). Moreover, the federal government

26   seeks control over not just "immigration" and "citizenship status" information, but essentially all

27   information that LEAs possess about their residents, regardless of how far removed that

28   information is from a person's right to enter or remain in the country. The principles of *Lopez* and

24

1   *Morrison* prohibit the federal government's indirect use of immigration powers to so directly

2   intrude into "truly local" aspects of the State's police power. *See Morrison*, 529 U.S. at 618.

3       **C.    The State's Laws Comply with § 1373 as Lawfully Construed**

4          An analysis based on the plain text of § 1373 compels the same result. As an initial matter,

5   the Values and TRUST Acts comply with § 1373 because the Values Act's savings clause

6   expressly authorizes compliance with all aspects of § 1373 as properly construed. Gov't Code §

7   7284.6(e); *see also Chamber of Commerce of the U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (the

8   "authoritative statement" of a statute is its "plain text," including its "savings clause"). Judge

9   Mendez in *U.S. v. California* found "no direct conflict between SB 54 and Section 1373." Op. at

10  36. Defendants attempt to create a conflict by interpreting § 1373 to encompass release dates,

11  addresses, and any information which the Executive Branch unilaterally determines "support"

12  immigration authorities in carrying out their duties. Sherman Decl. Ex. B (Defs. Rog Resps. 6,

13  17). But three courts, including Judge Mendez when faced with this exact issue, have already

14  concluded that "the plain meaning of Section 1373 limits its reach to information strictly

15  pertaining to immigration status (i.e. what one's immigration status is)." E.D. Cal. Op. at 38-39.

16  "[N]o plausible reading of 'information regarding . . . citizenship or immigration status'

17  encompasses the release date of an undocumented inmate." *Steinle v. City & Cty. of San*

18  *Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017), *appeal docketed*, 17-16283 (9th Cir. June

19  21, 2017); *see also* E.D. Cal. Op. at 39; *Philadelphia*, 2018 WL 2725503, at *35. Neither do

20  addresses have "any bearing on one's immigration or citizenship status." E.D. Cal. Op. at 39-40.

21         Those decisions are correct. For a federal statute to extend into "traditionally sensitive

22  areas" of the state's police power and "alter the usual constitutional balance between the States

23  and the Federal Government," Congress must make its intentions "unmistakably clear in the

24  *language of the statute*." *Gregory*, 501 U.S. at 460-61 (emphasis added); *see also Bond v. United*

25  *States*, 134 S. Ct. 2077, 2089 (2014). If Congress wanted § 1373 to broadly cover the exchange of

26  virtually all information about an individual, as Defendants seek to do here, "it knew how to do

27  so." *Custis v. United States*, 511 U.S. 485, 492 (1994). For instance, in the Illegal Immigration

28  Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, the same legislation that

25

1    created § 1373, Congress used the phrase, "any information which relates to an alien" in § 384 of

2    that Act (8 U.S.C. § 1367(a)(2) of the INA) to describe information that is protected from

3    disclosure. E.D. Cal. Op. at 39. This as well as other provisions of that legislation show that

4    Congress knew how to use more sweeping and precise terminology when it wished to cover

5    information about a person's address, nationality, or associations.[11] "The fact that Congress did

6    not adopt a readily available and apparent alternative strongly supports" not injecting into § 1373

7    the types of information brought in by Defendants' interpretation. *See Hawaii v. Trump*, 585 U.S.

8    __, slip op. at 23 (2018) (internal quotations omitted) (discussing 8 U.S.C. § 1152); *Steinle*, 230

9    F. Supp. 3d at 1015 ("[I]f the Congress that enacted [the Act] had intended to bar *all* restrictions

10   of communication between local law enforcement and federal immigration authorities, or

11   specifically to bar restrictions of sharing inmates' release dates, it could have included such

12   language in the statute.") (emphasis in original).

