CHAD A. READLER
Acting Assistant Attorney General
ALEX G. TSE
Acting United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
ANTONIA KONKOLY
LAURA HUNT
DANIEL MAULER
Trial Attorneys
Department of Justice, Room 7324
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone:     (202) 514-2395
Facsimile:      (202) 616-8470
E-mail:          antonia.konkoly@usdoj.gov
COUNSEL FOR DEFENDANTS
JEFFERSON B. SESSIONS III, Attorney
General of the United States; LAURA L.
ROGERS, Acting Principal Deputy Assistant Attorney
General;[1] and U.S. DEPARTMENT OF JUSTICE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, ex rel. XAVIER BECERRA, Attorney General of the State of California, <br><br> Plaintiff, <br> v. <br><br> JEFFERSON B. SESSIONS III, Attorney General of the United States, *et al.*, <br><br> Defendants. | No. 3:17-cv-04701-WHO <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date:          September 5, 2018 <br> Time:          2:00 p.m. |

---

[1] Laura L. Rogers is hereby substituted for Alan R. Hanson as a defendant herein pursuant to Federal Rule of Civil Procedure 25(d).

1

## TABLE OF CONTENTS

2   NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................. 1

3   MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

4   INTRODUCTION ............................................................................................. 1

5   STATUTORY AND ADMINISTRATIVE BACKGROUND .................................................... 4

    I.      The Immigration and Nationality Act ................................................................ 4

6   II.     USDOJ Office of Justice Programs and the Byrne JAG Program .......................... 6

7   III.    Conditions on Byrne JAG Awards .................................................................. 7

8   IV.     DOJ Office of Community Oriented Policing Services and the
            Anti-Methamphetamine and Anti-Heroin Task Force Programs ......................... 8

9   V.      Recent Developments .................................................................................. 9

10  LEGAL STANDARD ........................................................................................ 10

11  ARGUMENT ................................................................................................ 10

12  I.      California Does Not Challenge Final Agency Action Reviewable under the APA ........ 10

13  II.     The Challenged Immigration-Related Byrne JAG Conditions Are Lawful .................... 11

            A.      The Access and Notice Conditions Are Authorized by Statute and
14                  Do Not Violate the Seperation of Powers ........................................... 11

15          B.      The Notice, Access, and Section 1373 Conditions Are Consistent
                    with the Spending Clause .............................................................. 15

16                  i.      The Notice, Access, and Section 1373 Conditions Are Related to
17                          the Purposes of the Byrne JAG Program ................................. 15

                    ii.     The Notice and Access Conditions are Unambiguous ..................... 18
18
            C.      The Challenged Conditions Are Not Arbitrary or Capricious ................. 20
19

20  III.    The Court Should Enter Judgment for Defendants on Plaintiff's Request for a
            Declaration Regarding its Statutes' Compliance with Section 1373 ................. 26

21          A.      Plaintiff's Request for a Ruling Regarding Compliance with Section
                    1373 Is Non-Justiciable .............................................................. 27
22
            B.      Section 1373 Encompasses, at Minimum, the Contact Information
23                  And Release Status of Aliens ...................................................... 29

24          C.      The Values Act and Its Implementation Prohibit or Restrict Providing at
                    Least Some of the Information Protected by Section 1373 .................. 32
25
            D.      Section 1373 Is Consistent with the Tenth Amendment ...................... 33
26  IV.     If the Court Grants an Injunction, It Should Be Limited to California ........... 37

27  CONCLUSION ............................................................................................. 40

28

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................... 27

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*,
    809 F.2d 979 (3d Cir. 1986) ............................................................... 11

*Arizona v. United States*,
    567 U.S. 387 (2012) .................................................................. *passim*

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ........................................................................... 18

*Barbour v. Wash. Metro. Area Transit Auth.*,
    374 F.3d 1161 (D.C. Cir. 2004) ......................................................... 16

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................... 10

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) .......................................................... 20

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................... 38

*Ctr. for Arms Control & Non-Proliferation v. Pray*,
    531 F.3d 836 (D.C. Cir. 2008) ........................................................... 26

*Charles v. Verhagen*,
    348 F.3d 601 (7th Cir. 2003) ............................................................. 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................... 20

*City of Chicago v. Sessions*,
    264 F. Supp. 3d 933 (N.D. Ill. 2017) ................................................... 9

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted*, Order of June 4, 2018 (No.
    17-05270) .......................................................................................... 39

*City of N.Y. v. United States*,
    179 F.3d 29 (2d Cir. 1999) ................................................................ 35

*Clinton v. City of N.Y.*,
    524 U.S. 417 (1998) ........................................................................... 11

*Coons v. Lew*,
    762 F.3d 891 (9th Cir. 2014) ............................................................. 27

ii

*Ctr. for Envtl. Health v. McCarthy,*
   192 F. Supp. 3d 1036 (N.D. Cal. 2016) ................................................... 10

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ..................................................................................... 37

*Dean v. United States,*
   556 U.S. 568 (2009) ..................................................................................... 29

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.,*
   887 F.2d 275 (D.C. Cir. 1989) ......................................................... 3, 11, 12

*Duvall v. Att'y Gen. of U.S.,*
   436 F.3d 382 (3d Cir. 2006) ...................................................................... 16

*FCC v. Fox Television,*
   556 U.S. 502 (2009) ..................................................................... 23, 25, 29

*Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.*
   142 F. Supp. 2d 679 (D. Md. 2001), *aff'd sub nom. Freilich v. Upper Chesapeake Health, Inc.,*
   313 F.3d 205 (4th Cir. 2002) ..................................................................... 35

*FTC v. AT&T Mobility LLC,*
   883 F.3d 848 (9th Cir. 2018) ..................................................................... 15

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ............................................................................... 37

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ............................................................................. 31, 34

*Hawaii Cty. Green Party v. Clinton,*
   14 F. Supp. 2d 1198 (D. Haw. 1998) ....................................................... 27

*J&G Sales Ltd. v. Truscott,*
   473 F.3d 1043 (9th Cir. 2007) ................................................................... 20

*Johnson v. Consumerinfo.com, Inc.,*
   745 F.3d 1019 (9th Cir. 2014) ................................................................... 12

*Koslow v. Pennsylvania,*
   302 F.3d 161 (3d Cir. 2002) ...................................................................... 16

*Lamar, Archer & Cofrin, LLP v. Appling,*
   138 S. Ct. 1752 (2018) ............................................................................... 29

*Leocal v. Ashcroft,*
   543 U.S. 1 (2004) ....................................................................................... 29

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................................. 37, 38

iii

*Los Angeles Haven Hosp. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ................................................. 38

*Luminant Generation Co. LLC v. EPA,*
    714 F.3d 841 (5th Cir. 2013) ................................................. 25

*Madison v. Virginia,*
    474 F.3d 118 (4th Cir. 2006) ................................................. 19

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ........................................................... 38

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ...................................... 3, 15, 16

*McKenzie v. City of Chicago,*
    118 F.3d 552 (7th Cir. 1997) ................................................. 38

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) .................................................. 33, 35

*New York v. United States,*
    505 U.S. 144 (1992) ...................................................... 16, 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ........................................................... 34

*Oregon Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.,*
    288 F.3d 414 (9th Cir. 2002) ................................................. 27

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) ................................................. 10

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
    265 F.3d 1028 (9th Cir. 2001) ......................................... 10, 21

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) ........................................................... 16

*Pension Benefit Guaranty Corp. v. LTV Corp.,*
    496 U.S. 633 (1990) ........................................................... 15

*Preap v. Johnson,*
    831 F.3d 1193 (9th Cir. 2016), *cert. granted,* 138 S. Ct. 1279 (Mar. 19, 2018) .............. 17, 31

*Printz v. United States,*
    521 U.S. 898 (1997) .................................................. 35, 36, 37

*Providence Yakima Med. Ctr. v. Sebelius,*
    611 F.3d 1181 (9th Cir. 2010) ............................................... 20

iv

*Rattlesnake Coal. v. EPA,*
    509 F.3d 1095 (9th Cir. 2007) ............................................................ 10

*Reno v. Condon,*
    528 U.S. 141 (2000) ................................................................ 34, 35

*River Runners for Wilderness v. Martin,*
    593 F.3d 1064 (9th Cir. 2010) ............................................................ 25

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ................................................................ 29

*S. Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................ *passim*

*Sesay v. Attorney Gen. of U.S.,*
    787 F.3d 215 (3d Cir. 2015) ............................................................ 26

*Shenwick v. Twitter, Inc.,*
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................ 7

*State ex rel Becerra v. Sessions,*
    284 F. Supp. 3d 1015 (N.D. Cal. 2018) ............................................................ 10, 34-35

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................ 27, 28

*Texas v. United States,*
    523 U.S. 296 (1998) ................................................................ 27, 28

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) ................................................................ 37

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ................................................................ 38

*United States v. Craft,*
    535 U.S. 274 (2002) ................................................................ 15

*United States v. Elkins,*
    683 F.3d 1039 (9th Cir. 2012) ............................................................ 18

*United States v. Kebodeaux,*
    570 U.S. 387 (2013) ................................................................ 18

*United States v. Mendoza*
    464 U.S. 154 (1984) ................................................................ 39

*United States v. Wenner,*
    351 F.3d 969 (9th Cir. 2003) ............................................................ 12

*Util. Air Regulatory Grp. v. EPA*,
    134 S. Ct. 2427 (2014) ......................................................................... 29

*Virginia Soc'y for Human Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ............................................................... 38

*Wash. Legal Found. v. Legal Found. of Wash.*,
    271 F.3d 835 (9th Cir. 2001) ............................................................... 27

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................................ 39

*Zepeda v. U.S. Immigration & Naturalization Serv.*,
    753 F.2d 719 n.1 (9th Cir. 1983) ........................................................ 38

**Constitutional Law**

U.S. Const. art. III, § 2, cl. 1 .................................................................. 27

**Statutes**

5 U.S.C. § 553 ......................................................................................... 21

5 U.S.C. § 704 ......................................................................................... 10

5 U.S.C. § 706 ......................................................................................... 10

8 U.S.C. § 1101 ............................................................................. 28, 29, 30

8 U.S.C. § 1226 ................................................................................. *passim*

8 U.S.C. § 1227 ................................................................................. *passim*

8 U.S.C. § 1229b ..................................................................................... 30

8 U.S.C. § 1231 ................................................................................. *passim*

8 U.S.C. § 1252c ....................................................................................... 5

8 U.S.C. § 1305 ....................................................................................... 30

8 U.S.C. § 1324 ......................................................................................... 5

8 U.S.C. § 1357 .............................................................................. 3, 5, 25

8 U.S.C. § 1373 ................................................................................. *passim*

18 U.S.C. § 1913 ..................................................................................... 20

22 U.S.C. § 7105 ..................................................................................... 28

25 U.S.C. § 1644 ..................................................................................... 13

28 U.S.C. § 510 ....................................................................................... 12

31 U.S.C. § 1352 ..................................................................................... 20

34 U.S.C. § 10101 ...................................................................... 6, 7, 14, 39

34 U.S.C. § 10102 ............................................................................. *passim*

34 U.S.C. § 10110 ................................................................................... 14

34 U.S.C. § 10141 ......................................................................................................... 14

34 U.S.C. § 10151-58 ............................................................................................... 6, 14

34 U.S.C. § 10152 ............................................................................................... 6, 16, 21

34 U.S.C. § 10153 ................................................................................................... 6, 16

34 U.S.C. § 10154 ......................................................................................................... 11

34 U.S.C. § 10251 ................................................................................................... 6, 21

34 U.S.C. § 20901 ......................................................................................................... 18

34 U.S.C. § 20927 ................................................................................................... 18, 39

34 U.S.C. § 30307 ......................................................................................................... 39

42 U.S.C. § 713 ............................................................................................................. 13

42 U.S.C. § 1395l ......................................................................................................... 13

42 U.S.C. § 3712 ............................................................................................................. 6

42 U.S.C. § 5779 ........................................................................................................... 35

Pub. L. No. 90-351, 82 Stat. 197 (1968) ...................................................................... 6

Violence against Women and Department of Justice Reauthorization Act of 2005,
   Pub. L. No. 109-162, 119 Stat. 2960 (2006) ...................................................... 6, 12

**California Law**

Cal. Civ. Code § 1798.3 ............................................................................................... 32

Cal. Gov't Code § 7284.6 ....................................................................................... 32, 33

Cal. Gov't Code §§ 7282-7282.5 ........................................................................... 25, 32

Cal. Gov't Code §§ 7283-7283.2 ................................................................................. 26

California Code of Civil Procedure § 155 ................................................................... 26

California Penal Code § 422.93 ................................................................................... 26

California Penal Code § 679.10 ................................................................................... 26

California Penal Code § 679.11 ................................................................................... 26

California Welfare and Institutions Code § 827 ......................................................... 26

California Welfare and Institutions Code § 831 ......................................................... 26

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................... 10

Federal Rule of Civil Procedure 25 .............................................................................. 1

Hawaii, 138 S. Ct. 2392, 2425 ................................................................................... 38

**Administrative and Executive Material**

8 C.F.R. § 204.11 ......................................................................................................... 28

8 C.F.R. § 214.1 ........................................................................................................... 30

28 C.F.R. Part 18 ............................................................................................................. 11

28 C.F.R. § 66.12 ............................................................................................................ 13

Exec. Order No. 13,688,
    80 Fed. Reg. 3451 (Jan. 16, 2015), *rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499
    (Aug. 28, 2017) ......................................................................................................... 7

H. R. Conf. Rep. 104-725 (1996) ................................................................................. 31

H.R. Rep. No. 109-233 (2005) ........................................................................... 12, 13, 18

S. Rep. No. 104–249 (2d Sess. 1996) ...................................................................... 31, 36

**Other Authorities**

Dep't of Justice, Office of Justice Programs, *About Us*,
    https://ojp.gov/about/about.htm ............................................................................... 14

Bureau of Justice Assistance Programs Office Contact Information,
    https://www.bja.gov/About/Contacts/ ProgramsOffice.html ................................... 19

*Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction,*
    131 Harv. L. Rev. 417 (2017) .................................................................................. 38

1  **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2       PLEASE TAKE NOTICE that on Wednesday, September 5, 2018, at 2:00 p.m., or as soon

3  thereafter as counsel may be heard, before The Honorable William H. Orrick, in Courtroom 2,

4  17th Floor, of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California,

5  the defendants will move, and hereby do move, for summary judgment in this action under Rule

6  56 of the Federal Rules of Civil Procedure. This motion is based on the following Memorandum

7  of Points and Authorities, Defendants' Request for Judicial Notice, the other evidence and records

8  on file in this action, and any other written or oral evidence or argument that may be presented at

9  or before the time this motion is heard by the Court.

