1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CHAD A.  READLER
Acting Assistant Attorney General
ALEX G. TSE
Acting United States Attorney
JOHN R.  TYLER
Assistant Director
W.  SCOTT SIMPSON (Va.  Bar #27487)
Senior Trial Counsel
ANTONIA KONKOLY
LAURA HUNT
DANIEL MAULER
Trial Attorneys
Department of Justice, Room 7324
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C.  20530
Telephone:      (202) 514-2395
Facsimile:      (202) 616-8470
E-mail:          antonia.konkoly@usdoj.gov
COUNSEL FOR DEFENDANTS
JEFFERSON B.  SESSIONS III, Attorney
General of the United States; LAURA L.
ROGERS, Acting Principal Deputy Assistant Attorney
General; and U.S. DEPARTMENT OF JUSTICE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, ex rel.  XAVIER BECERRA, Attorney General of the State of California,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br>JEFFERSON B.  SESSIONS III, Attorney General of the United States, *et al*.,<br><br><div align="center">Defendants.</div> | No.  3:17-cv-04701-WHO<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          September 5, 2018<br>Time:          2:00 p.m. |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.    California Does Not Challenge Final Agency Action Reviewable under the APA ............ 2

II.    The Challenged Immigration-Related Byrne JAG Conditions Are Lawful ....................... 2

    A.    The Access and Notice Conditions Are Authorized by Statute and Do Not Violate the Separation of Powers .......................................................... 2

    B.    The Notice, Access, and Section 1373 Conditions Are Consistent with the Spending Clause ..................................................................................... 5

    C.    The Challenged Conditions Are Not Arbitrary or Capricious ................................ 7

III.    The Court Should Enter Judgment for Defendants on Plaintiff's Request for a Declaration Regarding its Statutes' Compliance with Section 1373 ................................ 10

    A.    Plaintiff's Request for a Ruling Regarding Compliance with Section 1373 Is Non-Justiciable ...................................................................................... 10

    B.    Section 1373 Encompasses, at Minimum, the Contact Information and Release Status of Aliens .......................................................................... 11

    C.    The Values Act and Its Implementation Prohibit or Restrict Providing at Least Some of the Information Protected by Section 1373 ................................... 14

    D.    Section 1373, as Properly Construed, Is Consistent with the Tenth Amendment ........................................................................................... 15

IV.    If the Court Grants an Injunction, It Should Be Limited to California ............................ 18

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORIITES

**CASES**

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................................ 8, 14

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ..................................................................................................... 5

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ..................................................................................................... 7

*City of Chicago v. Sessions*,
    __ F.Supp.3d __, 2018 WL 3608564 (N.D. Ill. July 27, 2018) ................................. 20

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ...................................................................................... 19

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................................... 7, 8, 10

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................................................... 18

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ................................................................................................... 14

*Hearst Radio, Inc. v. FCC*,
    167 F.2d 225 (D.C. Cir. 1948) ..................................................................................... 2

*Hills v. Gautreaux*,
    425 U.S. 284 (1976) ................................................................................................... 19

*In re Cohen*,
    62 F.2d 249 (2d Cir. 1932) ......................................................................................... 18

*In re Special April 1977 Grand Jury (Scott)*,
    581 F.2d 589 (7th Cir. 1978) ................................................................................. 17, 18

*In re Tax Liabilities of Does*,
    No. 2:10-MC-00130-MCE, 2011 WL 6302284 (E.D. Cal. Dec. 15, 2011) ............... 18

*Invention Submission Corp. v. Rogan*,
    357 F.3d 452 (4th Cir. 2004) ....................................................................................... 2

*Lamar, Archer & Cofrin, LLP v. Appling,*
  138 S. Ct. 1752 (2018) ............................................................................. 11, 12, 13

*Leocal v. Ashcroft,*
  543 U.S. 1 (2004) ....................................................................................... 11

*Mayweathers v. Newland,*
  314 F.3d 1062 (9th Cir. 2002) ..................................................................... 5

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  138 S. Ct. 1461 (2018) ............................................................................. 16, 18

*Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.,*
  575 F. App'x 88 (3d Cir. 2014) .................................................................... 2

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ..................................................................................... 16

*New York v. United States,*
  505 U.S. 144 (1992) ...................................................................................... 6

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
  465 F.3d 977 (9th Cir. 2006) ........................................................................ 2

*Printz v. United States,*
  521 U.S. 898 (1997) ...................................................................................... 17

*Providence Journal Co. v. U.S. Dep't of Army,*
  981 F.2d 552 (1st Cir. 1992) ......................................................................... 14

*Providence Yakima Med. Ctr. v. Sebelius,*
  611 F.3d 1181 (9th Cir. 2010) ........................................................................ 7

*Rattlesnake Coal. v. EPA,*
  509 F.3d 1095 (9th Cir. 2007) ........................................................................ 2

*Reno v. Condon,*
  528 U.S. 141 (2000) ...................................................................................... 17

*Roach v. Mail Handlers Benefit Plan,*
  298 F.3d 847 (9th Cir. 2002) ......................................................................... 14

*Rust v. Sullivan,*
  500 U.S. 173 (1991) ....................................................................................... 5

*S. Dakota v. Dole,*
  483 U.S. 203 (1987) ................................................................................... 5, 16

iii

*San Francisco v. Trump*,
   ___ F.3d ___, 2018 WL 3637911 (9th Cir. Aug. 1, 2018) ................................... 11, 19

*Stone v. INS*,
   514 U.S. 386 (1995) ............................................................................................ 4

*United States v. Elkins*,
   683 F.3d 1039 (9th Cir. 2012) ............................................................................ 7

*United States v. Kebodeaux*,
   570 U.S. 387 (2013) ............................................................................................ 7

*W. Fuels-Illinois, Inc. v. ICC*,
   878 F.2d 1025 (7th Cir. 1989) ............................................................................ 8

**STATUTES**

5 U.S.C. § 553 ........................................................................................................ 9

5 U.S.C. § 702 ........................................................................................................ 2

5 U.S.C. § 704 ........................................................................................................ 2

8 U.S.C. § 1182 ...................................................................................................... 18

8 U.S.C. § 1226 ................................................................................... 8, 12, 13, 18

8 U.S.C. § 1227 ............................................................................................. *passim*

8 U.S.C. § 1229b .................................................................................................... 12

8 U.S.C. § 1231 .................................................................................... 12, 13, 18

8 U.S.C. § 1305 ...................................................................................................... 12

8 U.S.C. § 1357 ............................................................................................. 6, 8, 18

8 U.S.C. § 1373 ............................................................................................... 1, 2, 8

11 U.S.C. § 523 ...................................................................................................... 13

