JOSEPH H. HUNT
Assistant Attorney General
ALEX G. TSE
United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:   (202) 514-3495
Facsimile:   (217) 492-4888
E-mail:        scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

MATTHEW G. WHITAKER, Acting Attorney
General of the United States; MATT M.
DUMMERMUTH, Principal Deputy Assistant
Attorney General; and U.S. DEPARTMENT OF
JUSTICE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *ex rel.* XAVIER BECERRA, Attorney General of the State of California,<br><br>Plaintiff,<br>v.<br><br>MATTHEW G. WHITAKER, Acting Attorney General of the United States, *et al.*,<br><br>Defendants. | No. 3:17-cv-04701-WHO<br><br>**OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE AMENDED JUDGMENT AND ORDER OF NOVEMBER 20, 2018**<br><br>Date:   December 21, 2018<br>Time:   10:00 a.m. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.............................................................................................ii

INTRODUCTION ......................................................................................................... 1

STATUTORY AND ADMINISTRATIVE BACKGROUND......................................... 1

    I.      Types of Federal Grants............................................................................. 1

    II.     Project Safe Neighborhoods Programs ...................................................... 2

ARGUMENT .................................................................................................................. 7

    I.      The Project Safe Neighborhoods Program for FY 2018
          Is a Discretionary, Competitive Program................................................... 7

    II.     This Court's Amended Judgment Does Not Require
          Making California a Fiscal Agent in the Project Safe
          Neighborhoods Program for FY 2018 ....................................................... 9

    III.    Plaintiff's Arguments Regarding Defendants' Statutory
          Authority and the Spending Clause Are Irrelevant ............................... 12

CONCLUSION ............................................................................................................ 12

1

# TABLE OF AUTHORITIES

2

3   **CASES**

4   *California v. U.S. Dep't of Labor*, 155 F. Supp. 3d 1089 (E.D. Cal. 2016) ........................... 10, 11

5   *Champaign Cty., Ill. v. U.S. Law Enf't Assistance Admin.*,
6       611 F.2d 1200 (7th Cir. 1979) ........................................................................ 2, 6

7   *States of New York, etc. Dep't of Justice*, ___ F. Supp. 3d. ___,
        2018 WL 6257693 (S.D.N.Y. Nov. 30, 2018)........................................................ 12

8
9   *Lincoln v. Vigil*, 508 U.S. 182 (1993) ....................................................................... 2, 8

10  *Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) ................................... 2

11  **STATUTES**

12
13  34 U.S.C. § 10102(a)(6)........................................................................................ 10

14  34 U.S.C. § 41504 ................................................................................................ 4

15  34 U.S.C. § 60704 ............................................................................................. 7, 9

16  34 U.S.C. § 60705 ................................................................................................ 9

17  34 U.S.C. §§ 60701-05 ......................................................................................... 7

18  34 U.S.C. § 60703 ................................................................................................ 7

19  28 U.S.C. § 509 note (2003) ................................................................................... 4

20  28 U.S.C. § 509 note (2008) ................................................................................... 4

21  28 U.S.C. § 509 note (2013) ................................................................................... 4

22  28 U.S.C. § 509 note (2017) ................................................................................... 4

23  Pub. L. No. 107-77, 115 Stat. 748 (2001).............................................................. 3, 9

24  Pub. L. No. 107-273, 116 Stat. 1758 (2002)............................................................. 4

25  Pub. L. No. 108-7, 117 Stat. 11, 64 (2003).............................................................. 4

26  Pub. L. No. 108-199, 118 Stat. 3, 58 (2004)............................................................. 4

27

28

ii

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO

1

2

Pub. L. No. 109-108, 119 Stat. 2290 (2005)......................................................................... 4

3

Pub. L. No. 110-161, 121 Stat. 1844 (2008)......................................................................... 4

4

Pub. L. No. 111-117, 123 Stat. 3034, 3135 (2010).............................................................. 4

5

Pub. L. No. 112-55, 125 Stat. 552 (2012)............................................................................ 5