13       "A contrary interpretation would know no bounds." E.D. Cal. Op. at 39. For instance,

14   Defendants insist that home addresses are information "regarding immigration status" because

15   they are "relevant" to whether an immigrant "evidenced an intent not to abandon his or her

16   foreign residence, or otherwise violated the terms of such admission." Sherman Decl. Ex. B

17   (Defs. Rog. Resp. 6). Under that same logic, whether a person receives any ongoing

18   governmental service, such as unemployment and health benefits, vehicle registration, or school

19   enrollment, would be relevant to immigration status. This confirms that Defendants' view of §

20   1373 "stop[s] nowhere." *Roach v. Mail Handlers Ben. Plan*, 298 F.3d 847, 849-50 (9th Cir.

21   2002); *supra* at 22.

22       The remainder of California's statutes also comply with § 1373 as lawfully construed. The

23   TRUTH Act governs ICE interviews with detainees, so does not restrict information sharing in

24   any way, as Defendants already determined. RJN Ex. 42. The State's Confidentiality Statutes

25   emulate protections for classes of people that the INA also protects. Penal Code sections 422.93,

26   ---

[11] *See, e.g.*, *id.* § 302, 8 U.S.C. § 1225(a)(5) (permitting immigration officers to ask "any information . . . regarding
27   the purposes and intentions of the applicant" including intended length of stay and the applicant's admissibility); *id.* §
241, 8 U.S.C. § 1231(a)(3)(C) (requiring information "about the alien's nationality, circumstances, habits,
28   associations, and activities and other information the Attorney General considers appropriate"); *id.* § 414, 8 U.S.C. §
1360(c)(2) (Social Security Commissioner must provide "information regarding the name and address of the alien").

679.10, and 679.11 protect victims and witnesses of crime. Likewise, 8 U.S.C. § 1367 generally prohibits the "use by or disclosure" of any information provided during the process of applying for U- or T-visas, or other benefits available for immigrant witnesses and victims of crime, "to anyone" other than identified federal departments. When a "general permission or prohibition is contradicted by a specific prohibition or permission . . . the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Therefore, § 1367's prohibition against disclosure should be construed as an exception to § 1373 to ensure both provisions are reconciled. *See id.*

For similar reasons, § 1373 cannot prohibit restrictions on the sharing of immigration status information for vulnerable youth in the juvenile justice system. *See* Civ. Proc. Code § 155(c); Welf. & Inst. Code §§ 827, 831. The "Special Immigrant Juvenile" process allows abused, abandoned and neglected youth to secure lawful immigration status, illustrating the INA's concern for such children. *See* 8 U.S.C. § 1101(a)(27)(J). Congress would not protect vulnerable youth in one section of the INA, but then undermine that protection by building in risks for those same youth in another section. Interpreting § 1373 to apply to children who provide information, at the government's invitation, to exercise a benefit, would constitute an unduly unfair form of entrapment. *See, e.g.*, *Raley v. Ohio*, 360 U.S. 423, 438 (1959); *Casa De Maryland v. DHS*, 284 F. Supp. 3d 758, 778-79 (D. Md. 2018) (enjoining DHS from using information provided by DACA applicants for immigration enforcement; doing so after inducing immigrants to provide this information would amount to "affirmative misconduct" by the government); *Sanchez v. Sessions*, 870 F.3d 901, 913 (9th Cir. 2017) (Pregerson, J., concurring) ("[I]t is unfair for the Government to encourage noncitizens to apply for immigration relief, and at a later date use statements in those relief applications against noncitizens in removal proceedings.").