10  **MEMORANDUM OF POINTS AND AUTHORITIES**

11  **INTRODUCTION**

12       The State of California has adopted state laws that frustrate information-sharing between

13  the State and the Federal Government, and thus the execution of one of the Federal Government's

14  core responsibilities under the Immigration of Nationality Act ("INA")—*i.e.*, the removal of

15  criminal aliens. The State is not content, however, to merely frustrate the removal of criminal

16  aliens from the country. In this suit, the State seeks to block the U.S. Department of Justice

17  ("USDOJ") from promoting information-sharing as a condition on federally-funded law

18  enforcement grants.

19       The Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program")

20  provides federal funds for state and local law enforcement. In furtherance of the INA and the

21  statutes governing the Byrne JAG Program, USDOJ requires Byrne JAG grantees to give federal

22  immigration authorities access to correctional facilities to meet with aliens (the "access condition"),

23  and to notify federal authorities "as early as practicable" before the scheduled release of an alien

24  from custody (the "notice condition"). USDOJ also requires grant recipients to comply with 8

25  U.S.C. § 1373(a) ("Section 1373"), which specifically bars state and local governments from

26  prohibiting or restricting the exchange of "information regarding the . . . citizenship or immigration

27  status" of any individual with federal immigration authorities (the "Section 1373 condition").

28  Similarly, for Fiscal Year ("FY") 2017, USDOJ's Office of Community Oriented Policing Services

1  ("COPS Office") required certification of compliance with Section 1373 as a threshold eligibility

2  requirement for various discretionary grant programs, including, as relevant here, the COPS Anti-

3  Methamphetamine Program ("CAMP").

4      The call for intergovernmental law enforcement cooperation embodied in these three

5  conditions follows from recognition that "[c]onsultation between federal and state officials is an

6  important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012).

7  For aliens who commit crimes and end up in state or local criminal custody, the expectation of

8  cooperation is particularly evident. In deference to a state or local jurisdiction's significant interest

9  in punishing its criminals, the INA usually permits these aliens to serve their entire sentence before

10  being subject to federal detention for possible removal from the country. Except in limited

11  circumstances, the Department of Homeland Security ("DHS") "may not remove an alien who is

12  sentenced to imprisonment until the alien is released from imprisonment," and that the alien's

13  removal period "begins on . . . the date the alien is released from [state or local criminal]

14  detention." 8 U.S.C. §§ 1231(a)(1)(B)(iii), (a)(4)(A); *see id.* § 1226(c)(1) (requiring that federal

15  immigration authorities take custody of a criminal alien "when the alien is released" from criminal

16  custody). But in delaying removal of these individuals until state and local jurisdictions' criminal

17  justice interests are served, it was certainly not Congress's intent that these criminal aliens would

18  evade federal immigration authorities. *See id.* § 1226(c)(1) (requiring detention of "criminal aliens"

19  pending removal proceedings); § 1231(a)(2) (mandating detention during the 90–day removal

20  period for all aliens against whom a final order of removal has been entered); § 1231(a)(1)(B)(iii)

21  (providing that "[i]f the alien is detained or confined (except under an immigration process)," the

22  90-day period presumptively runs from the date on which "the alien is released from detention or

23  confinement"). Thus, these provisions and others contemplate that federal immigration officials

24  will have access to information regarding the whereabouts, custody, and time of release of aliens in

25  state and criminal custody.

26      California alleges that USDOJ lacks authority to impose the access and notice conditions,

27  and that all three of the conditions violate the Spending Clause as well as the Administrative

28  Procedure Act ("APA"). All claims are without merit. In the very same enactment that created the

1   Byrne JAG Program in 2006, Congress delegated to the Assistant Attorney General ("AAG") for

2   USDOJ's Office of Justice Programs ("OJP") the authority to "plac[e] special conditions on all

3   grants," and to "determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). This

4   express delegation conveys ample authority to impose the challenged conditions, which do not,

5   accordingly, violate the constitutional separation of powers. *See DKT Mem'l Fund Ltd. v. AID*, 887

6   F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms

7   and conditions on federal spending programs).

8         In relation to plaintiff's Spending Clause claim, the challenged conditions bear much more

9   than "some relationship" to the purposes of the Byrne JAG Program, and thus meet the relatedness

10   element of the Spending Clause. *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir.

11   2002). OJP and the grant programs it administers are designed to strengthen law enforcement and to

12   "maintain liaison" among the various branches of government "in matters relating to criminal

13   justice." 34 U.S.C. § 10102(a)(2). The challenged conditions emanate from "the Department of

14   Justice's top priority of reducing violent crime" and the "long-established cooperative principles

15   among law enforcement agencies." *See* Administrative Record ("AR") at AR-00992 (USDOJ Press

16   Release No. 17-826 (July 25, 2017)). The conditions are also unambiguous. *See S. Dakota v. Dole*,

17   483 U.S. 203, 210 (1987).

18         For similar reasons, Plaintiff's APA claims also fail as a matter of law, as the challenged

19   conditions easily satisfy the deferential standard of review set forth by that statute. Numerous

20   federal statutes expressly tie immigration enforcement and criminal justice together—most

21   centrally inasmuch as a conviction for any of a wide array of criminal offenses renders an alien

22   removable from this country, *see* 8 U.S.C. § 1227(a)(2). The challenged conditions thus rationally

23   comport with, *inter alia*, the inter-governmental cooperation that Congress contemplates in

24   immigration enforcement. *See, e.g., id.* §§ 1226(d), 1231(i), 1357(g), 1373.

25         Plaintiff also seeks a ruling that its state laws do not violate Section 1373. Preliminarily,

26   although California has placed numerous of its statutes at issue in this litigation, OJP has never

27   expressed a concern to California that any of these statutes other than the California Values Act,

28   Cal. Gov't Code §§ 7284-7284.12 ("Values Act") might violate Section 1373. Further, OJP has not

1  yet reached a final administrative determination as to the Values Act, and continues to evaluate the

2  relevant evidence so that its final agency determination can include a record with all identifiable

3  bases for the decision. Thus, plaintiff's claim for declaratory judgment is not ripe for adjudication.

4  Further, to give Congress's choice of the phrase "*information regarding* . . . citizenship or

5  immigration status … " its intended meaning, 8 U.S.C. § 1373 (emphasis added), Section 1373

6  must encompass information relevant to determining an individual's compliance with the INA,

7  which naturally includes information relevant to ascertaining that individual's removability. Thus,

8  Section 1373 covers, at minimum, the contact information and release status of aliens, since that

9  information is central to that inquiry. Because the Values Act, on its face and as shown by the

10  information revealed in discovery in this action, prohibits or restricts giving ICE these categories

11  of information, California cannot be entitled to a declaratory judgment that this statute comports

12  with Section 1373.

13     Finally, plaintiff argues that Section 1373 would violate the Tenth Amendment if the statute

14  were construed as "extending" to the state statutes identified in the Amended Complaint;

15  alternatively, it advances the claim—for the first time in this litigation—that Section 1373 is

16  facially unconstitutional. Both of these theories likewise fail, as Section 1373 merely secures

17  information needed to carry out the federal removal scheme—in which the federal government

18  takes full responsibility for regulation of and enforcement against individuals—and thus does not

19  present any legitimate claim of "commandeering."

20     For these reasons and others set forth in detail *infra*, the Court should grant defendants'

21  motion for summary judgment and deny plaintiff's motion.

22                    **STATUTORY AND ADMINISTRATIVE BACKGROUND**

23  **I.     The Immigration and Nationality Act**

24     Enforcement of the immigration laws, including and especially the investigation and appre-

25  hension of criminal aliens, is quintessentially a law enforcement function. Through the INA, 8

26  U.S.C. §§ 1101 *et seq*., Congress granted the Executive Branch significant authority to control the

27  entry, movement, and other conduct of foreign nationals in the United States. These responsibilities

28  are assigned to law enforcement agencies, as the INA authorizes DHS, USDOJ, and other

4

No. 3:17-cv-04701-WHO, Defs' SJ Motion & Opp.

1    Executive agencies to exercise considerable discretion to direct enforcement pursuant to federal

2    policy objectives. *See Arizona*, 567 U.S. at 396-97.

3         Yet, immigration enforcement is also a cooperative endeavor, as the INA *also* repeatedly

4    contemplates cooperation among state and local officers and federal officials on immigration

5    enforcement. *See, e.g.*, 8 U.S.C. § 1357(g) (authorizing formal cooperative agreements under

6    which qualified state and local officers may perform specified functions of a federal

7    immigration officer in relation to the investigation, apprehension, or detention of aliens); *id.* §

8    1324(c) (authorizing state and local officers to make arrests for violations of the INA's

9    prohibition against smuggling, transporting, or harboring aliens); *id.* § 1252c (authorizing state

10   and local officers to arrest certain felons who have unlawfully returned to the United States); *see*

11   *also* Declaration of Francisco Madrigal (ICE) ("Madrigal Decl.") ¶¶ 6-8 (Attachment 1 hereto).

12   Under authorities such as these, "state officers may perform the functions of an immigration

13   officer." *Arizona*, 567 U.S. at 408. And, of particular relevance to this suit, pursuant to 8 U.S.C.

14   § 1373 ("Section 1373"), "a Federal, State, or local government entity or official may not prohibit,

15   or in any way restrict, any government entity or official from sending to, or receiving from, [federal

16   immigration authorities] information regarding the citizenship or immigration status, lawful or

17   unlawful, of any individual." *Id.* § 1373(a).

18        The INA further provides that certain classes of aliens shall be removed from the United

19   States upon order of the Attorney General or Secretary of Homeland Security. *See*, *e.g.*, *id.*

20   §§ 1227(a), 1228. In furtherance of that statutory objective, the INA requires federal authorities to

21   take custody of certain criminal aliens pending removal proceedings "when the alien is released"

22   from state or local custody. *Id.* § 1226(c)(1). Thus, the release of an alien who has been convicted

23   of certain criminal offenses from state custody constitutes a triggering event for one of the federal

24   government's core responsibilities under the INA—*i.e.*, the removal of criminal aliens. Also in

25   furtherance of the Federal Government's responsibility to remove criminal aliens "promptly"

26   after their release from criminal custody, federal immigration authorities need to be able to

27   interview aliens *while in custody* to determine whether they should be removed upon the

28   conclusion of that custody.

1     **II.      USDOJ Office of Justice Programs and the Byrne JAG Program**

2            Title I of the Omnibus Crime Control and Safe Streets Act of 1968 established the Office of

3     Justice Programs, and provides for OJP to be headed by an AAG. *See* Pub. L. No. 90-351, 82 Stat.

4     197 (1968), *codified as amended at* 34 U.S.C. §§ 10101 *et seq*. The same title of the Omnibus

5     Crime Control Act also established an early iteration of what became Byrne JAG Program. *See*

6     *generally* 34 U.S.C. §§ 10151-58. Under this Program—which came into its modern iteration

7     through the Violence against Women and Department of Justice Reauthorization Act of 2005,

8     Pub. L. No. 109-162, 119 Stat. 2960 (2006) ("Reauthorization Act")—OJP is authorized to "make

9     grants to States and units of local government . . .  to provide additional personnel, equipment . . .