34 U.S.C. § 10102 ......................................................................................... 1, 3, 5, 8

34 U.S.C. § 10152 .................................................................................................. 6

34 U.S.C. § 10153 ......................................................................................... 1, 3, 5, 9

34 U.S.C. § 10154 .................................................................................................. 2

iv

34 U.S.C. §§ 10156-10157 ....................................................................................................... 3

34 U.S.C. § 10251 .................................................................................................................... 8

34 U.S.C. § 20901 *et seq.* ....................................................................................................... 7

34 U.S.C. § 20927 .................................................................................................................... 7

42 U.S.C. § 5779 ..................................................................................................................... 17

Cal. Gov't Code § 7282.5 ....................................................................................................... 15

California Government Code § 7282.5 .................................................................................. 15

Judiciary Act of 1789,
    1 Cong. Ch. 20, 1 Stat. 73 ............................................................................................... 17

Pub. L. No. 109-162, 119 Stat. 2960 (2006) ...................................................................... 3, 4

**REGULATIONS**

8 C.F.R. § 214.1 ...................................................................................................................... 12

8 C.F.R. § 287.5 ........................................................................................................................ 6

28 C.F.R. Part 18 ...................................................................................................................... 2

28 C.F.R. § 66.12 ...................................................................................................................... 4

**OTHER AUTHORITIES**

California Law Enforcement Agencies, https://post.ca.gov/le-agencies
    (last visited Aug. 18, 2018) .......................................................................................... 15

Conference Report 104-725 ................................................................................................... 12

H.R. Conf. Rep. 104-725 (July 30, 1996) ........................................................................... 12

H.R. Rep. No. 109-233 (2005) ............................................................................................. 1, 4

# INTRODUCTION

Law enforcement in this country is a cooperative endeavor. Unlawful acts often implicate the jurisdiction of more than one agency, and thus local, state, tribal, and federal officials work together in a variety of ways to fight crime and ensure public safety. Not surprisingly, then, federal law often contemplates, and is premised upon, such coordination. This is true for the Immigration and Nationality Act ("INA"), and it is true for the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program"). Both statutes explicitly contemplate and encourage effective law enforcement by promoting coordination between the Federal Government on the one hand and local, state, and tribal governments on the other. Unfortunately, California has in recent years adopted policies of non-cooperation with respect to law enforcement involving aliens who have committed crimes. And in this suit, California seeks to further that policy by claiming that the Federal Government cannot condition its own law enforcement grants on such cooperation—even when the express statutory purpose of that funding is to promote cooperation.

Grant award conditions are a traditional aspect of participation in the Byrne JAG Program, and there is no legal infirmity in the decision of the U.S. Department of Justice ("USDOJ" or "Department") to impose the three conditions that California challenges. To further information-sharing, those conditions require Byrne JAG Program grantees to comply with 8 U.S.C. § 1373, to give federal immigration authorities access to the State's detention facilities to meet with aliens, and to give those authorities "as much advance notice as practicable" before releasing the alien. As a threshold matter, the State does not challenge final agency action so as to bring a proper challenge to the imposition of the conditions. Even setting that objection aside, however, the conditions are consistent not only with statutes governing the Byrne JAG Program, *see* 34 U.S.C. § 10102(a)(6), 10153(a), but also with legislative history confirming that the Department is empowered to "place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Moreover, there is no merit to California's claims that the conditions violate the Spending Clause or the Tenth Amendment, nor is imposition of the conditions arbitrary or capricious

1  because the conditions are rationally targeted at furthering the Byrne JAG Program's goals of

2  advancing criminal justice and public safety. Finally, the State's request for a declaration that the

3  State complies with 8 U.S.C. § 1373 ("Section 1373") is unripe and moreover fails in light of

4  State policy that on its face appears non-compliant. For all of these reasons, the Court should

5  grant summary judgment in Defendants' favor and deny Plaintiff's motion for summary judgment.

6                                    **ARGUMENT**

7  **I.    California Does Not Challenge Final Agency Action Reviewable under the APA**

8          "[T]he Administrative Procedure Act does not provide judicial review for everything done

9  by an administrative agency." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir.

10 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). One limitation is

11 that "[t]he APA provides for judicial review of [only] 'final agency action.'" *Naik v. Dir. U.S.*

12 *Citizenship & Immigration Servs. Vt.*, 575 F. App'x 88, 92 (3d Cir. 2014) (citing 5 U.S.C. §§ 702

13 & 704); *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

14         For the reasons set forth in Defendants' opening memorandum, California has not

15 identified a final agency action allowing for judicial review. In the context of grant-making in

16 particular, the Ninth Circuit has expressly held that "the congressional appropriation to [an

17 agency] of funds for a particular project does not constitute a final agency action by the [agency]

18 until the [agency] has reviewed [and adjudicated] a grant application," *Rattlesnake Coal. v. EPA*,

19 509 F.3d 1095, 1103-04 (9th Cir. 2007)—and action that has not yet occurred here.  Further, by

20 statute, the Byrne JAG Program has an administrative review and reconsideration process that

21 must exhausted before a grant application is "finally disapprove[d]." 34 U.S.C. § 10154; *see*

22 *generally* 28 C.F.R. Part 18. Accordingly, no final agency action has been taken against

23 California, as necessary for the State to pursue its APA claims.

24 **II.   The Challenged Immigration-Related Byrne JAG Conditions Are Lawful**

25         **A.    The Access and Notice Conditions Are Authorized by Statute and Do Not
26                 Violate the Separation of Powers**

27 California's first contention, that the imposition of the Access and Notice Conditions

28

2

violates the separation of powers,[1] is premised on an incorrect view that Congress has not authorized the Department to impose these conditions. CA Opp. at 2-6. These conditions fall squarely within the Department's multi-faceted authority—expressly granted by Congress—to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and to ensure that grantees "comply with . . . all other applicable Federal laws." *Id.* § 10153(a)(5)(D). The State's counter-arguments are unpersuasive.

First, California argues that the challenged conditions cannot be authorized by statute because the Byrne JAG Program sets forth a "carefully crafted formula" under which state and local jurisdictions are purportedly "guaranteed" a certain allocation of federal funds—*i.e.*, because the Byrne JAG Program provides formula rather than discretionary grants. CA Opp. at 3. But this argument confuses conditions placed on grant awards with the *formula* for allocating funds to eligible recipients. Although deviation from the statutory formula for allocating funds among eligible jurisdictions is only permitted in limited circumstances, *see* 34 U.S.C. §§ 10156-10157, the amount of a jurisdiction's award under that formula is unrelated to whether it has satisfied conditions authorized by statute. And the Notice and Access  award conditions do less to mandate a "one size fits all" approach than, for example, a Byrne JAG condition that for years prohibited using award funds to purchase items on a Prohibited Expenditure List that includes various types of equipment and weapons that some law enforcement agencies might otherwise have wanted to acquire. *See* FY 2016 Byrne JAG Award to California (Dkt. No. 125-1) ¶ 49.