6

Pub. L. No. 113-76, 128 Stat. 5 (2014)................................................................................ 5

7

Pub. L. No. 114-113, 129 Stat. 2242 (2016)......................................................................... 5

8

9

Pub. L. No. 115-141, 132 Stat. 348 (2018)...................................................................... 6, 8

10

Pub. L. No. 115-185, 132 Stat. 1485 (2018).................................................................... 7, 9

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO

**INTRODUCTION**

The plaintiff in this action challenged certain conditions in the Edward Byrne Memorial Justice Assistance Grant Program, a formula grant program created and described by statute. The Court enjoined those conditions, including a requirement for grantees to comply with a federal statute, 8 U.S.C. § 1373. Plaintiff now suggests that this judgment includes a different program, the Project Safe Neighborhoods program for Fiscal Year 2018, which is a discretionary, competitive grant program created by the Department of Justice ("Department") at the behest of the President in 2001. That program is funded by broad annual appropriations language, the most recent of which specifies only that appropriated funds may be distributed "for competitive and evidence-based programs to reduce gun crime and gang violence." This is the only statutory provision governing the 2018 program. Further, the Department has operated Project Safe Neighborhoods as a competitive program since FY 2012, and Congress's broad, undefined appropriations maximize the Department's discretion in administering this program.

Plaintiff fails to acknowledge that a federal agency can select participants in a discretionary, competitive grant program based on a variety of factors and can decide the amount of funding to be awarded. One of the relevant factors in Project Safe Neighborhoods is the ability of all proposed participants "to cooperate in a unified [law enforcement] effort led by the U.S. Attorney." While such cooperation could include expecting grantees to provide the type of minimal cooperation that Congress envisioned in Section 1373, exercising discretion in a discretionary grant program based on concerns about the ability to provide such cooperation does not constitute enforcing "8 U.S.C. § 1373's independent statutory obligations" as stated in the Court's amended judgment.

For these reasons and for those explained below, the Court should deny plaintiff's motion to enforce the Court's judgment in relation to the FY 2018 Project Safe Neighborhoods program.

**STATUTORY AND ADMINISTRATIVE BACKGROUND**

**I.     Types of Federal Grants**

A federal grant is either discretionary or mandatory. A discretionary grant is one "for which the federal awarding agency generally may select the recipient from among all eligible

recipients, may decide to make or not make an award based on the programmatic, technical, or scientific content of an application, and can decide the amount of funding to be awarded." *See* Discretionary Grant, https://www.grants.gov/ web/ grants/ learn-grants/ grant-terminology.html (last visited Dec. 7, 2018).  Applications for a discretionary grant "are sent to the federal agency for a competitive review process and final funding decision. . . . [T]he federal awarding agencies review, assess, and evaluate the quality of the grant application [for merit and eligibility] to inform their funding decisions – it's a competitive process." *See* What Is a Discretionary Grant?, https://blog.grants.gov/ 2016/ 05/ 17/ what-isa-discretionary-grant/ (last visited Dec. 7, 2018); *see also Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 593 (E.D. Pa. 2017) ("Discretionary grants are typically made through a competitive grant process . . . ."), *appeal dismissed sub nom. Philadelphia v. Attorney General*, No. 18-1103, 2018 WL 3475491 (3d Cir. July 6, 2018).  In some cases, Congress directs the agency how to exercise its discretion; in others, Congress states only a broad purpose for the grant program, maximizing the agency's discretion.  *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that "[t]he allocation of funds from a lump-sum appropriation is . . . traditionally regarded as committed to agency discretion").

A mandatory grant, on the other hand, is "awarded under a program where the authorizing statute requires the head of the agency or designee to make an award to each eligible entity under the conditions and in the amount (or based on the formula) specified in the statute." *See* Mandatory Grant, https://www.grants.gov/ web/ grants/ learn-grants/ grant-terminology.html (last visited Dec. 7, 2018); *see also Champaign Cty., Ill. v. U.S. Law Enf't Assistance Admin.*, 611 F.2d 1200, 1203 (7th Cir. 1979) ("Block grants are formula grants based on respective populations.").