### D. The State Laws Allow LEAs to Provide Information to Immigration Authorities as Defendants' Interpretation of § 1373 Requires

Although the Court need not look further than the plain text of § 1373 and the limits on how that statute may be constitutionality construed, even if Defendants' interpretation of § 1373 were given any credence, California's laws, and the implementation of its laws, still comply. The only

27

1    State entities that receive JAG or COPS grants are the BSCC and BI. The BSCC is not a law

2    enforcement agency, *see, e.g.*, Sherman Decl. Ex. F (CA Rog. Resp. 16), and the guidance that

3    BSCC has provided to LEAs is to comply with the § 1373 Condition. Sherman Decl. Ex. G.

4    There is also no dispute that BI complies with § 1373. DLE's policy changes following the

5    Values Act, applicable to BI, authorize compliance with § 1373. Caligiuri Decl. Ex. A; RJN Ex.

6    17 at 3, 7. There is no policy, manual, bulletin, or order in which DLE or BI has instructed

7    officers to limit communications with immigration authorities beyond the lawful limitations

8    found in state law. *See* Caligiuri Decl. ¶ 11. BI still cooperates with immigration authorities on

9    criminal investigations, and has specifically worked with Homeland Security Investigations

10   within ICE on investigations since the Values Act became law. Caligiuri Decl. ¶¶ 9-11, 15-16.

11   As part of these task forces, BI may share confidential information with immigration authorities.

12   Gov't Code § 7284.6(b)(3); Caligiuri Decl. ¶ 9. In fact, the federal government acknowledges that

13   it has no "issues" with BI. RJN Exs. 43 ¶ 11; 44 ¶ 6. And, although CDCR does not receive JAG

14   or COPS grants, *see, e.g.*, Sherman Decl. Ex. A (CA RFP Resp. 7), the undisputed evidence also

15   shows that state law requires CDCR to cooperate with immigration authorities, Pen. Code §§

16   5025-26, and CDCR has additional policies providing for cooperation. Sherman Decl. Exs. 12-16.

17        The Values Act itself permits LEAs to provide release dates if the subject of the request

18   was previously convicted of one or more of hundreds of offenses, whether the offense was a

19   California offense, a federal offense, or an offense committed in another state. *See* Gov't Code §

20   7282.5(a); Sherman Decl. Ex. F (CA. Rog Resp. 5). The Values Act additionally allows LEAs to

21   provide release dates to immigration authorities if the LEA has a practice of sharing such

22   information with the public or has posted the information on its website, so long as it follows

23   federal and state privacy laws. RJN Ex. 17 at 3. There is no state law that restricts the sharing of

24   release dates on a website, and the California Public Records Act allows the disclosure of release

25   dates unless that information would pose a safety risk. *See* Gov't Code § 6254(f)(1). Irrefutable

26   evidence shows that immigration authorities have access to, and actively use, California's

27   criminal history databases that contain addresses. Reich Decl. ¶¶ 6-15 & Exs. A-C.

28

1    The *Philadelphia* court's "second alternative holding" in finding for Philadelphia is

2    instructive. There, the court determined that although the city restricted the sharing of release

3    dates to immigration authorities, it complied with USDOJ's interpretation of § 1373 because it

4    shared release dates in response to a judicial warrant. *See* 2018 WL 2725503, at *38-39. Here,

5    similarly, the Values Act allows LEAs to facilitate a transfer of a person to immigration

6    authorities if provided with a judicial warrant or a judicial probable cause determination. Gov't

7    Code § 7284.6(a)(4). But, unlike in *Philadelphia*, the Values Act allows more because it permits

8    LEAs to provide release dates or addresses to immigration authorities if the information is

9    available to the public, and release dates if the person in custody meets the criminal history

10   criteria in § 7282.5. *Id.* § 7284.6(a)(1)(C)-(D).

11   Finally, the federal government's own treatment of immigration status information for the

12   categories of persons that the State's Confidentiality Statutes protect effectively concedes that

13   those statutes comply with § 1373. By its plain terms, § 1373(b)(3) subjects the federal

14   government to the same mandate as state and local entities not to restrict the sharing of

15   immigration status information to other governmental agencies. Yet, "it has been the long-

16   standing and consistent practice of DHS (and its predecessor INS) to use information submitted

17   by people seeking . . . other benefits for the limited purpose of adjudicating their requests, and not

18   for immigration enforcement purposes," except in limited circumstances. RJN Ex. 45. The federal

19   government has implemented policies that limit disclosure of immigration status information to