10    and information systems for criminal justice, including for any one or more of [certain enumerated]

11    programs." 34 U.S.C. § 10152(a)(1). In the same chapter, "criminal justice" is defined broadly to

12    include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1).

13           The Byrne JAG Program provides "formula grants," *i.e.*, grants that—when awarded—

14    follow a statutory formula based on population, the rate of violent crime, and other factors. *Id.*

15    §§ 10152(a)(1), 10156. By statute, in order to request a Byrne JAG grant, the chief executive officer

16    of a state or unit of local government must submit an application "in such form as the Attorney

17    General may require," 34 U.S.C. § 10153(a); and the application must include, among other things,

18    "[a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will

19    comply with . . . all . . . applicable Federal laws," *id.* § 10153(a)(5)(D).

20           Prior to 2006, the statute provided, without elaboration, that the AAG for OJP had the

21    power to "exercise such other powers and functions as may be vested in the [AAG] pursuant to

22    this chapter or by delegation of the Attorney General." 42 U.S.C. § 3712(a)(6) (2000). Of

23    particular relevance to the cross-motions now before the Court, in the same 2006 Reauthorization

24    Act that brought the Byrne JAG program into its modern iteration, Congress amended the statute

25    to expressly provide that these powers "includ[e] *placing special conditions on all grants, and*

26    *determining priority purposes for formula grants*." Pub. L. No. 109-162, § 1152(b), 119 Stat. at

27    3113; *see* 34 U.S.C. § 10102(a)(6) (emphasis added).

28

1    **III.**    **Conditions on Byrne JAG Awards**

2          OJP has historically included a variety of conditions, which have varied according to

3    national law enforcement necessities and USDOJ priorities, in Byrne JAG award documents. For

4    example, OJP has imposed, without objection, conditions related to information-sharing and

5    privacy protection, *see* Request for Judicial Notice ("RJN"), Ex. A (California's 2016 JAG

6    award) ¶ 27, research using human subjects, *see id.* ¶ 30, and training, *see id.* ¶¶ 33-34.[2] Other

7    historical conditions imposed by the Assistant Attorney General have been inspired by Executive

8    Branch prerogatives, and in some instances resulted in *subsequent* congressional codification.

9    One such condition, which prohibited use of Byrne JAG funds to purchase military style

10    equipment, related in part to an Executive Order issued by President Obama in 2015. *See id.* ¶ 43;

11    Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015), *rescinded by* Exec. Order No. 13,809,

12    82 Fed. Reg. 41,499 (Aug. 28, 2017). Since 2012, other conditions have required that recipients:

13    (a) comply with specific national standards when purchasing body armor and (b) institute a

14    "mandatory wear" policy for any purchased armor. RJN, Ex. A ¶¶ 39-40. While those conditions

15    have now been codified by Congress, *see* 34 U.S.C. §§ 10202(c)(1)(B), (C), they originated as

16    exercises of USDOJ's authority to impose special conditions. And the AAG has imposed an

17    "American-made" requirement for body armor purchases, something Congress did not choose to

18    codify last year. RJN, Ex. A ¶ 39. In recent years, the number of conditions attached to Byrne

19    JAG Grants has typically numbered in the several dozen. *See* RJN, Ex. A (California's 2016 JAG

20    award, containing more than 50 conditions).

21          In FY 2016, OJP included for the first time an explicit recognition that Section 1373 was

22    an applicable federal law under the Byrne JAG Program. *Id.* ¶ 55. That recognition followed a

23    memorandum issued by USDOJ's Inspector General on May 31, 2016, expressing concern that

---

[2] Plaintiff has asked the Court to take judicial notice of a wide variety of documents, from official government reports to news articles (Dkt. 117). Although defendants do not object to plaintiff's request in relation to the existence or authenticity of the documents submitted, the Court should not take judicial notice of any disputed facts contained in them. *See*, *e.g.*, *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1122-23 (N.D. Cal. 2017) ("The set of documents listed above are … properly subject to judicial notice. However, because the facts contained in the documents are subject to reasonable dispute, 'the Court takes judicial notice only of the statements contained therein, but not for the purpose of determining the truth of those statements.'") (citations omitted).

1   several state and local governments receiving federal grants may not be complying with Section

2   1373. *See* AR-00366-00381 ("2016 OIG Report").

3       For the current Byrne JAG grant cycle, FY 2017, OJP notified applicants that awards under

4   the Program will include three conditions requiring modest cooperation with federal law

5   enforcement prerogatives in the immigration setting. Those conditions require grantees to (1) have a

6   policy of providing DHS with advance notice of the scheduled release date of certain individuals

7   held in state or local correctional facilities; (2) have a policy permitting federal agents to access

8   state or local correctional facilities for certain immigration enforcement purposes; and (3) comply

9   with Section 1373, which, as noted above, prohibits state and local governments or officials from

10  restricting certain communications with DHS. RJN, Ex. B (Alaska JAG Award 2017) ¶¶ 52-56; Ex.

11  C (Charleston, WV JAG Award 2017) ¶¶ 52-56.

12      Under the "Rules of Construction" within those grant conditions, the award documents

13  make clear that nothing in the notice or access conditions requires a grantee to detain "any

14  individual in custody beyond the date and time the individual would have been released in the

15  absence of this condition." RJN, Ex. B ¶ 55; RJN, Ex. C ¶ 55. The documents also make clear that

16  these conditions impose no requirements in relation to any requests by federal immigration

17  authorities to detain non-U.S. citizens, and that the notice condition requires "only as much

18  advance notice as practicable" before the release of a non-U.S. citizen. *Id.* Finally, the conditions

19  apply only to the "program or activity" to be funded under the award, and they allow awarded

20  funds to be used for costs incurred in implementing the conditions. *See id.*

21  **IV.   DOJ Office of Community Oriented Policing Services and the**
22  **Anti-Methamphetamine and Anti-Heroin Task Force Programs**

23      USDOJ, through the COPS Office, also administers certain community policing grants. As

24  relevant here, these include CAMP, which "provid[es] funds directly to state law enforcement

25  agencies to investigate illicit activities related to the manufacture and distribution of

26  methamphetamine." RJN, Ex. D (CAMP Fact Sheet 2017). Like all programs administered by the

27  COPS Office, CAMP is a discretionary program, meaning all applicants must compete against each

28  other, according to evaluation criteria and methods developed by the COPS Office, for limited

available funds. *See* Am. Compl. ¶¶ 95-96; RJN, Ex. E (2017 CAMP Methodology). CAMP

grantees, like all federal grantees, are required to comply with all applicable federal laws. Begin-

ning with FY 2016, the COPS Office advised each CAMP applicant that these factors include

compliance with 8 U.S.C. § 1373. RJN, Ex. F at 1 (CAMP Award Owner's Manual 2016. In FY

2017, the COPS Office required certification of compliance with Section 1373 as a threshold

eligibility requirement. RJN, Ex. G at 5 (CAMP Pre-Award FAQs 2017).

## V.    Recent Developments

OJP ceased issuing FY 2017 Byrne JAG award documents after the access and notice

conditions were preliminarily enjoined nationwide in *City of Chicago v. Sessions*, 264 F. Supp. 3d

933 (N.D. Ill. 2017), which occurred after OJP had issued only two FY 2017 Byrne JAG awards.

OJP resumed issuing such award documents on June 26, 2018, after the Seventh Circuit en banc

stayed the nationwide application of that injunction, but OJP has not issued FY 2017 awards to

those applicant jurisdictions whose compliance with 8 U.S.C. § 1373 remains under review. *See*

Declaration of Marilynn B. Atsatt ("Atsatt Decl.") ¶¶ 2, 3 (Attachment 2 hereto). OJP is, however,

retaining sufficient FY 2017 monies to fund awards to all applicant states and localities, and those

monies will be available to fund such awards, if applicable, once the question of compliance with

Section 1373 is resolved. *Id.* ¶ 3. California is one of those jurisdictions. *Id.* ¶ 4.

Likewise, the COPS Office is maintaining sufficient funds to pay and/or reimburse

California for the full amount of the CAMP award it was provisionally awarded, in the event that

the Section 1373 Special Condition attached to that award is either satisfied or removed.

Declaration of Andrew A. Dorr ("Dorr Decl.") ¶ 7 (Attachment 3 hereto).[3]

---

[3] California avers that it understands the COPS Office to have "refused to waive the supplanting prohibition" contained within California's FY 2017 CAMP award—and that this purported "refusal" "rais[es] the specter" that the COPS Office "will use the supplanting prohibition to deny COPS funds" to the California Bureau of Investigation, even in the event that the State were to ultimately prevail in full in this litigation. CA Mem. at 10. As explained more fully in the attached Dorr Declaration, this understanding is in error. By expending its own funds to support allowable CAMP grant costs during the pendency of this litigation (and given the current status quo), California has incurred the risk of not being reimbursed by the COPS Office in the event that it cannot satisfy the terms of the Special Condition or that it does not prevail in full in the litigation. However, should California prevail in full in this litigation or otherwise satisfy the terms of the Special Condition, the COPS Office will, as a matter of standard procedure, reimburse allowable costs that the State has advanced to initiate the task force project on or after the award start date of November 1, 2017.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where claims call for judicial review under the APA, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Ctr. for Envtl. Health v. McCarthy*, 192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016) (citation omitted). The court does not resolve any issues of fact. *Id.* Instead, the court must uphold an agency decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). This is a "deferential standard ... designed to ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment." *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (citations omitted).

**ARGUMENT**

**I.   California Does Not Challenge Final Agency Action Reviewable under the APA**[4]

Inasmuch as California's claims arise under the APA, they are subject to the limit that they "must challenge a final agency action." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citing 5 U.S.C. § 704). Finality is reached only when the action in question (1) "marks the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). In the context of agency grant-making in particular, "the congressional appropriation to [an agency] of funds for a particular project does not constitute a final agency action by the [agency] until the [agency] has reviewed a grant application and decided to disburse the funds." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007). At this time, USDOJ has not yet granted or denied California's FY 2017 Byrne JAG application or imposed any condition on an FY 2017 award to

---

[4] Defendants recognize that the Court has previously ruled to the contrary at an earlier stage in the proceedings. *See State ex rel Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031-32 (N.D. Cal. 2018). However, Defendants respectfully reiterate their position on this issue, which remains unchanged, in order preserve the issue, if necessary, for appeal.

1 the state. And by statute there is an administrative review and reconsideration process to be

2 followed before "finally disapprov[ing]" California's FY 2017 Byrne JAG application. 34 U.S.C.

3 § 10154; *see generally* 28 C.F.R. Part 18. California's APA claims falter on this threshold ground,

4 apart from the failure of those claims on their merits.[5]

5  **II. The Challenged Immigration-Related Byrne JAG Conditions Are Lawful**

6   **A. The Access and Notice Conditions Are Authorized by Statute and Do Not**

7    **Violate the Separation of Powers**

8   Counts I and III of California's Amended Complaint allege that the Access and Notice

9 Conditions are *ultra vires* and violate the Constitution's separation of powers.[6] Am. Compl. ¶¶ 122-

10 26, 133-38. Both claims rest on the same flawed premise that Congress has not authorized USDOJ

11 to impose these conditions on the receipt of Byrne JAG funds.

12   As a preliminary matter, California does not dispute that Congress may, consistent with the

13 separation of powers, properly delegate to the Executive Branch the authority to attach conditions

14 on agency spending, this lack of congressional specification is wholly immaterial. *See*, *e.g.*, *Clinton*

15 *v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the

16 authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting) (citing

17 examples dating back to the founding of the Republic); *Ameron, Inc. v. U.S. Army Corps of*

18 *Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of

19 purposes and delegates to executive branch officials the authority to make certain decisions

20 regarding how those funds are to be spent."); *DKT Mem'l Fund Ltd.*, 887 F.2d 275 at 280-81

---

21

22 [5] California contends that the affirmative preemption suit filed by the United States against the State, *United*
*States v. California*, Case No. 2:18-cv-490, Dkt. No. 1, (E.D. Cal. March 6, 2018) "removes all doubt that a

23 final determination already exists" as to its FY 2017 Byrne JAG application, and that, "in [USDOJ's] view,
the Values and TRUST Acts violate § 1373." CA Mem. at 9. USDOJ acknowledges that—as reflected by the

24 positions taken by the federal government in the affirmative suit—it has determined that certain California
laws do not comport with Section 1373 as a facial matter. However, USDOJ's process of assessing relevant

25 factual evidence it has gathered from the State—so that the final determination as to California's FY 2017
application may be reflected in an administrative record that contains all relevant materials and bases

26 underlying the decision—remains ongoing. Accordingly, consistent with the legal framework set forth
above, the Court should defer its review until such time as (1) USDOJ's final determination on

27 California's FY 17 Byrne JAG application has formally issued, and (2) California has exhausted
administrative remedies under 34 U.S.C. § 10154.