Second, California argues that 34 U.S.C. § 10102(a)(6) is not itself a grant of authority, but rather constitutes merely an "ancillary" provision that refers to "other source[s]" of authority that must be granted elsewhere. CA Opp. at 3-4. As discussed in Defendants' opening memorandum, however, the authorities to "plac[e] special conditions on all grants, and [to] determin[e] priority purposes for formula grants" were added as part of the same legislation that created the Byrne JAG Program. *See* DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960 (2006) ("Reauthorization Act") (adding language to subsection (a)(6));

---

[1] California makes no such argument with respect to the Section 1373 condition. Thus, California concedes that this condition is indeed within the statutory parameters of the Byrne JAG Program.

1   *id*. § 1111 (creating Byrne JAG Program). California makes no attempt to explain why Congress

2   would have added that language, if not to confer the authority described. Instead, the State's

3   interpretation of the amendment would render wholly superfluous *both* the "special condition"

4   and the "priority purpose" powers—each of which, in order to be given effect, must confer

5   independent and meaningful authority. *Cf. Stone v. INS*, 514 U.S. 386, 397 (1995) ("When

6   Congress acts to amend a statute, [courts] presume it intends its amendment to have real and

7   substantial effect."). Indeed, notwithstanding California's attempt to minimize Section

8   10102(a)(6) as an "ancillary" provision, even California acknowledges that "[t]he authority to

9   identify federal priorities" for Byrne JAG grants "exists as long as they are within the bounds of

10  the purpose areas in the JAG statute." CA Opp. at 4. And, for the reasons set forth at length both

11  in Defendants' opening memorandum, *see* Defs' Mem. at 2-5, 24-25, 31, this threshold is easily

12  satisfied by the close inter-relationship between immigration enforcement and the Byrne JAG

13  Program's criminal justice purposes.

14      Third, California contradictorily argues that the term "special conditions," as it is used in

15  Section 10102(a)(6), is necessarily limited to either a restriction on "how a jurisdiction may spend

16  grant funding," CA Opp. at 5, or to certain accountability measures that may only be imposed on

17  "high risk" grantees, *id.* Even setting aside the self-contradiction in these arguments, California

18  offers no support for the former assertion, and relies only a concededly *repealed* regulation 28

19  C.F.R. § 66.12, that was in effect between 1988 and 2014, for the latter. But the statutory "special

20  conditions" authority contains no language referencing, incorporating, or otherwise limiting its

21  application to the former regulation. On the contrary, the legislative history contains the same

22  broad language as the statute, explaining that the new provision "allows the Assistant Attorney

23  General to place special conditions on all grants and to determine priority purposes for formula

24  grants." H.R. Rep. No. 109-233, at 101 (2005). And, in any event, California's reading still

25  leaves unexplained the Assistant Attorney General ("AAG")'s complementary power to

26  "determin[e] priority purposes" for formula grants like the Byrne JAG program.

27      Finally, California suggests that the Department's theory would confer on the Department

28  "unbounded authority" to impose "new conditions." CA Opp. at 4 (citation omitted); *see also id.*

4

1    (intimating that Defendants' theory would afford them the "sweeping power to impose *any*

2    conditions on *any* grants": (citation omitted) (emphasis in original).  But there is no dispute that,

3    in exercising its delegated authority to impose "special conditions on," "determin[e] priority

4    purposes for," and require "compl[iance] with . . . all other applicable Federal laws" in connection

5    with Byrne JAG grants, 34 U.S.C. §§ 10102(a)(6), § 10153(a)(5)(D), the Department must adhere

6    to the Spending Clause.  While Spending Clause authority is undoubtedly "broad," *Arlington*

7    *Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), it is "of course not unlimited,"

8    *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted). A grant condition must, for

9    example, be germane, non-coercive, and consistent with any independent constitutional

10   requirement. *See id*. at 207-08.  Moreover, the Department's conditioning power is self-limiting

11   in practice, because extremism in imposing conditions will cause prospective recipients to reject

12   the grant rather than accept the condition.

13       **B.    The Notice, Access, and Section 1373 Conditions Are Consistent with the**
14              **Spending Clause**

15       The Spending Clause authorizes Congress—or, where relevant, its agency delegee—to

16   "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the

17   recipient with federal statutory *and administrative* directives." *Dole*, 483 U.S. at 206 (emphasis

18   added); *cf.*, *e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("[W]hen the Government

19   appropriates public funds to establish a program it is entitled to define the limits of that

20   program."). Here, the challenged conditions enable potential Byrne JAG applicants to "exercise

21   their choice" to participate in the program "knowingly, cognizant of the consequences of their

22   participation," and the conditions bear much more than "some relationship" to the purposes of the

23   program.  *Dole*, 483 U.S. at 207 (citations omitted); *Mayweathers v. Newland*, 314 F.3d 1062,

24   1067 (9th Cir. 2002).

25       Primarily, California argues that the challenged conditions do not have a sufficient

26   "relationship" to the purpose of the Byrne JAG program. But this aspect of *Dole* does not impose

27   an "exacting standard," but rather only a "low-threshold" test that is easily satisfied here.

28   *Mayweathers*, 314 F.3d at 1067. Specifically, California attempts to frame the Byrne JAG

1   Program as involving only the enforcement of local criminal laws. *See* CA Opp. at 12. In reality,

2   California's framing is much too narrow. Byrne JAG is intended to aid more than just the

3   enforcement of local criminal laws. Congress ordained that the program should aid crime

4   *prevention* in addition to criminal *enforcement*. *See* 34 U.S.C. § 10152(a)(1)(C) (directing that

5   Byrne JAG funds may be used for crime "[p]revention and education programs."). In fact,

6   Congress authorized that such funds may be used for a host of other aspects of criminal justice,

7   such as "drug treatment . . . programs"", "mental health . . . programs", and "community

8   corrections programs." *Id.* at § 10152(a)(1)(A-H). This is in *addition* to (and not merely only)

9   funding for "[l]aw enforcement programs." *Id.* at § 10152(a)(1)(A); *see id.* § 10152(a)(2).