## II.    Project Safe Neighborhoods Programs

A Department of Justice grant program using the name "Project Safe Neighborhoods" has existed in one form or another since 2001.  On May 14, 2001, President George W. Bush announced "a national initiative to help cities [and States] fight gun violence."  He continued, "The program I propose we call Project Safe Neighborhoods will establish a network of law

2

enforcement and community initiatives targeted at gun violence." *See* Remarks by the President on Project Safe Neighborhoods, *available at* https://georgewbush-whitehouse.archives.gov/ news/ releases/ 2001/ 05/ 20010514-1.html (last visited Dec. 7, 2018).  Congress first provided funds for Project Safe Neighborhoods in November 2001, when it appropriated "$49,780,000 for a national program to reduce gun violence."  Pub. L. No. 107-77, 115 Stat. 748, 762 (2001).

Since its inception, one of the "core elements" of Project Safe Neighborhoods has been "partnership" among federal, state, local, and tribal law enforcement officials.  Defs' Request for Judicial Notice ("RJN"), Ex. A (Attachment 1 hereto).  In a report to Congress for FY 2002 entitled *Promoting Partnerships for Public Safety*, the Department noted that, "in response to President Bush's major gun violence reduction effort, [the Bureau of Justice Assistance] was actively involved in Project Safe Neighborhoods (PSN), a nationwide commitment to reduce gun crime in America."  The effectiveness of the program, the report said, "is based on the ability of local, state, and federal agencies to cooperate in a unified effort led by the U.S. Attorney in each of the 94 federal judicial districts across the United States." *See* Promoting Partnerships for Public Safety, Annual Report to Congress on Initiatives Funded by the Bureau of Justice Assistance, FY 2002, at 2, *available at* https://www.ncjrs.gov/ pdffiles1/ bja/ 200252.pdf (last visited Dec. 7, 2018).

Over the years, the PSN program announcements (solicitations) have required applicants to show how the proposed local implementation would "increase partnerships between federal, state, and local agencies," including "federal and local prosecutors, federal, state and local law enforcement agencies, and correctional agencies." *See, e.g.*, RJN, Ex. E at 4 (FY 2011); *see also, e.g.*, RJN, Ex. J at 5 (FY 2017).  Within each district, the U.S. Attorney certifies the selection of a "fiscal agent" – either the State, a local government, an educational institution, or a community or non-profit organization – to administer award funds among participants in the local partnership. *See, e.g.*, RJN, Ex. A at 1 (FY 2007); Ex. F at 1 (FY 2012).  The fiscal agent may retain up to 10% of its award for costs associated with administering the funds. *See, e.g.*, RJN, Ex. C at 3 (FY 2009); Ex. K at 9 (FY 2018).

1   In November 2002, a year and a half after the President announced the establishment of

2   Project Safe Neighborhoods and a year after first appropriating funds for a "program to reduce

3   gun violence," Congress authorized additional funds specifically for the hiring of additional

4   Assistant United States Attorneys to support Project Safe Neighborhoods, in Section 104 of the

5   21st Century Department of Justice Appropriations Authorization Act ("Section 104").  Under the

6   heading "Authorization for Additional Assistant United States Attorneys for Project Safe

7   Neighborhoods," Congress directed the Attorney General to "establish a program for each United

8   States Attorney to provide for coordination with State and local law enforcement officials in the

9   identification and prosecution of violations of Federal firearms laws including school gun

10  violence and juvenile gun offenses."  Pub. L. No. 107-273, § 104(a), 116 Stat. 1758 (2002).  The

11  same section authorized the appropriation of $9 million "for fiscal year 2002 to hire an additional

12  Assistant United States Attorney in each United States Attorney Office."  *Id*. § 104(b).  From

13  2003 through 2017, Section 104 was classified as a note to 28 U.S.C. § 509, which deals with

14  "Functions of the Attorney General."  *See, e.g*., 28 U.S.C. § 509 note (2003); 28 U.S.C § 509 note

15  (2008); 28 U.S.C. § 509 note (2013); 28 U.S.C § 509 note (2017).  Beginning with the U.S. Code

16  of 2018, this same enactment – still referring to Fiscal Year 2002 – is now codified at 34 U.S.C. §

17  41504.