20   other governmental entities. *See* RJN Exs. 46, 47 ("In no case may any DHS, DOJ, or DOS

21   employee permit use by or disclosure to anyone . . . of any information which relates to an alien

22   who is the beneficiary of an application for relief."). Likewise, DHS's policies acknowledge "that

23   there are often confidentiality rules that govern disclosure of records from juvenile-related

24   proceedings" that immigration officers should respect. RJN Ex. 48. This administration has

25   repeatedly contended that it has maintained the policy for Deferred Action for Childhood Arrivals

26   ("DACA") status individuals to "protect[] from disclosure" information provided by DACA

27   applicants "to ICE and CBP for the purpose of immigration enforcement proceedings." RJN Ex.

28   49, Q19; 50 at 39 (claiming the policy "currently remains in effect"). The federal government has

29

1    taken similar positions to protect the immigration status of people who interact with federal

2    agencies or seek benefits. *See, e.g.*, RJN Ex. 51 (IRS interpreting 26 U.S.C. § 6103 confidentiality

3    obligations as prohibiting the disclosure of information for immigration enforcement purposes); 8

4    C.F.R. § 244.16 (prohibiting information disclosure for Temporary Protected Status applicants,

5    with exceptions for federal and state LEAs, but not local LEAs).

6    **VI.    THE STATE IS ENTITLED TO INJUNCTIVE RELIEF**

7    **A.    Irreparable Harm and Balance of Hardships and the Public Interest**

8          A permanent injunction is appropriate where a plaintiff "suffered an irreparable injury,"

9    "remedies at law . . . are inadequate," "the balance of hardships between the plaintiff and

10   defendant" supports an equitable remedy, and "the public interest would not be disserved." *eBay*

11   *Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the federal government is the

12   opposing party, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

13   "[C]onstitutional violation[s] alone, coupled with the damages incurred, can suffice to show

14   irreparable harm." *Am. Trucking Ass'ns, Inc. v. Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir.

15   2009) (relying on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)). Injuries where

16   "sovereign interests and public policies [are] at stake" are irreparable. *Kansas v. United States*,

17   249 F.3d 1213, 1227-28 (10th Cir. 2001).

18         California faces constitutional injury to its sovereignty. A plaintiff can suffer a

19   constitutional injury by being forced to either comply with an unconstitutional law or else face

20   community and financial injury. *See Am. Trucking*, 559 F.3d at 1058-59. Since the Challenged

21   Conditions are unconstitutional, that is true here. Further, § 1373, or at minimum, Defendants'

22   expansive interpretation of § 1373, is unconstitutional, so Defendants expect the State to comply

23   with an unconstitutional law in order to receive funding. Defendants admit that the § 1373

24   certification requires jurisdictions to adopt the federal government's interpretation of the laws,

25   Sherman Decl. Ex. E (Defs. RFA Resp. 16), and Defendants' filing of a lawsuit against the State

26   alleging the Values Act violates § 1373 makes clear that the State faces legal jeopardy if

27   Defendants refuse to accept a qualified certification. *See Morales*, 504 U.S. at 380-81 (relief

28   proper where "respondents were faced with a Hobson's choice: continually violate the Texas law

30

1  and expose themselves to potentially huge liability; or violate the law once as a test case and

2  suffer the injury of obeying the law during the pendency of the proceedings").

3    In addition to the serious constitutional injuries, Defendants' actions will cause real harm to

4  the State's communities, no matter what the State does. If the State changes its laws to comply

5  with unlawful and constitutionally impermissible conditions, the relationship of trust that the

6  State statutes are intended to build will erode. *See* Hart Decl. ¶ 18; Goldstein Decl. ¶ 9; Wong.

7  Decl. ¶¶ 11-13, 41-44, 53; *cf. Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th

8  Cir. 2012) (injuries to goodwill not easily measurable and often irreparable). State and local

9  entities would have to divert limited resources to immigration activities to the detriment of more