28 [6] Notably, California does not challenge the Section 1373 condition on this ground.

1   (upholding conditions on spending imposed by President where statute authorized President to set

2   certain "terms and conditions as he may determine"). Accordingly, California's attempt to make

3   much of the fact that Congress did not *itself* directly "impose any immigration enforcement

4   conditions on the receipt of [Byrne JAG] funds," CA Mem. at 11 (citation omitted), is wholly

5   beside the point. Rather, the sole relevant question is whether Congress has *delegated* sufficient

6   authority to USDOJ to impose these conditions, in order to promote inter-governmental law

7   enforcement cooperation.

8          An examination of the relevant statutory framework for the Byrne JAG program

9   inexorably yields an answer in the affirmative to this inquiry. As California points out, *id.* at 8,

10  the contemporary version of the Byrne JAG Program was created in 2006, when the

11  Reauthorization Act merged two earlier programs. Pub. L. No. 109-162. What California fails to

12  mention, however, is that prior to the 2006 amendments, the relevant statute provided only that

13  the AAG for OJP was authorized to "exercise such other powers and functions as may be vested

14  in the [AAG] pursuant to this chapter or by delegation of the [AG]." In § 1152(b) of the

15  Reauthorization Act, Congress expressly amended this provision "by inserting, "'including

16  placing special conditions on all grants, and determining priority purposes for formula grants'

17  before the period at the end." 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6). And confirming this

18  amendment's plain text, a report accompanying the Act explained that the amendment would

19  "allow[] the Assistant Attorney General to place special conditions on all grants and to determine

20  priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

21         This context confirms that Congress intended the "special conditions" and "priority

22  purposes" language to confer distinctive and meaningful power. California has not explained why

23  Congress would have added that language, if not to confer the authority described. Another law

24  *already* authorized the Attorney General to delegate the performance of his functions. *See* 28

25  U.S.C. § 510. Thus, California's reading of the statute gives no practical effect to *either* the

26  "special condition" *or* the "priority purpose" powers—and directly contravenes the "fundamental

27  canon of statutory construction that a statute should not be construed so as to render any of its

28  provisions mere surplusage." *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003); *see*

1   *also*, *e.g.*, *Johnson v. Consumerinfo.com*, *Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("When

2   Congress acts to amend a statute, we presume it intends its amendment to have real and

3   substantial effect.") (citation omitted).

4       Initially, California's insistence that "special conditions" may be imposed only on a case-

5   by-case basis, and only on "high-risk" grantees, CA Mem. at 12, is flatly belied by OJP's history

6   of employing its "special conditions" authority to impose various substantive conditions on *all*

7   grantees—including, to cite but two recent examples, limitations on research using human

8   subjects, and an "American-made" requirement for body armor purchases. Def. RJN, Ex. A ¶

9   30, 39; *see supra* at 7-8 (discussing other conditions); *see generally* Def. RJN, Ex. A (setting

10   forth more than 50 "special conditions" of general applicability). California fails to explain how

11   its narrow reading of "special circumstances" is compatible with any of the across-the-board

12   conditions that USDOJ has imposed pursuant to this delegated authority.[7]

13       Further, in keeping with the canon against surplusage, Section 10102(a)(6) conveys

14   *independent* authority for the AAG to "determine priority purposes for formula grants."

15   Congress's express formulation here plainly indicates an intention to allow the AAG to exercise a

16   degree of discretion over *formula* grants in particular.[8] Such discretion must, if this language is to

17   

18   [7] California posits that a *rescinded* regulation somehow constrains the "special conditions" authority conferred by Section 10102(a)(6). *See* CA Mem. at 12 (citing the former 28 C.F.R. § 66.12 (rescinded Dec. 19, 2014)). But even apart from the absence of any legal authority supporting the proposition that a former regulation may somehow constrain the meaning of a current law, this theory suffers from several fundamental defects. Most significantly, if Congress had intended to cabin the term "special conditions" in the manner proposed by plaintiff, it could easily have said so. But not only is the statute utterly devoid of any language referencing, incorporating, or otherwise limiting its application to the former regulation, it expressly authorizes the imposition of special conditions" on not just "some" or "certain" grants, or in certain circumstances, but rather "*on all grants*." 34 U.S.C. § 10102(a)(6) (emphasis added). Simply put, this capacious phrasing—which, as noted above, is reaffirmed in the relevant legislative history, H.R. Rep. No. 109-233, at 101—is not compatible with the straight-jacketed interpretation advanced by California.

24   [8] Similar delegations of discretionary authority over the terms and conditions of federal grants are commonplace. *See*, *e.g.*, 42 U.S.C. § 713(a)(1)(C) (providing for U.S. Department of Health & Human Services ("HHS") grants for personal responsibility education, to be paid upon satisfaction of certain statutory requirements *and* "such additional requirements as the [HHS] Secretary may specify"); *id.* § 1395l(t)(2)(E) (providing that HHS Secretary may make certain adjustments to Medicare spending as well as "other adjustments as determined to be necessary to ensure equitable payments"); 25 U.S.C. § 1644(b) (authorizing Secretary of Interior to "place conditions as deemed necessary to effect the purpose of this section in any grant or contract which the Secretary makes with any Indian tribe or tribal organization pursuant to this section.").

1    be afforded any meaningful legal effect, encompass at least the minimal authority to (1) articulate

2    broad priorities for a given Fiscal Year's grant program; (2) include, on program application

3    forms, inquiries regarding the designated priority purpose; and (3) impose eligibility conditions

4    reflecting the priority purpose. In other words, under a plain reading of the statute, the authority to

5    "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies

6    for those state and local jurisdictions that assist in furthering relevant federal *purposes*.[9] Further,

7    because states and localities would decline to participate in—and thus, effectively annul—the

8    Byrne JAG Program were this authority invoked to impose unreasonable conditions, any arguable

9    risk of overreach that might otherwise inhere in this authority has a built-in structural check.

10            Finally, California also contends that because Section 10102(a)—which sets forth the

11   general duties and authorities of the AAG for OJP—is codified in Subchapter 1 ("Office of

12   Justice Programs"), while the Byrne JAG Program itself is codified in Subchapter 5 ("Bureau of

13   Justice Assistance Grant Programs") of the same chapter of Title 34 of the U.S. Code, Section

14   10102(a)(6) "lies outside the [Byrne] JAG authorizing statute." CA Mem. at 13. According to

15   California, the structure of these respective codifications compels the conclusion that Section

16   10101(a)(6) "merely exemplifies the type of other powers that the [AAG] may possess by

17   delegation elsewhere." *Id.* (citation omitted). But this argument fundamentally misunderstands the

18   codification of the Byrne JAG Program under OJP's Bureau of Justice Assistance Grant

19   Programs. *See* 34 U.S.C. §§ 10151-58. The Director of the Bureau of Justice Assistance ("BJA")

20   "report[s] to the [AG] *through the [AAG]*" for OJP.  34 U.S.C. § 10141(b) (emphasis added); *see*

21   OJP, *About Us*, https://ojp.gov/about/about.htm (OJP organizational chart) (last visited July 30,

22   2018). Thus, BJA *is part of OJP*, not an independent entity—and the authority conferred on the

23   OJP AAG by Section 10102(a)(6) necessarily reaches all programs under his supervision,

24

25

26

27   ───────────────────────
     [9] Section II.B.ii, *infra*, sets forth in the detail the close inter-relationship between immigration
     enforcement, which the challenged conditions promote, and the Byrne JAG Program's criminal justice
28   purposes.

1   including (but not limited to) the Byrne JAG Program.[10]

2         Thus, the notice and access conditions—which merely promote inter-governmental law

3   enforcement cooperation with respect to criminal aliens, so that grantee policies do not impair

4   important federal policies—come comfortably within the fonts of delegated power in Section

5   10102(a)(6). Pursuant to this authority, the AAG may prioritize condition the award of formula

6   grants, like the Byrne JAG Program, on state and local cooperation with federal authorities in

7   achieving federal law enforcement priorities, including the removal of criminal aliens.[11]

8        **B.**     **The Notice, Access, and Section 1373 Conditions Are Consistent with the**
9                       **Spending Clause**

10         Counts II and III[12] allege that the notice, access, and Section 1373 conditions in the Byrne

11   JAG Program violate the Spending Clause. Am. Compl. ¶¶ 127-32, 137. More specifically, these

12   claims allege that all three conditions are insufficiently related to the statutory purposes of the

13   Byrne JAG Program, *id.* ¶¶ 130, 137, and further that the notice and access conditions—although,

14   again, *not* the Section 1373 condition—are impermissibly ambiguous, *id.* ¶¶ 86-87, 131.  Both

15   contentions are wrong.

16        **i.**     **The Notice, Access, and Section 1373 Conditions Are Related to the**
                    **Purposes of the Byrne JAG Program**

17         First, with respect to California's "nexus" argument, any relatedness inquiry required by

---

18   [10] Further, it is wholly unremarkable that Congress would choose to delegate such substantive authority to
19   the AAG, under the supervision of the Attorney General. The former is expressly charged with
"*maintain[ing] liaison* with … State governments in matters relating to criminal justice," 34 U.S.C. §
20   10102(a)(2), and the latter, of course, is the nation's chief law enforcement officer, with express "*final
authority* over all … grants" executed by OJP and its component offices, *id.* § 10110(2) (both emphases
21   added). Both, moreover, are Senate-confirmed positions.

22   [11] California would also attach legal significance to the fact that Congress considered, but ultimately
declined to enact, various proposed amendments to the Byrne JAG Program that would—by statute—
23   attach similar conditions to those created administratively, and challenged here. CA Mem. at 12. But as the
Supreme Court has repeatedly cautioned, "failed legislative proposals are 'a particularly dangerous ground
24   on which to rest an interpretation of a prior statute.'" *United States v. Craft*, 535 U.S. 274, 287 (2002)
(quoting *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)). "Such proposals lack
25   'persuasive significance' because 'several equally tenable inferences may be drawn from [congressional]
inaction, including the inference that the existing legislation already incorporated the offered change.'"
26   *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 857-58 (9th Cir. 2018) (quoting *Pension Benefit Guaranty
Corp.*, 496 U.S. at 650).

27   [12] As with the separation of powers claims in Counts I and III, there is substantial overlap between Counts
28   II and III, the latter of which reiterates the theories of Counts I and II, but under the aegis of the APA.

15

1  the Spending Clause does not pose a difficult hurdle. To the contrary, the Ninth Circuit has

2  emphasized that this is a "low-threshold" inquiry that "is a far cry from . . . an exacting standard for

3  relatedness." *Mayweathers*, 314 F.3d at 1067; *see also id.* (stating that conditions on federal grants

4  "*might* be illegitimate if the conditions share no relationship to the federal interest in particular

5  national projects or programs") (citation omitted)). Thus, in *Dole*, the Supreme Court upheld condi-

6  tioning the receipt of federal highway funds on the loosely-related requirement that a State adopt a

7  minimum drinking age. *See* 483 U.S. at 208-09; *see also New York v. United States*, 505 U.S. 144,

8  167 (1992) (stating that only "some relationship" is necessary between spending conditions and

9  "the purpose of the federal spending."); *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002)

10 (explaining that there need only be a "discernible relationship" between a condition imposed

11 pursuant to the Spending Clause and the "federal interest in a program it funds"). As the D.C.

12 Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on

13 relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir.

14 2004).

15      The grant conditions at issue here easily satisfy this "low-threshold" relatedness inquiry.

16 *Mayweathers*, 314 F.3d at 1067. The Byrne JAG Program's organic statute specifies that program

17 funds are designed to provide resources "for criminal justice," to support programs including law

18 enforcement, prosecution, crime prevention, and corrections. 34 U.S.C. § 10152(a)(1). These

19 goals are also reflected in the responsibilities of the AAG, which involve "disseminat[ing] infor-

20 mation" and "*maintain[ing] liaison with* . . . State governments" in matters relating to "criminal

21 justice." 34 U.S.C. § 10102(a)(1), (2) (emphasis added). The conditions also comport with the

22 Byrne JAG purposes of ensuring that grantees undertake "appropriate coordination with affected

23 agencies," *id.* § 10153(a)(5)(C), and "report such data . . . and information (programmatic and

24 financial) as the Attorney General may reasonably require," *id.* § 10153(a)(4).

25      Further, immigration enforcement, which the conditions promote, undoubtedly intersects

26 with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that

27 a conviction for any of a wide array of criminal offenses renders an alien removable from this

28 country. *See* 8 U.S.C. § 1227(a)(2). Indeed, "[a] primary goal of several recent overhauls of the

INA has been to ensure and expedite the removal of aliens convicted of serious crimes."