10         One reasonable way to prevent future crime is to remove deportable aliens who have

11   committed past crimes, and the notice and access conditions aid federal immigration authorities in

12   accomplishing that task. The access condition allows immigration authorities to interview

13   suspected deportable aliens—who are already being held on state or local criminal charges—

14   about their removability and their criminal backgrounds. *Cf.* 8 U.S.C. § 1357(a) (federal

15   immigration authorities "have power without warrant ... to interrogate any alien or person

16   believed to be an alien as to his right to be or to remain in the United States"); 8 C.F.R. § 287.5(a)

17   (the power 8 U.S.C. § 1357(a) may be exercised "anywhere in or outside the United States"). The

18   notice condition allows immigration authorities to take removable aliens into safe, controlled

19   custody after their release from criminal custody. And the Section 1373 condition enables law

20   enforcement personnel to identify removable criminal aliens within their custody and to the

21   aliens' removability. Considering the numerous provisions of the INA that directly relate to

22   criminal law (*see, e.g.,* 8 U.S.C. § 1227(a)(2) (delineating list of crimes that render an alien

23   immediately deportable)), a reasonable, rational relationship exists between the challenged

24   conditions and the Byrne JAG Program's goal of preventing crime. This easily satisfies the nexus

25   requirement of the Spending Clause, as the conditions "bear some relationship to the purpose of

26   the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992).

27         Further, insofar as California's argument that immigration enforcement cannot bear even

28   "some relationship" to criminal justice relies on the civil nature of the former, *see* CA Opp. at 6-

6

7, this argument fails to account for the federal Sex Offender Registration and Notification Act ("SORNA"), 34 U.S.C. § 20901 *et seq.*, which is also "a civil regulatory scheme rather than a criminal one." *United States v. Elkins*, 683 F.3d 1039, 1044-45 (9th Cir. 2012). Yet notwithstanding SORNA's civil nature, a state's compliance with the same is directly tied to its entitlement to its full allotment of Byrne JAG funding. 34 U.S.C. § 20927(a); *see, e.g.*, *United States v. Kebodeaux*, 570 U.S. 398 (2013) (observing with approval that SORNA "used Spending Clause grants to encourage States to adopt its uniform definitions and requirements."). The relatedness inquiry under the Spending Clause thus plainly allows for the linkage of civil and criminal subject areas.

California's secondary attack—that the challenged conditions are constitutionally ambiguous under the Spending Clause—fares no better. Defendants need not belabor the fact that the Access and Notice conditions are clear on their faces. They require grant awardees to allow federal immigration officers to visit suspected deportable aliens in custody and to provide reasonable advance notice of any releases from custody. They are straight-forward and readily understandable, despite California's attempt to make them seem more complicated. Each of these conditions survive constitutional scrutiny.

### C.     The Challenged Conditions Are Not Arbitrary or Capricious

The challenged conditions are not arbitrary or capricious, because they relate rationally to the Byrne JAG Program's purposes. The Supreme Court directs that the "arbitrary and capricious" standard affords only a "narrow standard of review," under which "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted). This standard is "highly deferential," *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (citation omitted), and does not authorize a district court "to substitute its judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Where the action represents a shift in policy, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is

1  permissible under the statute, that there are good reasons for it, and that the agency believes it to

2  be better." *Fox Television*, 556 U.S. at 515.

3       The challenged conditions easily meet this standard because they support the Byrne JAG

4  Program's criminal justice purposes with respect to "activities pertaining to *crime prevention,*

5  *control, or reduction*, or the enforcement of the criminal law, including, but not limited to, police

6  efforts to prevent, control, or reduce crime or to *apprehend criminals*, . . . activities of courts

7  having criminal jurisdiction, and *related agencies*," *id*. § 10251(a)(1) (emphases added), by

8  facilitating federal efforts to remove criminal aliens. Once removed, an alien who has committed

9  a removable criminal offense is undeniably no longer present in this country with the potential to

10  re-offend. *See* 8 U.S.C. § 1227(a)(2) (providing that a criminal conviction for any of a wide array

11  of criminal offenses renders an alien removable). The conditions also rationally promote interests

12  in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34

13  U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress

14  contemplates in immigration enforcement, *see* 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona v.*

15  *United States*, 567 U.S. 387, 411-12 (2012) (noting that Congress "has encouraged the sharing of

16  information about possible immigration violations").

17       California contends that this rationale—reducing crime based on information-sharing that

18  supports immigration enforcement to remove criminal aliens—does not fully consider the issue

19  and lacks supporting evidence. CA Opp. at 8-12. But the Department found that it is "common-

20  sense" that facilitating removal to eliminate the threat of recidivism by criminal aliens "help[s]

21  keep our communities safe," AR-993, and "even in the absence of evidence, the agency's

22  predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather

23  than clairvoyance." *Fox Television*, 556 U.S. at 521; *see W. Fuels-Illinois, Inc. v. ICC*, 878 F.2d

24  1025, 1030 (7th Cir. 1989) (noting "great deference to an agency's predictive judgments …within

25  the agency's field of discretion and expertise") (citation omitted). The State's apparent expecta-

26  tion that the Department should have issued a comprehensive supporting study also ignores that

27  Congress did not intend to encumber agencies with burdensome procedural prerequisites for

28

1   determining grant conditions; to the contrary, Congress expressly exempted "grants" from the

2   APA's ordinary notice-and-comment rulemaking procedures. 5 U.S.C. § 553(a)(2).[2]

3          In any event, the challenged conditions are wholly rational. As an initial matter, California

4   *does not even dispute* that the Section 1373 Condition is statutorily authorized and in comport-

5   ment with the Spending Clause—nor does the State respond at all to Defendants' point that, this

6   being the case, it is at best obscure how "arbitrary or capricious" scrutiny could otherwise apply.

7   *See* Defs' Mem. at 20. Independent of the authority conferred in Section 10102(a)(6), the

8   Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other

9   applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). California does not dispute that this

10  authority plainly permits the Department to impose as a funding condition a requirement that

11  recipients certify their compliance with an existing federal law (Section 1373) with which a state

12  or locality is *already obligated independently* to comply. When the prior Administration formally

13  imposed the Section 1373 condition for the first time in fiscal year ("FY") 2016, *see* Konkoly

14  Decl. ¶ 2 & Ex. A (Dkt No. 124-4), it was simply exercising this straightforward authority.

15  California accepted the FY 2016 Section 1373 condition without complaint, *see* Dkt. No. 125-1 ¶

16  55—and does not and cannot the challenge the imposition of that condition from a prior grant

17  year now.