18  Over the years, Congress has regularly appropriated funds for "programs to reduce gun

19  violence" to the Office of Justice Programs ("OJP"), usually without referring to "Project Safe

20  Neighborhoods" and never with any guidance on selecting grantees or otherwise allocating the

21  funds.  *See, e.g*., Pub. L. No. 108-7, 117 Stat. 11, 64 (2003) ($45 million for "a national program

22  to reduce gun violence"); Pub. L. No. 108-199, 118 Stat. 3, 58 (2004) ($30 million "for Project

23  Safe Neighborhoods to reduce gun violence, and gang and drug-related crime"); Pub. L. No. 109-

24  108, 119 Stat. 2290 (2005) ($15 million for "Project Safe Neighborhoods, of which $4,500,000 is

25  for the National District Attorneys Association to conduct prosecutorial training by the National

26  Advocacy Center"); Pub. L. No. 110-161, 121 Stat. 1844, 1911 (2008) ($20 million "for

27  programs to reduce gun crime and gang violence"); Pub. L. No. 111-117, 123 Stat. 3034, 3135

28

4

(2010) ($15 million "for programs to reduce gun crime and gang violence"); Pub. L. No. 112-55, 125 Stat. 552, 616 (2012) ($5 million "for competitive and evidence-based programs to reduce gun crime and gang violence"); Pub. L. No. 113-76, 128 Stat. 5, 62 (2014) ($8.5 million "for competitive and evidence-based programs to reduce gun crime and gang violence"); Pub. L. No. 114-113, 129 Stat. 2242, 2307 (2016) ($6.5 million "for competitive and evidence-based programs to reduce gun crime and gang violence").  In none of those appropriations has Congress referred to Section 104, and none of the Department's Project Safe Neighborhoods announcements, from at least FY 2007 through FY 2018, has referred to Section 104.  RJN, Exs. A-K.

From at least FY 2003 through FY 2011 (with one year's exception), the Department of Justice chose to use a formula for distributing the funds and to make awards to fund law enforcement efforts consistent with the decisions of local steering committees coordinated in each U.S Attorney's office – an average of approximately 94 districts each year during that period. *See* Declaration of Tracey J. Trautman ¶ 5 (Attachment 2 hereto).[1]  After FY 2011, however, the Department changed PSN from a straight administrative "formula"-based program to a competitive program.  The announcement for the program in FY 2011 said that "while grant awards for this FY 2011 program are based on a formula, in future years, if funds are appropriated, grant awards will be made through a competitive process to encourage and focus funding in high-performing and evidence-based programs where the need is greatest."   RJN, Ex. E at 3.  The announcement added that "[f]unding allocated in FY 2011 should be used to make this transition so that when the program becomes competitive in FY 2012, districts will be better positioned to compete for funding on the basis of successful implementation of the core PSN strategies."  *Id*. at 4.

Since FY 2012, the Department has operated Project Safe Neighborhoods as a competitive grant program.  RJN, Exs. F-K.  The program announcement for FY 2012 said:

---

[1] For FY 2005, Congress did not appropriate funds specifically to reduce gun violence, so the Department used other funding to provide PSN awards to a more limited number of districts. *See* Trautman Decl. ¶¶ 2, 5.  That year is not included in the average stated above.

5

> The Department of Justice has transitioned the PSN program from a formula-based allocation of funding to a competitive-based program. In a competitive environment, "need" and use of more effective, intelligence- and data-driven strategies will be key factors for funding selections, in addition to performance results and other factors. Therefore, grant awards for FY 2012 will be made through a competitive process to encourage and focus funding in high-performing and evidence-based programs where the need is greatest.