10  immediate local priorities. *See, e.g.*, Hart Decl. ¶ 19. Alternatively, if the State preserves its laws

11  and Defendants cut off millions of dollars in JAG funding that the State is otherwise entitled to,

12  the State will be unable to fund critical public safety programs, and the elimination of programs

13  and staff positions may result. *See* Jolls Decl. ¶ 19; Caligiuri Decl. ¶¶ 23, 31, 32; McDonnell

14  Decl., ECF 31, ¶¶ 8-9, 15; *see also United States v. North Carolina*, 192 F. Supp. 3d 620, 629

15  (M.D.N.C. 2016). The courts in *Chicago*, *Philadelphia*, and *Los Angeles* issued injunctions under

16  similar circumstances, with far smaller amounts of money at issue than here. *Chicago*, 888 F.3d at

17  287; *Philadelphia*, 2018 WL 2725503, at *41-43; *Los Angeles*, 293 F. Supp. 3d at 1100.

18    The harm to the State from the loss of COPS grants is already being felt. USDOJ has

19  refused to allocate BI's awarded COPS funds based on its ongoing "inquiry" into the State's

20  compliance with § 1373. As a result, BI has had to divert funds it would otherwise spend toward

21  other law enforcement priorities to keep BI personnel on the task force that COPS is supposed to

22  fund. Caligiuri Decl. ¶ 24.  BI has been constrained in its ability to fill six vacancies on its task

23  force, indefinitely depriving it of resources to investigate large-scale illicit drug trafficking.

24  Caligiuri Decl. ¶ 23. Moreover, notwithstanding this Court's suggestion that the State "cover" the

25  costs of the grant while the litigation is pending, ECF 89 at 27, Defendants' position is that the

26  COPS award prohibits BI from using its own dollars to fund the task force in the interim, and

27  Defendants refuse to waive that prohibition. Sherman Decl. ¶ 6 & Ex. D. Defendants' actions

28  have left BI between a rock and a hard place, with the Court's guidance in its March 5 Order and

31

1    public safety on the one side and Defendants' obstinacy on the other. BI chose to follow the

2    Court's guidance by funding the task force in the interim to avoid additional damage to public

3    safety. Caligiuri Decl. ¶¶ 24-25. BI should not be penalized for making that decision.

4         The balance of the hardships and the public interest also favor "'prevent[ing] the violation

5    of a party's constitutional rights.'" *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069

6    (9th Cir. 2014) (citation omitted). As this Court stated previously, "the public interest would

7    appear to be better served if the State did not have to choose between the Byrne JAG Program

8    grant funds to assist its criminal law enforcement efforts and the health of its relationship with the

9    immigrant community." ECF 89 at 27. The record on these points has only grown stronger.

10        **B.    Nationwide Injunctive Relief**

11        A nationwide injunction barring the Challenged Conditions is needed here both to protect

12   California's specific interests in JAG funding and to protect the strong public interest in enjoining

13   the unconstitutional conditions. First, a nationwide injunction protects California's interest in

14   receiving its statutorily-allocated grant from a limited annual fund. JAG funding consists of one

15   annual pool of money, and the statute requires it be disbursed according to a formula among

16   qualifying jurisdictions, with none held back. Defendants violated that framework by failing to

17   provide any jurisdiction in California with JAG funding. Absent a nationwide injunction,

18   Defendants could continue to disburse the remaining appropriated JAG funds to jurisdictions

19   without injunctions, while refusing to disburse funds to California. Then when this case is

20   resolved, funds may no longer be available for California. *Cf. Suffolk v. Sebelius*, 605 F.3d 135,

21   141-42 (2d Cir. 2010) (affirming as moot dismissal of challenge to denial of grant funds where

22   funds were already distributed during the pendency of litigation). The State faces that possibility

23   here because Defendants have already awarded $197.3 million of JAG awards, RJN Exs. 27, 28,

24   the authorizing statute provides no guarantee that withheld funds will be saved indefinitely, and in

25   other circumstances, the authorizing statute allows for withheld funds to be reallocated to other,

26   "compliant" JAG recipients. *See* 34 U.S.C. §§ 20927, 30307(e)(5).