*Duvall v. Att'y Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted). Once removed, a criminal alien who has committed a removable offense—for example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses—is no longer present in this country with the potential to re-offend.

As explained above, *see supra* at 5, the INA repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement, particularly with respect to criminal aliens. Furthermore, given that the INA contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities not impair the law enforcement activities of the federal government with respect to the same population—namely, aliens who have committed crimes. Congress has mandated that aliens who have committed certain criminal offenses be taken into federal custody pending removal proceedings "when the alien is released" from state custody. *Id.* § 1226(c)(1) With respect to incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90 days that begins with the date of the alien's release. 8 U.S.C. § 1231(a)(1)(A), (B). Indeed, the Ninth Circuit and certain other courts have interpreted the mandatory federal custody provision as applying *only* to aliens who are taken into federal custody "promptly" after their release from state criminal custody—further highlighting the need for federal knowledge of release dates. *Preap v. Johnson*, 831 F.3d 1193, 1199 (9th Cir. 2016), *cert. granted*, 138 S. Ct. 1279 (Mar. 19, 2018); *see also* 831 F.3d at 1196-97 (noting Circuit disagreement). The Federal Government has sought review of that specific holding, but regardless of the outcome of *Preap*, it is crucial to this cooperative law enforcement framework that states and localities respond to requests for release date information, give federal agents access to detainees in their custody, and avoid restricting communication of information regarding immigration status to DHS.

1    Thus, contrary to California's view that the Byrne JAG Program's goal is to promote state

2    and local flexibility, the program's overall goals are much broader: to support and strengthen law

3    enforcement and criminal justice. Unalloyed deference to purely local prerogatives and issues is

4    self-evidently misplaced, as the Byrne JAG statute directs no such thing and under the State's

5    theory it is unclear how any conditions on these federal funds would be constitutionally viable.

6    Even the legislative history that the State has cited talks only of "more flexibility" for State and

7    local governments, not all-embracing local flexibility that leaves no room for federal

8    prerogatives. *See* H.R. Rep. No. 109-233, at 89. And the challenged conditions do less to mandate

9    a "one size fits all" approach than, for example, a Byrne JAG condition that for years prohibited

10   using award funds to purchase items on a Prohibited Expenditure List that includes various types

11   of equipment and weapons that some law enforcement agencies might otherwise have wanted to

12   acquire. *See* RJN, Ex. A ¶ 43.[13]

13                    **ii.      The Notice and Access Conditions are Unambiguous**

14   Another limitation on the spending power is that when the federal government "desires to

15   condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to

16   exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483

17   U.S. at 207 (citation omitted). The notice and access conditions satisfy this requirement.

18   It is well-established that the Spending Clause authority is "broad," and empowers Congress

19   to "set the terms on which it disburses federal money to the States[.]" *Arlington Cent. Sch. Dist. Bd.*

20   *of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also*, *e.g.*, *Dole*, 483 U.S. at 206 (noting that

21   Congress has "repeatedly employed the [spending] power to further broad policy objectives by

22   conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and

23

_____

24   [13] Finally, plaintiff claims that the connection between the 1373 Condition and the purposes of the Byrne
     JAG program are attenuated because the Section 1373 Condition would apply to the information of non-
25   criminal individuals. However, it is no barrier that immigration enforcement is civil in nature, because the
     Spending Clause allows for the linkage of civil and criminal subject areas. Indeed, the federal Sex
26   Offender Registration and Notification Act ("SORNA"), 34 U.S.C. § 20901 *et seq.*, is "a civil regulatory
     scheme rather than a criminal one," *United States v. Elkins*, 683 F.3d 1039, 1044 (9th Cir. 2012), but
27   notwithstanding SORNA's civil nature, compliance with SORNA is directly tied to Byrne JAG funding.
     *See* 34 U.S.C. § 20927(a); *United States v. Kebodeaux*, 570 U.S. 387, 398 (2013) (observing that SORNA
28   "used Spending Clause grants to encourage States to adopt its uniform definitions and requirements").

administrative directives.") (citations omitted). While it is beyond cavil that the Spending Clause confers "broad" authority, that authority is nonetheless subject to certain discrete limitations, including that any terms attached to the receipt of federal funds must be "unambiguous[]," and thus enable the potential recipient to "exercise [its] choice" to participate (or not) in the program "knowingly, cognizant of the consequences of [its] participation." *Dole*, 483 U.S. at 207 (citations omitted); *see also*, *e.g.*, *Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (the Spending Clause is a "'permissible method of encouraging a State to conform to federal policy choices,' because 'the ultimate decision' of whether to conform is retained by the States – wh[ich] can always decline the federal grant.") (quoting *New York*, 505 U.S. at 168)).  Contrary to plaintiff's assertions, the notice and access conditions easily satisfy the clear-notice requirement.

These conditions clearly state what conduct is required, so that grantees can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted). They require grantees (1) to give "agents of the United States acting under color of federal law" access to correctional facilities "to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States," and (2) to notify DHS, upon "formal written request" and "as early as practicable," before "the scheduled release date and time for a particular alien in such facility." RJN, Ex. B ¶ 55, Ex. C ¶ 55. The award documents also specify that nothing in these conditions requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition;" that the conditions impose no require-ments regarding any requests by federal immigration authorities to detain aliens; and that the notice condition requires "only as much advance notice as practicable." *Id.* Moreover, to the extent any uncertainty might remain, the FY 2017 Byrne JAG solicitation invited any prospective grantee with a question about "any . . .  requirement of this solicitation" to contact OJP's Response Center (customer service center) by telephone, email, or internet chat. *See* Am. Compl., Ex. A at 2. A prospective grantee could also contact the appropriate "Grant Manager"—that is, a specific, named OJP employee assigned to work with jurisdictions within a specified

1    geographical area. *Id*.; BJA Programs Office Contact Information, *available at*

2    https://www.bja.gov/About/Contacts/ ProgramsOffice.html (last visited July 30, 2018).[14]

3          Further, any arguable marginal uncertainty regarding the outer boundaries of the notice

4    and access conditions would not render these conditions unconstitutionally ambiguous. Indeed,

5    "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence

6    of the conditions is clear, such that States have notice that compliance with the conditions is

7    required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see*, *e.g.*,

8    *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its

9    intent to attach federal conditions to Spending Clause legislation, it need not specifically identify

10   and proscribe in advance every conceivable state action that would be improper.") (citation

11   omitted). Moreover, plaintiff does not complain about the clarity of any other Byrne JAG

12   conditions, such as those requiring compliance with restrictions on lobbying under 18 U.S.C. §

13   1913 and 31 U.S.C. § 1352, RJN Ex. B (Alaska Award 2017) ¶ 19, compliance with "federal

14   appropriations statutes" generally, *id.* ¶ 20; reporting of evidence of violations of the False Claims

15   Act, *id.* ¶ 21; and compliance with prohibitions on reprisal under 41 U.S.C. § 4712, *id.* ¶ 23.

16          **C.      The Challenged Conditions Are Not Arbitrary or Capricious**

17          Count IV alleges that the notice, access, and Section 1373 conditions are arbitrary or

18   capricious in violation of the APA. *See* Am. Compl. ¶¶ 139-44. As an initial matter, if the

19   conditions are statutorily authorized and comport with the Spending Clause—which California

20   largely *concedes* at least for the Section 1373 condition[15]—it is unclear how "arbitrary or

21   capricious" scrutiny could otherwise limit USDOJ's broad discretion. In any event, when a court

22   reviews an agency's action under the "arbitrary or capricious" standard, it is "required to be

23   'highly deferential,'" and to "presum[e] the agency action to be valid" as long as it is supported

24   by a rational basis. *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010)

25   (quoting *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)). This standard of

26   _____

27   [14] The BJA is the component of OJP that administers the Byrne JAG Program.

28   [15] As explained above, the Amended Complaint raises no claim that the Section 1373 condition violates the separation of powers, is *ultra vires*, or offends the "ambiguity" inquiry under the Spending Clause.

review is "narrow," and does not authorize a district court "to substitute its judgment for that of

the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). An

agency action should be overturned only when the agency has "relied on factors which Congress

has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Pac. Coast Fed'n of Fishermen's Ass'n*, 265 F.3d at 1034.

The challenged conditions easily satisfy this deferential standard. The Byrne JAG

Program's authorizing statute specifies that Byrne JAG funds are designed to provide resources

for, *inter alia*, "criminal justice," 34 U.S.C. § 10152(a)(1), defined broadly as "activities

pertaining to *crime prevention, control, or reduction*, or the enforcement of the criminal law,

including, but not limited to, police efforts to prevent, control, or reduce crime or to *apprehend*

*criminals*, . . . activities of courts having criminal jurisdiction, and *related agencies*," *id.* §

10251(a)(1) (emphases added). Such purposes are rationally advanced by facilitating federal

access to aliens who have violated, or are suspected of violating, state or local criminal laws—if

for no other reason than that once removed, an alien who has committed a removable criminal

offense is undeniably no longer present in this country with the potential to re-offend.  *See* 8

U.S.C. § 1227(a)(2) (providing that a criminal conviction for any of a wide array of criminal

offenses renders an alien removable).

Further, the challenged conditions rationally promote interests in "maintain[ing] liaison"

among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and

comport with the inter-governmental cooperation that Congress contemplates in immigration

enforcement.  Indeed, the imposition of the challenged conditions is understandable as a result of

a pair of investigations conducted the Department's Office of Inspector General ("OIG").

In 2007, the OIG conducted a congressionally-mandated audit concerning the cooperation

of State Criminal Alien Assistance Program ("SCAAP") recipient jurisdictions in the removal of

criminal aliens from the United States. *See* AR-00001-00109 (Cooperation of SCAAP Recipients

in the Removal of Criminal Aliens from the United States ("2007 OIG Audit").[16] In conducting

this audit, the OIG "interviewed ICE officials to obtain their views, distributed a questionnaire to

164 SCAAP recipients, and conducted independent testing in 7 jurisdictions that received SCAAP

funding" under 8 U.S.C. § 1231(i). *Id.* at AR-00005. Relevant to compliance with 8 U.S.C. §

1373, the audit reported that "[t]he 99 jurisdictions that responded to the questionnaire stated

almost unanimously that there was no legislation or policy impeding the ability of local officers

and agencies to communicate with ICE on immigration-enforcement matters." *Id.* at AR-00011.

Regarding the seven jurisdictions that were studied further, the audit reported that "ICE officials

objected to San Francisco's policies but they did not raise any concerns about the flow of

information to and from any of the other six sites where [they] performed field work." *Id.* at AR-

00013. The 2007 OIG Audit observed broadly that "many state, county, and local law

enforcement agencies are unwilling to initiate immigration enforcement but have policies that

suggest they are willing to cooperate with ICE when they arrest individuals on state or local

charges and learn that those individuals may be criminal aliens." *Id.* at AR-00022-23.

Nine years later, the OIG issued a report in response to a request by the OJP to examine

allegations of potential violations of Section 1373 by grant recipients. *See* 2016 OIG Report at

AR-00366. This 2016 review found deteriorating local cooperation with "efforts to remove

undocumented criminal aliens from the United States." *Id.* at AR-00366-67 n.1. The 2016 OIG

Report advised that "the information we have learned to date during our recent work about the

present matter differs significantly from what OIG personnel found nearly 10 years ago" when, in

the 2007 OIG Audit, federal immigration authorities had "commented favorably to the OIG with

respect to cooperation and information flow they received from the seven selected jurisdictions,

except for the City and County of San Francisco" that were examined. *Id.* The 2016 OIG Report

found that "each of the 10 jurisdictions" surveyed "had laws or policies directly related to how

---

[16] The APA expressly exempts from its "notice and comment" rulemaking requirements any agency matter "relating to … grants." 5 U.S.C. § 553(a)(2). Further, because this case implicates only three straightforward and discrete grant conditions, it is unsurprising that the relevant Administrative Record is not voluminous. Nonetheless, as set forth above, together with the relevant legal framework supplied by the Byrne JAG authorizing statute and the INA, the AR amply supports the challenged agency action.

those jurisdictions could respond to ICE detainers, and each limited in some way the authority of

the jurisdiction to take action with regard to ICE detainers." *Id*. at AR-00369. The State of

California was one of the jurisdictions on which the OIG Report focused in explaining the

changed state of affairs in 2016. *See id*. at AR-00368, 378. Examining various jurisdictions'

policies, the OIG stated that, "based on our discussions with ICE officials about the impact these

laws and policies were having on their ability to interact with local officials, as well as the

information we have reviewed to date, we believe these policies and others like them may be

causing local officials to believe and apply the policies in a manner that prohibits or restricts

cooperation with ICE in all respects," which "would be inconsistent with and prohibited by

Section 1373." *Id*. at AR-00373. The OIG Report expressly recommended that USDOJ "[r]equire

grant applicants to provide certifications specifying the applicants' compliance with Section

1373, along with documentation sufficient to support the certification." *Id*. at AR-00374.