18          With respect to the FY 2017 conditions at issue here, Defendants have explained these

19  conditions were the logical outgrowth of two investigations conducted by the USDOJ Office of

20  Inspector General ("OIG")—the respective import of which California fundamentally

21  misunderstands. As explained at greater length in Defendants' opening memorandum, *see* Defs'

22  Mem. at 20-25, the first of these investigations was conducted in 2007 and concerned the

23  cooperation of State Criminal Alien Assistance Program ("SCAAP") recipients in the removal of

24  criminal aliens from the United States. *See* AR-1-109 ("2007 OIG Audit"). The 2007 OIG Audit

25  concluded broadly that "many state, county, and local law enforcement agencies are unwilling to

26  initiate immigration enforcement but have policies that suggest they are willing to cooperate with

27

28
_____
[2] Further, because this case implicates only three straightforward and discrete grant conditions, it
is unsurprising that the relevant Administrative Record is not voluminous.

ICE when they arrest individuals on state or local charges and learn that those individuals may be criminal aliens." *Id.* at AR-00022-23. Nine years later, OIG issued a second report, finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States." *Id.* at AR-00366-67 n.1. In response to the changed circumstances reflected by the disparities between the 2007 and 2016 Reports—as well as the "common-sense" understanding that facilitating removal to eliminate the threat of recidivism by criminal aliens "help[s] keep our communities safe," AR-993—the Department rationally determined to renew the Section 1373 Condition and add the Notice and Access Conditions. Accordingly, and for the additional reasons set forth in Defendants' opening memorandum, *see* Defs' Mem. at 20-25, California's APA claim fails because the Department's "reasons for" imposing the challenged conditions "were entirely rational." *Fox Television*, 556 U.S. at 513, 517.

### III.   The Court Should Enter Judgment for Defendants on Plaintiff's Request for a Declaration Regarding its Statutes' Compliance with Section 1373

#### A.   Plaintiff's Request for a Ruling Regarding Compliance with Section 1373 Is Non-Justiciable

Plaintiff's request for a declaration that several of its statutes comply with Section 1373 is constitutionally non-justiciable, especially as to the statutes other than the California Values Act. Although the Office of Justice Programs ("OJP") has expressed a concern that the Values Act may violate Section 1373, it has not reached a final administrative determination on that subject and continues to evaluate the relevant evidence so that its final agency determination can include a record with all identifiable bases for the decision. Moreover, OJP has never expressed a specific concern regarding California statutes other than the Values Act.[3]

Nevertheless, California makes essentially four arguments in attempting to establish the justiciability of its claim for a declaration regarding compliance with Section 1373:

- Plaintiff relies on this Court's holding (in denying Plaintiff's motion for preliminary

---

[3] As Defendants have pointed out, an analysis of California's other statutes would have to take into account several provisions of the INA related to confidentiality and information-sharing. Defs' Mem. at 28 n.19. The point is *not* that the complexity of such an analysis "renders an issue nonjusticiable," Pl's Opp. at 13, but that USDOJ has not yet undertaken that necessary analysis and thus has not reached an administrative determination regarding the State's statutes.

10

injunction) that Plaintiff has standing and that this claim is ripe. CA Opp. at 12. Defendants respect the Court's prior holding, but hope to convince the Court otherwise, and, in any event, seek to preserve their position to the contrary.

- Plaintiff argues that Defendants' justiciability defense is precluded by the Court of Appeals' finding, in *San Francisco v. Trump*, that "California has been a specific target of the Administration's anti-sanctuary cities policies." CA Opp. at 13 (quoting *San Francisco v. Trump*, ___ F.3d ___, 2018 WL 3637911, at *7 (9th Cir. Aug. 1, 2018)). That finding, however, was based on general statements about California's sanctuary policies, not on any specific assertion that the State's statutes violated Section 1373.

- Plaintiff asserts that the Federal Government's separate lawsuit against the Values Act precludes arguing that OJP has not decided the issue. CA Opp. at 12, 14. The request for a judicial ruling in *United States v. California*, No. 2:18-cv-490-JAM-KJN (E.D. Cal.), that the Values Act violates Section 1373 was not, however, intended to short-circuit OJP's administrative consideration of that question. And, in any event, that case does not seek a ruling regarding the other statutes on which California seeks declaratory judgment here.

- Lastly, Plaintiff relies on OJP's withholding of California's 3017 Byrne JAG award. CA Opp. at 13-14. However, OJP has refrained from disbursing those funds, not because it has decided administratively that California's laws violate Section 1373, but precisely because it has *not* yet resolved that issue. Dkt. No. 80-1, Ex. D.

### B. Section 1373 Encompasses, at Minimum, the Contact Information and Release Status of Aliens

Turning to the merits, Section 1373 forbids a state or local government from prohibiting the exchange of "information *regarding*" an individual's immigration status, not merely the individual's immigration status. The courts "must give effect to every word of a statute wherever possible," *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004), and the use of "regarding" and similar words in a statute "generally has a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018) [hereinafter *Appling*]. "Information regarding" immigration status under the INA necessarily includes one's address, both home and work, which is crucial to the fulfillment

11

of several federal responsibilities, including determining whether an alien has kept federal authorities informed of any change of address and whether an alien has engaged in unauthorized employment. 8 U.S.C. §§ 1227(a)(1)(C), 1229b(a)(1), (a)(2), (b)(1)(A), 1305; 8 C.F.R. § 214.1; *see* H.R. Conf. Rep. 104-725, at 383 (July 30, 1996) (stating that language of Section 1373 was intended to enable state and local officials to "communicate with the INS regarding the presence, whereabouts, and activities of illegal aliens").[4] Additionally, since federal authorities generally cannot remove an alien from the United States until after release from state or local custody, the timing of that release is necessarily included within "information regarding" immigration status. 8 U.S.C. § 1231(a)(1)(B)(iii), (a)(4); *see id.* § 1226(c)(1). Therefore, Section 1373 protects, at minimum, the contact information and release status of aliens.[5]

Attempting to limit Section 1373 to whether an individual "is a citizen, has other lawful status in the United States, or is unlawfully present," California endeavors to distinguish *Appling* on its facts. CA Opp. at 18, 29. But Defendants did not seek to analogize to the *facts* of *Appling*, but rather to rely on the *rule* stated by the Court—although, to be sure, *Appling* is more factually similar to this case than California would like to admit. The Court in *Appling* held that "respecting" and similar words generally have a "broadening effect," and that a certain piece of information consti-tuted a "statement respecting [a] debtor's . . . financial condition" under the Bankruptcy Code because it had "*a direct relation to or impact* on the debtor's overall financial status." 138 S. Ct. at 1760 (emphasis added). Here, an alien's contact information and release status have "a direct relation to or impact" on the individual's status under the INA. Plaintiff argues that *Appling* cannot

---

[4] Plaintiff asserts that this conference report relates to a bill other than the one that became Section 1373. CA Opp. at 22. That is unclear in the legislative history. In any event, the bill to which Conference Report 104-725 relates contained essentially the same language that was enacted as Section 1373:  "Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." H.R. Conf. Rep. 104-725, at 178.