RJN, Ex. F at 4. The language and amount of Congress's appropriations from FY 2012 through FY 2017 – explicitly describing the program as "competitive" – have also reflected the competitive nature of the program. During that period, an average of only 14.6 districts received a PSN award each year. *See* Trautman Decl. ¶ 5. Although applicants have had to compete for awards since FY 2012, the Department has chosen to allocate funds among the successful applicants according to a formula. *Id*. ¶ 3. OJP occasionally chooses to use such administrative formulas for ease of administration of otherwise discretionary funding. *Id*.

For FY 2018, the Department proposed to increase the funding for Project Safe Neighborhoods and thus to increase the number of districts that could participate. *Id*. ¶ 4. The Attorney General issued a memorandum to all United States Attorneys on October 4, 2017, describing the need to "strengthen" the PSN program and emphasizing the need for "robust partnerships" among federal, state, local, and tribal law enforcement, among the other principles of the program. RJN, Ex. L. In response, Congress's FY 2018 appropriation for the Office of Justice Programs included $20 million "for competitive and evidence-based programs to reduce gun crime and gang violence." Pub. L. No. 115-141, 132 Stat. 348 (2018). The Department supplemented that appropriation with deobligated funds from other appropriations, to provide a total of approximately $33 million in PSN funding for FY 2018. *See* Trautman Decl. ¶ 4.

OJP issued the Project Safe Neighborhoods FY 2018 Grant Announcement on June 18, 2018. RJN, Ex. K. The announcement invited an application from an eligible fiscal agent certified by the U.S. Attorney for each district, describing how the district's project would be implemented. As in prior years, one of the core principles of the program is "partnership," under which all stakeholders – federal, state, and local law enforcement – "are necessary partners . . . and must collaborate to achieve success." *Id*. at 6. The FY 2018 announcement allows fiscal

6

agents to keep both the usual "10 percent in administrative funds" and an additional portion of the funds "to carry out a part of the PSN strategy when the activity cannot be performed by or competed to another entity." *Id*. at 1.  If the fiscal agent (or any subrecipient) is a state or local government, it must submit a certification that it complies with 8 U.S.C. § 1373.  *Id*. at 20-21, 23-24.

On June 18, 2018, Congress enacted the Project Safe Neighborhoods Grant Program Authorization Act of 2018 ("Authorization Act"), which creates a statutory grant program, including a "Project Safe Neighborhoods Block Grant Program," beginning with FY 2019.  Pub. L. No. 115-185, 132 Stat. 1485 (2018), *codified at* 34 U.S.C. §§ 60701-05.  The Authorization Act sets forth the purposes of the new block grant program and additionally provides that funds authorized may be used for "competitive and evidence-based programs to reduce gun crime and gang violence" or for certain other purposes.  34 U.S.C. §§ 60703(a) & (b).  The statute specifies that funds made available under the program shall, "to the greatest extent practicable, [be] locally controlled to address problems that are identified locally"; provides that 30% of those funds "shall be granted to Gang Task Forces in regions experiencing a significant or increased presence of criminal or transnational organizations engaging in high levels of violent crime, firearms offenses, human trafficking, and drug trafficking"; and directs the Attorney General to "issue guidance to create, carry out, and administer the Program."  *Id*. § 60704.  The final section of the Authorization Act says, "There are authorized to be appropriated to the Attorney General to carry out the Program $50,000,000 for each of fiscal years 2019 through 2021."[2]

# ARGUMENT

## I.     The Project Safe Neighborhoods Program for FY 2018 Is a Discretionary, Competitive Program

As shown unequivocally by Congress's appropriation of funds for FY 2018, the current Project Safe Neighborhoods program is a competitive, discretionary grant program.  The FY 2018 appropriation explicitly stated that the funds were for "competitive and evidence-based

---

[2] Whether (or to what extent) this authorization will be implemented in any appropriations act is not yet known, as the FY 2019 appropriations have not been finalized.