27        Second, where a court finds an agency's actions to be unlawful, "the ordinary result is that

28   the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l*

32

1   *Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Utility*

2   *Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2449 (2014). A court has broad discretion to define

3   the terms of an injunction, *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015), and there is

4   no requirement that an injunction affect only the parties. *Bresgal v. Brock*, 843 F.2d 1163, 1170

5   (9th Cir. 1987). Since the Challenged Conditions are illegal and unconstitutional, and § 1373 is

6   unconstitutional, the most equitable course of action is to enjoin the application of the conditions

7   nationwide. When a law is unconstitutional on its face, a nationwide injunction is proper. *See,*

8   *e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) (citation omitted).

9       Third, nationwide relief is appropriate because the conditions' constitutional deficiencies

10  are not geographically limited to California. Defendants' statutory authority over JAG is uniform

11  across jurisdictions. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("The scope of

12  injunctive relief is dictated by the extent of the violation established," not by geography). The

13  structure of the program—where state and local governments are interconnected because funding

14  changes to one grantee affect allocations to others, 34 U.S.C. § 10156—makes piecemeal relief

15  unsuitable. Here, all state and local jurisdictions in six states, and at least 17 local jurisdictions in

16  other states, have been deprived of JAG funding, and are currently suffering harm from the

17  inability to fund critical programs. *See* Pittman Decl. ¶ 9; Schmidt Decl. ¶ 14; Swift Decl. ¶¶ 2-3;

18  Springer Decl. ¶¶ 10-15; Wall Decl. ¶¶ 5-7; Grumet Decl. ¶¶ 12-16. And many jurisdictions may

19  have awards that are too small to justify litigation.  *See, e.g.*, Swift Decl. ¶ 3.  Thus, these

20  jurisdictions as a practical matter are forced to choose between forgoing funds or subjecting

21  themselves to unconstitutional grant award conditions. Finally, as the Challenged Conditions are

22  unconstitutional, only a nationwide injunction provides complete relief. "When the court believes

23  the underlying right to be highly significant, it may write injunctive relief as broad as the right

24  itself." *Zamecnik v. Indian Prairie Sch. Dist*. #204, 636 F.3d 874, 879 (7th Cir. 2011) (Posner, J.).

25      **C.    Mandamus Relief/Mandatory Injunction**

26      In addition and/or in the alternative, California is entitled to mandamus relief. Under the

27  APA, courts shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.

28  § 706(1). Section 706(1) "is a source of injunctive relief to remedy an arbitrary or capricious

33

delay or denial of agency action." *Sierra Pacific Industries v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989). Because the imposition of the Challenged Conditions are unlawful under the APA for exceeding statutory authority and being arbitrary and capricious, *see* FAC ¶¶ 133-144, the Court should issue a mandatory injunction under § 706(1) compelling disbursal of the awards and funds to all qualifying jurisdictions. *See* FAC ¶ 17 & FAC, Prayer for Relief ¶¶ 3, 4.[12]

A "ministerial or non-discretionary act" is necessary for a mandatory injunction. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (internal quotations omitted). Congress's use of a formula grant structure, in conjunction with the use of the word "shall" in § 10156(a)(1), imposed a non-discretionary duty on Defendants. *Philadelphia*, 2018 WL 2725503, at *44. Defendants have failed to issue awards to all qualifying jurisdictions, inconsistent with the statute's formula. Sherman Decl. Ex. C. The Executive Branch may not refuse congressional mandates to allocate the full amounts appropriated. *See Train v. City of New York*, 420 U.S. 35, 45-46 (1975). This is especially so for formula grants. *See, e.g.*, *Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) ("We hold that the [agency] was required to distribute the money available so as to preserve the allocation formula provided by [statute].")*; Volpe*, 479 F.2d at 1114; *see also Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("[F]ormula grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula").