   In the FY 2016 grant cycle, USDOJ under the prior Administration introduced a

requirement to certify compliance with Section 1373. *See* Declaration of Antonia Konkoly

("Konkoly Decl.") (Attachment 4 hereto) ¶ 2 & Ex. A (March 2016 email from BJA to Byrne JAG

Program grantees, stating that if OJP "receive[d] information that indicates that an applicant may be

in violation of [Section] 1373 … that applicant maybe referred to the DOJ Office of Inspector

General for investigation," and may be "subject to . . . relevant OJP programmatic penalties,

including suspension or termination of funds  . . ."); AR-00384 (July 7, 2016 OJP Memorandum

stating determination that Section 1373 is an applicable federal law for Byrne JAG Program);

RJN, Ex. A ¶ 55 (special condition in California's FY 2016 Byrne JAG award).

   For the FY 2017 cycle, USDOJ maintained the Section 1373 condition, added the notice

and access conditions, and publicly offered a sound explanation for all three conditions. USDOJ's

July 25, 2017 "Backgrounder on Grant Requirements" states that the conditions have a "goal of

increasing information sharing between federal, state, and local law enforcement" so that "federal

immigration authorities have the information they need to enforce the law and keep our

communities safe."  AR-00993. The Backgrounder notes that some jurisdictions have "refus[ed]

to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes," and states that the conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id.* The three conditions are "common-sense measures," *id.*, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *FCC v. Fox Television*, 556 U.S. 502, 521 (2009). The accompanying declarations from U.S. Immigration and Customs Enforcement further describe the crucial need for cooperation from state and local authorities in the enforcement of immigration law. *See* Declaration of Francisco Madrigal ¶¶ 6-8; Amended Declaration of Thomas D. Homan ¶¶ 22-23, 35.

Immigration enforcement—particularly against aliens who have committed crimes—undoubtedly relates to criminal justice. Numerous federal statutes expressly tie these two subjects together—most centrally inasmuch as a conviction for any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), and thus no longer present here with the potential to re-offend. *See* 2007 OIG Audit at AR-00014 (observing, in analyzing the recidivism of criminal aliens released from state or local custody, that if the examined "data is indicative," then "the rate at which released criminal aliens are rearrested is extremely high"). Accordingly, a July 25, 2017 press release by the Attorney General, accompanying the Backgrounder, stated opposition to policies that "protect illegal aliens who have committed crimes," and an intent to encourage jurisdictions "to change their policies and partner with federal law enforcement to remove criminals." AR-00992 (DOJ Press Release No. 17-826).

Relatedly, as explained above, the INA mandates that aliens who have committed certain criminal offenses be taken into federal custody pending removal proceedings, but only "when the alien is released" from state custody. *Id.* § 1226(c)(1). Thus, the release of an alien who has been convicted of certain criminal offenses from state custody constitutes a triggering event for one of the federal government's core responsibilities under the INA—*i.e.*, the removal of criminal aliens. The notice and access conditions plainly facilitate the fulfillment of this statutory responsibility—

1    the former by allowing federal immigration authorities to interview aliens *during* their state

2    custody to determine whether they should be removed upon the conclusion of that custody, and

3    the latter by greatly reducing the resources and risk involved in ICE taking qualifying criminal

4    aliens into custody. *See* Declaration of Thomas D. Homan ("Homan Decl.") ¶ 36 (Attachment 5

5    hereto) (contrasting situations in which ICE officers are able to take qualifying criminal aliens

6    into federal custody in "controlled, law enforcement setting, where they have been searched for

7    weapons and contraband" with "at-large operations," in which "other people may be present, the

8    surroundings are not secure, and individuals may be armed or ready to flee"). Given that the INA

9    expressly contemplates local law enforcement activity with respect to immigration law

10   enforcement, it is perfectly rational for USDOJ to condition grant funding to promote these

11   purposes.

12        For these reasons, the conditions rationally promote interests in "maintain[ing] liaison"

13   among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and

14   comport with the inter-governmental cooperation that Congress contemplates in immigration

15   enforcement. *See*, *e.g.*, 8 U.S.C. §§ 1226(d), 1231(i), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12

16   ("Consultation between federal and state officials is an important feature of the immigration

17   system" and Congress "has encouraged the sharing of information about possible immigration

18   violations." (citation omitted)). Because "the agency's reasons for" imposing the challenged

19   conditions "were entirely rational," California's claim fails. *Fox Television*, 556 U.S. at 517.[17]

20   _____

21   [17] Citing, *inter alia*, the declaration of Tom K. Wong, California repeatedly advances—under a variety of
     legal theories—its policy view that acceptance of the challenged conditions would make its "communities

22   … less safe, healthy, and educated." CA Mem. p. 23; *see also id.* p. 17, 31. Regardless of the heading
     under which the State files such arguments, they amount, at bottom, to a policy disagreement regarding the

23   challenged conditions.  However, whatever the Court makes of these policy arguments, it is well-
     established that under the APA, the Court "may not substitute its judgment for that of the agency

24   concerning the wisdom or prudence of [the USDOJ's] action." *River Runners for Wilderness v. Martin*,
     593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted). Rather, "[i]f the agency's reasons and policy

25   choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld."
     *Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013). For all of the reasons given

26   above, the challenged conditions easily satisfy this deferential standard, even if may be true that other
     policy alternatives would likewise be within USDOJ's purview to adopt.

27   In any event, Defendants note that Dr. Wong's deposition testimony in *United States v. California* shows

28   that his declaration is replete with methodological flaws that fundamentally undercut the value and
     reliability of his opinions. For example, in assessing the effects of "sanctuary" policies, Dr. Wong included

25

1

2

### III.   The Court Should Enter Judgment for Defendants on Plaintiff's Request for a Declaration Regarding its Statutes' Compliance with Section 1373

3

4

5

6

7

8

9

10

Finally, in Count V, California seeks a declaration that several of its statutes "comply with Section 1373"—specifically, the TRUST Act, Cal. Gov't Code §§ 7282-7282.5; the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2; the California Values Act, Cal. Gov't Code §§ 7284-7284.12 ("Values Act"); California Penal Code §§ 422.93, 679.10, and 679.11; California Code of Civil Procedure § 155; and California Welfare and Institutions Code §§ 827 or 831. *See* Am. Compl. ¶¶ 145-153. Plaintiff's request, however, is non-justiciable as to all of these statutes under principles of standing and ripeness, especially as to the statutes other than the Values Act. Accordingly, this claim should be dismissed in its entirety for lack of justiciability.

11

12

13

14

15

16

17

18

19

20

Further, assuming the Court reaches the merits of this claim, it should enter judgment for the defendants denying plaintiff's request for a declaratory judgment regarding the Values Act. In order to address and resolve the merits of plaintiff's claim, the defendants need not articulate, and the Court need not adjudicate, every category of information that may fall within Section 1373(a) and (b). Nor need the Court address whether Section 1373 requires affirmative steps to facilitate the orderly transfer of aliens to ICE custody beyond sharing the information relevant to immigration status including possible removal. While preemption principles require (and the Tenth Amendment does not prohibit) the minimal level of cooperation involved in permitting an orderly transfer, *see generally Arizona*, 567 U.S. at 394-97, as a matter of statutory interpretation, § 1373 does not extend that far.

21

22

23

Rather, to decide plaintiff's request for a declaration that the Values Act does not violate Section 1373, it is enough to know that the Act prevents the State's employees from exchanging with federal authorities *at least some* of the information covered by Section 1373. *Cf. Ctr. for*

24

25

26

27

28

within his definition of sanctuary jurisdictions localities that continue to cooperate with federal immigration enforcement in certain ways. Wong Deposition Transcript ("Wong Tr.") (Attachment 6 hereto) at 32-33. This failure to draw a clear demarcation between "sanctuary" and "non-sanctuary" jurisdictions undercuts the conclusion of Dr. Wong's analysis, in that some of the outcomes in the jurisdictions categorized as "sanctuaries" by Dr. Wong may in fact be partly attributable to their cooperation with ICE. *Id.* Further, Dr. Wong acknowledged a complete lack of understanding regarding the meaning of Section 1373, *id.* at 33-34, and conceded both that other research has demonstrated no difference in crime rates between sanctuary cities and non-sanctuary cities, *id.* at 66, and that uncontrolled variables could have skewed his research results, *id.* at 63-64.

26

*Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 842 (D.C. Cir. 2008) ("We need not now fix the outer boundaries of [a particular] exemption [under the Federal Advisory Committee Act] because the Commission on the Intelligence Capabilities so clearly lies at its center[.]"); *Sesay v. Attorney Gen. of U.S.*, 787 F.3d 215, 221-22 (3d Cir. 2015) ("We need not define the outer boundaries of materiality today, however, because we conclude that Sesay's actions exceeded [the minimal] threshold."). Because the contact information and release status of aliens are essential for federal immigration authorities to perform their basic functions, Section 1373 encompasses at least that information.  And the Values Act, on its face and as shown by the information revealed in discovery in this action, prohibits or restricts giving ICE the contact information and release status of aliens.

### A.   Plaintiff's Request for a Ruling Regarding Compliance with Section 1373 Is Non-Justiciable

Under Article III of the Constitution, the jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Matters outside this rubric are "nonjusticiable." *Or. Bureau of Labor & Indus. ex rel. Richardson v. U.S. W. Commc'ns, Inc.*, 288 F.3d 414, 416 (9th Cir. 2002). Two principles of justiciability are involved here:  standing and ripeness. "While standing is concerned with *who* is a proper party to litigate a particular matter, the doctrines of mootness and ripeness determine *when* that litigation may occur." *Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198, 1201 (D. Haw. 1998). To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998) (citation omitted).

Constitutional justiciability also requires that a dispute be ripe for judicial consideration. In a challenge to governmental action, that means the challenged action must have been "formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). Like the rules of standing described above,

1    these considerations are part of whether the case presents a concrete controversy under Article III.

2    *See Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001) ("The

3    ripeness doctrine is derived from Article III's case or controversy requirement.  It prevents the

4    courts from entangling themselves in abstract disagreements over administrative policies, and also

5    protects the agencies from judicial interference until an administrative decision has been formalized

6    and its effects felt in a concrete way by challenging parties.") (citation omitted).[18]

7           Under these principles, plaintiff's request for declaratory judgment is constitutionally non-

8    justiciable as to all of the statutes it lists, and especially as to those statutes other than the Values

9    Act. As explained above, *see supra* at 11 n.5, OJP has expressed concerns that the Values Act may

10   violate Section 1373, but the Office has not reached a final administrative determination on that

11   subject. OJP continues to evaluate the relevant evidence so that its final agency determination can

12   include a record with all identifiable bases for the decision. Therefore, plaintiff's claim for

13   declaratory judgment is "not ripe for adjudication [because] it rests upon contingent future events

14   that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (citation

15   omitted). Further, OJP has never expressed a concern to California that the other statutes on which

16   the State seeks declaratory relief—the TRUST Act, the TRUTH Act, and the general confidentiality

17   statutes—might violate Section 1373. Given that OJP has not addressed whether any provisions of

18   California law other than the Values Act may violate Section 1373, there is no "live controversy"

19   regarding whether any of those statutes comply with Section 1373 and no foreseeable "injury in

20   fact" arising out of defendants' application of any such statutes.[19]

21   ─────────────────────────

22   [18] These considerations do not involve merely "prudential ripeness," which asks, in contrast, about the "fitness" of the issues presented for judicial review and whether withholding review would subject the parties to "hardship." *See Coons v. Lew*, 762 F.3d 891, 900 (9th Cir. 2014).

23   [19] Further, any examination of the TRUST Act, the TRUTH Act, and the confidentiality statutes would

24   need to involve consideration of provisions of the INA that provide for special treatment of children seeking special immigrant juvenile status, as well as victims and witnesses of crimes. Those INA

25   provisions include their own confidentially or information sharing provisions that may work in conjunction with the state law provisions, or may give rise to different conflicts that are not implicated by

26   Section 1373 or are handled under the more specific provisions rather than Section 1373 that incorporate state law protections. *See*, *e.g.*, 8 C.F.R. § 204.11(c)(3), (d) (special immigrant juvenile status requires a

27   state court order declaring dependency "in accordance with state law governing such declarations" but requires the sharing of certain information regarding the state juvenile court proceeding); 8 U.S.C. §

28   1101(a)(15)(U)(iii) & 1184(p) (providing immigration status for certain victims of crime  where the alien "has been helpful . . . or is likely to be helpful to a Federal, State, or local law enforcement official" and

1

2

### B.    Section 1373 Encompasses, at Minimum, the Contact Information and Release Status of Aliens

Turning to the merits, plaintiff argues that "information regarding . . . citizenship or immigration status" under Section 1373 means nothing more than "what one's immigration status is," CA Mem. at 25, but that reading is contrary to the language, context, and purposes of the statute.  As the Supreme Court has recognized, "reasonable statutory interpretation must account for both 'the specific context in which ... language is used' and 'the *broader context of the statute as a whole.*'" *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (emphasis added). When coupled with its placement within the wider framework of federal immigration law, the text of Section 1373 reflects Congress's intent that the provision reach the types of information critical in applying the "immigration laws," including the "removal of aliens."  8 U.S.C. § 1101(a)(17).