[5] California asserts that Defendants' understanding of Section 1373 is "so broad as to encompass a breathtaking amount of information including familial status, identity, medical records, education records, and financial records." CA Opp. at 15. But the Declaration of Francisco Madrigal submitted with Defendants' motion stated that ICE "rarely, if ever," uses an individual's medical history, educational history, or financial history. Dkt. No. 124-1.

12

1   apply here because the Court noted that a different interpretation "would have read [the word

2   "respecting"] out of the Bankruptcy Code." CA Opp at 20. That, however, is a point of *similarity* to

3   this case rather than a difference: limiting Section 1373 to whether an individual "is a citizen, has

4   other lawful status in the United States, or is unlawfully present," CA Opp. at 18, would read the

5   word "regarding" out of the statute. If Congress had intended to limit Section 1373 as California

6   contends, the statute would instead have said "a statement disclosing an individual's citizenship or

7   immigration status" or "a statement of an individual's citizenship or immigration status." *Cf.*

8   *Appling*, 138 S. Ct. at 1761 ("Had Congress intended [11 U.S.C.] § 523(a)(2)(B) to encompass only

9   statements expressing the balance of a debtor's assets and liabilities, there are several ways in which

10   it could have so specified, e.g., 'statement disclosing the debtor's financial condition' or 'statement

11   of the debtor's financial condition.'").

12        California also seeks to undercut the relationship between an alien's contact information and

13   release status and the alien's immigration status under the INA, arguing, for example, that an alien's

14   "current address, alone, does not say anything about a person's continuous presence in the United

15   States" and thus whether the individual may be eligible for relief from removal. CA Opp. at

16   21.True, information regarding an alien's address on a single date may not establish continuous

17   presence, but if federal authorities already have the individual's address as of a date in the past,

18   securing the individual's current address from state or local authorities may well facilitate making

19   that determination. Plaintiff also argues that an alien's release date is irrelevant to immigration

20   status because only a criminal conviction, not a release from custody, "may alter one's immigration

21   status." CA Opp. at 21. But an alien's release status is "information regarding immigration status"

22   not because mere release from custody affects whether the individual is lawfully present in the

23   United States or removable, but because the INA requires federal immigration authorities to take

24   custody of an alien upon release from state or local custody. *See* 8 U.S.C. § 1226(c)(1); *see also id.*

25   §§ 1231(a)(1)(B)(iii), (a)(4)(A).[6] Similarly, California argues that "information regarding

26

27   ─────────────────────
    [6] California argues that Defendants' position that Section 1373 encompasses contact information
28   and release status would necessarily extend to other categories of information, such as tax bills,
    unemployment services, or vehicle registration. CA Opp. 21. But all that is needed here, to decide

13

immigration status" cannot include information needed to remove an individual from the United States when appropriate because removal of an alien depends on "certain additional requirements, such as valid notice, a proper hearing, and an order of removal." CA Opp. at 18-19. But California confuses removability with actual removal. An alien is removable if the alien falls within one or more categories in 8 U.S.C. § 1227—clearly a question of the alien's status under the INA. Additionally, in order to *provide* "valid notice, a proper hearing, and an order of removal" to an alien, federal authorities obviously must know how to contact the alien.[7]

Finally, Plaintiff argues that Section 1373 "intrudes into state and local law enforcement," such that Congress's intent to include contact information and release status within Section 1373 must be "unmistakably clear." CA Opp. at 19 & n.15 (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). When a State or locality exercises its law enforcement authority in relation to *aliens*, however, the matter necessarily and fundamentally involves the Federal Government. Although the INA allows state and local governments to punish criminal conduct by aliens before imposing immigration-related consequences under the INA, the treatment of foreign nationals in the United States is quintessentially a federal concern—so that Congress could have preempted criminal punishment in favor of immigration consequences. *See Arizona*, 567 U.S. at 394.[8]

## C.     The Values Act and Its Implementation Prohibit or Restrict Providing at Least Some of the Information Protected by Section 1373

The California Values Act prohibits and restricts providing contact information and release dates to federal immigration authorities, and Plaintiff's two-paragraph response on this subject does

---

Plaintiff's claim for declaratory relief, is to know that the Section 1373 encompasses contact information and release status. The Court need not decide the outer reaches of Section 1373.

[7] California also argues that the OIG understood Section 1373 as not encompassing addresses and release dates. CA Opp. at 18. An OIG report does not, however, represent the official views of the agency. *See Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 561 (1st Cir. 1992) (noting that agency was "not required to accept the IG's recommendations," so that disclosure of IG report "would either inaccurately reflect or prematurely disclose the views of the agency").

[8] Thus, *Roach v. Mail Handlers Benefit Plan*, 298 F.3d 847 (9th Cir. 2002), has no bearing here. *Contra* CA Opp. at 20. There, the court held that the term "relate to" in the Federal Employees Health Benefits Act must be interpreted in light of a State's "traditional . . . interest in the quality of medical care" within its borders. 298 F.3d at 850.

14

not seriously contend otherwise. CA Opp. at 22-23. The Values Act prohibits employees from using "moneys or personnel to investigate persons . . . for immigration enforcement purposes," including (1) by "[p]roviding personal information . . . about an individual, including, but not limited to, the individual's home address or work address unless that information is available to the public," or (2) by "[p]roviding information regarding a person's release date or responding to requests for notification by providing release dates or other information unless that information is available to the public, or is in response to a notification request from immigration authorities in accordance with Section 7282.5."[9] Although the California Department of Justice's guidance states that law enforcement agencies "should comply" with Section 1373, that guidance reflects Plaintiff's narrow understanding of the federal statute by specifically reiterating that agencies are prohibited from giving federal immigration authorities the name, address, or telephone number of an alien and from notifying federal authorities regarding an alien's release status (except as permitted by California Government Code § 7282.5). Konkoly Decl. ¶ 3 & Ex. B (Dkt No. 124-4).

In response, Plaintiff argues that Section 1373's bar on "restricting" the provision of information to federal authorities leaves the State vulnerable to "dramatically increasing requests for assistance regardless of their affect [sic] on state resources," CA Opp. at 22, but California does not, and cannot, allege that federal requests have actually constituted a drain on the State's resources. The numbers cited by California count the federal requests sent to any of approximately 700 law enforcement agencies across the State for an entire year. *Id.* at 22; *see* California Law Enforcement Agencies, https://post.ca.gov/le-agencies (last visited Aug. 18, 2018). Plaintiff also asserts that immigration authorities "have access to California's criminal history databases, CA Opp. at 23 n.18, but the State does not deny that those databases often lack the information needed by federal authorities. *See* Declaration of Francisco Madrigal ¶¶ 11-13 (Dkt. No. 124-1).