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO

1  programs," and it did not provide guidance regarding the selection of grantees or the awarding of

2  funds other than that they should be used in an effort "to reduce gun crime and gang violence."

3  Pub. L. No. 115-141, 132 Stat. 348.  Thus, the Department could select recipients and fiscal

4  agents; could "decide to make or not make an award based on the programmatic, technical, or

5  scientific content of an application[;] and [could] decide the amount of funding to be awarded."

6  *See* Discretionary Grant, https://www.grants.gov/ web/ grants/ learn-grants/ grant-

7  terminology.html (last visited Dec. 7, 2018).  The governing legislation set forth neither

8  conditions nor requirements for the Department to follow.  *See* Mandatory Grant,

9  https://www.grants.gov/ web/ grants/ learn-grants/ grant-terminology.html (last visited Dec. 7,

10  2018).  Selecting or rejecting a proposed fiscal agent was, therefore, within the discretion of the

11  Department of Justice, which could consider the extent to which it felt it could trust a given state

12  or local government to act in "partnership."  *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The

13  allocation of funds from a lump-sum appropriation is another administrative decision traditionally

14  regarded as committed to agency discretion.  After all, the very point of a lump-sum appropriation

15  is to give an agency the capacity to adapt to changing circumstances and meet its statutory

16  responsibilities in what it sees as the most effective or desirable way.").

17       Moreover, all of the history described above further reinforces the competitive,

18  discretionary nature of the current Project Safe Neighborhoods program.  Other than making

19  annual appropriations for a program or programs to reduce gun crime, Congress *never* provided

20  guidance on the selection of recipients or fiscal agents in this program from its inception in FY

21  2001 through FY 2018.  Most of Congress's appropriations never even referred to a specific

22  program by name.  Thus, the parameters, requirements, and conditions of this program have

23  always been up to the Department of Justice.  Moreover, the program has been explicitly

24  "competitive" from FY 2012 through FY 2017 – as reflected in both annual appropriations and

25  annual agency announcements – during which only a small proportion of the judicial districts in

26  the country has received funds each year.

27

28

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO

8

1      The enactment of Section 104 of the 21st Century Department of Justice Appropriations

2   Authorization Act in November 2002 does not affect the nature of this program, especially in FY

3   2018.  Project Safe Neighborhoods actually began with the President's announcement in May

4   2001, followed by Congress's first appropriation for "a national program to reduce gun violence"

5   in November 2001.  Although Section 104 purported to direct the Attorney General to "establish

6   a program," the program had already been established in 2001; Section 104 always referred to

7   only one Fiscal Year (FY 2002); and none of the subsequent appropriations or program

8   announcements ever referred to that legislation.  Section 104 is a one-time authorization to

9   appropriate funds for the hiring of additional Assistant United States Attorneys to support the

10   program, and places no standards on those entities that receive grants under the various other

11   appropriations.  Indeed, the 2002 enactment did not relate to a grant program at all; the

12   appropriation authorized was only for the internal use of U.S. Attorneys' offices to hire staff.

13   And a separate, earlier-enacted appropriation – not referencing or referenced by this enactment –

14   provided for the issuance of grants in FY 2002 for "national program to reduce gun violence."

15   Public L. No. 107-77, 115 Stat. 748, 762.  In any event, Section 104, like all of the other

16   legislation from FY 2001 through FY 2018, was devoid of any guidance on selecting grantees or

17   fiscal agents.

18      Nor does the Project Safe Neighborhoods Grant Program Authorization Act of 2018 affect

19   the nature of the program for FY 2018.  The Authorization Act directs the Attorney General to

20   "create" a program, whereas the existing Project Safe Neighborhoods program was created in

21   2001.  Pub. L. No. 115-185, § 5, 132 Stat. 1485, *codified at* 34 U.S.C. § 60704(a).  Also, the

22   Authorization Act authorizes the appropriation of funds for the Attorney General to "carry out"

23   the new program starting in FY 2019.  *Id*. § 6, codified at 34 U.S.C. § 60705.  That new program

24   does not impact the distribution of FY 2018 funds authorized by different legislation.