The Ninth Circuit uses the six-factor test laid out in *Telecommc'ns. Research & Action v. FCC (TRAC)*, 750 F.2d 70, 79-80 (9th Cir. 1984) to decide if the agency action was "unlawfully withheld" under § 706(1). The first two factors look at whether the statutory scheme or a "rule of reason" govern the time an agency has to make a decision. *Id.* at 80. "[I]t bears emphasis that Congress specifically set the JAG Program as an annual award, and the DOJ's delay has precluded the [plaintiff] from receiving the intended award at such time as the [plaintiff] can make timely use of it." *See Philadelphia*, 2018 WL 2725503, at *44; *supra* at 31. The other factors look to hardship and equity, and also support an injunction. The delay impacts human

---

[12] That Defendants may respond to an injunction preventing application of the Challenged Conditions to JAG by simply refusing to issue the funds at all is not a hypothetical problem. That is precisely what Defendants did in reaction to Chicago securing a nationwide injunction against the Access and Notification Conditions.

34

1    welfare rather than only economic regulation (factor three), and serious state public safety

2    interests are prejudiced by the delay (factor five). *TRAC*, 750 F.2d at 80. Without the funds,

3    California would be forced to abandon effective programs that otherwise reduce recidivism for at-

4    risk youth, counter the distribution of illegal drugs, [and] advance community policing. *See, e.g.*,

5    Jolls Decl. ¶ 10. Because Defendants do not claim that disbursing the funds would negatively

6    impact competing agency priorities, they have not shown that "the effect of expediting delayed

7    action on agency activities of a higher or competing priority," (factor four) weighs in their favor.

8    *TRAC*, 750 F.2d at 80. Finally, as for factor six, "the court need not find any impropriety . . . to

9    hold that agency action is unreasonably delayed," *Id.* at 80—though Defendants are acting

10   improperly by withholding funding based on unlawful conditions. *See* FAC ¶¶ 139-144.

11        Likewise, even though COPS is not a formula grant, California satisfies all of the factors

12   for mandatory relief for that grant.  Since Defendants awarded the grant to California already,

13   Defendants' allocation of funding to California is no longer discretionary since the State complies

14   with the grant's conditions. Further, Defendants unlawful withholding of funding has precluded

15   California from timely using the grant to the detriment of public safety. Caligiuri Decl. ¶¶ 23-25.

16        Alternatively, the court should issue a mandatory injunction ordering the disbursement of

17   JAG funding on the basis of Plaintiff's request that it "[p]ermanently enjoin Defendants from

18   using the § 1373, Access, and Notification Conditions as restrictions for JAG funding," FAC,

19   Prayer for Relief ¶ 2, and from "withholding and terminating" JAG and COPS funding, *id.* ¶¶ 3,

20   4. *See Marquez v. Hardin*, 339 F. Supp. 1364, 1366, 1368 (N.D. Cal. 1969) (analyzing Plaintiffs'

21   prayer that Defendants be enjoined from "failing or refusing to enforce their statutory duty" under

22   the National School Lunch Act as a mandamus claim, though it was "cast in terms of a restraining

23   injunction"). In this case, a mandatory injunction compelling the government to disburse the

24   funds is a necessary component of the requested injunctive relief.

25                             **CONCLUSION**

26        For the foregoing reasons, California requests this Court grant its Motion.

27

28

1    Dated:  July 9, 2018                    Respectfully Submitted,

2                                             XAVIER BECERRA
                                              Attorney General of California
3                                             SATOSHI YANAI
                                              Supervising Deputy Attorney General
4
                                              */s/ Lee Sherman*
5                                             */s/ Lisa C. Ehrlich*
                                              */s/ Sarah E. Belton*
6
                                              LEE SHERMAN
7                                             LISA C. EHRLICH
                                              SARAH E. BELTON
8                                             Deputy Attorneys General
                                              *Attorneys for Plaintiff*
9                                             *State of California*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff State of California's Motion for Summary Judgment (3:17-cv-04701-WHO)