First, Section 1373 forbids a state or local government from prohibiting the exchange of "information *regarding*" an individual's immigration status, not merely the individual's immigration status, and courts "must give effect to every word of a statute wherever possible." *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004). The Supreme Court recently provided guidance on the meaning of "regarding" and similar words in *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) (hereinafter "*Lamar*"). There, the Court noted that "respecting" in statutory language is materially equivalent to "concerning" and "regarding," and that use of "respecting" (and similar words) "generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id*. at 1759-60. Faced with deciding whether a given piece of information constituted a "statement respecting [a] debtor's financial condition" under the Bankruptcy Code, the Court fashioned a standard—holding that a piece of information falls within that category "if it has a direct relation to or impact on the debtor's overall financial status"—but did not delineate all types of information that might be included. *Id*. at 1761.

---

requiring a "certification from . . . State, or local law enforcement official"); 22 U.S.C. § 7105(c) (certain victims of trafficking provided benefits under immigration laws and regulations must, while in U.S. custody, "ensur[e] that the names and identifying information of trafficked persons and their family members are not disclosed to the public"). The complexity of such an assessment is yet another reason not to evaluate these statutes where OJP has made no inquiry or allegation that they violate Section 1373.

29

1          Thus, Congress's use of "information regarding" in Section 1373(a) was clearly intended to

2   broaden the scope of the information covered. Later in Section 1373, Congress used narrower

3   language, referring to "[immigration] status information." 8 U.S.C. § 1373(c); *see Dean v. United*

4   *States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a

5   statute but omits it in another section of the same Act, it is generally presumed that Congress acts

6   intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted). As the

7   Supreme Court explained in *Lamar*, the use of "regarding" in Section 1373(a) "has a broadening

8   effect." A contrary reading would render the statute largely meaningless, as DHS is already aware

9   of an individual's legal right to be present in the United States.

10         The text and relevant interpretive principles thus make clear that Section 1373(a) and

11  Section 1373(b) cover more than an alien's immigration status. To give Congress's choice of the

12  phrase "information regarding" its intended meaning, it must encompass information relevant to

13  determining one's compliance with the INA, which naturally includes information relevant to

14  ascertaining removability. Under the structure of the INA, information relevant to removability

15  includes the date on which an alien will be released from state or local custody, as release is

16  generally necessary before DHS may remove an alien. "Information regarding" immigration

17  status also includes one's address, both home and work, which is crucial to many determinations

18  under the INA, including whether the alien has accrued the necessary continuous presence to be

19  eligible for relief from removal, 8 U.S.C. § 1229b(a)(1), (a)(2), (b)(1)(A); whether the alien has

20  kept DHS informed of any change of address as required by *id.* § 1305; and whether an alien

21  admitted in a particular nonimmigrant status (e.g., B-1 business visitor) has remained in the

22  United States beyond their authorized period of admission, evidenced an intent not to abandon his

23  or her foreign residence, or otherwise violated the terms and conditions of such admission (e.g.,

24  engaged in unauthorized employment), *see id.* § 1227(a)(1)(C), 8 C.F.R. § 214.1.

25         Further, "the broader context" of the INA "as a whole" confirms the importance of

26  Section 1373 to the overall immigration system enacted by Congress. In the INA, Congress

27  instructed DHS to enforce the "immigration laws," that is, the "laws, conventions, and treaties of

28  the United States relating to the immigration, exclusion, . . . . or removal of aliens." 8 U.S.C. §

1  1101(a)(17). Further, in deference to a state or local jurisdiction's significant interest in punishing

2  its criminals, the INA generally permits aliens convicted under state or local law to serve their

3  entire sentence before being subject to federal detention for possible removal from the country.

4  Except in limited circumstances, DHS "may not remove an alien who is sentenced to imprisonment

5  until the alien is released from imprisonment," and the alien's removal period "begins on . . . the

6  date the alien is released from [state or local criminal] detention." 8 U.S.C. § 1231(a)(1)(B)(iii),

7  (a)(4); *see id.* § 1226(c)(1) (requiring that federal immigration authorities take custody of a criminal

8  alien "when the alien is released" from criminal custody). But in delaying removal of these

9  individuals until state and local jurisdictions' criminal justice interests are served, it was certainly

10 not Congress's intent that these criminal aliens would evade federal immigration authorities. *See id.*

11 (requiring detention of "criminal aliens" pending removal proceedings). Thus, to position DHS to

12 carry out its significant duties related to the removal of criminal aliens, Congress enacted Section

13 1373 to ensure the sharing of immigration-related information between all levels of government

14 and DHS.[20]

15        The legislative history accompanying Section 1373 also confirms that the provision

16 should not be narrowly construed to encompass only "what one's immigration status is." CA

17 Mem. at 25. The House Conference Report states that Section 1373 was intended to enable state

18 and local officials to "communicate with the INS *regarding the presence, whereabouts, and*

19 *activities of illegal aliens.*" H. R. Conf. Rep. 104-725, at 383 (July 30, 1996) (emphasis added).

20 The Senate Report states in more general terms that that "[t]he acquisition, maintenance, and

21 exchange of immigration-related information by State and local agencies is consistent with, and

22 potentially of considerable assistance to, the Federal regulation of immigration and the achieving

23 of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104–249, at

24 19-20 (2d Sess. 1996). If, as the House Report indicates, Section 1373 encompasses the

25

26 [20] Indeed, the Ninth Circuit and certain other courts have held that DHS may not detain a criminal alien under the mandatory detention provisions if it does not take the alien into custody "promptly upon [his or

27 her] release" from state custody. *See Preap*, 831 F.3d at 1202. Although the Federal Government is challenging that particular holding, *see supra* at 17, the current law in this Circuit highlights the need for

28 information-sharing at that critical juncture.

"whereabouts" of illegal aliens, it should be understood to include requests to acknowledge or report the presence of incarcerated illegal aliens, plans to release those aliens into the general population, and the individual's address following release.[21]

Accordingly, Section 1373 encompasses, at minimum, the contact information and release status of an alien, as well as "what [his or her] immigration status is," CA Mem. at 25.

## C.   The Values Act and Its Implementation Prohibit or Restrict Providing at Least Some of the Information Protected by Section 1373

The California Values Act provides, among other things, that law enforcement agencies shall not use "moneys or personnel to investigate persons . . . for immigration enforcement purposes," including by "[p]roviding information regarding a person's release date or responding to requests for notification by providing release dates or other information unless that information is available to the public, or is in response to a notification request from immigration authorities in accordance with Section 7282.5," or by "[p]roviding personal information, as defined in Section 1798.3 of the Civil Code, about an individual, including, but not limited to, the individual's home address or work address unless that information is available to the public." Cal. Gov't Code § 7284.6(a). Section 7282.5 of the Government Code, referenced in the Values Act, sets forth a very specific list of circumstances in which a law enforcement agency is permitted to "cooperate with [federal] immigration officials," based mostly on whether the individual in question has committed any of certain listed felonies. *Id.* § 7282.5(b). Section 1798.3 of the Civil Code, also cited in the Values Act, defines "personal information" as "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history." Cal. Civ. Code § 1798.3(a). Thus, the

---

[21] Finally, given that Section 1373 is protects information needed for federal authorities to carry out quintessentially federal functions, this case presents a straightforward question of statutory construction, and defendants need not satisfy a heightened standard regarding Congress's intent in the statute. California cites *Gregory v. Ashcroft*, 501 U.S. 452 (1991), for the proposition that the inclusion of anything beyond an alien's mere immigration status in Section 1373 must be "unmistakably clear." CA Mem. at 25. But that rule of construction applies only where a statute intrudes into an area of "traditional state authority," such as whether a state is amenable to suit. 501 U.S. at 469. This case, by contrast, involves an area of traditional *federal* authority—the entry, movement, and other conduct of foreign nationals in the United States. *See Arizona*, 567 U.S. at 394.

—

1   Values Act clearly prevents sharing information that qualifies as information regarding immigration

2   status as shown above, including contact information and release status.

3        This conclusion is made even clearer by documents produced by the plaintiff in discovery in

4   this action. On March 29, 2018, the California Department of Justice issued guidance to law

5   enforcement agencies on Senate Bill 54, which enacted the Values Act. Konkoly Decl. ¶ 3 & Ex. B.

6   That guidance confirmed that law enforcement agencies in California are prohibited from giving

7   federal immigration authorities the name, address, or telephone number of an alien and from

8   notifying such authorities regarding an alien's release status (except as permitted by California

9   Government Code § 7282.5). *Id.* Not surprisingly, not all State law enforcement personnel agree

10  with the policies reflected in Values Act, nor with plaintiff's position that the Act does not violate

11  Section 1373. For example, the District Attorney of El Dorado County wrote to the State Attorney

12  General in May 2017, observing that the intent of Senate Bill 54 was inescapably "to frustrate the

13  comprehensive federal framework for the enforcement of immigration by barring communication

14  and participation between federal law enforcement and state and local law enforcement." Konkoly

15  Decl. ¶ 4 & Ex. C. As the District Attorney noted, that framework "relies on some involvement of

16  state and local government" to function "appropriately and consistently." *Id.*

17       Plaintiff argues that the Values Act does not prohibit providing information regarding

18  immigration status because law enforcement agencies may provide "release dates or addresses to

19  immigration authorities if the information is available to the public, and release dates if the person

20  in custody meets the criminal history criteria in § 7282.5" CA Mem. at 29 (citing Cal. Gov't Code §

21  7284.6(a)(1)(C)-(D)). But Section 1373 bars not only prohibiting the provision of covered

22  information to federal authorities, but also "restricting" the provision of such information.

23  Allowing the provision of information only in certain narrow circumstances or only information

24  that is already public clearly constitutes restricting its provision.[22] Lastly, plaintiff seems to take the

25  position that only the practices of the state agencies that actually receive Byrne JAG funding are

26

27  _____

    [22] Contrary to plaintiff's argument (*e.g.*, CA Mem. at 28), federal authorities' access to state databases
28  does not supply this need because those databases lack much of the information needed. *See* Declaration
    of Francisco Madrigal ¶¶ 11-13.

1    relevant here. CA Mem. at 28. But plaintiff's request for declaratory relief is not so limited; the

2    State seeks a general declaration that certain of its laws do not violate Section 1373, not that certain

3    state agencies' implementation of state law complies with Section 1373.

4        **D.    Section 1373 Is Consistent with the Tenth Amendment**

5            Plaintiff's final claim is that the Section 1373 condition would violate the Tenth

6    Amendment if the statute were construed as "extending" to the state statutes identified in the

7    Amended Complaint. See Am. Compl. ¶¶ 149-150, 153. Relatedly, citing the Supreme Court's

8    recent decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), California

9    attempts to add—for the first time in this litigation—a new claim that Section 1373 "is

10   unconstitutional on its face." CA Mem. at 19. These arguments fail as a matter of law.

11           As a threshold—but dispositive—matter, both the Tenth Amendment generally, and the

12   *Murphy* decision specially, are wholly inapposite here, where plaintiff is challenging conditions

13   on a *voluntary federal grant*. It is well-established that "a perceived Tenth Amendment limitation

14   on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions

15   legitimately placed on federal grants." *Dole*, 483 U.S. at 210. Instead, the only pertinent

16   constitutional question presented is whether the grant conditions are a valid exercise of the

17   Spending Clause power. In that context, the federal government "may offer funds to the States,

18   and may condition those offers on compliance with specified conditions.  These offers may well

19   induce the States to adopt policies that the Federal Government itself could not impose." *Nat'l

20   Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 537 (2012). Because California may

21   "adopt the simple expedient of not yielding to what she urges is federal coercion," *Dole*, 483 U.S.

22   at 210, by declining to participate in the Byrne JAG Program, the Spending Clause, not the Tenth

23   Amendment, provides the proper rubric for analyzing Plaintiff's claims—and the commandeering

24   theory has no purchase here.