### D.    Section 1373, as Properly Construed, Is Consistent with the Tenth Amendment

Finally, Plaintiff argues that Section 1373 would violate the Tenth Amendment if it

---

[9] Section 7282.5 of the Government Code sets forth a very specific list of circumstances in which a law enforcement agency is permitted to "cooperate with [federal] immigration officials," based mostly on whether the individual in question has committed any of certain listed felonies. Cal. Gov't Code § 7282.5(b).

1   encompasses information beyond mere citizenship or immigration status. As a preliminary matter,

2   California's First Amended Complaint does not plead a claim that Section 1373 violates the

3   Tenth Amendment or seek a declaration to that effect. Further, California does not—and indeed,

4   cannot—dispute the black-letter principle that "a perceived Tenth Amendment limitation on

5   congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions

6   legitimately placed on federal grants." *Dole*, 483 U.S. at 210; *see also*, *e.g.*, *Nat'l Fed'n of Indep.*

7   *Bus. v. Sebelius*, 567 U.S. 519, 537 (2012). Thus, the Tenth Amendment does not constrain the

8   conditions that the Federal Government may impose on grants, and the only pertinent question in

9   that regard is whether the condition satisfies the strictures of the Spending Clause—which, for the

10  reasons set forth in Section II.B, *supra*, it incontrovertibly does. However, even assuming

11  *arguendo* that these initial deficiencies may be overcome, to the extent that California could

12  nevertheless proceed with an attack on Section 1373 as an independent statutory mandate, any

13  such claim would be without merit, and Plaintiff's arguments to the contrary are unavailing.

14          California purports to advance a number of "distinct" Tenth Amendment-based arguments

15  against Section 1373, but in essence contends that Section 1373 runs afoul of the principle that

16  the Constitution "'confers upon Congress the power to regulate individuals, not States.'" CA

17  Opp. at 16 (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018)); *see*

18  *also id.* (arguing that "[h]ere, Defendants attempt to regulate the state *qua* state by requiring that

19  the State allow the use of government resources and personnel to advance a federal program.");

20  *id.* at 17 (asserting that "the federal government is preventing the State's regulation not of private

21  actors, but of the State's own law enforcement officers."); *id.* ("Defendants are demanding that

22  the State permit the disclosure of non-public information that state and local law enforcement

23  officers possess solely by virtue of their status as public officers.").

24          However, there can be no dispute that federal statutes relating to immigration—including

25  the information gathering protected by Section 1373—is exclusively concerned with regulating

26  private actors, namely aliens in the country in violation of federal law. The information that is

27  subject to Section 1373 is information regarding those private actors that is needed for federal

28  immigration authorities to perform their regulatory function against the private actors—and

16

1   contrary to California's assertions, the fact that this information is in the hands of a state or local

2   government does not immunize it from being accessed by the federal government when necessary

3   for federal enforcement or regulation. As the Supreme Court has recognized, the Constitution

4   does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to

5   regulate their own citizens," but instead "regulate[] the States as the owners of data bases." *Reno*

6   *v. Condon*, 528 U.S. 141, 151 (2000). Thus, *Reno* held that a provision that "restricts the States'

7   ability to disclose a driver's personal information without the driver's consent," *id.* at 144, was

8   consistent with the Tenth Amendment even if the regulation would "require time and effort on the

9   part of state employees," or the State had acquired the relevant information in its capacity as a

10  regulator of drivers. *Id.* at 150. Similarly, the Court in *Printz* recognized that statutes "which

11  require only the provision of information to the Federal Government[] do not involve … the

12  forced participation of the States' executive in the actual administration of a federal program."

13  *Printz v. United States*, 521 U.S. 898, 918 (1997).[10] Accordingly, the Court's key Tenth

14  Amendment cases reflect the different considerations that apply when the federal government

15  needs to access information to perform its functions, and *Murphy*—which has nothing to do with

16  information access—does not disturb this analysis or the basic principles that underlie it.

17       Indeed, it would be an extraordinary departure from historical practice to immunize states

18  from this responsibility to provide information relevant to the federal regulation of individuals.

19  Congress frequently calls on States to share relevant information, and these enactments have

20  never been drawn into question. It makes sense that access to information works differently: for

21  example, in a different context, it is not controversial that courts have the authority to obtain

22  information relevant to the controversies before them, that this authority may extend to state

23  officials, and that this is not treated as a regulation of those officials. *See* Judiciary Act of 1789, §

24  13, 15, 1 Stat. 73 (providing that "all … said courts … shall have the power … to require the

25  parties to produce books or writings in their possession or power"); *cf. In re Special April 1977*

---

26  [10] Justice O'Connor further explained that Tenth Amendment jurisprudence is not properly read

27  to invalidate information sharing requirements, such as the requirement for "state and local law
    enforcement agencies to report cases of missing children to the Department of Justice." *Printz*,

28  521 U.S. at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)).

1  *Grand Jury (Scott)*, 581 F.2d 589, 592 (7th Cir. 1978) ("[n]othing in the United States

2  Constitution immunizes any exclusive domain of the state … from the reach of a federal grand

3  jury"); *In re Cohen*, 62 F.2d 249, 251 (2d Cir. 1932) (similar). This is also true with respect to

4  administrative processes that require information in state hands. *See In re Tax Liabilities of Does*,

5  No. 2:10-MC-00130-MCE-EFB, 2011 WL 6302284, at *4 (E.D. Cal. Dec. 15, 2011) ("If the

6  Tenth Amendment cannot bar a grand jury subpoena, it cannot bar an IRS summons"). These

7  cases raise different issues, but there is one important takeaway: obtaining information relevant to

8  a regulatory function is not the same as regulating the party with that information, just as a court

9  subpoena for information would never be thought of as regulation of the state qua state. Here,

10  Section 1373 protects access to information that is essential to the regulation of aliens and to

11  initiating the removal process. *See* 8 U.S.C. §§ 1182, 1226, 1227, 1231, 1357.