25   **II.     This Court's Amended Judgment Does Not Require Making California
            a Fiscal Agent in the Project Safe Neighborhoods Program for FY 2018**

26

27      The Court's Amended Judgment and Order in this action prohibits the defendants from

28   "[r]equiring compliance with 8 U.S.C. § 1373 as a grant condition against any California state

9

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO

1    entity or political subdivision based on 34 U.S.C. § 10102(a)(6) or 34 U.S.C. § 10153(A)(5)(D),

2    on the basis of 8 U.S.C. § 1373 being an 'applicable Federal law,' or on the basis of 8 U.S.C.

3    § 1373's independent statutory obligations." Dkt. No. 154.  This provision does not compel the

4    Department of Justice to approve the selection of California as a fiscal agent for the FY 2018

5    Project Safe Neighborhoods program.  Most importantly, as explained already, this is a

6    discretionary, competitive program, and the Department is entitled to consider a variety of factors

7    in the selection of a fiscal agent, including the extent to which the Department believes a

8    proposed agent is willing and able to act in "partnership" with federal agencies.  Moreover, the

9    authorities contained in Sections 10102(a)(6) and 10153(A)(5)(D) of Title 34 are not involved

10   here since this is a discretionary program without statutory guidance.  And the judgment prohibits

11   requiring compliance with Section 1373's "independent statutory obligations," not with any

12   separate grant condition based on other statutory authority.  *See California v. U.S. Dep't of Labor*,

13   155 F. Supp. 3d 1089, 1096 (E.D. Cal. 2016) (on motion to enforce judgment, "court may grant

14   the moving party only that relief to which it is entitled under the original judgment").

15          None of plaintiff's arguments establishes that its non-selection as a fiscal agent for FY

16   2018 violates the Court's judgment.  First, plaintiff argues that its non-selection cannot be

17   attributable to the need for federal-state-local "partnership" in Project Safe Neighborhoods

18   because "the requirement of 'working in partnership with a wide range of engaged stakeholders'

19   . . . applies to the *U.S. Attorneys*" rather than the fiscal agents.  Pl's Mem. at 9.  A "partnership,"

20   however, necessarily connotes joint, united, and cooperative effort; a U.S. Attorney cannot act in

21   partnership with an uncooperative State.  Moreover, Project Safe Neighborhoods has always

22   emphasized the need for reciprocal partnership among all participants.  As stated in the OJP

23   report issued shortly after the program was established, its effectiveness "is based on the ability of

24   local, state, and federal agencies to cooperate in a unified effort . . . ."  *See* Promoting

25   Partnerships for Public Safety, Annual Report to Congress on Initiatives Funded by the Bureau of

26   Justice Assistance, FY 2002, at 2, *available at* https://www.ncjrs.gov/ pdffiles1/ bja/ 200252.pdf

27   (last visited Dec. 7, 2018).

28

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO

1    Second, plaintiff argues that it has, in fact, engaged in "partnership" with federal law

2    enforcement officials.  Pl's Mem. at 10-11.  Given that this is a discretionary, competitive

3    program, however, the extent to which a proposed fiscal agent satisfies this element of the

4    program – or any other relevant consideration – is up to the Department of Justice.  Further, in

5    any event, the plaintiff cannot deny that its policies against cooperating in the enforcement of

6    immigration law have led to the exclusion of federal immigration agents from certain joint

7    federal-state law enforcement operations.  Such exclusion of federal personnel necessarily affects

8    the Department's thinking regarding California's willingness and ability to engage in "robust

9    partnership."  RJN, Ex. L (Attorney General memorandum).