25           However, to the extent that the State could nevertheless proceed with an attack on Section

26   1373 as an independent statutory mandate, that attack fails on its own merits. As an initial point,

27   "[t]he Government of the United States has broad, undoubted power over the subject of

28   immigration and the status of aliens." *Arizona*, 567 U.S. at 394 (citation omitted). "As long as it is

                                          34

1    acting within the powers granted it under the Constitution, Congress may impose its will on the

2    States" and "may legislate in areas traditionally regulated by the States." *Gregory*, 501 U.S. at

3    460. And courts "begin with the time-honored presumption that [a statute] is a constitutional

4    exercise of legislative power." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

5           Merely protecting the transmission of information to federal authorities does not "compel

6    the State[] to enact or administer a federal regulatory program" or to "act on the Federal

7    Government's behalf." *NFIB*, 567 U.S. at 575, 620; *cf. State ex rel. Becerra*, 284 F. Supp. 3d at

8    1035 (noting that "[n]o cited authority holds that the scope of state sovereignty includes the

9    power to forbid state or local employees from voluntarily complying with a federal program");

10   *City of N.Y.*, 179 F.3d at 34-35 (rejecting a Tenth Amendment facial challenge to Section 1373 of

11   the kind the State raises here, and noting that the Tenth Amendment does not give States and their

12   subdivisions "an untrammeled right to forbid all voluntary cooperation by state or local officials

13   with particular federal programs," particularly in the information sharing context).

14          Second, the Supreme Court has explained elsewhere that its precedents on

15   "commandeering" do not apply in the same way when access to information is at issue—a

16   principle that *Murphy* does not in any way undermine.[23] Simply put, the Constitution does not

17   prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate

18   their own citizens," but instead "regulate[ ] the States as the owners of data bases." *Reno*, 528

19   U.S. at 151; *see also, e.g., Printz v. United States*, 521 U.S. 898, 918 (1997) (recognizing that

20   statutes "which require only the provision of information to the Federal Government[ ] do not

21   involve . . . the forced participation of the States' executive in the actual administration of a

22   federal program."); *id.* at 936 (noting that the commandeering principle is not properly

23   understood as reaching "purely ministerial reporting requirements," such as the requirement for

24   "state and local law enforcement agencies to report cases of missing children to the Department

25   of Justice.") (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *ee also, e.g., Freilich v. Bd.*

26

---

27   [23] Indeed, the statute addressed in *Murphy*—the Professional Amateur Sports Protection Act of 1992 ("PASPA")—had nothing to do with the sharing of information. Rather, it required states to themselves

28   regulate sports betting in the manner Congress wished. *See Murphy*, 138 S. Ct. at 1478.

1    *of Dirs. of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court

2    has found no case" holding that a statutory command to report information for a federal data bank

3    "commandeers the state."), *aff'd sub nom. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d

4    205 (4th Cir. 2002).

5             The distinction drawn by this line of cases reflects the sound principle that an information-

6    access requirement like Section 1373 does not "regulate the States' sovereign authority to

7    regulate their own citizens," *Murphy*, 138 S. Ct. at 1479 (citation omitted), but rather ensures

8    federal access to information regarding regulated individuals that is needed *for the federal*

9    *government to regulate* those individuals.[24] As explained above, the INA provides that a federal

10   immigration officer "shall have power without warrant . . . to interrogate any alien or person

11   believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).

12   The INA also provides that certain classes of aliens, including certain criminal aliens, shall be

13   removed from the United States upon the order of the Attorney General or the Secretary of

14   Homeland Security, *see*, *e.g.*, *id.* §§ 1227(a), 1228. Simply put, federal officials cannot carry these

15   fundamental statutory duties, without knowing where those persons are located.  Indeed, the

16   legislative history of Section 1373 indicates that the statute was intended to counteract passive

17   resistance to sharing information. *See*, *e.g.*, S. Rep. No. 104-249, at 19-20 (1996) (noting that "[t]he

18   acquisition, maintenance, and exchange of immigration-related information by State and local

19   agencies is consistent with, and potentially of considerable assistance to, *the Federal regulation of*

20   immigration and the achieving of the purposes and objectives of the [INA]") (emphasis added).

21   Thus, because Section 1373 merely secures information needed to carry out the federal removal

22   scheme—in which the federal government takes full responsibility for regulation of and

23   enforcement against individuals—it does not present any legitimate concern regarding a

24   deflection of political responsibility. On the other hand, Section 1373 *does* ensure that the Federal

25

26   ――――――――――――――
     [24] In this respect, it also bears emphasizing that *Murphy* did not call into question any aspect of *Arizona*—
27   and indeed, cited the decision favorably with respect to the settled understanding that the federal
     government's broad immigration authority permits Congress to "foreclose any state regulation in the
     area," 138 S. Ct. at 1481 (quoting *Arizona*, 567 U.S. at 401). *Murphy* thus supports defendants' argument
28   that States may not employ conflicting practices that interfere with the federal immigration scheme.

1
2
3
4
5
6

Government can carry out its statutory responsibilities to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and to remove the alien "upon the order of the Attorney General" after completion of criminal sentences. 8 U.S.C. §§ 1227(a), 1228, 1357(a)(1). Thus, both the purpose and the effect of Section 1373 and the challenged grant conditions are to ensure that the federal government has the information it needs to "regulate individuals, not States." *Murphy*, 138 S. Ct. at 1476 (citation omitted).[25]

7
8

## IV.   If the Court Grants an Injunction, It Should Be Limited to California

9
10
11
12
13
14

Plaintiff seeks a permanent injunction against "using the Section 1373, Access, and Noti[ce] Conditions as restrictions for JAG funding." Am. Compl. at 37. Plaintiff further asks this Court to enter a nationwide injunction, binding numerous parties who have never appeared in this case. For all of the reasons set forth above, California is not entitled to *any* relief. However, and in any event, if the Court were to enter such an injunction, it should be limited to California rather than extending to to any jurisdiction throughout the country. Such an injunction would violate the requirements of Article III and equity.

15
16
17
18
19
20

To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). "[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

21
22
23
24

The Supreme Court recently reaffirmed these principles in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts. The plaintiffs alleged that voters who shared their political views were disadvantaged by the way district lines were drawn

25
26
27
28

[25] Plaintiff contends that "[s]ince [Section] 1373, or Defendants' interpretation of it, constitutes commandeering, 'a balancing analysis is inappropriate.'" CA Mem p. 24 (quoting, *inter alia*, *Printz*, 521 U.S. at 932). But the relevant passage from *Printz* on which Plaintiff relies stands only for the proposition that *in circumstances* "where … it is the whole *object* of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a "balancing" analysis is inappropriate." *Printz*, 521 U.S. at 932. Because—for the reasons explained above—such circumstances are not present here, Plaintiff's invocation of this principle is inapt.

1    statewide, and that they were therefore entitled to challenge the entire state map. *Id.* at 1924-25.

2    But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that

3    produced [his] injury in fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is

4    district specific" because it "results from the boundaries of the particular district in which he

5    resides." *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Accordingly, the Court

6    held that "the remedy that is proper and sufficient lies in the revision of the boundaries of the

7    individual's own district," not the broader remedy of "restructuring all of the State's legislative

8    districts." *Id.* at 1930-31; *accord id.* at 1933 ("The Court's constitutionally prescribed role is to

9    vindicate the individual rights of the people appearing before it."). The Ninth Circuit, among

10   others, has recognized these same principles. *Zepeda v. U.S. Immigration & Naturalization Serv.*,

11   753 F.2d 719, 729 n.1 (9th Cir. 1983) (recognizing the "elementary principle" that in the absence

12   of class certification, plaintiffs are "not entitled to relief for people whom they do not represent"

13   because any individual plaintiff "could merely file an individual suit as a pseudo-private attorney

14   general and enjoin the government in all cases"); *see also, e.g.*, *McKenzie v. City of Chicago*, 118

15   F.3d 552, 555 & n.* (7th Cir. 1997).

16        Even apart from Article III's requirements, fundamental principles of equity support the

17   same rule. Both the Supreme Court and the Ninth Circuit have cautioned that "injunctive relief

18   should be no more burdensome to the defendant than necessary to provide complete relief to the

19   plaintiffs before the court." *Los Angeles Haven Hosp. v. Sebelius*, 638 F.3d 644, 664 (9th Cir.

20   2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) (vacating the entry of a

21   nationwide injunction insofar as it applied to parties other than the plaintiff, and specifically

22   rejecting the argument that the district court's holding that a challenged federal policy was

23   "facially invalid" sufficed to justify this remedy); *see also Madsen* v. *Women's Health Ctr., Inc.*,

24   512 U.S. 753, 765 (1994); Samuel L. Bray, *Multiple Chancellors: Reforming the National*

25   *Injunction*, 131 HARV. L. REV. 417, 428-37 (2017) (explaining the lack of historical basis for

26   nationwide injunctions).

27        Moreover, nationwide injunctions "take a toll on the federal court system—preventing

28   legal questions from percolating through the federal courts, encouraging forum shopping, and

making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Los Angeles Haven Hosp.*, 638 F.3d at 664-65 (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue") (quoting, *inter alia*, *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001)). They also create an inequitable "one-way-ratchet" under which any prevailing plaintiff obtains relief on behalf of all others, but a victory by the government would not preclude other potential plaintiffs from "run[ning] off to the 93 other districts for more bites at the apple." *City of Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., dissenting in part), *reh'g en banc granted*, Order of June 4, 2018 (No. 17-05270) (vacating panel judgment "insofar as it sustained the district court's decision to extend preliminary relief nationwide"); *cf. United States v. Mendoza*, 464 U.S. 154, 158-62 (1984) (holding that non-parties to an adverse decision against the federal government may not invoke the decision to preclude the government from continuing to defend the issue in subsequent litigation).

Here, there are multiple cases across the country challenging the same Byrne JAG and COPS grant conditions as are at issue here.[26] Each court should adjudicate the claims of the plaintiffs before it, and the plaintiffs in others cases should not benefit if this Court were to rule against the defendants here as to certain issues—just as those plaintiffs will not be bound by any aspect of the Court's decision if defendants prevail in full or in part in this action.[27] Conversely,

---

[26] California makes the half-hearted argument that a nationwide injunction is necessary to accord it full relief because of the risk that Byrne JAG funds owed to California might be depleted and sent to other compliant jurisdictions. *See* CA Mem. at 32. But California offers scant support for this proposition. California cites only two statutory provisions—34 U.S.C. §§ 20927 and 30307(e)(5)—but these are wholly inapposite to the current case. Section 20927 allows a 10% reduction in funds if a jurisdiction fails to properly register and track sex offenders and notify their victims. *See* 34 U.S.C. § 20927(a). Similarly, § 30307(e)(5) provides for a 5% reduction in funds if a jurisdiction fails to take steps to combat prison rape. *See id.* § 30307(e)(2). Neither of these provisions provide for the diversion of funds from California to other jurisdictions under the present circumstances. And, significantly, California cites no other provision within the Byrne JAG authorizing statutes that permit such diversions of funds.

[27] California's argument is not supported by *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) or similar cases regarding presidential executive orders. In *Washington*, for example, the court allowed a nationwide TRO in a very different context—immigrant arrivals at various ports of entry—than the disbursal of grants funds to a particular recipient. *See, e.g., id.* at 1167 (noting what the court viewed as the "lack of a workable alternative," in light of the "nation's multiple ports of entry and interconnected transit

1    California does not have standing to seek an injunction broader than necessary to remedy its own

2    asserted injuries. Issuing such an injunction would harm the development of legal precedent in

3    this area. California simply cannot plausibly assert that an injunction that extending to any other

4    jurisdictions is necessary to remedy its own claimed harm.

5                                          **CONCLUSION**

6              For the reasons set forth above, the Court should grant summary judgment in defendants'

7    favor and deny plaintiff's motion for summary judgment.

8    Dated:  July 31, 2018

9

10                                                   Respectfully submitted,

11                                                   CHAD A.  READLER
                                                     Acting Assistant Attorney General
12
                                                     ALEX G. TSE
13                                                   United States Attorney

14                                                   JOHN R.  TYLER
                                                     Assistant Director
15

16                                                   W. SCOTT SIMPSON(Va.  Bar #27487)
                                                     Senior Trial Couunsel
17
                                                     /s/ Antonia Konkoly
18                                                   _____

19                                                   ANTONIA KONKOLY
                                                     LAURA HUNT
20                                                   DANIEL MAULER
                                                     Trial Attorneys
21
                                                     Attorneys, Department of Justice
22                                                   Civil Division, Room 7324
                                                     Federal Programs Branch
23                                                   20 Massachusetts Avenue, NW
                                                     Washington, D.C.  20530
24                                                   Telephone:   (202) 514-2395
                                                     Facsimile:   (202) 616-8470
25                                                   E-mail:       antonia.konkoly@usdoj.gov

26    _____

27    system," as well as the "proprietary interests of the States" there at issue). Thus, *Washington* does not
      support the entry of a nationwide injunction where, as here, more limited means are sufficient to redress a
28    particular plaintiff's injuries.

                                                  40

1

2                                COUNSEL FOR DEFENDANTS
JEFFERSON B.  SESSIONS III, Attorney

3                                General of the United States; LAURA L.
ROGERS, Acting Principal Deputy Assistant

4                                Attorney General; and U.S. DEPARTMENT OF
JUSTICE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41