12        Thus, California's contentions to the contrary notwithstanding, this case cannot properly

13  be analogized to *Murphy*. The statute at issue in *Murphy*—the Professional Amateur Sports

14  Protection Act of 1992 ("PASPA")—made it "unlawful" for States to authorize any "betting,

15  gambling, or wagering scheme based … on competitive sporting events." 138 S. Ct. at 1470. The

16  Court found that PASPA was a clear effort to avoid accountability by requiring the States to

17  regulate sports betting in the manner Congress wished. *See id.* at 1477. Section 1373, on the other

18  hand, is an information-access component of a regulatory scheme—immigration removal—over

19  which the Federal Government retains full responsibility and accountability for its actions.

20  **IV.    If the Court Grants an Injunction, It Should Be Limited to California**

21        Lastly, California continues to overreach by seeking nationwide injunctive relief to benefit

22  parties that are not before this Court. But California has failed to sufficiently explain why a

23  nationwide injunction—as opposed to an injunction limited to the parties before this Court—is

24  necessary to afford appropriate relief. California has not, for example, successfully shown that

25  any funds to which it is supposedly entitled are at risk of transfer to another jurisdiction. As the

26  Supreme Court noted this past term, "[t]he Court's constitutionally prescribed role is to vindicate

27  the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933

28  (2018). This Court should not attempt to regulate the relationship between the United States and

non-parties, many of which do not object to the conditions challenged here.

California has clearly chosen one set of public policies regarding immigration. Yet the State's request for nationwide relief ignores the reality that other jurisdictions are free to choose vastly different policies. Many jurisdictions have chosen policies that closely mirror the United States' immigration enforcement priorities, and as such, would have no objection to the challenged conditions. At the same time, still other jurisdictions have chosen policies that are a mixture of opposition and cooperation to federal priorities. Considering the gravity of any constitutional challenge to federal action, each of these choices by different jurisdictions must be evaluated on its own merits. A one-size-fits-all injunction issued by a single district court is inappropriate, and the potential for "divergent results" counsels against issuing a nationwide injunction settling the propriety of the challenged conditions in relation to all States and localities. Percolation of legal issues across the country is proper, necessary, and helpful for the federal courts to grapple with complicated issues.[11] "Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations omitted). This is so because "broad injunctions may stymie novel legal challenges and robust debate." *San Francisco*, 2018 WL 3637911.[12]

---

[11] Indeed, this Court has already recognized that different jurisdictions have different policies, which can lead to different legal results. When Los Angeles sought to intervene in the San Francisco action now related to this one, the Court denied the motion, noting that Los Angeles's "policies are different than those of San Francisco." Dkt. No. 39 at 2. The Court went on to say that the same "would be true for virtually every jurisdiction," and that while the "legal analyses for similar cases will overlap, they may not be identical because of the difference in the policies and practices of each governmental entity." *Id*. The Court also noted that "established forum and venue rules [will] result in different lower courts deciding similar legal issues, sometimes with divergent results." *Id*. at 2. Those different rulings, however, "*are appropriately reconciled by higher courts*." *Id.* (emphasis added).

[12] California quotes a portion of the Ninth Circuit's decision in *San Francisco v. Trump* that the Byrne JAG statute "interconnects" all recipients of Byrne JAG grants to infer that the Ninth Circuit has essentially blessed a nationwide injunction in a Byrne JAG case. CA Opp. at 25 (quoting *Trump*, 2018 WL 3637911, at *13 (citing *City of Chicago*, 888 F.3d, 272, 292-93 (7th Cir. 2018)). That statement by the Court of Appeals, however, cites a portion of the Seventh Circuit panel's decision in *City of Chicago v. Sessions* that the *en banc* Seventh Circuit later vacated. *See City of Chicago v. Sessions*, No. 17-cv-2991 (7th Cir. June 4, 2018) (ECF No. 128) ("Part IV of the panel's opinion of April 19, 2018 in this matter is VACATED and the panel's

19

1    Further, events in the current Byrne JAG litigation in Chicago reflect the inadvisability of

2 a nationwide injunction. The district court in that case initially entered a preliminary injunction

3 with nationwide scope, but the en banc Seventh Circuit stayed the injunction as to all parties

4 outside Chicago. *See City of Chicago v. Sessions*, No. 17-cv-2991 (7th Cir. June 26, 2018) (ECF

5 No. 134). And later, in entering a permanent injunction, the district court sua sponte chose to stay

6 its nationwide application pending appeal. *See City of Chicago v. Sessions*, __ F.Supp.3d __,

7 2018 WL 3608564, at *18 (N. D. Ill. July 27, 2018). The district court justified the stay by noting

8 that the "scope of the injunction involves novel issues upon which reasonable minds could differ"

9 and that because the appellate court had granted rehearing *en banc*, "Chicago's nationwide-scope

10 argument is less auspicious than it had otherwise been." *Id.*

11    Finally, in attempting to justify the entry of nationwide relief, California has submitted

12 declarations from various cities throughout the country, and argues that a nationwide injunction is

13 necessary to protect jurisdictions that cannot justify the expense of litigation when balanced

14 against the small-dollar amounts of a Byrne JAG award. CA Opp. at 25. As an initial matter, this

15 barrage of hearsay is improper and should be disregarded by the Court. In any event, this

16 rationale is no justification to award relief to a party not before the Court. The reality of our legal

17 system is that parties are generally expected to vindicate their own rights, not to sit on their hands.

18 Many potential litigants lack the financial resources (or the will) to pursue litigation. Such

19 situations are not novel. What would be novel is to award extraordinary nationwide injunctive

20 relief on such grounds. That would make significant new law, undermine the existence of class-

21 action rules, and set courts on a path with no discernible limiting principle. This Court should

22 decline California's invitation to do so.

### CONCLUSION

23

24    For the reasons set forth above and in Defendants' opening memorandum, the Court should

25 grant summary judgment in Defendants' favor.

26 Dated:  August 22, 2018

27

28 judgment of the same date is likewise VACATED insofar as it sustained the district court's
decision to extend preliminary relief nationwide.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

CHAD A.  READLER
Acting Assistant Attorney General

ALEX G. TSE
United States Attorney

JOHN R.  TYLER
Assistant Director

W. SCOTT SIMPSON(Va.  Bar #27487)
Senior Trial Couunsel

/s/ Antonia Konkoly

ANTONIA KONKOLY
LAURA HUNT
DANIEL MAULER
Trial Attorneys

Attorneys, Department of Justice
Civil Division, Room 7324
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C.  20530
Telephone:   (202) 514-2395
Facsimile:    (202) 616-8470
E-mail:        antonia.konkoly@usdoj.gov

COUNSEL FOR DEFENDANTS
JEFFERSON B.  SESSIONS III, Attorney
General of the United States; LAURA L.
ROGERS, Acting Principal Deputy Assistant
Attorney General; and U.S. DEPARTMENT OF
JUSTICE

21