10    Third, plaintiff argues that the sequence of communications with defendants' counsel

11    regarding the State's non-acceptance as a fiscal agent creates "clear suspicions" that the non-

12    acceptance was attributable to concerns about the State's non-compliance with Section 1373.  Pl's

13    Mem. at 10.  In the first instance, even if the decision that California was not a robust partner had

14    been based on the State's rejection of the kind of minimal cooperation that Congress sought to

15    foster through Section 1373, that does not mean the Court's judgment was violated, given that

16    considering the lack of such cooperation would have been merely an exercise of discretion under

17    this discretionary program, not a reliance on Section 1373 as an "independent statutory

18    obligation."  In any event, the Court should not find that defendants are violating the Court's

19    judgment based only on "suspicions."  A motion to enforce a previous judgment may be granted

20    only "when the prevailing party demonstrates [that] its opponent has not complied with the

21    judgment's terms."  *See California v. U.S. Dep't of Labor*, 155 F. Supp. 3d at 1096.

22    Fourth and finally, plaintiff argues that its non-acceptance as fiscal agent was necessarily

23    based on concerns about its compliance with Section 1373 because the Department has not

24    provided PSN funds for FY 2018 in Oregon or two of the three districts in Illinois, and the

25    Department has previously expressed concerns about compliance with Section 1373 in California,

26    Oregon, and Illinois.  Pl's Mem. at 9.  Again, however, an exercise of discretion based on con-

27    cerns about whether a given government entity would be a robust partner does not constitute

28

11

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO

1   denial of participation based on Section 1373 as an "independent statutory obligation."

2   Additionally, California, Oregon, and Illinois are not the only States as to which the Department

3   has expressed concerns about compliance with Section 1373.  Such concerns have existed in

4   relation to other States, *see States of New York, etc. v. Dep't of Justice*, ___ F. Supp. 3d. ___,

5   2018 WL 6257693 (S.D.N.Y. Nov. 30, 2018); *see also* RJN, Ex. M (OIG Memorandum), in all of

6   which the Department *has* provided PSN funds for FY 2018, *see* Pl's RJN, Ex. C (Dkt. No. 156).

7   Also, the Department has, in fact, provided such funds for one of the judicial districts in Illinois.

8   *Id*.

9   **III.    Plaintiff's Arguments Regarding Defendants' Statutory Authority
            and the Spending Clause Are Irrelevant**

10

11          In addition to arguing that defendants' non-acceptance of California as the Department's

12  fiscal agent for FY 2018 violates the Court's judgment, plaintiff also asserts that the non-

13  acceptance exceeds defendants' statutory authority and violates the Spending Clause.  Pl's Mem.

14  at 11-14.  The plaintiff has not, however, pled a challenge to its non-acceptance as fiscal agent in

15  this action, and the Court has already entered judgment adjudicating plaintiff's claims.  The

16  present motion asks whether certain later action by the defendants violates the Court's judgment,

17  not whether that action exceeds defendants' statutory authority or violates the Constitution.  To

18  seek a ruling on those independent claims, the plaintiff would have to challenge defendant's

19  action anew.

20                                         **CONCLUSION**

21          Accordingly, the Court should deny plaintiff's motion to enforce the Court's Amended

22  Judgment and Order.

23  Dated:  December 7, 2018

24                                                      Respectfully submitted,

25                                                      JOSEPH H. HUNT
                                                       Assistant Attorney General

26
                                                       ALEX G. TSE
27                                                      United States Attorney

28
                                                       12
    Opposition Enforce Judgment
    No. 3:17-cv-04701-WHO

1

2
JOHN R.  TYLER
Assistant Director

3
/s/ W. Scott Simpson

4
_____
W.  SCOTT SIMPSON (Va.  Bar #27487)

5

6
Department of Justice, Civil Division
318 South Sixth Street, Room 244

7
Springfield, Illinois 62701
Telephone:   (202) 514-3495

8
Facsimile:    (217) 492-4888
E-mail:       scott.simpson@usdoj.gov

9

10
COUNSEL FOR DEFENDANTS

11
MATTHEW G. WHITAKER, Acting Attorney
General of the United States; MATT M.

12
DUMMERMUTH, Principal Deputy Assistant
Attorney General; and U.S. DEPARTMENT OF

13
JUSTICE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition Enforce Judgment
No. 3:17-cv-04701-WHO